**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| GEORGE HENGLE, SHERRY BLACKBURN, WILLIE ROSE, ELWOOD BUMBRAY, TIFFANI MYERS, STEVEN PIKE, SUE COLLINS, and LAWRENCE MWETHUKU, *on behalf of themselves and all individuals similarly situated,* | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | Civil Action No. 3:19-250 |
| v. | ) ) | |
| SCOTT ASNER, JOSHUA LANDY, RICHARD MOSELEY, JR., GOLDEN VALLEY LENDING, INC., SILVER CLOUD FINANCIAL INC., MOUNTAIN SUMMIT FINANCIAL, INC., MAJESTIC LAKE FINANCIAL, INC., and UPPER LAKE PROCESSING SERVICES, INC., | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF TRIBAL DEFENDANTS'**
**MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND .............................................................................................................. 3

A.    The Tribe Enters The Online Lending Industry In Order To Develop An
Independent, Self-Sustaining Economy ................................................................ 4

B.    The Tribe Establishes A Corporate Structure For Its Lending Businesses
That Ensures Tribal Control .................................................................................. 6

C.    The Tribe Exercises Its Sovereign Right To Enact A Lending Ordinance
That Includes Substantive And Procedural Protections For Consumers ................ 7

D.    The Tribe Enters Service Contracts To Facilitate Its Loan Operations,
And Then Acquires And Integrates Core Service Providers Into Its Own
Business Operations .............................................................................................. 9

E.    The Tribe Acquires Capital To Get Its Lending Operations Off The
Ground, And Then Quickly Seeks To Eliminate Any Debt Burden On
Its Businesses .................................................................................................... 10

F.    The Lending Businesses Keep The Tribe Operational And Have
Provided Valuable Resources And Jobs For Tribal Members ............................. 14

ARGUMENT ................................................................................................................. 14

A.    Tribal Defendants Are Entitled To Sovereign Immunity ................................... 14

1.    Tribal Defendants Were Created By The Tribe Pursuant To
Tribal Law ............................................................................................. 15

2.    Tribal Defendants Were Created For And Function For The
Express Purpose Of Promoting Tribal Welfare ....................................... 17

3.    The Tribe Wholly Controls All Aspects Of Its Lending
Operations .............................................................................................. 20

4.    Tribal Defendants Expressly Share In The Tribe's Sovereign
Immunity ................................................................................................ 21

5.    The Tribe's Economy Depends Almost Entirely On Revenue
From Tribal Defendants .......................................................................... 23

6.    The Purposes Of Sovereign Immunity Are Best Served If Tribal
Defendants Are Considered Arms Of The Tribe ..................................... 23

i

B.     Plaintiffs' Claims Independently Fail Because They Have Not Stated A Valid Claim Under Applicable Law ................................................................ 24

   1.     The Parties' Loan Agreements Are Governed By Tribal Law ................ 25

   2.     This Case Presents No "Exceptional Circumstances" To Warrant Setting Aside The Parties' Agreement........................................................ 26

       i.     Applying Tribal Law Is Not Contrary To Virginia's Public Policy ................................................................................... 27

       ii.     The Choice-Of-Law Clauses Are Not Unconscionable................ 28

CONCLUSION........................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albemarle Corp. v. AstraZeneca UK Ltd.*,
   628 F.3d 643 (4th Cir. 2010) ........................................................................... 25

*Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*,
   629 F.3d 1173 (10th Cir. 2010) .................................................................. 14, 18

*Canal Ins. Co. v. Lebanon Ins. Agency, Inc.*,
   504 F. Supp. 2d 113 (W.D. Va. 2007) ............................................................. 27

*Cash Advance & Preferred Cash Loans v. State*,
   242 P.3d 1099 (Colo. 2010) ........................................................................ 14, 15

*Colgan Air, Inc. v. Raytheon Aircraft Co.*,
   507 F.3d 270 (4th Cir. 2007) ........................................................................... 27

*de Fontbrune v. Wofsy*,
   838 F.3d 992 (9th Cir. 2016) ........................................................................... 24

*DiFederico v. Marriott Int'l, Inc.*,
   714 F.3d 796 (4th Cir. 2013) ........................................................................... 25

*Eagle Paper International, Inc. v. Expolink, Ltd.*,
   2008 WL 170506 (E.D. Va. 2008) ................................................................... 24

*Fransmart, LLC v. Freshii Development, LLC*,
   768 F. Supp. 2d 851 (E.D. Va. 2011) .............................................................. 28

*Global One Comm. v. Ansaldi*,
   2000 WL 1210511 (Va. Cir. Ct. 2000) ....................................................... 26, 27

*Goines v. Valley Community Services Board*,
   822 F.3d 159 (4th Cir. 2016) ........................................................................... 24

*In re Merritt Dredging Co.*,
   839 F.2d 203 (4th Cir. 1988) ........................................................................... 25

*JAAAT Tech. Servs., LLC v. Tetra Tech Tesoro, Inc.*,
   No. 3:15CV235, 2017 WL 4003026 (E.D. Va. Sept. 11, 2017) ....................... 25

*Mgmt. Enters., Inc. v. Thorncroft Co.*,
   416 S.E.2d 229 (Va. 1992) .............................................................................. 28

*Michigan v. Bay Mills Indian Cmty.*,
   572 U.S. 782 (2014) .................................................................... 14, 26

*Montana v. United States*,
   450 U.S. 544 (1981) .......................................................................... 26

*Paul Business Systems, Inc. v. Canon U.S.A., Inc.*,
   397 S.E. 2d 804 (Va. 1990) ............................................................... 25

*Pelfrey v. Pelfrey*,
   487 S.E.2d 281 (Va. App. 1997) ....................................................... 28

*People v. Miami Nation Enterprises*,
   386 P.3d 357 (Cal. 2016) .................................................................. 15

*Pistor v. Garcia*,
   791 F.3d 1104 (9th Cir. 2014) .......................................................... 15

*Secretary of State for Defence v. Trimble Navigation Ltd.*,
   484 F.3d 700 (4th Cir. 2007) ............................................................ 24

*Settlement Funding v. Von Neumann-Lillie*,
   274 Va. 76, 645 S.E.2d 436 (2007) ........................................... *passim*

*Solomon v. American Web Loan*,
   2019 WL 1324490 (E.D. Va. 2019) .................................................. 21

*Solomon v. American Web Loan*,
   2019 WL 1320790 (E.D. Va. 2019) .................................................. 29

*Sydnor v. Conseco Financial Servicing Corp.*,
   252 F.3d 302 (4th Cir. 2001) ............................................................ 28

*Willard v. Aetna Cas. & Sur. Co.*,
   213 Va. 481 (1973) ........................................................................... 27

*Williams v. Big Picture Loans*,
   329 F. Supp. 3d 248 (2018) ...................................................... *passim*

*Williams v. United States*,
   50 F.3d 299 (4th Cir. 1995) .............................................................. 15

**Statutes**

12 U.S.C. § 85 .......................................................................................... 24

12 U.S.C. § 5481(27) ............................................................................... 26

12 U.S.C. § 5517(o) ................................................................................. 24

iv

18 U.S.C. § 1961(6) ................................................................................................ 25

25 U.S.C. § 2701(4) ................................................................................................ 27

25 U.S.C. § 4301 ............................................................................................ *passim*

25 U.S.C. § 5302(b) ................................................................................................ 27

25 U.S.C. §§ 5601-02 ............................................................................................. 27

**INTRODUCTION**

After winning a protracted battle to retain its federal recognition as a sovereign Nation, the Habematolel Pomo of Upper Lake Tribe (the "Tribe"), has pursued one value above all others: self-reliance.  To combat generations of poverty and oppression, the Tribe has sought to establish a self-sustaining economy without dependence on outsiders.  Given its remote location and limited land, the only feasible means to achieve this goal is e-commerce.  So, since 2012, the Tribe has offered unsecured, small dollar loans to consumers who connect with Tribal businesses through the internet and sign contracts fully disclosing the loan terms as well as the fact that they are offered by arms of a Tribe.

By any measure, the Tribe has succeeded in meeting its goal.  The Tribe entered online lending in 2012 with no capital or experience in a complicated, competitive industry.  Yet the Tribe has maintained control of every aspect of its lending operations, including by seating the Tribe's governmental leadership as the Board of every business.  Over the years, it has exercised comprehensive oversight over everything from strategic growth to job descriptions of particular employees.  Today, the Tribe operates a fully integrated lending operation capable of servicing loans from applications through collections.  Three of its portfolios have had zero outside financial participation since 2014 and are now debt-free.  The remaining portfolio, launched later, has no outside financial participation and will retire its existing debt next year.  Achieving so much so quickly would be unprecedented in any startup business.

Plaintiffs' Complaint seeks to end this progress and grind the Tribe's economy and pursuit of self-determination to a halt.  But that effort fails at the first step.  Golden Valley Lending, Inc., Silver Cloud Financial, Inc., Mountain Summit Financial, Inc., Majestic Lake Financial, Inc., and Upper Lake Processing Services, Inc. ("Tribal Defendants"), are arms of the Tribe sharing in its

1

sovereign immunity.   Tribal Defendants were incorporated under Tribal law as economic development arms; have always been owned, operated, and controlled by the Tribe; and generate virtually all of the revenue that supports the Tribal government.   Tribal Defendants are thus immune from suit and all claims against them should be dismissed under Rule 12(b)(1).

In suggesting otherwise, the Complaint misstates how Tribal Defendants operate.   Along with this motion, Tribal Defendants have submitted an 82-page affidavit from the Chairperson of the Tribe and President of each of the Tribal Defendants, and 111 supporting documents, that demonstrate that the limited portions of the Complaint that actually address Tribal Defendants bear no resemblance to reality.   To provide just a few examples, the Complaint asserts that Tribal Defendants do not participate in the operations of their business, receive a small portion of the revenue, and redirect the vast majority of the revenue to "non-tribal outsiders."  There is no truth to any of these allegations, or the offensive argument they support—that the Tribe is renting out its hard-fought sovereignty.

That Tribal Defendants secured startup capital and initially entered into service agreements allowing them to develop expertise in a competitive industry does not deprive them of immunity. Sovereign immunity is not reserved for the rich or experienced.   On the contrary, Congress has repeatedly urged tribes to pursue outside capital and expertise, recognizing that the surest path to "strong tribal governments, Indian self-determination, and economic self-sufficiency among Indian tribes" is one that seizes "the resources of the private market; adequate capital; and technical expertise."  25 U.S.C. § 4301 (Native American Business Development, Trade Promotion, and Tourism Act of 2000).

The facts here show that the Tribe did not simply "facilitate[] the absorption of [a] fully-functioning lending enterprise" with "a decidedly non-tribal character," as the Court concluded in

rejecting immunity in *Williams v. Big Picture Loans*, 329 F. Supp. 3d 248, 272 (2018).  Rather, the Tribe built its lending businesses on its own, drawing on outside resources as necessary, but preventing those outside resources from exercising any improper influence or control.  And those lending businesses allow the Tribe to provide essential government services, as well as social welfare programs and employment opportunities for its citizens.  It is hard to imagine a set of businesses that better advances the "broader goals of tribal self-governance," *id.* at 273 (internal quotation marks and citation omitted), that undergird the doctrine of sovereign immunity.

Even if Tribal Defendants were not immune, Plaintiffs' claims would fail under Rule 12(b)(6) because their agreements are governed by—and lawful under—the Tribe's law. Plaintiffs' claims depend on the flawed premise that Virginia's usury limitations apply to their loans.  But the loan agreements Plaintiffs signed contain a choice-of-law clause specifying that Tribal law applies, and Tribal law—like the laws of Arizona, Idaho, Massachusetts, Nevada, South Dakota, Utah, and other states—does not contain a maximum interest rate.  There is no reason for this Court to override the parties' agreement.  Indeed, the Virginia Supreme Court has held that such clauses should be enforced, even where the chosen law does not include a provision capping interest rates.  *See Settlement Funding v. Von Neumann-Lillie*, 274 Va. 76, 645 S.E.2d 436 (2007).

## BACKGROUND

Because Tribal Defendants challenge subject-matter jurisdiction, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Big Picture*, 329 F. Supp. 3d at 267 (internal quotation marks and citation omitted).  Accordingly, Tribal Defendants submit the affidavit of Sherry Treppa, the Chairperson of the Tribe's Executive Council and President and Chairperson of the Board of each Tribal Defendant ("Treppa Affidavit").  Chairperson Treppa explains in detail the Tribe's involvement in lending; the steps

3

taken to ensure the Tribe's control over its businesses; the Tribe's successful efforts to build independent, self-sustaining businesses (and thus an independent, self-sustaining Tribal economy) by acquiring and operating service providers and eliminating all outside financial participation in its loans; and the Tribe's reliance on the substantial revenues generated from these businesses to provide essential services for its citizens.  What follows is an abbreviated recitation of the key facts supporting this motion to dismiss.

### A.    The Tribe Enters The Online Lending Industry In Order To Develop An Independent, Self-Sustaining Economy.

The Habematolel Pomo are indigenous to California's Clear Lake Basin (several hours north of San Francisco) and have lived there for at least 8,000 years.  Treppa Aff. ¶ 6.  Decades of tragic interactions with the federal government decimated the Tribe's population and left the remaining citizens poor and landless.  *Id.* ¶¶ 7, 9.  In the 1950s, the federal government took the extraordinary steps of terminating the Tribe's federal recognition, eliminating federal aid, and distributing the Tribe's lands.  *Id.* ¶¶ 9, 38.  The Tribe successfully fought this unlawful termination, but was left completely landless.  *Id.* ¶¶ 9, 45.  Thus, even after the Tribe approved its modern Constitution and created its Executive Council in 2004, it remained financially dependent on the same federal government whose past polices had crippled it.  *Id.* ¶¶ 8, 47.

The Tribe's goals moving forward were simple—preserving independence and sovereignty and promoting the general welfare of its people.  *Id.* ¶¶ 8, 48.  To do that, the Tribe needed to develop a self-sustaining economy to minimize, if not eliminate, reliance on federal aid.  *Id.* ¶¶ 8, 48.  Those goals align with modern federal Indian policy, which obligates the federal government "to guard and preserve the sovereignty of Indian tribes in order to foster strong tribal governments, Indian self-determination, and economic self-sufficiency among Indian tribes."  25 U.S.C. § 4301(a)(6).  Indeed, federal law "encourage[s] the sustainable development of resources of

Indian tribes and Indian-owned businesses," *id.* at § 4301(b)(2), and "promote[s] economic self-sufficiency and political self-determination for Indian tribes and members of Indian tribes," *id.* at § 4301(b)(6).

The Tribe, like others before it, first turned to the casino industry as a potential source of economic development.  Treppa Aff. ¶¶ 10, 53.  Given the Tribe's lack of land and capital, the Tribe sought to partner with a casino developer in 2005.  *Id.* ¶¶ 10, 53-55.  Under the original business agreements, the developer was responsible for providing capital and eventually for managing and operating the casino under Tribal supervision, using some employees not physically located on Tribal land—a common approach in the casino industry.  *Id.* ¶ 55.  But while those agreements were pending approval from the National Indian Gaming Commission, the developer attempted to change the terms.  *Id.* ¶¶ 11, 56.  After intense negotiations, the Tribe effectively cancelled the management agreement in 2009 and decided to hire and oversee its own management team.  *Id.* ¶¶ 11, 56.  This experience reinforced the importance of self-reliance:  Just as the Tribe could not depend on the federal government, it also could not have its economic future depend on outsiders.  *Id.*  The casino opened in 2012, under Tribal management, and continues to be a source of hope and pride for the Tribe.  *Id.* ¶¶ 57-58.  But it has never been a meaningful source of revenue.  *Id.* ¶¶ 12, 58.  Casinos are profitable only to the extent they attract customers, and Upper Lake is located in Lake County, a remote part of California that generates little tourism or through-traffic but nevertheless features several competing casinos.  *Id.* ¶¶ 51-52, 252.

The Tribe's geographic challenges inexorably led it to e-commerce as the path to economic self-sufficiency.  *Id.* ¶¶ 13, 59.  The internet allows the Tribe to virtually connect consumers with Tribal businesses on Tribal land, and cures the geographic limitations created by the Tribe's history.

**B.     The Tribe Establishes A Corporate Structure For Its Lending Businesses That Ensures Tribal Control.**

From the start, there was no question that the Tribe would wholly own and control its businesses.  The Tribe first incorporated Tribal Lending Enterprise, Inc. ("TLE") under Tribal law and as an arm of the Tribe.  *Id*. ¶ 73.  The resolution creating TLE specifies that it serves as a parent company for the lending businesses and a hub for the overall operation.  *Id*. ¶ 74.  TLE's Articles of Incorporation make clear that it is to be completely tribally controlled—TLE's Board consists only of the Tribe's Executive Council.  Treppa Aff. ¶¶ 75-76; *see also* Treppa Aff. Ex. 8 at 2 (TLE Articles of Incorporation).

Since establishing TLE, the Tribe has incorporated four lending portfolios—Silver Cloud (March 2012); Golden Valley (August 2012); Mountain Summit (August 2012); and Majestic Lake (March 2013).  Treppa Aff. ¶ 81.  The Tribe also incorporated two service providers:  Upper Lake Processing Services, Inc. ("ULPS"), which provides call center support, *id*. ¶¶ 19, 124-25, and Pomo One Marketing, Inc. ("Pomo One"), which owns some of the Tribe's intellectual property assets, including software that aggregates potential customers for both the Tribe's lending portfolios and other lenders, *id*. ¶¶ 19, 119, 132-34.  Each of these organizations is incorporated under Tribal law.  *Id*. ¶¶ 124, 133.  Each is a subsidiary of TLE with its shares wholly held by the Tribe.  *Id*.¶¶ 80, 124.  And each has a Board of Directors consisting solely of the Tribe's Executive Council.  *Id*. ¶¶ 15, 124, 133, 198.

The Executive Council, acting through the various corporations' boards, has always actively supervised these lending businesses.  The TLE Board has authority over the businesses' bank accounts and is exclusively responsible for approving, among other things, the strategic direction of the businesses, their annual budgets and forecasts, their capital structure and funding strategy, the appointment of corporate officers, and any policies proposed by any corporate officer.

*Id.* ¶¶ 199-200.  The Board routinely exercises this authority, addressing everything from high-level questions of strategy to more discrete issues, like setting job descriptions or terminating employees.  *Id.* ¶ 203.

Over the years, TLE and ULPS (but never the lending portfolios) have hired individuals from outside the Tribe into executive positions.  *Id.* ¶ 204.  The Tribe entered the online lending business with little experience and a desire to adopt best practices across the board, and it sought to hire expertise in areas like customer service, loan servicing, and human resources.  *Id.* ¶¶ 204, 208.  But the Tribe has made clear to these non-Tribal individuals, since day one, that they would never exercise any meaningful control over the Tribe's business.  *Id.* ¶ 205.  They have always been subject to strict Delegation of Authority Policies that circumscribed their authority, and the Tribe has terminated employees who exceeded their delegated authority.  *Id.* ¶¶ 205-06.

Today's corporate structure underscores the commitment to Tribal control.  Chairperson Treppa is President of each Tribal Defendant.  *Id.* ¶ 208.  There are a few Vice Presidents, who report to the Chairperson or the Board and have limited delegated authority.  *Id.*  For example, no Vice President can approve a contract with an annualized impact of over $25,000.  *Id.*

### C.    The Tribe Exercises Its Sovereign Right To Enact A Lending Ordinance That Includes Substantive And Procedural Protections For Consumers.

From the beginning, the Tribe has also been committed to appropriate regulation of its lending entities and a positive experience for its customers.  Before originating a single loan, the Tribe established a Consumer Financial Services Regulatory Commission with oversight authority over lending activities.  *Id.* ¶ 70.  All tribal lending entities are required to obtain a license from the Commission, and as a condition of that license, must maintain a legal compliance management system and agree to at-least annual audits.  *Id.*  The Commission also has enforcement authority to address any violations.  *Id.*  The Commission is led by a Tribal member with extensive

7

knowledge of Tribal governance and business operations.  *Id*. ¶ 71.  But to ensure that the Commission stays abreast of the changing legal and regulatory climate surrounding banking and lending, it draws expertise from a former U.S. Attorney and a former acting deputy enforcement director for the U.S. Consumer Financial Protection Bureau.  *Id*.

The Tribe's commitment to consumer protection is also evident in the substantive law that applies to its loans.  As the Complaint notes, the Tribal Consumer Financial Services Regulatory Ordinance does not contain a usury limit—a sovereign policy choice that other states have chosen to make as well.  But the Ordinance incorporates the substantive standards of numerous federal banking and consumer protection laws, including the Truth in Lending Act, the Equal Credit Opportunity Act, and Section 5 of the Federal Trade Commission Act, which prohibits unfair or deceptive acts or practices.  *Id*. ¶¶ 69, 239; *id.* Ex. 7 at 20-21 (Tribal Consumer Financial Services Regulatory Ordinance, as Amended Dec. 2015).

The Tribe also seeks to offer its consumers a fair, transparent product.  The loan agreements fully disclose the loan terms.  Treppa Aff. ¶ 224-26.  They include several provisions stating that Tribal law applies and explaining the businesses' status as arms of a sovereign Nation sharing in the Nation's immunity from suit.  *Id*. ¶¶ 235-37.  And the loan agreements establish a fair and accessible dispute resolution process for consumer complaints.  *Id*. ¶¶ 227-34; *see also* Tribal Defendants' Motion To Compel Arbitration at 11-13.  But there are few complaints—the complaint rate was less than 1% in 2018 across all four lending portfolios.  Treppa Aff. ¶¶ 23, 218.

The Tribe has also been transparent about its business in seeking cooperative government-to-government relationships wherever possible.  Chairperson Treppa has testified before countless federal and state regulatory and legislative bodies, including the House Financial Services Committee.  *Id*. ¶ 24.  And just last year, the Virginia Bureau of Financial Institutions issued a

letter acknowledging that Mountain Summit was "an arm of the Habematolel Pomo of Upper Lake," was "not required to be licensed under the laws that are enforced by the Bureau," and thus was free to issue loans to consumers in Virginia.  Treppa Aff. ¶ 25; *id.* Ex. 2 at 2.

**D.      The Tribe Enters Service Contracts To Facilitate Its Loan Operations, And Then Acquires And Integrates Core Service Providers Into Its Own Business Operations.**

In less than five years, the Tribe moved from having virtually no lending infrastructure or experience to owning and operating a fully integrated lending business.

At the start, the Tribe's lack of financial resources and experience meant that it had to contract for many of the services needed in the lending industry.  The first three portfolios (Silver Cloud, Golden Valley, and Mountain Summit) contracted with call center service providers, including National Performance Agency, LLC ("NPA"), located in Kansas that could handle support functions such as customer service and account management.  Treppa Aff. ¶¶ 117-18, 121. Those businesses also contracted with Cyberclick for access to software that facilitates various aspects of lending operations.  *Id.* ¶¶ 119, 121.  The Tribe had to hire other vendors as well, including "lead aggregators" (who provide potential borrowers), payment processors, credit reporting agencies, and financial literacy services.  *Id.* ¶ 121.  But the Tribe resolved to exercise oversight and control over all of these contracts.  So each was reviewed, amended if needed, and signed by Chairperson Treppa.  *Id.* ¶ 120.

The Tribe never expected to rely on outside vendors for core services over the long term. From the start, its goal was to vertically integrate its businesses—in other words, to acquire the ability to provide the essential services necessary to service and collect on a consumer loan by itself.  *Id.* ¶ 60.  By July 2013, the Tribe had accumulated enough capital to take a major step towards this goal.  In that month, ULPS acquired the call center assets of NPA for $232,000.  *Id.* ¶ 127; Treppa Aff. Ex. 32.  At that time, NPA terminated the call center employees, and the Tribe

9

offered employment to them through ULPS.  Treppa Aff. ¶ 128.  Shortly thereafter, the Tribe acquired Cyberclick's assets through a stock purchase and assigned them to a new tribally chartered company called Pomo One Marketing, Inc.  *Id*. ¶¶ 131-34.

The Tribe did not just absorb the assets of these entities and then allow them to continue business as usual—it has actively supervised and reshaped these entities over time.  For example, the Complaint repeatedly mentions the Tribe's decision to re-hire NPA's employees into ULPS.  That decision made good business sense; the Tribe needed time to properly plan and pay for a call center on Tribal land, and even today recognizes the challenges of providing customer service to the whole United States from a single location in rural California and the Pacific Time Zone.  *Id*. ¶ 128.  But what the Complaint does not acknowledge is that the Tribe has replaced virtually all of the original employees at NPA, through both attrition and termination, including personally hiring upper-level management with no relationship to past financial participants.  *Id*. ¶ 129.  Likewise absent from the Complaint is any mention of the second call center on Tribal land that opened an expanded facility in December 2018.  *Id*. ¶ 130.

Similarly, the Tribe has hired new leadership at Pomo One to replace the initial President after the asset purchase.  *Id*. at 204.  And, under the Tribe's direction, Pomo One recently acquired (rather than licensed) a new "lead aggregation" platform that connects both the Tribe's lending portfolios and other lending businesses with potential customers.  *Id*. ¶¶ 135-36.

### E.   The Tribe Acquires Capital To Get Its Lending Operations Off The Ground, And Then Quickly Seeks To Eliminate Any Debt Burden On Its Businesses.

Making subprime loans requires money and the ability to internalize significant risk of nonpayment.  In 2012, the Tribe had no financial assets.  Consistent with federal policy, the Tribe turned to well-established mechanisms for raising capital, selecting only those methods that avoided yielding control to outsiders.  *See* 25 U.S.C. § 4301(b)(2) (federal law seeks "[t]o promote

10

private investment in the economies of Indian tribes"); *id.* at § (a)(12)(A) (encouraging Tribes to seek "the resources of the private market").

The Tribe obtained seed loans for its first two portfolios (Silver Cloud and Golden Valley). *Id*. ¶¶ 84-85, 106.  The Tribe retired both loans within two years with its lending revenues.  *Id*. ¶ 87, 106.

The Tribe also offered participation interests to third parties—a mechanism commonly used in banking to spread risk.  *Id*. ¶¶ 88-89.  Under this approach, the Tribe owned and controlled every loan.  *Id*. ¶ 89.  Participants had the option to purchase a share of the risk in those loans— with potential for both upside and downside.  *Id*. ¶ 90.  Because the Tribe was developing its businesses and economy from nothing, it initially sold participation interests that shifted a significant portion of the risks inherent in Silver Cloud, Golden Valley, and Mountain Summit's loan portfolios.  Participants had the right to participate in up to 97.75% of the net value of the economic risk and reward of loans made by Silver Cloud and Golden Valley, and then 96.5% of the net value of the economic risk and reward of loans made by Mountain Summit (a sign of the Tribe's increasing bargaining power).  *Id*. ¶¶ 98, 107-08.

These participation percentages significantly understate the financial benefits that flowed to the Tribe:  The agreements were structured to minimize the Tribe's exposure to the risk involved in issuing loans while ensuring that its lending businesses realized far more than just 2.25% or 3.5% of the economic value of the loans.  First, the price the Tribe charged for the partial participation interests was the face value of the loan—meaning the Tribe achieved a benefit at the moment of sale.  *Id*. ¶ 92.  Second, the Tribe's interest was calculated based on the gross revenues of each lending portfolio (thus eliminating operating expense volatility and certain default risks).  *Id*.  Third, the payments to participants were made only from net proceeds, after deducting

11

operating and certain other expenses.  *Id.*  As an example of this structure's benefits, in 2013 the Tribe retained in its tribal budget and lending operations 12.21% of Silver Cloud's revenue.  *Id.*; *see also id.* Ex. 106 (Portfolio Financial Summary) at 2.  And only one year later, that number increased to 36.35%.  Treppa Aff. ¶ 92; Treppa Aff. Ex. 106 at 2.

Nothing about the participation interest model undermined Tribal control.  Each loan was issued from Tribal land, approved by an Executive Council member directly or through an established process, and subject to Tribal law.  Treppa Aff. ¶ 95, 211, 236-39.  The participation agreements confirmed that the Tribal businesses had exclusive authority over all lending phases, including underwriting, refinancing, and origination.  Treppa Aff. ¶ 95.  The agreements offered no general right to access any of the portfolios' internal or operational information, though the participants did receive periodic updates on the business and, on a quarterly basis, reports of loan agreements in which they participated.  *See id.* at ¶ 100.  And the participants played no role in managing the service contracts signed by the businesses.  *Id.* ¶ 95.

In summer 2014, the Tribe successfully terminated the participation agreements in its first three lending portfolios as part of its consistent push for self-reliance.  *Id.* ¶¶ 139-41.  The associated buyouts were seller financed and involved similar terms.  *Id.* ¶ 142.  The Tribe and the participants agreed on a value for the remaining life of the agreements; the participants loaned the Tribe the capital to terminate the participation interests; and the participants then received non-fixed, formula-driven monthly payments from the loan business revenue as payment towards the note obligations.  *Id.* ¶ 148.

The buyout agreements offered better terms than if the Tribe had simply obtained a bank loan.  For example, by basing payments on the revenue generated each month, the Tribe could quickly repay its debt without default risk if the businesses had a down month or unexpected

expenses and could not meet a fixed monthly payment. *Id.* ¶ 148. The agreements also allowed the businesses to retain significant revenue from the lending businesses each month—including all capital needed for operating expenses, additional capital as needed to ensure that the portfolios maintained sizeable monthly cash reserve that would allow for the origination of new loans, and 5-7.5% of gross profits. *Id.* ¶ 148.

As a result of these buyout agreements, the Tribe has had no outside financial participation and has received 100% of the revenue in three of its portfolios since 2014. And the Tribe had completely paid off all of the debts of each of those portfolios ahead of schedule: Silver Cloud in June 2018, Mountain Summit in October 2018, and Golden Valley in January 2019. (Certain notes were retired earlier than others.) *Id.* ¶ 149. From the moment the final remaining note for each portfolio was paid off, these businesses had zero debt obligations.

The last portfolio, Majestic Lake, was launched in August 2015 and has a slightly different life cycle. Like the other portfolios, Majestic Lake initially used a participation model to help spread the risk of a new loan offering. But in light of the Tribe's improved finances and expertise, the Tribe sold a smaller participation interest in each loan, and retained roughly one third of the net income from the loans each month. *Id.* ¶ 182. And as with its other businesses, the Tribe ended its participation agreement for Majestic Lake ahead of schedule. After just two years, the Tribe bought out its participation agreement and—because it was increasingly solvent—agreed to fixed monthly note payments slated to be retired next year. *Id.* ¶ 187. Since 2018, Majestic Lake has had zero outside financial participation in its loans and controls 100% of the revenues they generate. *Id.* ¶ 188.

13

**F.      The Lending Businesses Keep The Tribe Operational And Have Provided Valuable Resources And Jobs For Tribal Members.**

The Tribe depends on its lending revenues.  The vast majority of the Tribe's operating budget comes from these businesses.  *Id.* ¶ 255.  Those revenues have allowed the Tribe to acquire culturally and historically significant lands, including its ancestral cemetery, and provide essential services to its citizens, such as education and elder care.  *Id.* ¶¶ 267-68.  The revenues have funded social welfare programs, such as programs that assist in purchasing school clothing, assist first-time homebuyers with down payments, and encourage tribal youth to stay in school and seek job opportunities.  *Id*. ¶ 267-68.  And the revenues have supported cultural preservation programs that seek to preserve the knowledge held by the Tribe's elders before it vanishes.  *Id.* ¶ 271.  These critical programs would end without the lending businesses' revenues.

The Tribe's lending businesses also employ, directly or indirectly, dozens of the Tribe's fewer than 300 members.  In addition to the Executive Council, who compose the Board of each lending business, the businesses directly employ four Tribal members and a member's spouse at the call center.  *Id.* ¶ 250.  Over a dozen more members or spouses work in Tribal governmental positions wholly funded by the lending businesses, such as the Tribe's historian, education director, education coordinators, and cemetery maintenance director.  *Id.* ¶ 251.  And the casino, which employs still more Tribal members, remains operational thanks to distributions from the lending businesses that help fund its debt obligations and operational upgrades.  *Id.* ¶ 252.

## ARGUMENT

**A.      Tribal Defendants Are Entitled To Sovereign Immunity.**

Tribes are "separate sovereigns pre-existing the Constitution" that, "unless and until Congress acts, . . . retain their historic sovereign authority."  *Michigan v. Bay Mills Indian Cmty*., 572 U.S. 782, 788 (2014) (internal quotation marks and citations omitted).  This immunity extends

14

to entities that function as arms of the tribe—including business entities. *See, e.g.*, *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010); *Cash Advance & Preferred Cash Loans v. State*, 242 P.3d 1099, 1109-1111 (Colo. 2010).

Tribal Defendants submit that Plaintiffs bear the burden of demonstrating that Tribal Defendants are not arms of the Tribe.[1]   In addition, in determining whether Plaintiffs meet this burden, this Court should apply the Colorado Supreme Court's *Cash Advance* test.[2]

Tribal Defendants recognize, however, that this Court ruled in *Big Picture* that defendants bear the burden of showing that they are arms of the tribe, and applied the test set forth in *Breakthrough*, as modified by *People v. Miami Nation Enterprises*, 386 P.3d 357 (Cal. 2016).   *See Big Picture*, 329 F. Supp. 3d at 269-71.   As a result, Tribal Defendants focus here on the *Breakthrough* and *Miami Nation* factors.   Ultimately, regardless of which test is applied, Tribal Defendants are arms of the Tribe.

### 1.  *Tribal Defendants Were Created By The Tribe Pursuant To Tribal Law.*

Tribal Defendants satisfy the first *Breakthrough* factor because they were "organized under and operated pursuant to tribal law."  *Big Picture*, 329 F. Supp. 3d at 272.   Tribal Defendants' founding documents make clear that they were created pursuant to the Tribe's Business Corporation Ordinance, which gives the Tribe authority to create entities that aid in the Tribe's

---

[1] *See, e.g.*, *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995) (in addressing federal sovereign immunity, "plaintiff bears the burden of persuasion if subject matter jurisdiction is challenged under Rule 12(b)(1)"); *Pistor v. Garcia*, 791 F.3d 1104, 1111 (9th Cir. 2014) ("the party asserting subject matter jurisdiction has the burden of proving its existence, *i.e.*, that immunity does not bar the suit") (internal quotation marks and citation omitted); *Cash Advance*, 242 P.3d at 1112 (plaintiff bears the burden of demonstrating that the defendant is not an arm of the tribe).

[2] 242 P.3d at 1109-11 ("(1) whether the tribes created the entities pursuant to tribal law; (2) whether the tribes own and operate the entities; and (3) whether the entities' immunity protects the tribes' sovereignty").

economic empowerment.  Treppa Aff. Ex. 11 at 2 (Silver Cloud Articles of Incorporation); *id.* Ex. 12 at 2 (Golden Valley); *id.* Ex. 13 at 2 (Mountain Summit ); *id.* Ex. 14 at 2 (Majestic Lake); *id.* Ex. 29 at 2 (ULPS).  These Articles state that Tribal Defendants were created as "subordinate entit[ies]" of the Tribe and are "considered to be . . .  governmental instrumentalit[ies]."  *E.g.*, *id.* Ex. 11 at 2.  And Tribal Defendants are governed by Tribal law, including the Tribe's Consumer Financial Services Regulatory Ordinance.  *See e.g.*, *id.* at 3.

Nothing about this analysis changes in light of this Court's observation in *Big Picture* that "[t]he circumstances under which the entity's formation occurred, including whether the tribe initiated or simply absorbed an operational commercial enterprise, may be relevant to this factor." 329 F. Supp. 3d at 272 (internal quotation marks and citation omitted).  Unlike *Big Picture*, this case does not involve a Tribe "facilitating the absorption of [a] fully-functioning lending enterprise" that "had a decidedly non-tribal character."  *Id.* at 272.  As discussed above, *see supra* pp. 9-10, the Tribe created each Tribal Defendant as part of its push to own and operate a vertically integrated lending business.  And while ULPS and Pomo One initially absorbed assets and employees from other companies, the Tribe had no choice but to take those steps.  The Tribe currently has 161 adult members; few lived within a commutable distance of the reservation when the Tribe began lending, and none were trained customer service representatives.  Treppa Aff. ¶ 128.  But since the acquisitions, the Tribe has actively managed and operated the assets it purchased, including by expanding the services they provide and terminating or otherwise replacing employees.  The Tribe has built its own, independent lending enterprise and controlled it from day one.

Nor is there any basis to believe that the Tribe created this structure "to reduce exposure to liability" based on a cease-and-desist letter from the New York Department of Financial Services.

16

*Big Picture*, 279 F. Supp. 3d at 272.  The Tribe founded Silver Cloud and Golden Valley and acquired NPA's call center *before* those letters were issued.  *See supra* pp. 9-13.  And the evidence is clear that the further restructuring of business operations that took place thereafter (such as the decision to buy out the participants) was part of the Tribe's consistent push toward self-reliance.

### 2.    *Tribal Defendants Were Created For And Function For The Express Purpose Of Promoting Tribal Welfare.*

Tribal Defendants satisfy the second *Breakthrough* factor because each "'has a stated purpose that 'relates to broader goals of tribal self-governance' separate from the entity's commercial activities, like developing the tribe's economy or funding governmental services." *Big Picture*, 329 F. Supp. 3d at 273 (citation omitted).  In incorporating the lending businesses, the Tribe specified that their stated purpose was (1) "[t]o create and stimulate the economy of the [Tribe] and to create employment opportunities for members of the [Tribe]"; (2) "[t]o increase the economic well being of the members of the [Tribe] in accordance with the economic development and self-determination policies and plans of the [Tribe]"; and (3) "to generate financial benefits for the [Tribe]."  *E.g.*, Treppa Aff. Ex. 11 at 2-3 (Silver Cloud).  The Articles of Incorporation for ULPS similarly specify that the entity exists to "further[] the economic advancement functions of the [Tribe]."  *Id.* Ex. 29 at 2.

The Court's reasons for concluding that this factor weighs against immunity in *Big Picture*, notwithstanding similar purpose language in those incorporation documents, do not apply here.  *First*, the Court's determination that it was unclear whether the revenues from the lending business were "effectively serving the Tribe's economic development," 329 F. Supp. 3d at 275, does not fit this case.  The *Big Picture* tribal defendants submitted evidence that the lending business proceeds "constitute[] more than 10% of the Tribe's general fund, and may contribute more than 30% of the fund within the next few years," but, according to the Court, this evidence "shed[] no light" on

whether this revenue was critical to the tribal government's essential services. *Id.* By contrast, Chairperson Treppa's affidavit demonstrates that the lending businesses fund the vast majority of the Tribe's general fund. *See supra* pp. 13-14; Treppa Aff. ¶ 255. Without these revenues, the Tribe would not be able to sustain almost any of its government programs or the jobs that the Tribe and the casino provide.

*Second*, unlike in *Big Picture*, the revenues received by the Tribe are not a "sliver" of the businesses' total earnings. 329 F. Supp. 3d at 275. Today, Silver Cloud, Golden Valley, and Mountain Summit are debt free and retain *100%* of their revenues. Majestic Lake does the same— its buyout agreement does not entitle the former participant to any revenues—and it will be debt free next year. *See supra* p.13. The facts here are analogous to those in *Breakthrough*, where the purpose factor weighted in favor of immunity because "the entity seeking immunity . . . provided 100% of its revenue to various tribal services." *Big Picture*, 329 F. Supp. 3d at 275 (citing *Breakthrough*, 629 F.3d at 1192-93).[3]

That the Tribe needed startup capital and technical expertise cannot strip these businesses of immunity. As Congress recognizes, tribes often must seek capital in rebuilding their Nations. *See, e.g.*, 25 U.S.C. § 4301(a)(9) ("[T]he United States has an obligation to assist Indian tribes with the creation of appropriate economic and political conditions with respect to Indian lands to . . . encourage investment from outside sources."); *id.* at §4301(a)(12) ("[T]he twin goals of economic self-sufficiency and political self-determination for Native Americans can best be served by making available . . . (A) the resources of the private market; (B) adequate capital; and (C)

---

[3] Unlike the casino in *Breakthrough*, the Tribe has elected to keep some of the revenues from the lending portfolios in the portfolios themselves to facilitate future loans, ensure the businesses remain sustainable long term and avoid a "death spiral," and prevent dependency on distributions from the government. Treppa Aff. ¶ 27. But the relevant point is that all of the revenues are the Tribe's to distribute; how it elects to do so is a quintessentially sovereign matter.

technical expertise.").  Congressional policy dictates that Courts should encourage, not punish, these steps.  Indeed, concluding that tribal entities lose sovereignty by obtaining start-up funding and enlisting technical expertise would impose conditions on sovereignty that are both unfair and absurd as applied to the Tribe, which entered the lending industry *precisely because* it needed to increase its resources in order to achieve self-sufficiency.

Moreover, the Tribe minimized its reliance on outside funding by paying back the seed loans in two years or less, buying out the participation agreements before their expiration, and paying off the resulting debt obligations ahead of schedule.  *See supra* pp. 10-13.  The Tribe also struck deals that ensured it would retain a significant portion of revenue.  For example, in 2013, when participation agreements were in place, Silver Cloud retained almost 13% of revenue, and in 2018, when participation had ended across all four portfolios, the Tribe retained 33.56% of all portfolio revenues.  Treppa. Aff. Ex. 106 (Portfolio Financial Summary).   That number will be close to 100% in 2019.

*Third*, to the extent it is relevant to the analysis, the Tribe uses these revenues to do more than "encourage tribal members to pursue educational opportunities that would allow them to work for [the company] in the future."  *Big Picture*, 329 F. Supp. 3d at 276.  The lending businesses are leanly staffed; the four lending companies have no employees, and there are under 170 employees in the shared services providers.  Treppa Aff. ¶ 248.  As discussed above, beyond the Board members (all members of the Tribe's Executive Council), the lending businesses have hired five other Tribal members or spouses.  And the businesses support tribal employment by generating revenues to pay the salaries of workers who provide government services to the Tribe and by supporting the casino, which employs many more tribal members.  *See supra* pp. 13-14

19

In sum, the Tribe took aggressive steps to retain all revenue from the businesses as quickly as possible, and it has used those revenues to benefit its members, demonstrating that the entities' purpose "relates to broader goals of tribal self-governance." *Big Picture*, 329 F. Supp. 3d at 273 (internal quotation marks and citations omitted).

### 3.   *The Tribe Wholly Controls All Aspects Of Its Lending Operations.*

"[T]he leadership of the entit[ies] claiming immunity," *Big Picture*, 329 F. Supp. 3d at 277, is, and has always been, the Tribe's Executive Council.  This Court has acknowledged that "[c]ontrol of a corporation need not mean control of business minutiae." *Id.* (internal quotation marks and citation omitted).   But here, the Tribe *is* involved in both overall supervision *and* business minutiae.

As discussed above, *see supra* p. 6, each Tribal Defendant features the Tribe's Executive Council as their Board of Directors and Chairperson Treppa as their President.  Any loan issued originates on Tribal land and all services for that loan are provided by the Tribe's wholly owned operations center.  Treppa Aff. ¶¶ 13, 262.  No one but Tribal Defendants has ever decided whether to approve and issue a loan. *See id.* at ¶¶ 95, 101.  No one but Tribal Defendants has ever originated a loan. *See id. at* ¶¶ 95, 101. And no one but Tribal Defendants has ever exercised control over a loan. *See id.* at 95, 101.  In addition, every participation agreement specified that the Tribe was to maintain complete control of all aspects of the lending process. *Id.* ¶ 95.

The Court's basis for resolving this factor "slightly" against immunity in *Big Picture*, 329 F. Supp. 3d at 279, is, once again, absent here.  There, the Court concluded that the formal control structure for the businesses was overcome by the way the businesses operated in practice—the CEO of Big Picture had limited knowledge of business operations, and an entity "not controlled by the Tribe" played a "dominant role." *Id.* at 272, 278.  Not so here.  Chairperson Treppa's affidavit belies any notion that she "do[es] little to oversee" the lending businesses' operations—

she has familiarized herself with all aspects of the business and is intimately involved in all decisions. The Boards, too, exercise control over matters both large and small. *See supra* pp. 6-7.[4]

That the Tribe delegated some business responsibilities to executives with experience in the industry does not change this analysis. In *Big Picture*, the Court observed that the lending businesses not only appointed a non-tribal member as President but delegated him control over "important managerial [actions] that can significantly affect an entity's directions and its decisions," including "strategic direction," the right to "execute documents," and "open[ing] and maintain[ing] . . . bank accounts." 329 F. Supp. 3d. at 279. No individual has ever exercised such broad authority for Tribal Defendants, and the Tribe has terminated employees who attempted to exceed their narrowly delegated authority. *See supra* p.7. Today, Chairperson Treppa is the President of all of Tribal Defendants, and she supervises a small number of non-Tribal-member Vice Presidents who possess limited decision-making authority over specific areas over the business. That structure reinforces, rather than minimizes, tribal control.

### 4. Tribal Defendants Expressly Share In The Tribe's Sovereign Immunity.

There is no basis to dispute that the Tribe intends for its businesses "to share its immunity"—the fourth *Breakthrough* factor. *See Big Picture*, 329 F. Supp. 3d at 279. The incorporation documents for Tribal Defendants all make clear that each company is to be considered a "governmental instrumentality of the Tribe," and that the Tribe confers on them "all

---

[4] Similarly, the court in *Solomon v. American Web Loan* concluded that the tribal lender did not control its businesses because, among other things, a majority of the board members were appointed by a non-tribal member, who also functioned as CEO and board member and "exercise[d] authority over [the company's] day-to-day functions." 2019 WL 1324490, at *9-10 (E.D. Va. 2019). That conclusion is not possible here, given that Chairperson Treppa serves as President and the boards consist exclusively of members of the Executive Council.

privileges and immunities of the Tribe." *See, e.g.*, Treppa Aff. Ex. 11 at 2 (Silver Cloud Articles of Incorporation); *id.* Ex 29 at 2-4 (ULPS Articles of Incorporation). The loan agreements each Plaintiff signed make these points clear as well. *See, e.g.*, Treppa Aff. Exs. 83 at 6 (Pike), 84 at 8 (Blackburn), 88 at 5 (Bumbray), 89 at 6 (Hengle), 92 at 6 (Myers), 94 at 6 (Collins), 97 at 6 (Rose), 100 at 2 (Mwethuku).[5]

The Tribe has also always been clear about the limited circumstances under which Tribal Defendants waived immunity. The Tribe granted limited waivers in connection with a participation or asset purchase agreement with a non-Tribal individual, or in certain vendor agreements. But these agreements specified that Tribal Defendants' immunity was to be waived only in connection with the agreements, and that the companies otherwise retained the immunity granted under their Articles of Incorporation. *See* Ex. 26 at 6.

There is no basis for disregarding these clear statements about immunity on the theory that the true purpose of Tribal Defendants was to immunize third parties from financial liability, as this Court found in *Big Picture*. 329 F. Supp. 3d at 280. The Tribe started its lending portfolios on its own, used methods of securing outside capital that allowed it to retain control over every loan and ownership over its businesses, and took aggressive steps in a short period of time to vertically integrate the lending businesses and eliminate outside funding. In this case, the Tribe's only intent "no doubt was . . . to help the Tribe." *Id.*

---

[5] As noted in Tribal Defendants' concurrently filed Motion to Compel Arbitration (at 9), Mr. Mwethuku's agreement did not contain the "Preservation of Sovereign Immunity" provision, but did make clear that the relevant lending entity, Golden Valley, was "an arm of the Habematolel Pomo of Upper Lake Tribe of Indians." Treppa Aff. Ex. 100 at 2-3.

> **5.      The Tribe's Economy Depends Almost Entirely On Revenue From Tribal Defendants.**

As the Court recognized in *Big Picture*, "some tribes rely on [an entity's] business revenues to an extent that a judgment against the entity could effectively strike a blow against the tribal treasury, regardless of whether the Tribe is directly liable."  329 F.3d at 280-81 (internal quotation marks and citation omitted).   That is why the fifth *Breakthrough* factor is satisfied here.   The lending businesses are the engine for the Tribe's economy, with lending revenues funding the vast majority of the governmental programs the Tribe has been able to implement. *See supra* pp. 13-14. Precluding the Tribe from continuing its lending operations would strike a crippling blow to its ability to self-govern.

> **6.      The Purposes Of Sovereign Immunity Are Best Served If Tribal Defendants Are Considered Arms Of The Tribe.**

A little more than a decade ago, the Tribe had no land or economy and was dependent on federal aid.  Today, the Tribe owns successful lending businesses that are almost completely debt free and receives 100% of the revenues from those businesses.  And those revenues are the critical source of financial support for the Tribe.  In 2018, for example, TLE's annual distribution of lending business revenue to the Tribal administrative budget was $2,912,305.00, and the Tribe's administrative budget for that year was $2,912,305.00.  Treppa Aff. ¶ 274, Exs. 109-10.  The Tribe did not get here overnight—it developed expertise and capital over time and leveraged them into "favorable terms in future business transactions," *Big Picture*, 329 F. Supp. 3d at 283, such as increasingly reduced financial participation in Mountain Summit and Majestic Lake.  This progress would be remarkable under any circumstances, but it is especially so given the Tribe's tragic history.  The Tribe has thus fulfilled the precise goals of modern federal policy: "guard[ing] and preserv[ing] the sovereignty of Indian tribes in order to foster . . . economic self-sufficiency."  25 U.S.C. § 4301(a)(6).  Because Tribal Defendants function as wholly owned and controlled arms

of the Tribe, they are entitled to share in the Tribe's immunity and Plaintiffs' claims against them should be dismissed.

**B.**   **Plaintiffs' Claims Independently Fail Because They Have Not Stated A Valid Claim Under Applicable Law.**

Even if Tribal Defendants were not immune, Plaintiffs' claims should still be dismissed because they depend on a faulty premise: that the loans violate Virginia law. They do not, because Virginia law does not apply to them. Each agreement signed by the Plaintiffs stated that the loan was to be "governed by applicable tribal law, including but not limited to the Habematolel Tribal Consumer Financial Services Regulatory Ordinance." Treppa Aff. ¶ 237.[6] The Tribe's law—like federal law and the law of Arizona, Idaho, Massachusetts, Nevada, South Dakota, and Utah, among other states—sets no cap on interest rates. *See* Treppa Aff. Ex. 103 (HPUL Tribal Consumer Financial Services Regulatory Ordinance) at 20-21;[7] 12 U.S.C. §§ 85, 5517(o) (no federal usury limitation). As explained below, the Virginia Supreme Court has made clear that the parties' choice of law must be enforced in these circumstances. *Settlement Funding v. Von Neumann-Lillie*, 645 S.E.2d 436 (Va. 2007). Because the loan agreements are governed by Tribal law, there is no basis for applying Virginia's anti-usury statute and thus no "unlawful debt" under RICO. Accordingly, Plaintiffs' claims fail as a matter of law.

---

[6] The Court may consider Plaintiffs' loan agreements in resolving Tribal Defendants' Rule 12(b)(6) motion. *See Secretary of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (the Court may "consider documents attached to the . . . motion to dismiss, so long as they are integral to the complaint and authentic") (citations omitted). Plaintiffs' loan agreements are of unquestioned authenticity, and they are integral to the complaint because Plaintiffs' claims "turn on, [or] are . . . otherwise based on" the agreements' terms. *Goines v. Valley Community Services Board*, 822 F.3d 159, 166 (4th Cir. 2016).

[7] The content of foreign law is a legal issue, and, accordingly, the Tribal laws cited here may be considered on a motion to dismiss. *See, e.g.*, *de Fontbrune v. Wofsy*, 838 F.3d 992, 996-1000 (9th Cir. 2016); *Eagle Paper International, Inc. v. Expolink, Ltd.*, 2008 WL 170506, at *6 (E.D. Va. 2008).

### 1.    The Parties' Loan Agreements Are Governed By Tribal Law.

Because this is a diversity suit, Virginia conflict-of-law rules apply.  *See DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 807 (4th Cir. 2013).[8]  The Virginia Supreme Court has been unequivocal:  Where, as here, "parties to a contract have expressly declared that the agreement shall be construed as made with reference to the law of a particular jurisdiction, [Virginia courts] will recognize such agreement and enforce it, applying the law of the stipulated jurisdiction." *Paul Business Systems, Inc. v. Canon U.S.A., Inc.*, 397 S.E. 2d 804, 807 (Va. 1990).

This rule makes good sense.  It "gives effect to the legitimate expectations of the parties" by making it possible for the parties to foretell with accuracy what their rights and liabilities will be under the contract.  *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 654 (4th Cir. 2010) (citation omitted); *see also JAAAT Tech. Servs., LLC v. Tetra Tech Tesoro, Inc.*, No. 3:15CV235, 2017 WL 4003026, at *6 (E.D. Va. Sept. 11, 2017) (respecting the parties' choice of law "encourages predictability and uniformity").  As the Fourth Circuit has explained, contractual choice-of-law provisions are "an almost indispensable precondition to achievement of the orderliness and predictability essential to" economic relations.  *Albemarle Corp.*, 628 F.3d at 654 (internal quotation marks and citation omitted).

The Virginia Supreme Court has specifically applied these principles to determine that another state's laws governed a consumer loan, *even where that state had decided not to include a usury limitation on interest rates*.  In *Settlement Funding*, the plaintiff sought damages from a lender who, she claimed, had charged an unreasonable interest rate on a loan collateralized by her

---

[8] Reference to Virginia choice-of-law principles would be proper even if this were a federal-question case because "the applicable federal law"—here, the RICO "unlawful debt" provision, 18 U.S.C. § 1961(6)—"incorporates matters which are the subject of state law."  *In re Merritt Dredging Co.*, 839 F.2d 203, 205-206 (4th Cir. 1988).

Virginia lottery winnings.  645 S.E.2d at 437.   The parties had agreed that Utah law would apply, and that state allows lenders and borrowers to agree to a loan at market rates, with no cap.  *Id.*  At 438.  Even though Virginia law limits the interest rate that may be charged, the Supreme Court enforced the agreement, concluding that "the parties' choice of substantive law should be applied." *Id*.

There is no basis for a different outcome here.  If Plaintiffs and Tribal Defendants had agreed that Utah law would govern these loans, the interest rates charged would be lawful under *Settlement Funding*.  The parties' choice of Tribal law is materially indistinguishable; the Tribe has exercised its sovereign right to make the same policy choice regarding interest rates as Utah, and the choices of Tribal sovereigns are entitled to the same weight as those of a state like Utah. *See, e.g.*, *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (tribes are "separate sovereigns pre-existing the Constitution" that, "unless and until Congress acts, . . . retain their historic sovereign authority") (internal quotation marks and citations omitted); *Montana v. United States*, 450 U.S. 544, 565 (1981) (tribes "retain inherent sovereign power" to order their interactions with consenting non-members); *see also* 12 U.S.C. § 5481(27) (Consumer Financial Protection Act defines "State" to include States and tribes).[9]

## 2.   *This Case Presents No "Exceptional Circumstances" To Warrant Setting Aside The Parties' Agreement.*

Virginia "presumes contracts to be valid"—even if "entered into by parties of unequal bargaining power"—and thus a choice of law provision can be set aside only if the party seeking to do so carries the burden of identifying "exceptional circumstances."  *Global One Comm. v.*

---

[9] Notably, as discussed above, the Virginia Bureau of Financial Institutions recently sent a letter to Mountain Summit acknowledging that it was "an arm of the Habematolel Pomo of Upper Lake," was "not required to be licensed under the laws that are enforced by the Bureau," and thus was free to issue loans to consumers in the state.  *See supra* at 8-9.

*Ansaldi*, 2000 WL 1210511, at *2 (Va. Cir. Ct. 2000); *see also*, *e.g.*, *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) ("Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances."). To invalidate a choice-of-law provision, Plaintiffs must demonstrate that the provision is "unconscionable or in contravention of public policy." *Canal Ins. Co. v. Lebanon Ins. Agency, Inc.*, 504 F. Supp. 2d 113, 118 (W.D. Va. 2007). Plaintiffs cannot make either showing.

### i. *Applying Tribal Law Is Not Contrary To Virginia's Public Policy.*

Plaintiffs have not so much as alleged that applying Tribal law would be "contrary to the public policy of [Virginia]." *Willard v. Aetna Cas. & Sur. Co.*, 213 Va. 481, 483 (1973). And *Settlement Funding* makes clear that it would not. The plaintiff there argued that the choice-of-law clause was invalid because it exposed a Virginia borrower to an interest rate that, although legal in the jurisdiction designated by the parties as providing the governing law, was contrary to Virginia "public policy to protect its citizens from usurious and high rate loans." Brief of Appellee at *4, *available at* 2006 WL 4701777. The Virginia Supreme Court rejected that argument. *See* 645 S.E.2d at 439. Nothing about the loan agreements here warrants a different conclusion.

If anything, the federal policy in favor of developing tribal self-sufficiency makes this an even more clear-cut case than *Settlement Funding*. In *Settlement Funding*, there was no reason to privilege Utah law over Virginia's usury statute other than the parties' agreement. Utah's connection to the transaction was simply that the lender was doing business there. *See* 645 S.E.2d at 438. Here, the Tribe licensed the Tribal Defendants' lending operations. And unlike private parties who chose to follow Utah law, the Tribe has a special interest in enforcing its own lending laws. Time after time, Congress has recognized the importance of tribal "self-determination regarding governmental authority and economic development." 25 U.S.C. §§ 5601-02; *see also* 25 U.S.C. § 4301(a)(6) (similar); 25 U.S.C. § 5302(b) (similar); 25 U.S.C. § 2701(4) (similar).

27

Tribal enterprises like Tribal Defendants are "critical to the goals of tribal self-sufficiency because such enterprises in some cases may be the only means by which a tribe can raise revenues," *Bay Mills*, 134 S.Ct. at 2043 (Sotomayor, J., concurring) (internal quotation marks and citation omitted), due to the "insuperable (and often state-imposed) barriers [t]ribes face in raising revenue through more traditional means, such as income and property taxes." *Id.*; *see also* 25 U.S.C. § 4301(a)(7), (8). If the Tribe is not allowed to make the same sovereign legal policy choices as Utah and the other States, the judicial system will have imposed yet another improper barrier to tribal economic development and self-determination contrary to congressional policy.

### ii.    *The Choice-Of-Law Clauses Are Not Unconscionable.*

Plaintiffs also cannot carry their burden of demonstrating that the choice of law provision is unconscionable. Establishing unconscionability requires extraordinary proof. The provision must "shock[] the conscience"; in other words, Plaintiffs must demonstrate that the provision is "one that no man in his senses and not under a delusion would make, on the one hand, and [that] no fair man would accept on the other." *Fransmart, LLC v. Freshii Development, LLC*, 768 F. Supp. 2d 851, 870-71 (E.D. Va. 2011) (quoting *Mgmt. Enters., Inc. v. Thorncroft Co.*, 416 S.E.2d 229, 231 (Va. 1992)); *see also*, *e.g.*, *Sydnor v. Conseco Financial Servicing Corp.*, 252 F.3d 302, 305 (4th Cir. 2001) (an unconscionable contract provision is "one which no reasonable person would enter into, and the 'inequality must be so gross as to shock the conscience'") (citation omitted). Plaintiffs must demonstrate unconscionability with "clear and convincing evidence." *Fransmart*, 768 F. Supp. 2d at 871 (citing *Pelfrey v. Pelfrey*, 487 S.E.2d 281, 284 (Va. App. 1997)).

Plaintiffs do not allege—nor could they—that only someone "under a delusion" would agree to Tribal law. Plaintiffs' challenge to Tribal law is based entirely on the fact that it does not contain a usury limit. But as noted above, other states have made the same policy choice, and the Virginia Supreme Court held in *Settlement Funding* that—as a matter of law—it was not delusional

for a borrower to agree to the application of one of those states' laws.  645 S.E.2d at 437.  The same must be true with respect to Tribal law, which provides added benefits to consumers by incorporating a number of federal consumer protections and a regulatory regime that involves licensing requirements and audits for the Tribe's lending operations.  *See supra* p. 8; *see also* Treppa Aff. ¶¶ 69, 239.  Choosing to apply a set of laws that promise certain consumer protections and not others—as consumers throughout this country have elected to do—cannot be called "delusional."

*Solomon*, 2019 WL 1320790, does not compel a different result.  In *Solomon*, the court declined to apply Tribal law at the motion to dismiss stage because the plaintiffs' complaint "*alleged facts* supporting a claim" of unconscionability.  *Id*. at *8 (emphasis added).  For example, the *Solomon* plaintiffs alleged that "the choice of law provisions were not disclosed to them before agreeing to the provisions."  *Id*.  By contrast, Plaintiffs here do not so much as acknowledge the choice-of-law provision in the Complaint, let alone allege even a single fact suggesting that the provision is unconscionable.  Nor could they make similar allegations as in *Solomon*, given that (1) Tribal Defendants provided the loan agreements to each of the Plaintiffs as part of the application process, *see* Treppa Aff. ¶¶ 224-25, (2) the loan agreements state unequivocally that Tribal law governs, *see id.* ¶ 237, and (3) each of the Plaintiffs had to acknowledge that he or she had reviewed the agreement to obtain the loan, *see id.* ¶¶ 224-25.

In these circumstances, Plaintiffs have not carried their heavy burden to invalidate their own agreement that Tribal law should apply.  Plaintiffs' claims depend on the application of Virginia law to these loans and therefore fail as a matter of law.

## CONCLUSION

Tribal Defendants are entitled to share in the Tribe's sovereign immunity, as each operates as a wholly owned and operated arm of the Tribe.  Accordingly, the Court should dismiss the

claims against them pursuant to Rule 12(b)(1).  Alternatively, if the Court determines that Tribal

Defendants are not immune from suit, it should conclude that Plaintiffs failed to state a claim under

Tribal law and dismiss the claims pursuant to Rule 12(b)(6).

Respectfully Submitted.

/s/ Matthew Skanchy
Matthew Skanchy (Bar No. 89575)
mskanchy@wilkinsonwalsh.com
Rakesh Kilaru (*pro hac vice*)
rkilaru@wilkinsonwalsh.com
James Rosenthal (*pro hac vice*)
jrosenthal@wilkinsonwalsh.com
Kosta Stojilkovic (*pro hac vice*)
kstojilkovic@wilkinsonwalsh.com
Beth Wilkinson (*pro hac vice*)
bwilkinson@wilkinsonwalsh.com
WILKINSON WALSH + ESKOVITZ LLP
2001 M Street NW, 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000
Fax: (202) 847-4005

*Counsel for Tribal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2019, I electronically filed the foregoing document with the Clerk of Court using the ECF system, which will send notification of such filing to the following:

Kristi C. Kelly
kkelly@kellyguzzo.com
Andrew J. Guzzo
aguzzo@kellyguzzo.com
Casey S. Nash
casey@kellyguzzo.com
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030

Leonard A. Bennett
lenbennett@clalegal.com
Craig C. Marchiando
craig@clalegal.com
Elizabeth W. Hanes
elizabeth@clalegal.com
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314

James W. Speer
jay@vplc.org
VIRGINIA POVERTY LAW CENTER
919 East Main Street, Suite 610
Richmond, VA 23219

*Counsel for Plaintiffs*

Matthew L. Haws
MHaws@jenner.com
Thomas J. Perrelli
TPerrelli@jenner.com
Jan A. Larson
JanLarson@jenner.com
JENNER & BLOCK LLP
1099 New York Avenue,NW
Washington DC, 20001

*Counsel for Defendants Scott Asner and Joshua Landy*

I further certify that on June 21, 2019, I caused a copy of the foregoing document and the notice of electronic filing to be mailed by U.S. Mail to the following non-ECF parties:

Richard Moseley, Jr.
3901 W 56th Street
Fairway, KS 66205

DATED: June 21, 2019                    Respectfully Submitted.

                                        /s/ Matthew Skanchy
                                        Matthew Skanchy (Bar No. 89575)
                                        mskanchy@wilkinsonwalsh.com
                                        Rakesh Kilaru (*pro hac vice*)
                                        rkilaru@wilkinsonwalsh.com
                                        James Rosenthal (*pro hac vice*)
                                        jrosenthal@wilkinsonwalsh.com
                                        Kosta Stojilkovic (*pro hac vice*)
                                        kstojilkovic@wilkinsonwalsh.com
                                        Beth Wilkinson (*pro hac vice*)
                                        bwilkinson@wilkinsonwalsh.com
                                        WILKINSON WALSH + ESKOVITZ LLP
                                        2001 M Street NW, 10th Floor
                                        Washington, D.C. 20036
                                        Telephone: (202) 847-4000
                                        Fax: (202) 847-4005

                                        *Counsel for Tribal Defendants*