**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

GEORGE HENGLE, SHERRY
BLACKBURN, WILLIE ROSE, ELWOOD
BUMBRAY, TIFFANI MYERS, STEVEN
PIKE, SUE COLLINS, LAWRENCE
MWETHUKU, *on behalf of themselves and
all individuals similarly situated,*

      Plaintiffs,

v.

SCOTT ASNER, JOSHUA LANDY,
RICHARD MOSELEY, JR., GOLDEN
VALLEY LENDING, INC., SILVER
CLOUD FINANCIAL, INC., MOUNTAIN
SUMMIT FINANCIAL, INC., MAJESTIC
LAKE FINANCIAL, INC., and UPPER
LAKE PROCESSING SERVICES, INC.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.  3:19-250

**AFFIDAVIT OF SHERRY TREPPA
IN SUPPORT OF TRIBAL DEFENDANTS' MOTION TO DISMISS
AND MOTION TO COMPEL ARBITRATION**

**TABLE OF CONTENTS**

I.      Executive Summary ................................................................................. 2

II.     Our Tribe's Origin And History With The Federal Government. .................................. 10

III.    The Tribal Government's Modern Structure. .................................................. 12

IV.     Our Tribe's Early Efforts To Become Economically Self-Sufficient............................. 13

V.      The Tribe's Initial Consideration Of The Online Lending Industry............................. 16

VI.     The Creation Of Tribal Law Governing Online Lending. .............................. 17

VII.    The Creation Of The Tribal Lending Enterprise.................................... 19

VIII.   Securing General Membership Approval. .......................................... 20

IX.     The Creation Of Our Four Lending Portfolios. .............................. 21

    a.  Our Tribe secured limited early seed money to get its lending business off the ground. .............................. 22

    b.  Our Tribe then entered into participation interest agreements with third parties. 23

    c.  Silver Cloud participation agreements................................ 26

    d.  Golden Valley participation agreements................................ 29

    e.  Mountain Summit participation agreements................................ 29

X.      The Tribe Secured Initial Contracts For Employees, Technology, And Infrastructure.... 30

XI.     In 2013, The Tribe Began Buying Out Core Outside Infrastructure And Achieved Vertical Integration. .............................. 33

XII.    In 2014, The Tribe Bought Out All Participants................................ 38

    a.  Silver Cloud Buyout. .......................................... 41

    b.  Golden Valley Buyout. .......................................... 43

    c.  Mountain Summit Buyout. .......................................... 45

XIII.   In 2015, Our Tribe Began Operating A Fourth Lending Company................ 46

XIV.    The Tribe Changes Outside Counsel In 2016. ................................ 49

i

XV.     Every Lending Entity Created By Our Tribe Was Incorporated As A Wholly-Owned Arm Of The Tribe With The Express Intention That The Entity Share In The Tribe's Sovereign Immunity ............................................................................................ 49

XVI.    Our Tribe Has Always Controlled All Aspects of Its Lending Business. ........................ 50

XVII.   The Tribe Is Involved In Every Step Of The Loan Servicing Process. .......................... 55

XVIII.  The Tribe Designed The Loan Application Process To Ensure That Applicants Are Aware Of Their Rights And Responsibilities. ................................ 58

XIX.    The Tribe Designed The Consumer Loan And Arbitration Agreement To Provide A Convenient, Efficient, And Fair Dispute-Resolution Process. ......................................... 64

XX.     The Tribe Took Steps To Ensure That Applicants Are Aware That They Are Contracting With Arms Of The Tribe And That Their Agreements Are Governed By Tribal Law. .... 68

XXI.    Our Tribe Has Engaged In Meaningful Government Outreach As A Testament To Its Commitment To Operating A Sustainable Business. ......................................................... 71

XXII.   The Lending Portfolios Have Employed Tribal Members Whenever Possible And Will Employ More in the Future. ............................................................................................. 74

XXIII.  The Tribe Has Derived Increasing Profit From Our Lending Portfolios As Our Business Has Grown. .................................................................................................................... 76

XXIV.   Profits From Our Lending Portfolios Go Directly To Tribal Welfare. ............................ 80

XXV.    Our Tribe Would Be Financially Devastated Without Online Lending. ......................... 84

XXVI.   Conclusion. .................................................................................................................... 86

I, Sherry Treppa, hereby declare:

1.  I am an enrolled member of the Habematolel Pomo of Upper Lake Tribe ("the Tribe"), a federally recognized Indian Nation located in Upper Lake, California.

2.  I have been involved with the Tribe's reorganization and government since 2002 and have served on the Tribe's Executive Council since 2004.  As explained in detail below, the Tribe's Executive Council consists of seven elected officials and constitutes the governing body of the Tribe.  I began my service as a Tribal officer as Vice Chairperson of the Tribal Executive Council.  In 2008, I was elected Chairperson, and have continued to serve as Chairperson to this day.

3.  In addition, I am Chairperson of the Boards of Directors and President of the four Tribally-incorporated lending portfolios at issue here (Silver Cloud Financial, Inc., Golden Valley Lending, Inc., Mountain Summit Financial Inc., and Majestic Lake Financial, Inc.).  I am also Chairperson of the Boards of Directors and President of four other tribally-incorporated companies:  Tribal Lending Enterprise, Inc., the parent company of all of our lending businesses; Upper Lake Processing Services, Inc., which provides support services to our lending portfolios; Pomo One Marketing Inc., our lead generation company, which also owns some of our intellectual property assets; and Uprova Holdings, LLC, our new corporate shared services company.[1]  I have served as Chairperson of the Boards of Directors of all eight of these entities since their inception.

---

[1] Effective January 1, 2019, Tribal Lending Enterprise, Inc. employees were technically transferred to Uprova Holdings, LLC for corporate benefits reasons, but the transfer had no impact on the decision-making structure set forth in this affidavit.

4.     In these capacities, I have actively overseen the Tribe's efforts to grow its economy in order to rebuild our sovereign Nation.   A critical part of that process has been developing a self-sustaining lending business that is completely controlled by the Tribe and that generates essential revenue for our Tribal government.

5.     Below I provide a general overview of our Tribe's origin, our early struggles with economic development, our decision to look to the internet to bring customers to our business, our decision to enter the online lending industry, our creation of our own lending portfolios, the steps we took to ensure Tribal control and ownership at all times, and how we grew those portfolios from small enterprises reliant on outside capital and contracts with outside service providers into the first tribally operated, completely self-funded, vertically integrated online lending business.  We are immensely proud of our success in this competitive industry, and of how this business has empowered our Tribe to make large strides toward economic self-sufficiency and political self-determination.

## I.     <u>Executive Summary</u>

6.     The Habematolel Pomo are indigenous to California's Clear Lake Basin and have called the area near Clear Lake home for at least 8,000 years.

7.     We are a Tribe that narrowly survived centuries of federal policies that subjected us to unspeakable cruelties, including attempted genocide, that left scars that our people are still trying to overcome today.  These misguided policies have left our Tribe essentially without a traditional tax base and in a remote geographic location that makes it virtually impossible for us to build an economy through tourism or physical visits to our land.  Our Tribe, like many other tribes, has been forced to seek out innovative solutions to the persistent lack of funds needed to provide essential government services to our people.

8.   In 2004, our Tribe had a Secretarial Election that approved our modern Constitution.  Since then, our chief goal has been to embrace modern federal Indian policy, outlined in the Congressional findings regarding tribal economic development in the Native American Business Development, Trade Promotion, and Tourism Act, 25 U.S.C. § 4301, *et seq.*, which rightfully promotes tribes' efforts to attain political self-determination through economic self-sufficiency.

9.   Upon securing its Constitution, the Tribe immediately set out to restore a portion of its original land base.  The Tribe had lost its land as a result of Congress's attempt to terminate the Tribe's federal recognition in the 1950s.  Courts eventually ruled this termination illegal, but not before the Tribe could save its lands.

10.  In order to build capital to acquire land, we began taking steps to open a casino.  We first developed the necessary regulatory framework, including the enactment of a gaming ordinance.  We also partnered with a casino developer to not only fund our efforts but manage and operate the casino once opened, under the oversight of the Tribe's Executive Council.

11.  Our relations with our development partner grew strained when it attempted to restructure our loan and management agreements while those agreements were pending approval by the National Indian Gaming Commission ("NIGC").  We ultimately decided to withdraw the agreements from the approval process, transform the original agreement into a simple loan, and hire our own management team.  The challenging experience of attempting to open the casino and negotiating with our development partner taught us invaluable lessons for our business ventures going forward.  Most importantly, it taught us that the Tribe must carefully retain control of its economic endeavors so that our future is not in the hands of

non-Tribal parties.  Although difficult to endure at the time, I credit our early challenges in gaming with teaching me, personally, and others in our government to use relationships with and resources from third parties as a tool and not a crutch, and to always retain focus on our ultimate goal of financial independence and self-reliance.

12. We soon learned that our remote location would prevent our casino from sustaining the economic future of our Tribe.  Indeed, our casino has been at best revenue neutral.

13. We began to view the internet as the great equalizer for our people—a unique opportunity to virtually bring consumers to reservation lands to provide them with valuable services and improve the lives of our Tribal members.

14. In 2009, as a result of our experience with the casino project, the Tribe's Executive Council began to explore creating and operating an online lending business.  Like any startup company, we faced major obstacles in launching our lending business.  First, the Tribe needed a substantial amount of capital to begin issuing online loans.  We had next to none.  Second, the Tribe needed experience and infrastructure—call centers, computer technology, software, and human capital trained in the online lending industry.  We lacked these capacities and resources as well.

15. Nonetheless, the Tribe resolved to create and operate its lending business in a way that embodied a commitment to Tribal sovereignty and control.  Each company we have created has been incorporated under Tribal law, is completely Tribally owned, and is controlled by a Board of Directors consisting solely of the Tribe's Executive Council.

16. We first incorporated Tribal Lending Enterprise, Inc.  This entity was created to serve as a holding company for the various entities that would make up our lending operation.  We

then incorporated several lending portfolios to actually issue loans—five in total, between 2012 and 2013—all as wholly owned, sovereign arms of our Tribe.[2]

17.   Because of our lack of startup capital, we could not assume the full risk profile associated with making subprime loans originated from Tribal land.  Therefore, the Tribe turned to a mechanism commonly used in the banking industry.  We decided to offer participation interests in our loans to spread to other parties risks beyond the Tribe's comfort level and financial resources.  In short, third parties could elect to take on a share of the risk and potential revenue of individual loans, but without obtaining any ownership interest in or control over the loans.  The Tribe chose this approach because it maximized Tribal control and our ability to phase out non-Tribal interests on a time schedule chosen by the Tribe.

18.   To gain access to the necessary infrastructure for a lending business, we signed service contracts with already-operative call centers and providers of necessary software and technology.  We did not outsource the process of finding and executing these contracts— we performed the proper due diligence and every agreement was signed by a member of the Executive Council.  But we did not view these contracts as long-term solutions—the goal was always to acquire and integrate these core capabilities into our own business.

19.   Our Tribe learned all aspects of this business quickly.  We were soon able to make strategic asset purchases that allowed us to bring all core technology and infrastructure in-house.  In 2013, the Tribe purchased the assets of a call center with whom it had contracted.  It then assigned them to Upper Lake Processing Services, Inc., a Tribally-chartered corporation, which began to provide shared services to all of our lending portfolios.  Soon after, we

---

[2] In addition to the four lending portfolios named in this Complaint, the Tribe incorporated a fifth portfolio, Dancing Winds Financial, in December of 2012. That portfolio was never officially launched.

purchased strategic software assets as another step toward vertical integration and assigned them to a new Tribal corporation called Pomo One Marketing, Inc.

20.    In 2014, we took the next step of entering buyout agreements with the third-party participants in our initial three portfolios well before the end of our five-year participation agreements.  These buyouts involved short-term seller financing that we repaid from our loan portfolios.  This method of repayment allowed us to retire debt quickly without running the risk of defaulting on debt obligations.  In 2018, we decided to buy out the only participant in our remaining, more recently-launched lending portfolio, Majestic Lake Financial, Inc.  We did so using a fixed note obligation as a result of our increased financial solvency.

21.    The Tribe has achieved self-sufficiency in a complex industry at an unprecedented pace. The Tribe has maintained complete control and ownership of our lending business since their inception.  And in just a few short years, we secured core technical assets to become vertically-integrated and eliminated all outside financial participation in our loans.  Today, three of our lending portfolios are debt-free and the current debt on the remaining portfolio is set to be retired next year.  We believe our lending operations represent an extraordinary achievement in economically-challenged Indian Country and would be a clear success for any startup.

22.    The loans we offer to customers are unsecured loans that are paid in installments, leaving us very limited remedies if a customer defaults.  To reduce the risk of default, our lending portfolios use computer algorithms and data analytic tools to assess a customer's application.  If a customer's creditworthiness or ability to repay does not meet the lending portfolio's underwriting requirements, or if the identity verification process fails, then the

application will be denied.  For example, from all of the applications received by our lending portfolios in 2018, only 3.33% were accepted, and only 1.86% were approved and funded.

23.     We have also endeavored to be transparent with our customers.  We consider ourselves an under-banked Tribe that provides services to a similarly under-banked population.  We determined that customers choosing to accept loans from our jurisdiction would access highly regulated, transparent, and fair services.  And like any responsible sovereign, we established a regulatory body to ensure as much.  Our websites and loan agreements repeatedly make clear that our lending companies are arms of the Habematolel Pomo of Upper Lake Tribe, and that our loan contracts are governed by Tribal law.  Customers must acknowledge the applicability of Tribal law as part of the loan application process.  The Tribal Consumer Financial Services Regulatory Commission, which licenses and audits every lending business, is led by a Commissioner knowledgeable in tribal law who receives technical support from a former United States Attorney and a former high-ranking enforcement official at the federal Consumer Financial Protection Bureau.  We also seek to provide fair dispute resolution procedures, including by offering binding arbitration through the American Arbitration Association ("AAA")/JAMS that is not subject to Tribal override.  We are proud to have a very low complaint rate—less than 1% in 2018.

24.     More broadly, we have never attempted to hide our business operations from the public.  On the contrary, since we decided to enter the online lending industry, we have pursued government-to-government relationships at the state and federal levels with governors, legislators, regulators, and law enforcement officials in an attempt to educate and be transparent about our presence in this industry.  We have sought (and in one case obtained)

Memoranda of Understanding with different states that acknowledge our sovereign authority to issue online loans; we collaborate with state consumer protection departments, which has involved the willful sharing of otherwise proprietary company information; and we constantly monitor federal and state consumer protection laws to ensure that our own lending ordinances reflect best practices.  I have given presentations at meetings of both Democratic and Republican State Attorneys General. I have also testified about the history and progress of our lending business in front of countless federal and state regulatory and legislative bodies, including the House Financial Services Committee.[3]

25.    These efforts to educate governments continue to produce a greater understanding of the historic mistreatment of native populations, as well as the evolution of tribal self-determination efforts that reach beyond gaming to e-commerce opportunities.  In 2018, the Virginia Bureau of Financial Institutions issued a letter acknowledging that Mountain Summit Financial, Inc. is "an arm of the Habematolel Pomo of Upper Lake," is  "not required to be licensed under the laws that are enforced by the Bureau," and thus was free to issue loans to consumers in that state.  Ex. 2 at 2 (Letter from Commonwealth of Virginia State Corporation Commission, Bureau of Financial Institutions (Feb. 12, 2018)).  More recently, two states provided amicus briefs on our behalf in a recent dispute with a federal agency that the agency subsequently dismissed—including one of the states whose laws the federal agency was attempting to enforce.  *See* Brief as *Amicus Curiae* By State of Oklahoma (Dkt. No. 85); Brief as *Amicus Curiae* By State of New Mexico (Dkt. No. 94),

---

[3] *See, e.g.*, Ex. 1 (*Short-Term, Small Dollar Lending: The CFPB's Assault on Access to Credit and Trampling of State and Tribal Sovereignty: Hearing Before the Subcomm. on Fin. Insts. and Consumer Credit of the H. Comm. on Fin. Servs.*, 114th Cong. 2 (2016)) (statement of Honorable Sherry Treppa, Chairperson, Habematolel Pomo of Upper Lake)).

*Consumer Financial Protection Bureau v. Golden Valley Lending*, No. 17-2521-JAR-JPO (D. Kan. 2017).

26.  The revenue we derive from online lending is essential to the Tribe.  We have used funding from our lending business to create over a dozen different Tribal programs that fund job training, education, health, home ownership, contributions to local governments that aid our members and our neighbors, and many other things.  These programs, funded almost exclusively by proceeds from the lending business, are designed to reverse the social ills created by past federal policies and instill a sense of pride, self-worth, and self-determination in our members, with the ultimate goal of promoting productive, stable citizens and families.

27.  At the same time, our Tribal government has made the conscious decision not to direct all of the revenues from our business into the Tribal budget, for several reasons.  First, we want to ensure our business remains self-sustaining and capable of providing opportunities for generations to come.  There are countless examples of Tribal governments raiding their companies for "quick governmental cash" and sending their companies into a "death spiral" for lack of adequate capital—a particularly pronounced concern in a competitive environment like e-commerce.  Second, as a developing sovereign Nation, we strive to strike a balance between providing means and increased opportunities for our Tribal citizens without creating a culture of dependency—a dynamic all nations face with their social and public welfare programs.  How funds generated from our lending operations are directed is a careful balancing act for our Tribal government, and is a completely internal, sovereign matter.

28. While we believe we have achieved remarkable success in a highly competitive industry, we have not been immune from challenges.  We have attempted to attract the best and the brightest talent to our business, but we have had to terminate executives who did not perform at the level we expected, or who committed one of the three cardinal sins for our Tribally owned business: failing to be completely transparent with the Tribe's Executive Council; exceeding the scope of their delegated authority; or ignoring a Council directive. Simply put, our most important business objective is to create companies that are endowed with and maintain Tribal control, and we have zero tolerance for anything or anyone that would jeopardize that goal.

29. Our people have deserved a better way of life for generations, and the online lending business has finally allowed our Tribe to provide them with the opportunity for one. Without the online lending industry, our Tribe will no longer be able to guarantee the better future that our people have finally come to expect.

## II.    Our Tribe's Origin And History With The Federal Government.

30. The Habematolel Tribe descends from four "pre-contact" groups[4] known as the Xowalek, Danoxa, Yobotui, and Kaiyao-Matuku that have occupied the area of Upper Lake, California since time immemorial.

31. Upper Lake is located in rural Lake County, California, about two hours northwest of Sacramento and over three hours from San Francisco.

32. The Pomo people are a collection of smaller tribal groups who are indigenous to Northern California.  The Pomos, along with the Patwin and Wintun, were made up of numerous small bands or villages spread throughout the area north of the Sacramento River Delta and

---

[4] "Pre-contact" refers to groups that existed in North America before the arrival of Europeans.

10

between the Russian River and the California River Valleys, as well as along the Pacific Coast.

33.    The Tribe's history is marred by a series of tragic interactions with the federal government. In 1850, the United States Cavalry assaulted many of the Tribe's ancestors, predominantly women and children, in an aggressive military operation known as the "Bloody Island Massacre" that was tantamount to attempted genocide.   The following year, the United States promised lands to the Tribe's remaining ancestors in a federal treaty that was executed, but never ratified.

34.    In 1856, the Pomos were gathered and forcibly relocated to the Nome Cult Indian Farm in Mendocino County.   This land eventually became the Round Valley Indian Reservation. The Pomo people were forced to share the Reservation with eleven other tribes, all of whom had different cultures, languages, and traditions.

35.    In 1878, four local Pomo groups joined together and purchased ninety acres of land north of Upper Lake and established a traditional community known as Habematolel, which loosely translates to the "people of rock village."  This is the root of the modern-day Tribe.

36.    In 1907, the federal government set aside the Upper Lake Rancheria for the Indians of Upper Lake.   The Rancheria ultimately grew to 564 acres through a series of piecemeal conveyances.

37.    In 1935, the Upper Lake Rancheria adopted and ratified a Constitution pursuant to the Indian Reorganization Act.  This Constitution was amended in 1941.

38.    The United States maintained governmental relations with the Rancheria until Congress passed the California Rancheria Act of 1958, Pub. L. No. 85-671, 72 Stat. 619 (1958), which had the effect of terminating the Tribe's recognition and federal aid, revoking its

11

Constitution, and distributing the Rancheria's assets to individual members.  This decision had disastrous effects on the Tribe and our way of life and truly represents a dark time in our history.

39.   In 1975, the Tribe filed an action in federal court against the United States, alleging that the termination of the Upper Lake Rancheria was unlawful.[5]  After years of litigation, the Tribe ultimately prevailed in 1983.

## III.      The Tribal Government's Modern Structure.

40.   After restoration of the Tribe's recognition, the Bureau of Indian Affairs ("BIA") refused to recognize the Tribe's 1941 Constitution and required the Tribe to reorganize under federal law.  The BIA then delayed the Tribe's reorganization process and prevented the Tribe from restoring its lands for years.

41.   Despite these challenges, the Tribe commenced reorganization in 1998 and began the process of reinstituting a formal government.  The Tribe formally approved its Constitution in a 2004 Secretarial Election, over 20 years after the illegal termination of the Tribe's recognition was overturned.  See Ex. 3 (Constitution of the Habematolel, Pomo of Upper Lake).

42.   Our Constitution establishes a seven-member Tribal Executive Council as the governing body of the Tribe, composed of a Chairperson, Vice-Chairperson, Secretary, Treasurer, and three Members-at-Large.  *Id*. at 2-3.

43.   All members of the Tribal Executive Council are Tribal members who are elected for four-year terms by a majority of voting-eligible Tribal members.  *Id*. at 3.

---

[5] The action was filed as *Upper Lake Pomo Association v. Andrus* and became *Upper Lake Pomo Association v. Watt*, after James Watt succeeded Cecil Andrus as Secretary of the Interior.

44.     The Executive Council is the Tribe's governing body and is responsible for acting in all matters that concern the general welfare of the Tribe.  The Council is tasked with passing all ordinances and resolutions relating to the Tribe's business, environmental, jurisdiction, health, education, and welfare needs.  Our mission is to build a nation of citizens with the tools and opportunities to seek out success on their own and end generations of governmentally-instituted dependence.

IV.     **Our Tribe's Early Efforts To Become Economically Self-Sufficient.**

45.     Although our Tribe had won our lawsuit restoring federal recognition, the actions of the federal government during the attempted termination left the Tribe landless and with very few economic resources.

46.     The Tribe receives some federal funding to provide essential social services including housing, Indian child welfare, and access to health care.  This federal funding was meager at the outset and has diminished over the years. It is not sufficient to meet the basic needs of the Tribe and its members.

47.     Moreover, given our history with the federal government, we cannot accept reliance on it as our sole source of funding for support and opportunities for our members. Nor is that what the federal government wants.  In the modern era, Congress has made clear in statutes such as the Native American Business Development, Trade Promotion, and Tourism Act that federal policy is to encourage tribes to develop self-sustaining economies to support tribal sovereignty and self-determination.  *See* 25 U.S.C. §§ 4301(a)(6), (a)(12), (b)(6).

48.     In keeping with these values, the Tribe saw economic development and decreased reliance on outsiders, including the federal government, as the only sustainable path to rebuilding

our Nation.   This objective has been my main focus since my election to the Tribal Executive Council in 2004.

49.   Crucial to this effort was the Tribe's push for greater trust land from the federal government.   Pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461-79, the federal government will at times take certain parcels of land into trust for a sovereign Indian tribe. [6]   The majority of land occupied by tribes today has come from this trust process.

50.   In 2008, the Tribe succeeded in having the Department of the Interior take approximately 11.24 acres of land into trust for the Tribe.   Initially, the Tribe requested that Interior take 60.55 acres of land into trust, but we reduced our request to accommodate an ongoing multiyear environmental restoration project on some of that land by the surrounding county.

51.   A few tribes have been able to achieve economic self-sufficiency and meet the needs of their people by operating a casino on tribal land.   But whether this approach is successful depends significantly on the location of the land.   Tribes are generally only able to achieve self-sufficiency through casinos or other businesses dependent on physical access when the land is conveniently located near a major urban area or place otherwise conducive to tourism.

52.   Our Tribal land is meager in size and sufficiently remote that a casino is not a viable means of achieving financial independence for the Tribe.   We know because we have tried.

---

[6] *See* Fee to Trust, BUREAU OF INDIAN AFFAIRS, https://www.bia.gov/bia/ots/fee-to-trust (last visited June 20, 2019).

53. Like many tribes, we first attempted to develop a self-sustaining economy by opening a casino.  Due to our lack of capital, we partnered with a casino developer to fund the legal, archeological, and environmental effort needed to open a Class III Casino.

54. To prepare for gaming, the Tribe developed the proper regulatory framework by passing a gaming ordinance and creating a regulatory body to oversee licensure related to the casino and ensure compliance with applicable federal and Tribal law.

55. Like many other tribes, we signed agreements in 2005 not only to secure capital to open the casino but also to have a third party manage and operate the casino under the oversight of the Tribe's Executive Council, using some employees not physically located on Tribal land—a common approach in the casino industry.

56. While our loan and management agreements were still pending with the NIGC for approval, the Tribe's development partner attempted to completely restructure our arrangements.  After several months of intense negotiations with the development partner, in 2009 the Tribe withdrew the agreements from consideration by the NIGC, effectively nullifying the management agreement, and decided to hire its own management team.  In other words, the Tribe abandoned its initial approach in favor of one that would guarantee us more control, even though doing so posed challenges to our growing Nation.

57. After several years of intensive effort, millions of dollars of debt, and a long, protracted negotiation with both the State of California and the Assistant Secretary of the Interior Office of Indian Gaming, the Tribe opened Running Creek Casino in 2012.

58. The casino provides many things that are invaluable to the Tribe: employment opportunities for Tribal citizens; employment opportunities for members of a surrounding community with high unemployment rates; an ability to make contributions to our local

15

community that has earned us a positive reputation; and above all, a source of pride and hope for our Nation.  But because of its remote location, the casino does not provide revenues to the Tribe.  In fact, in recent years, the Tribe often has used funds from its lending operations to prevent a default on the casino's debt and keep it open.

## V.    The Tribe's Initial Consideration Of The Online Lending Industry.

59.    Given the limitations described above, the Tribe began considering creating its own online lending business in 2009.  We saw the internet as a unique opportunity to allow consumers to virtually access goods and services from Tribal businesses within the Tribe's jurisdiction.  The internet would, in other words, cure the disadvantage of our remote location.

60.    From the very beginning, our objective was to create a sustainable lending business that was wholly owned and operated by the Tribe, and that provided resources to our Tribe for the benefit of its members.  We also hoped that the lending business would generate revenues to allow us to expand our efforts to contribute to our surrounding community.

61.    The Tribe faced significant hurdles in entering the online lending business.  First, operating a lending business requires significant capital.  At the outset of its entry into the lending business, the Tribe had next to none.  Second, operating a lending business requires substantial infrastructure and expertise.  For example, lending businesses require extremely complex computer software and algorithms to connect with and evaluate loan applicants to attempt to minimize bad debt write offs.  Lending businesses also require call centers staffed with trained employees to communicate with customers.  When we decided to enter the industry, we did not have this necessary infrastructure or expertise at hand.

62.     As a result, it was clear that at the outset the Tribe would have to do what many startup businesses do—enter into business arrangements with third parties and borrow startup capital.  These arrangements with non-Tribal members would help us to achieve "[t]he twin goals of economic self-sufficiency and political self-determination . . . by making available . . . the resources of the private market; adequate capital; and technical expertise," as Congress envisioned.  25 U.S.C. § 4301(a)(12).

63.     As a result of our experience with gaming, our intent was always that these core business arrangements would be short-term and structured in a way that would not disrupt our overall commitment to Tribal control and ownership.

64.     With these objectives in mind, the Tribe's Executive Council began discussing e-commerce opportunities with the legal counsel it was using for its casino initiative, Rosette LLP.

65.     In early 2011, Rosette LLP identified several parties interested in aiding Indian tribes in establishing lending operations.

66.     The Tribe ultimately chose to work with individuals who had an understanding of the economic challenges in Indian country and were interested in aiding the Tribe in creating its own lending business from the ground up.

67.     Rosette LLP continued to serve as the Tribe's legal counsel until 2016.

## VI.     <u>The Creation Of Tribal Law Governing Online Lending.</u>

68.     Before entering the lending business, the Tribe recognized the need to update its own laws and regulations to provide a robust framework for regulating consumer financial services offered from Tribal jurisdiction.

69. The Tribe ratified its lending ordinance in December 2011.  *See* Ex. 6 (Tribal Lending Regulatory Ordinance (2011)).  Enacting laws is a quintessentially sovereign function, but the Tribe elected to take guidance from state and federal consumer protection laws.  In particular, the Tribe incorporated substantive standards of numerous federal banking and consumer protection laws, including but not limited to the Truth in Lending Act, the Equal Credit Opportunity Act, the Electronic Fund Transfer Act, the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Fair Debt Collection Practices Act, the Telephone Consumer Protection Act, the Telemarketing Sales Rule, and Section 5 of the Federal Trade Commission Act, which prohibits unfair or deceptive acts or practices.  *See* Ex. 7 at 20-21 (Tribal Lending Regulatory Ordinance (2015)); *see also* Ex. 103 at 17 (Tribal Lending Regulatory Ordinance (2012)). The Tribe thus subjects its consumer financial services business to many of the same requirements and audits that federal and state laws impose on non-tribal businesses. The Tribe resolved that all tribal lending entities would have to comply with this legislation.  Over the years, the Tribe has continued to amend its lending ordinance to take account of changes to state best practices and federal regulations.  *See* Ex. 103 (Tribal Lending Regulatory Ordinance (2012)); Ex. 7 (Tribal Lending Regulatory Ordinance (2015)).

70. The Tribe also exercised its sovereign authority to establish the Tribal Consumer Financial Services Regulatory Commission (the "Commission") to oversee the Tribe's consumer financial services business.  The independent Commission licenses all tribal lending entities, and no Tribal lending entity can operate without a license.  All lending entities are expected to maintain a compliance management system to ensure adherence to Tribal law, including the provisions of Tribal law that incorporate substantive standards of federal law,

18

as well as internal controls and processes to allow the Commission to exercise meaningful oversight.  The lending entities are audited at least annually by the Commission, and the Commission has the full autonomy to exercise its enforcement authority should a lending business violate the Tribe's consumer protection laws.  The Commission also has the authority to suggest revisions to the lending ordinance, but revisions cannot be implemented absent approval by the Executive Council.

71.    Today, the Commission is led by Commissioner David Tomas, a Tribal member. Commissioner Tomas has a great deal of experience in Tribal governance and in business operations and has helped with our efforts to develop productive relationships with state and federal enforcement authorities.  For technical matters the Commissioner employs the expertise of Brendan Johnson, the former U.S. Attorney for the District of South Dakota; and Sarah Auchterlonie, the former acting deputy enforcement director for the federal Consumer Financial Protection Bureau.  The Commission chose Mr. Johnson due to his in-depth understanding of the interplay of federal law and Indian law and chose Ms. Auchterlonie for her expertise in consumer finance regulatory law.

## VII.    The Creation Of The Tribal Lending Enterprise.

72.    Once the Tribe had set up the necessary legal framework, it began the process of setting up its lending portfolios.  To do so, the Tribe employed basic corporate precepts that other businesses have traditionally used to manage resources and risk.

73.    First, pursuant to its Business Corporation Ordinance, the Tribe created Tribal Lending Enterprise, Inc. ("TLE"), in March 2012.  *See* Ex. 8 (TLE Articles of Incorporation).  TLE was formally established by resolution of the Tribe's Executive Council.  *See* Ex. 9 (Resolution 08-10-01 Approving Creation of TLE).

74. That Resolution specified that the purpose of TLE would be "limited to ownership and management of the other assets of the Tribal Lending Enterprise." *See Id.* at 4. In other words, TLE was to be the parent company for the smaller lending portfolios that the Tribe would eventually create.

75. TLE was to serve as the epicenter of the Tribe's online lending effort, and TLE's Board of Directors was to become the lending operation's core leadership. The company's Articles of Incorporation specify that the TLE Board must be composed solely of the members of our Tribal Executive Council. *See* Ex. 8 at 6 ("The initial Board of Directors shall be comprised of each then-sitting member of the Executive Council.").

76. Making the Boards of our lending companies coextensive with our Tribal Executive Council is something that we have done across our lending business. We chose this approach in order to maintain Tribal control and ensure that all companies remained ideologically and logistically aligned. We envisioned that this structure would allow our portfolios to run more efficiently by assigning key decision-making for all our lending entities to the same Tribal body.

## VIII.    <u>Securing General Membership Approval.</u>

77. The Tribe's Constitution reserves any waiver of sovereign immunity to the Tribe's General Membership (all voting members of the Tribe). But the General Membership meets only once a quarter, and the Executive Council knew from experience with gaming efforts that it would be impractical to require membership approval for the many contracts with third parties needed to get our business off the ground. Accordingly, the Executive Council requested and received authority to explicitly waive the sovereign immunity of the Tribe's

20

entities with regard to business transactions directly or indirectly related to the Tribe's consumer financial services business.  *See* Ex. 10 (Resolution No. 01-12-01).

78.   We have agreed to limited waivers of sovereign immunity in select contracts with third parties, but those waivers have always been limited to the terms of the contracts and have never conferred broader immunity on any entity or individual.  The limited waivers were essential to our efforts to get our business off the ground.  For example, without these waivers, potential financial participants would have no recourse in the event of a default, and thus would have been unwilling to provide us with any capital.  But we were unwilling to expand any waiver of immunity we conferred beyond what was absolutely necessary to support our business.

## IX.       **The Creation Of Our Four Lending Portfolios.**

79.   The next task for the Tribe was to incorporate the individual lending portfolios out of which the Tribe would actually issue consumer loans.

80.   The Tribe incorporated its individual lending portfolios as entities wholly owned by TLE. Those are, in the order in which they were incorporated: Silver Cloud Financial, Inc. ("Silver Cloud"), Golden Valley Lending, Inc. ("Golden Valley"), Mountain Summit Financial, Inc. ("Mountain Summit"), and Majestic Lake Financial, Inc. ("Majestic Lake") (collectively, "the lending portfolios").

81.   The lending portfolios were created at different times throughout the course of the Tribe's involvement in the online lending industry.  The Tribal Executive Council incorporated Silver Cloud in March 2012.  *See* Ex. 11 (Silver Cloud Articles of Incorporation).  The Tribe's second lending company, Golden Valley, was incorporated by the Tribal Executive Council in August 2012.  *See* Ex. 12 (Golden Valley Articles of Incorporation).  The third,

21

Mountain Summit, was also incorporated in August 2012. *See* Ex. 13 (Mountain Summit Articles of Incorporation).  The last, Majestic Lake, was incorporated in March 2013 but did not begin operating until 2015.  *See* Ex. 14 (Majestic Lake Articles of Incorporation).

82. Because Majestic Lake was incorporated and began operation last, that company had a different trajectory than the other three.  What follows is a timeline of the key events in the life cycles of our four lending portfolios, which today are completely self-sustaining and free of any outside financial participation.

### a. Our Tribe secured limited early seed money to get its lending business off the ground.

83. After the Tribal Executive Council established the legal and regulatory foundation for its entry into the online lending business, the Tribe began a limited search for outside investment.

84. We could not originate loans ourselves without startup capital.  Accordingly, in 2012, the Tribe secured loans to provide seed money to cover initial infrastructure and operating costs for our first lending companies, Silver Cloud and Golden Valley.  Those loans were provided by Shannon Group, LLC, a Kansas City, Missouri-based company.

85. Silver Cloud and the Shannon Group executed a loan agreement on July 21, 2012.  *See* Ex. 15 (Silver Cloud-Shannon Group Loan Agreement).  The Shannon Group loaned $1,500,000 to Silver Cloud, paid in two installments.  *Id.* at 2-3.  The loan was to be used only "as working capital and to implement, operate and maintain the [Tribe's] consumer lending business."  *Id.* at 3.  In October of that year, the Shannon Group provided a second loan in the amount of $500,000 to cover initial infrastructure and operating costs for Golden

Valley. *See* Ex. 20 (Golden Valley-Shannon Loan Agreement).[7]   *See* Ex. 20 (Golden Valley-Shannon Loan Agreement).

86.   Both of these loans were executed with the consent of the Tribal Executive Council.  As would become standard practice for all agreements with outside funding, the Tribe engaged in a limited waiver of its sovereign immunity with respect to the Shannon Group in order to execute the loan agreements.

87.   Shannon Group's loan to Silver Cloud was paid off in July 2014, only two years after it was issued.  Its loan to Golden Valley was also paid off within two years, in January 2014.  This early repayment was consistent with our practice of trying to eliminate third-party debt as quickly as practicable.

### *b.  Our Tribe then entered into participation interest agreements with third parties.*

88.   Because the Tribe could not yet fully internalize the full risk of originating unsecured subprime loans from its land, its next step was to structure an agreement with outside participants that would allow the Tribe to spread this risk across different parties.

89.   The Tribe's decision to utilize the participation model—an approach commonly used by banks throughout the country[8]—was consistent with its overall goal of ensuring Tribal control.  Under this approach, the Tribe would retain full ownership of its loans while allowing third parties to share only in the risk and the possible profits.

---

[7] Although the terms of the loan allowed Golden Valley to borrow up to $1,000,000, Golden Valley only borrowed $500,000.  Ex. 20 at 2-3.

[8] *See* U.S. Department of the Treasury, *Best Practices From Participating States: Loan Participation Programs* (2015), *available at* https://www.treasury.gov/resource-center/sb-programs/Documents/LPP%20Best%20Practices_Sept%202015_v%20FINAL.pdf (last accessed June 20, 2019).

90.  In general, the participation model worked as follows: The Tribe would first underwrite a loan and agree to provide that loan to the consumer.  After making the loan, the Tribe would then offer participants the opportunity to participate in that loan, up to a maximum amount allowed under the parties' participation agreement.  The participant would inform the Tribe of the percentage in which it intended to participate in each loan.  The participant would then wire payment to the Tribe for the purchase price of its participation interest.

91.  In the early stages, the Tribe offered participants the opportunity to take on a substantial amount of the risk of the loans given the Tribe's lack of institutional capital—typically, around 97.75% of the amount ultimately issued to the consumer.  The deals the Tribe consummated required the participant to pay the portfolio 100% of the face value of the loans in which it intended to participate and permitted it to recover 97.75% of the net revenue from the loans.

92.  This structure did not mean that the Tribal portfolios received only 2.25% of the fees received on each loan.  As noted above, the Tribe would initially receive payment for the full face value of a loan, even though a participant was never permitted to participate in a loan's full value.  The Tribe was then entitled to retain 2.25% of gross revenues, defined as gross receipts less bad debt write offs and plus bad debt recovery.  The Tribe would then deduct operating expenses—including lead costs, underwriting, capital costs, and call center support services—before arriving at the amount of net proceeds from which the participants' 97.75% interest would be repaid.  In practice, this approach meant that the portfolios received much more than 2.25% of the revenues from the loans they issued.  In 2013, for example, the Tribe retained in its Tribal budget and lending operations 12.21% of the revenue generated by Silver Cloud.  *See* Ex. 106 at 2 (Portfolio Financial Summary).

24

And only one year later, that number increased to 36.35%. *Id.* Year by year, the Tribe was well on its way to achieving its goal of retaining 100% of the revenue from its lending portfolios.

93. As a backstop to the participation arrangement, the original participants also agreed that the Tribal portfolios would earn a guaranteed minimum payment of $20,000 per month for the first few months, regardless of the amount of revenue generated by the loans. The purpose of this arrangement was to allow the Tribe to build capital early on to facilitate the growth and expansion of its lending business.

94. The Tribe ultimately used the participation model to get all four of its lending portfolios off the ground. Although all participation agreements were signed for five-year terms, the Tribe ended up terminating all participation interests well before the five-year terms expired.

95. The Tribe did not relinquish any control over its business in the course of securing participation interests. To the contrary, every participation agreement the Tribe ever signed made clear that the Tribe would have sole and exclusive control over all phases of the lending business, including, without limitation, developing and identifying lending opportunities, evaluating the creditworthiness of prospective borrowers, deciding whether to make a loan to a prospective borrower, making all advances of principal required by a loan, managing compliance with the terms and conditions of loans made, and managing all financial and operational aspects of the lending business. *See, e.g.*, Ex. 16 at 8-12 (Silver Cloud-Nagus Participation Agreement). Every loan issued from the Tribe's portfolios was approved directly by a member of the Tribal Executive Council or through an established process that was subject to Tribal law.

96.    The sole exceptions to complete Tribal control over all aspects of the business were the Deposit Account Control Agreements ("DACAs") that the Tribe signed in the early days of the first portfolios.  DACAs are common across many industries, and are frequently used by lenders to tribal gaming operations.  In fact, the Tribe's casino lender maintains a DACA on its casino accounts even today.  These agreements allowed participants limited control over withdrawals from Tribal bank accounts in which participant funds were stored.  *See e.g.*, Ex. 17 (Silver Cloud-Shannon-Nagus DACA Agreement).[9]   The Tribe and the participants had a mutual understanding that these agreements could be used only in the event that a party breached the participation agreement.  These agreements are both commonplace and unavoidable in many aspects of tribal business.  As with any funding source to a tribal entity, participants used DACAs to protect their interests; most had little or no prior experience doing business with Indian tribes and feared that a lone Tribal bad actor with access to company accounts might misappropriate funds.  For the Tribe, these agreements, as in gaming, were thus a normal and necessary prerequisite to securing the funding it needed.

97.    The DACAs were phased out over time as the Tribe and the participants developed a positive, trusting relationship.  The Tribe's lending business has not been subject to a DACA since late 2013.

c.   *Silver Cloud participation agreements.*

98.    The Tribe's first participation agreement was signed with Nagus Enterprises, LLC ("Nagus"), a Delaware limited liability company, in July 2012 and amended in November

---

[9] Ex. 17 is a representative copy of the cited DACA agreement that was ultimately fully executed.  However, this copy bears only my signature.

2012. *See* Ex. 16 (Silver Cloud-Nagus Participation Agreement). The participation agreement gave Nagus the first right of refusal to participate in up to 97.75% of every loan issued by Silver Cloud over a five-year term. *Id*. at 7-8. Nagus had no obligation under the agreement to purchase a certain amount or percentage of loans. *Id*. The Tribe retained a minimum 2.25% interest in each consumer loan issued by Silver Cloud. *Id*.

99.  Silver Cloud was to pay to Nagus as frequently as each day and as infrequently as once per week the participant's share of revenues collected on the repaid loans. *Id*. at 11. On that same day, Silver Cloud would transfer to TLE the amount reflecting the Tribe's retained interest in those same loans. *Id*. And, as previously explained, the parties agreed that Silver Cloud would retain a minimum payout of $20,000 per month for the first six months of the agreement so that it could continue to grow its portfolio. *Id*.

100. The agreement also specified that Silver Cloud would furnish Nagus on the fifth business day of each calendar quarter with a report of all loans in which Nagus purchased a participation interest. *Id*. Beyond that contractual requirement, the participation agreement conferred no general right to access any of the portfolio's internal or operational information, though the participants did receive periodic updates on the business. *Id*.

101. The agreement also highlighted the Tribe's control over operation of the business in the following ways:

- Silver Cloud retained the sole authority to establish all underwriting criteria;

- Silver Cloud was to be identified in all loan documents as the sole lender;

- Silver Cloud was to underwrite each refinancing of any existing loan;

- An officer of Silver Cloud was to make the final determination as to whether to issue or refinance a consumer loan;

27

- Silver Cloud retained the right to handle and resolve all customer complaints. *Id.* at 20.

102. As detailed further below, Nagus played no role in our contracting with third parties to provide support to our lending portfolios; I reviewed and executed all of those agreements.

103. Silver Cloud entered a participation agreement with a second participant, Edison Creek, LLC ("Edison Creek"), in November 2012.  Under the agreement, Edison Creek was given a right to purchase up to a 15% participation interest in each Silver Cloud loan.  Ex. 18 at 7-8 (Silver Cloud-Edison Creek Participation Agreement).  The agreement was otherwise identical to that entered into with Nagus, and similarly reaffirmed the Tribe's full control over its own loan portfolio.

104. In July 2013, Silver Cloud entered a third and final participation agreement with RM Partners, LLC.  Under the agreement, RM Partners, LLC was given the first right of refusal to purchase up to a 30% participation interest in each of Silver Cloud's loans.  *See* Ex. 19 at 7-8 (Silver Cloud-RM Partners Participation Agreement).  The terms of the agreement were otherwise identical to previous agreements and similarly reaffirmed the Tribe's full control over its own loan portfolio.

105. Although the aggregate outside participation allowed for under these agreements was more than 100% of a loan's value, the Tribe always maintained a minimum of 2.25% retained interest in each loan.  In the event that multiple participants wished to participate in a loan, the contracts specified the terms under which the 97.75% participation interest the Tribe offered would be divided among the participants on a pro-rata basis.  *See, e.g.*, *id.* at 8.

#### d. *Golden Valley participation agreements.*

106. The Tribe followed the same process when it incorporated its second lending company, Golden Valley, in October 2012.

107. The Tribe signed its only participation interest agreement for Golden Valley with Cobalt Hills, LLC ("Cobalt Hills"), a Delaware limited liability company, on October 17, 2012. Under this agreement, Golden Valley retained a minimum 2.25% interest in each of the loans in its loan portfolio and gave Cobalt Hills the first right of refusal for a five-year term to participate in the remaining 97.75% of each loan. *See* Ex. 21 at 7 (Golden Valley-Cobalt Hills Participation Agreement). Golden Valley retained the same right to sell participation interests to other participants, in which case Golden Valley would divide the available percentage interest in loans on a pro-rata basis among all eligible participants. *Id.* This participation agreement contained identical terms to Silver Cloud's, including the many provisions reaffirming the Tribe's complete control over operation of the business.

#### e. *Mountain Summit participation agreements.*

108. The Tribe launched its third lending portfolio, Mountain Summit, in October 2013. Ultimately, the Tribe entered into three participation agreements for its Mountain Summit portfolio. By this time, the Tribe's awareness of and experience in the online lending business had increased, as had its profitability. Accordingly, these contracts participated out, in total, up to 96.5% of each loan, with the Tribe's stake increasing along with its own capital reserve.

109. Mountain Summit entered into one participation agreement with Granite River Holdings, LLC ("Granite River"), in which Mountain Summit retained a minimum 3.5% interest in each of the loans in its portfolio, and Granite River was given first right of refusal of up to

96.5% participation in each loan in the portfolio.  Ex. 22 at 8 (Mountain Summit-Granite Holdings Participation Agreement).

110.  Mountain Summit signed a second participation agreement with RTR Solutions, LLC, ("RTR").  That agreement gave RTR the option to purchase up to 96.5% participation in each loan in the company's lending portfolio.  Ex. 23 at 8 (Mountain Summit-RTR Participation Agreement).

111.  Mountain Summit signed a third agreement with Cherry Wood Capital, LLC, ("Cherry Wood").  Under the agreement, Cherry Wood was given a first right of refusal to purchase up to a 32% participation interest in each loan issued by Mountain Summit.  Ex. 24 at 8 (Mountain Summit-Cherry Wood Participation Agreement).

112.  Although the aggregate outside participation allowed for under these agreements was more than 96.5%, the Tribe always maintained a 3.5% retained interest in each loan.  In the event that multiple participants wished to participate in a loan, the contracts specified the terms under which the 96.5% participation interest the Tribe had offered would be divided among the participants on a pro-rata basis.  *See, e.g.*, *id*.

113.  These participation agreements contained identical terms to Silver Cloud's, including the many provisions reaffirming the Tribe's control over operation of the business.

## X.   **The Tribe Secured Initial Contracts For Employees, Technology, And Infrastructure.**

114.  Around the same time that it began entering into participation agreements in order to manage the risks associated with sustaining a sizable lending portfolio, the Tribe sought to acquire the infrastructure necessary for operating an online lending business.  The Tribe needed trained employees, computer technology, software, and the like, none of which it owned or had any experience with operating.

115. Again, because of the Tribe's small population and lack of industry experience, it lacked the capacity to build its entire lending operation from scratch; doing so would have taken years and would have severely delayed any profit from flowing to benefit the Tribe and its members. Thus, although the Tribe hoped to cultivate its own talent and infrastructure over time, it was realistic about what it needed to do in order to be successful in the short term.

116. The Tribe's first effort on this front was to secure a contracting agreement with a support center of trained customer service employees.

117. Silver Cloud contracted call center support with a company called National Performance Agency, LLC ("NPA LLC"), which was based in Overland Park, Kansas.  NPA LLC was essentially an independent operations center that provided the Tribe with customer service, account management, and a call center.  As was the case with all business transactions, the Tribal Executive Council passed a resolution on July 21, 2012, authorizing Silver Cloud to sign a services agreement with NPA LLC and authorizing a limited waiver of Silver Cloud's sovereign immunity for this purpose.  *See* Ex. 25 (Resolution No. 7-12-04).  The services contract was signed that same day.  *See* Ex. 26 (NPA LLC-Silver Cloud Services Agreement). The Tribe's other portfolios entered into similar servicing and licensing agreements at various points throughout their trajectory until the Tribe was able to bring all major operations in-house.

118. NPA LLC provided support services to the Tribe's lending business, including help with implementing the Tribe's strict underwriting process.  NPA LLC also became the primary call center through which the Tribe serviced its loans.

119. The Tribe, through Silver Cloud, also contracted with a company called Cyberclick for the use of its software platform.  Among other things, Cyberclick provided access to software

allowing the lending business to screen loan applications and manage potential customer relationships. As was the case with the NPA LLC agreement, the Tribal Executive Council approved a services and licensing agreement between Silver Cloud and Cyberclick that provided for Silver Cloud's use of Cyberclick's software. *See* Ex. 27 (Silver Cloud-Cyberclick Services Agreement);[10] Ex. 28 (Resolution No. 10-13-16).

120. Online lending involves many moving parts beyond call center support services and software; operators of an online lending business often must retain dozens of outside vendors and contractors in order to operate successfully. But we were unwilling to trust an outsider to handle these vendor agreements. Instead, I, as Chairperson, personally reviewed, amended as necessary, and signed the terms of every single outside vendor agreement. The Board maintained active oversight of our servicing agreements even in later years, when the Tribe delegated limited authority to non-Tribal executives to help secure and negotiate these agreements. The Board and I took these steps in an effort to become proficient in this industry and so that the Tribe could retain autonomy and control over all aspects of its growing business.

121. Silver Cloud ultimately entered into over a dozen agreements with other vendors, including payment processors, credit reporting agencies, financial literacy services, loan management systems, and extra call centers for evenings and weekends. Golden Valley and Mountain Summit entered into virtually the same agreements with all the same vendors.

---

[10] This exhibit is a representative copy of the amendment to the services agreement between Silver Cloud and Cyberclick, which was ultimately fully executed.

**XI.      In 2013, The Tribe Began Buying Out Core Outside Infrastructure And Achieved Vertical Integration.**

122.    By 2013, the Tribe's lending business was well off the ground. Our Tribe started to feel that we had a command of the industry and were ready to take the logical next step of acquiring core service providers to allow us to vertically integrate our business.

123.    The first step in this process was to create another Tribal entity that the Tribe would use to centralize all infrastructure and operations.

124.    The Tribe, by resolution of the Tribal Executive Council, created Upper Lake Processing Services, Inc. ("ULPS") in 2013.  Like the four lending portfolios, ULPS was created as a wholly-owned subsidiary of TLE and thus the Tribe itself.  And like the four lending portfolios, the Board of Directors of ULPS was comprised only of our seven-member Tribal Executive Council.  *See* Ex. 29 (ULPS Articles of Incorporation).

125.    Our vision was that ULPS would provide operational support to the four lending portfolios, and that each lending portfolio would enter into an Intra-Tribal Services Agreement with ULPS.  The Tribe was interested in having a very strict division of labor between its companies to maximize efficiency and maintain control over all operations.  A typical agreement between ULPS and one of the four lending portfolios specified, for example, that ULPS was to provide for the lending company personnel and equipment, responsibility for answering customer service inquiries, and the use of the lending portfolio's chosen technology and software in connection with its loan servicing services.  *See* Ex. 30 (ULPS-Golden Valley Intra-Tribal Services Agreement).   These types of shared services agreements are commonly used throughout the industry to reduce costs and enhance efficiencies.

33

126. In 2013, the Tribal Executive Council approved plans for ULPS to acquire NPA LLC's assets, which were identified as core needs for the Tribe.  That agreement was executed on July 15th of that year.  *See* Ex. 31 (ULPS-NPA LLC Asset Purchase Agreement).  The agreement transferred to ULPS all of NPA LLC's tangible property, equipment, software, seller contracts, and data and records.  *Id.*  No information was destroyed in this transition.  Once the asset acquisition was completed, the Tribe essentially owned its own call center support facility and software applications.

127.  ULPS purchased NPA LLC's assets for $232,000.  *See* Ex. 32 at 2 (ULPS-NPA LLC Promissory Note).  ULPS purchased NPA LLC's assets using money from the operating expenses of its first three lending portfolios.  Because this transaction was a purchase of tangible property and not a merger, NPA LLC technically still existed as a separate non-Tribal entity once the Tribe assumed control over all of its assets.

128. The Tribe made the decision to keep ULPS's call center operations in Kansas, while planning to eventually develop another call center on Tribal land.  There were three reasons for this decision.  First, our Tribal land was not yet equipped to operate a full call center.  Critical infrastructure, including upgrading internet service to this rural area, had to be created.  Second, our land is in the Pacific Time Zone, and it is very difficult to run a call center that can cover the entire United States from that time zone.  For this reason, most businesses that depend on call centers generally locate at least part of their call center operations in the Central Time Zone.  Third, our Tribe has only 161 adult members, very few of whom lived within commuting distance of the reservation or had the requisite education.  The Tribe thus chose to rehire NPA LLC call center employees as Tribal employees of ULPS and permitted them to continue working in Kansas.  *See* Ex. 33

34

(ULPS-NPA LLC Transition Services Agreement).  ULPS agreed to hire Josh Landy as a Vice President only for a transitional period.  Landy had been serving as a manager of NPA LLC before the asset purchase.  The Tribe was concerned that it would lose some of NPA LLC's employees due to the change in management, and it hoped that Landy  could help ease that transition and provide a sense of continuity in the first few months of new ownership.

129.  Since we acquired NPA LLC's assets, the Tribe has replaced virtually all of the original employees at NPA LLC through attrition and termination.  The Tribal Board has chosen a slate of completely new upper level management with no relationship to any of the past financial participants.

130.  ULPS's Tribal headquarters were located in modular facilities, until we opened a second call center on Tribal land on December 1, 2018.  We have since expanded the Upper Lake call center into a new, 80-seat facility, which we intend to use to employ dozens more Tribal employees.

131.  Software is another important part of an online lending operation.  After the Tribe purchased NPA LLC's assets and created ULPS, it set to work on procuring other technology it needed for the operation and issuance of loans, including Cyberclick's software assets.

132.  In March 2014, the Tribe created wholly owned subsidiary Habematolel Holdings Inc. ("HHI"), which it intended to use to facilitate stock purchase agreements.  *See* Ex. 34 (HHI Articles of Incorporation).   HHI then entered into a stock purchase agreement with Brighton River Holdings, LLC ("Brighton River"), the company that owned 100% of Cyberclick's shares.  *See* Ex. 35 (HHI-Brighton River Stock Purchase Agreement).  HHI

paid $225,000 for all shares of Cyberclick. *Id*. at 2. As a result, the Tribe was Cyberclick's sole owner.

133. In March 2014, the Tribal Executive Council approved articles of incorporation for Pomo One Marketing, Inc., ("Pomo One"), a new company the Tribe intended to use to facilitate customer acquisition and marketing activities. Once again, the Tribe restricted control of Pomo One within the Tribal Executive Council; its Board of Directors is exactly the same as each other lending entity, and I serve as the company's president. *See* Ex. 36 (Pomo One Articles of Incorporation).

134. The Tribal Executive Council subsequently resolved to transfer Cyberclick's software assets to Pomo One, while all stock in Cyberclick remained controlled by HHI. *See* Ex. 37 (Pomo One-Cyberclick Bill of Sale Assignment). That bill of sale and assignment was executed on March 21, 2014. *Id*. at 2. On that same day, after these assets had been transferred from Cyberclick to Pomo One, the Tribe made the decision to formally dissolve Cyberclick. *See* Ex. 38 (Cyberclick Unanimous Consent Dissolution).

135. Using the assets acquired from Cyberclick, the Tribe launched its d/b/a Arrowshade from Pomo One. Pomo One entered into separate licensing and lead agreements with Silver Cloud, Golden Valley, and Mountain Summit. These transactions brought another important aspect of the lending business within Tribal control. An example of a typical servicing agreement between Pomo One and our lending portfolios is attached. *See* Ex. 39 (Pomo One-Mountain Summit Lead Agreement).

136. Since this acquisition, the Tribe has expanded Pomo One's offerings. Another critical part of online lending is lead generation and aggregation. Customers do not typically apply for loans on one of our lending company websites. The more common practice is for the

consumer to enter a loan application on one of the first websites that the consumer finds after a simple web search for an online loan. These websites are run by businesses known as lead generators or affiliates. A separate set of companies known as lead aggregators then acquire these leads and sell them to lenders. In the early days of our operations, our portfolios purchased leads from lead aggregators, after an underwriting algorithm determined if the leads were likely to result in consumers who could qualify for loans under the Tribe's underwriting criteria. But today, Arrowshade has taken on this lead aggregation role for the Tribe, and provides the Tribe's lending businesses with the majority of their leads. In fact, Arrowshade often provides the Tribe with more leads than it could turn into loans. The Tribe also has strict underwriting criteria, and some of the leads collected by Arrowshade fall outside of the Tribe's underwriting criteria. Arrowshade accordingly began selling those leads to other lenders.

137. Today, across our business, only fifteen employees remain who worked for the entities whose assets were eventually transferred to ULPS and Pomo One. We employ just under 170 people across our business.

138. While the Tribe accomplished vertical integration primarily by purchasing NPA LLC's assets and Cyberclick, complete control was much more involved than the simple effectuation of two purchase agreements. There are dozens of steps that go into issuing a consumer loan; the Tribe had to ensure that it had an understanding and control of each of these steps if it was going to assume control of all of them. I took personal responsibility for ensuring that our Tribe gained a command of all aspects of this business so that our efforts at vertical integration would succeed.

## XII.        In 2014, The Tribe Bought Out All Participants.

139.   By early 2014 the Tribe now owned and controlled the core operational aspects of its lending business. Vertical integration, while requiring a large capital investment by the Tribe, brought larger profits and expertise, and the Tribe decided to take the next step of eliminating financial participation in its existing lending portfolios. The Tribe could have simply allowed its participation contracts to expire several years in the future. But based on our experiences in gaming, we sought to be free of any outside encumbrances as quickly as possible.

140.   The Tribe accomplished this goal by using another method that is common in non-Tribal business transactions. It first created a separate acquisition company, in this case a Tribal Acquisition Company ("TAC"), for each of the three lending portfolios in existence at the time. The Tribe created simple names for each TAC that corresponded to the first letter of each of the lending portfolios. For example, the Tribe incorporated "Clear Lake TAC S" to facilitate the termination of participation agreements involved with Silver Cloud, "Clear Lake TAC G" for Golden Valley, and "Clear Lake TAC M" for Mountain Summit. *See* Ex. 40 (Clear Lake TAC S Articles of Incorporation); Ex. 41 (Clear Lake TAC G Articles of Incorporation); Ex. 42 (Clear Lake TAC M Articles of Incorporation).

141.   In August 2014, each TAC merged with all the entities that had purchased participation interests in its companion lending portfolio. Each agreement specified that the TAC was to be the only entity that survived each merger. These mergers took effect by way of separate merger agreements, all of which were finalized in August 2014.

142.   These buyout agreements were seller-financed. The parties set a purchase price for each participation agreement based on a negotiated multiplier of the value that the agreement

would have provided to the participant were it executed for its full term.   The participantsthen issued loans in the amount of the purchase price to the corresponding TAC.   The portfolios, pursuant to the terms of promissory notes negotiated by the parties, agreed to pay those loan amounts, plus 1.8% interest per annum.

143.   The Tribe also negotiated sunset provisions that would extinguish all debt remaining after eight years.   However, it was and always has been important to the Tribe to pay off its debt to demonstrate its creditworthiness for future business opportunities.

144.   Some merger agreements involved different companies than the ones that had signed the participation agreements with the Tribe's portfolios.   This disparity was a result of mergers and restructuring on the participant side prior to the consummation of the buyouts.

145.   The Tribal Executive Council was involved in every step of the buyout process; after approving the creation of the TACs, it individually approved each merger agreement by Executive Council resolution.   It then individually approved the issuance of the promissory note that corresponded to each merger agreement, as well as the issuance of a parental acknowledgement agreement.   This agreement essentially memorialized that the Tribe itself was guaranteeing certain aspects of debt repayment for the lending portfolios.   *See, e.g.*, Ex. 43 (Parental Acknowledgement Agreement).

146.   The mergers between the TACs and the participant companies took effect on the date of the signing of the merger agreement; not the date on which the final payment was made to the seller.

147.   Once each of the mergers took effect, the Tribal Executive Council consolidated all assets from each of the TACs into their respective lending portfolios along with any associated debt. Once the consolidation of assets and liabilities was complete, the TACs, which were

39

created only for the purpose of easily facilitating each merger, could be dissolved. After those transfers took place, Silver Cloud, Golden Valley, and Mountain Summit had successfully terminated all participation interests in their respective lending portfolios.

148. Although each promissory note contained slightly different terms, they all shared a few common features. Generally, each lending portfolio retained 5% or 7.5% of the monthly total of "receipts" (which were the principal and fees each portfolio recovered each month), less bad debt write-offs and plus bad debt recovery. This percentage would be paid as a monthly dividend to TLE. The lending portfolios also retained a percentage of monthly income for operating expenses, as well as a cash operating reserve so that the portfolios could maintain enough capital to continue issuing loans. The amount of this operating reserve fluctuated depending on market timing and conditions. Any income remaining after the Tribe reserved these three amounts for itself was then defined as "Net Cash Available." The "Net Cash Available" was then used to pay down debt to the noteholders in accordance with the percentage of Net Cash Available to which each noteholder was entitled under the terms of the parties' agreement. For instance, Silver Cloud had three noteholders, which were entitled to 42.5%, 42.5%, and 15% of Net Cash Available.

149. This method of payment was beneficial to the Tribe for several reasons. It allowed the notes to be repaid quickly, consistent with our goal of minimizing any encumbrances on our business. This method was also preferable to a fixed debt obligation (for example, a fixed monthly payment), because it allowed us to avoid the risk of default if a portfolio were to have a low-revenue month or incur unexpectedly high expenses.

150. Because the notes varied in size, the Tribe ultimately retired these notes at different times. The Tribe retired all of its Silver Cloud notes by August 2018; all of its Golden Valley

notes by March 2019; and all of its Mountain Summit notes by December 2018.  All notes were retired well before each agreement's eight-year sunset provision, and the original three portfolios are completely debt-free.

### a. *Silver Cloud Buyout.*

151. Two mergers and three promissory notes were needed in order to terminate all participation interests for Silver Cloud.

152.  Clear Lake TAC S entered into its first merger agreement with Nagus on August 20, 2014. *See* Ex. 44 (Clear Lake TAC S-Nagus Merger Agreement).

153. The Nagus buyout agreement specified the parties' intent that Nagus "be merged with and into the Clear Lake TAC-S, with the CLTAC-S surviving that merger."  *Id.* at 3.  Silver Cloud paid, pursuant to a secured promissory note, $24,112,215.33 for Nagus's total participation interest in Silver Cloud's portfolio.  *Id.* at 5.  This payment included a principal amount of $22,316,435.86 plus $1,795,779.47, which represented a 1.8% interest rate.  *Id.*

154. Silver Cloud paid a monthly amount based on the terms set forth in the promissory note signed by the parties. This note, attached as Ex. 45 (Clear Lake TAC-Nagus Merger Promissory Note), specified as follows:

   a.  Silver Cloud was to pay on the 15th of each month the "Net Cash Available" in that calendar month.  Ex. 45 at 2.

   b.  Following the structure described above, the parties' agreement defined Net Cash Available as 42.5% of any non-principal returns that Silver Cloud earned that month ("Receipts"), minus a comparable portion of the following:

    i. For the first two years of the note agreement, 5% per month of Receipts that Silver Cloud took in, which was distributed as a dividend to TLE. After two years, that percentage would increase to 7.5% for the remaining duration of the note term.

    ii. Reasonable monthly operating expenses for Silver Cloud.

    iii. A cash operating reserve sufficient to maintain a portfolio size (principal outstanding) of $4-8 million so that Silver Cloud's portfolio would be at an efficient size to continue issuing loans.  Ex. 45 at 2-3.

155. Each month, the Tribe determined the necessary size of the operating reserve. The size of the operating reserve fluctuated depending on market timing and conditions.

156. Silver Cloud executed a second promissory note with the David Vittor Revocable Trust  as a result of its merger with Nagus.

157. Silver Cloud owed $7,400,000 ($6,848,878.21 at 1.8% interest) under this note.  *See* Ex. 46 at 2 (Clear Lake TAC S-Vittor Promissory Note).  The terms of this note were generally the same, except Vittor was to receive only 15% of the Net Cash Available each month, which is what remained after a proportional share of TLE's 5-7.5% dividend, operating expenses, and the same cash operating reserve.  *Id.* at 2-3

158. After a series of mergers on the participant side, Clear Lake TAC S then merged with Creative Hills Holding.  The merger was effectuated in exchange for a note in the amount of $12,878,784.67—or $12,312,316.24 in principal and $475,468.43 in interest. *See* Ex. 47 at 2 (Clear Lake TAC S-Creative Hills Holding Merger Promissory Note).

159. The repayment terms for this note were identical to the terms for the note from the Nagus merger:  The seller received 42.5% of "Net Cash Available" each month, which is what

remained after a proportional share of TLE's 5-7.5% dividend, operating expenses, and the same cash operating reserve. *Id.* at 2-3.

160. Silver Cloud eliminated its participation relationship with RM Partners using a different process.  The Tribe lacked any relationship with RM Partners beyond the participation agreement with Silver Cloud, and received no responses to inquiries regarding RM Partners' desire to continue a participation relationship with Silver Cloud.  As a result, the Tribe in September 2014 decided to simply terminate Silver Cloud's participation agreement with RM Partners.

161. After Silver Cloud's mergers with its participants were complete, Clear Lake TAC S was dissolved by unanimous consent of the Tribal Executive Council on August 21, 2014.  *See* Ex. 48 (Clear Lake TAC S Certificate of Dissolution).

162. Silver Cloud's note for the Nagus merger was retired in June 2018. The note for the Creative Hills merger was retired in February 2017.  The Vittor Trust note was retired in June 2018. All of these notes were retired ahead of schedule.

163. Since 2014, Silver Cloud has operated wholly without any financial participation in its loans by any non-Tribal party and has been debt-free since June 2018.

   ***b.  Golden Valley Buyout.***

164. Two mergers and two promissory notes were needed in order to terminate all outside participation interests in the Tribe's Golden Valley portfolio.

165. Clear Lake TAC G, Golden Valley's corresponding TAC, first merged with NPA, Inc.  *See* Ex. 49 (Clear Lake TAC G-NPA Inc. Merger Agreement).

166. Golden Valley's promissory note to NPA Inc.'s seller required that Golden Valley pay $14,187,466.53 ($13,659,955.93 principal at 1.8% interest, amounting to $527,510.60). Ex. 50 at 2 (Clear Lake TAC G-Sunny Ridge Promissory Note).  The note had a similar

structure to those involving the Silver Cloud buyout.  Golden Valley was to pay on a monthly basis 30% of all "Net Cash Available," which is what remained after a proportional share of TLE's 5-7.5% dividend, operating expenses, and a cash operating reserve.  *Id.* at 2-3.  Because Golden Valley was a larger portfolio, it was entitled to retain a larger monthly cash operating reserve sufficient to maintain a portfolio size (principal outstanding) of $7-12 million so that Golden Valley's portfolio would be at an efficient size to continue issuing loans.  *Id.*  This monthly reserve similarly fluctuated based on market timing and conditions.

167.   To complete the full buyout transaction, Clear Lake TAC G also formally merged with NPA LLC, the same company whose assets it had purchased the year before.

168.   Under the NPA LLC note, Golden Valley was to pay $64,162,533.48 ($59,383,969.65 in principal and $4,778,563.88 in interest at 1.8%).  Ex. 51 at 2 (Clear Lake TAC G-NPA LLC Merger Promissory Note).  Golden Valley was to pay the remaining 70% of all Net Cash Available after Golden Valley's own standard deductions, which is what remained after a proportional share of TLE's 5-7.5% dividend, operating expenses, and the same cash operating reserve.  *Id.* at 2-3.

169.   The assets and liabilities of Clear Lake TAC G were then transferred to Golden Valley, and Clear Lake TAC G was dissolved by unanimous consent of the Tribal Executive Council on August 21, 2014.  Ex. 52 (Clear Lake TAC G Certificate of Dissolution).

170.   Golden Valley's note for the NPA Inc. merger was retired in June 2017. Its note for the NPA LLC merger, the largest note the Tribe held as a result of its termination of all participation interests, was retired in January 2019. Both of these notes were retired ahead of schedule.

171. Since 2014, Golden Valley has operated wholly without any financial participation in its loans by any non-Tribal party has been debt-free since January 2019.

   *c.   Mountain Summit Buyout.*

172. Two mergers and two promissory notes were needed in order to terminate all participation interests in the Tribe's Mountain Summit portfolio.

173. Clear Lake TAC M entered into a first merger agreement with Granite River Holdings, LLC ("Granite River") on August 20, 2014.  *See* Ex. 53 (Clear Lake TAC M-Granite River Merger Agreement).

174. Under the terms of the Granite River promissory note, Mountain Summit paid $5,800,000.00 ($5,584,347.59 principal and $215,652.41 at 1.8% interest). Ex. 54 at 2 (Clear Lake TAC M-Oceanside Breeze Promissory Note).  The agreement defined "Net Cash Available" as 90% of Receipts until the Lender received $1,200,000, at which point the monthly payment dropped down to 50% of Receipts.  Receipts were defined as what remained after a proportional share of TLE's 5-7.5% dividend, operating expenses, and a monthly cash reserve sufficient to maintain a portfolio size of $1.5-4 million (principal outstanding) that was to fluctuate based on market timing and conditions.  *Id.* at 2-3.

175. The TAC's second merger agreement was with RTR Solutions, LLC.  *See* Ex. 55 (Clear Lake TAC M-RTR Merger Agreement).

176. Under the RTR note, Mountain Summit paid $11,800,000.00 ($10,921,184.17 principal and $878,815.83 interest at 1.8%).  Ex. 56 at 2-3 (Clear Lake TAC M-RTR Promissory Note).  That note specified that Mountain Summit was to pay each month all remaining Receipts, which were what remained after a proportional share of the same 5-7.5% TLE distribution, reasonable operating expenses, and the same operating cash reserve.  *Id.*

177. Clear Lake TAC M's assets and liabilities were transferred to Mountain Summit, and Clear Lake TAC M was dissolved by unanimous consent of the Tribal Executive Council on August 21, 2014.  *See* Ex. 57 (Clear Lake TAC M Certificate of Dissolution).

178. Mountain Summit's note for the Granite River promissory note was retired in March 2017. Its note for the RTR merger was retired in October 2018. These notes were also retired ahead of schedule.

179. Since 2014, Mountain Summit has operated wholly without any financial participation in its loans by any non-Tribal party and has been debt-free since October 2018.

## XIII.     In 2015, Our Tribe Began Operating A Fourth Lending Company.

180. In August 2015, the Tribe made the decision to launch its fourth and final lending company, Majestic Lake.[11] The Tribe believed that expansion would serve it better in the long run, including by generating revenue to pay down existing debts and ensuring that Tribal programs had an additional source of revenue.  This expansion also involved limited outside financial participation to get the portfolio off the ground, but on different terms from previous participation agreements.

181. In order to launch a new lending portfolio in Majestic Lake, the Tribe secured a $1.5 million seed loan from Signal Light, LLC ("Signal Light").  *See* Ex. 58 (Majestic Lake-Signal Light 2015 Promissory Note).  Majestic Lake also signed a participation agreement with Signal Light on July 31, 2015. *See* Ex. 59 (Majestic Lake-Signal Light Participation Agreement).

---

[11] Although the Tribe incorporated Majestic Lake in March 2013, the portfolio did not begin issuing loans until it had secured the requisite seed funding.

182. The Tribe approached its agreement with Signal Light with increased bargaining power. It had established a track record of success within the industry and had acquired enough capital to assume a greater proportion of the risk in this portfolio. Signal Light was given the opportunity to purchase anywhere from a 75 to 99% participation interest in Majestic Lake's available loans. *Id.* at 8. But under this agreement, Majestic Lake did not pay the face value of the loans up front; both sides accepted the relative allocation of risk in accordance with their respective interest in each loan. The agreement also set forth the terms by which Majestic Lake would calculate the portion of profits that would be distributed each month. The Tribe's share in the company's profit was sizable; pursuant to the parties' definition of net income and the corresponding monthly "Tribal Share," the Tribe was to retain roughly one third of net income each month. For examples of how the parties' agreement divided Majestic Lake profits each month, please see Schedule 2 attached to Ex. 59 (Majestic Lake-Signal Light Participation Agreement).

183. This agreement, like all others entered into by the Tribe's other lending portfolios, specified that the Tribe was to "have sole and exclusive control over all phases of the lending business, including without limitation developing and identifying lending opportunities, evaluating the credit worthiness of prospective borrowers, deciding whether to make a loan to a prospective borrower, making all advances of principal required by a loan, managing compliance with the terms and conditions of loans made and managing all financial and operational aspects of the lending business." *Id.* at 1.2(a).

184. But this agreement made even more clear the Tribe's intention to cease offering participation interests as soon as practicable. The agreement specifies that "The Parties' expectation is that, by the end of the Term, the Tribal Parties will have developed the full,

independent financial capability to operate the small dollar consumer lending business at full scale to contribute significantly to financing the needs of the Tribe and its members." *Id.* at 2(d).

185. The Tribe retained the right to create new lending portfolios and to sell additional participation interests as it saw fit.

186. After two years, the Tribe and Signal Light mutually agreed to the early termination of the Participation Agreement and a purchase of Signal Light's existing participation interests in the Majestic Lake loan portfolio.

187. The Tribal Executive Council authorized Majestic Lake to purchase all of Signal Light's participation interest in Majestic Lake on January 6, 2018. *See* Ex. 60 (Majestic Lake Board Resolution No. 01-18-01). Pursuant to the terms of the parties' related promissory note, Majestic Lake was to pay Signal Light $17,000.000 for the negotiated value of Signal Light's participation interest ($16,797,722.31 principal and $202,277.69 interest) in Majestic Lake. *See* Ex. 61 at 2 (Majestic Lake-Signal Light 2018 Promissory Note). Majestic Lake was to pay Signal Light $8 million in total over the first fifteen months (amortized equally over those months) and then $9 million over the course of the next fifteen months. *Id.* Because of the success of its business, the Tribe was comfortable structuring this buyout around fixed payment amounts rather than as a percentage of Majestic Lake's revenue.

188. Signal Light's loan to the Tribe will be paid in full next year. Since 2018, Majestic Lake has operated wholly without offering participation interests in any loans to non-Tribal party.

XIV.    **The Tribe Changes Outside Counsel In 2016.**

189.   After the Tribe's entry into the online lending business, Rosette LLP continued to provide

the Tribe and the Tribe's entities with legal advice.

190.   As part of the acquisition of NPA LLC's assets, the Tribe acquired the expertise of an in-

house General Counsel and her team.  As our trust in the in-house counsel grew, the Tribe

drastically reduced Rosette LLP's work for our lending business.  Additionally, with

considerable transactional experience under our belt from both gaming and lending, the

Tribe had interacted with a variety of other knowledgeable transactional and regulatory

attorneys.  Accordingly, we began supplementing our in-house legal expertise with several

outside firms.

191.   In June 2016, for a variety of reasons, the Tribal Executive Council voted to end the Tribe's

relationship with Rosette LLP.

XV.    **Every Lending Entity Created By Our Tribe Was Incorporated As A
Wholly-Owned Arm Of The Tribe With The Express Intention That The
Entity Share In The Tribe's Sovereign Immunity.**

192.   The history of the development of our lending business proves that despite the Tribe's need

to secure outside capital at the start, the Tribe has always ensured that its lending portfolios

and associated parent and service companies are arms of our Tribe that are to share in the

attributes of the Tribe's sovereignty, including our sovereign immunity.

193.   First, each of our lending portfolios, TLE, ULPS, and Pomo One were all incorporated

under Tribal law.

194.   Second, the Tribe has always ensured that all of its subsidiaries were wholly owned by the

Tribe itself.  No one but the Tribe has ever owned any part of TLE, ULPS, Pomo One,

Silver Cloud, Golden Valley, Mountain Summit, or Majestic Lake.  Article 8 of the Articles

of Incorporation of each business provides that "[t]he Corporation shall issue one (1) share of stock, which share shall be owned by the TRIBE and voted upon by its Executive Council. No individual or entity other th[a]n the TRIBE or one of its subordinate entities shall acquire any ownership interest in the Corporation." *See e.g.*, Ex. 8 at 7 (TLE Articles of Incorporation); Ex. 29 at 7 (ULPS Articles of Incorporation) (same clause); Ex. 36 at 7 (Pomo One Articles of Incorporation) (same); Ex. 11 at 1 (Silver Cloud Articles of Incorporation) (same).

195. Third, each lending portfolio's incorporation documents make clear that the company is to be considered a "governmental instrumentality of the Tribe," and that the Tribe confers on its portfolios all privileges and immunities to which the Tribe itself is entitled. *See, e.g.*, Ex. 11 at 2-5 (Silver Cloud Articles of Incorporation).  ULPS and Pomo One's incorporation documents similarly specify that the entities are to be considered sovereign arms of the Tribe itself.  *See* Ex. 29 at 27 (ULPS Articles of Incorporation); Ex. 36 at 27 (Pomo One Articles of Incorporation).

196. Fourth, the Tribe has always made clear to its funding sources, vendors, and consumers that Tribal law and Tribal control formed the bedrock of this lending business.

## XVI.      Our Tribe Has Always Controlled All Aspects of Its Lending Business.

197. Because this business is so essential to our Tribe's future, we could not risk control being in the hands of any person who is not a member of our Tribe.

198. As explained previously, each of the four lending portfolios, along with TLE, Pomo One, and ULPS, is composed of the exact same Board of Directors (the Tribal Executive Council) and Chairperson (me).  I also serve as the Chairperson and President of each of these companies.

199. Our Tribe is committed to formal corporate structure to ensure that our business continues to run smoothly. We have separate board meetings for TLE and each of our lending portfolios, often held one after the other each month.  For consistency's sake, most Board decisions are made at the corporate shared services level (TLE).  But we also propose separate resolutions for each company as necessary, depending on the company's needs and performance at the time, and we are sure to hold separate votes for the implementation of a new policy for each entity, even if the Tribe is considering a proposal that would affect all entities equally.

200. Under this organizational structure, the TLE Board of Directors ("the Board"), and thus the members of the Tribal Executive Council, are solely responsible for, among other things:

- Approval of strategic direction

- Approval of annual budgets and forecasts

- Approval of capital structure and funding strategy

- Appointment of corporate officers, if any

- Approval of policies as proposed by any corporate officer

- Banking account issues

- Approval of benefits plans

- Approval of the hiring of any employee with an annual compensation and benefits package totaling over $125,000.

201. The Board acts in one of three ways: action at meetings typically contained in minutes, through poll votes, and through formalized resolutions (which are rarely used).  Given that this is a business and decisions are often required quickly, the majority of decisions are made via poll vote—often after one or a series of communications providing background,

51

actionable options and recommendations for next steps.  The Board then affirms all poll votes at its next formal meeting.

202. The Board also forwards to the Tribal Executive Council all agreements with a limited waiver of sovereign immunity for review and approval.

203. Some illustrative examples of the role of each company's Board of Directors in the operation and control of its respective business include:

- Approval of the strategy and process.  *See* Ex. 62 (TLE Poll Vote No. 02-01-2019); Ex. 63 (TLE Poll Vote No. 08-05-2017);

- Annual reviews of several employees.  *See* Ex. 64 (TLE Poll Vote No. 02-02-2019); Ex. 65 (TLE Poll Vote No. 02-03-2019);

- Decisions to terminate employees.  *See* Ex. 66 (TLE Poll Vote No. 06-01-2018);

- Decisions regarding hiring employees. *See* Ex. 67 (TLE Poll Vote No. 07-01-18);

- Approval of job descriptions, salaries and other employee issues. *See* Ex. 68 (TLE Poll Vote No. 08-01-2017); Ex. 69 (TLE Poll Vote No. 07-02-2018);

- Approval of legal matters.  *See* Ex. 70 (Majestic Lake Poll Vote 02-02-2019); Ex. 71, (Majestic Lake Poll Vote No. 02-03-2019); Ex. 72 (TLE Poll Vote 08-06-2017);

- Approval of logo design and implementation.  *See* Ex. 73 (TLE Poll Vote No. 02-04-2019);

- Approval of banking and financial matters.  *See* Ex. 74 (TLE Poll Vote No. 08-04-2017).

- Approval of agreements by the lending entity Boards.  *See* Ex. 75 (Silver Cloud Poll Votes 02-01-2019); Ex. 76 (Golden Valley Poll Vote 02-01-2019); Ex. 77

(Mountain Summit Poll Vote No. 02-01-2018); Ex. 78 (Mountain Summit Poll Vote 02-02-2019).

- Approval of health insurance benefits programs and payroll changes for employees. *See* Ex. 79 (TLE Poll Vote No. 02-07-2019); Ex. 80 (TLE Poll Vote No. 07-03-2018).

204. Over the years, we have hired individuals to serve in executive roles at the corporate shared services levels—primarily at ULPS and TLE. We wanted to ensure that our business was operating with corporate and industry best practices, and so we have set out to hire the best people we can find to aid the Board as we learn more and more about this complex industry. Before we transitioned to our current corporate structure (described in further detail below), we hired individuals to serve as Chief Executive Officer, Chief Operating Officer, Chief of Human Resources, and General Counsel. We also hired individuals to serve in President and Vice President roles at Pomo One and Arrowshade. These individuals all operated under delegations of authority from the Board that made clear what issues were exclusively within the domain of the Board and the Tribe, and then set out the job functions which these individuals were supposed to perform.

205. For example, when the Tribe incorporated ULPS in 2013, it enacted a Delegation of Authority Policy that applied to all non-Tribal executives at ULPS. ULPS's Board, which consists of the Tribal Executive Council, controls ULPS. But the Tribe initially retained an executive management team to ease the transition of ownership. The authority of this management team was strictly controlled by the delegation of authority from the Board. This delegation gave the management team the authority to engage in activities necessary for the day-to-day operation of ULPS. *See* Ex. 81 (ULPS Delegation of Authority Policy

8-10-13).  It reserved all major decision making to the Board, including approval of strategic direction; waivers of sovereign immunity; approval of annual budgets; approval of capital structure; approval of all company policies; and approval of all major financial expenditures.  *Id*.

206. Like many growing businesses, however, we have made our share of mistakes in these hiring decisions.  We have had to terminate executives who did not perform at the level we expected, or who committed one of the three cardinal sins for our Tribally-owned business: failing to be completely transparent with the Board, exceeding the scope of their delegated authority, or ignoring a Board directive.  As noted above, today, only 15 of the over 100 employees who were hired by the Tribal companies through their core services acquisitions remain employed by the Tribal business.

207. The foundational principle of our business is that it is Tribally controlled, and we have zero tolerance for anything or anyone that would take actions that appear to jeopardize that goal.

208. In 2018, we adopted a new organizational structure that is still in place today.  Based on my knowledge and experience in the industry, gained over the last several years of learning both by doing and by amassing outside knowledge wherever I can, I was appointed by the Board as President of every entity in our lending business.  We continue to delegate limited authority to a small set of Vice Presidents who are all employed through TLE.  These Vice Presidents manage marketing, compliance, technology, human resources, and call center operations for the Tribe.  The terms of these delegation agreements are nearly identical to those used in earlier years. The agreements for these individuals clearly limit their authority to their particular areas of expertise as outlined in the Tribe's delegation policy and reserve the vast majority of control over both day-to-day operation and strategic management for

the TLE Board.  *See* Ex. 82 at 2-3 (TLE Delegation Policy).  More specifically, the current delegation policy gives subordinate corporate officers limited power relating only to: a) approval of all agreements not exceeding twenty-five thousand dollars ($25,000) in annualized impact to the TLE and/or its affiliates; b) supervision of all employees reporting to that officer; and c) management of consultants engaged pursuant to an agreement approved under the Delegation Policy. *Id.* at 5-6.

209.  All other executive officers report to me or the Board.  All decisions made by me as President must be presented to the full Board each month to ensure the Board is fully aware of all decisions made by the President.  I also obtain full Board approval on all employee reviews performed by me in my capacity as President.

210.  To ensure that we can operate at the fast pace needed to survive in e-commerce, we have also adopted a "decision tree" that requires different levels of input and approval based on the financial impact of a decision.  Vice Presidents must obtain proper approval for any transaction totaling above $25,000.  *Id.*  As President, I have signature authority for decisions up to $250,000.  Our Management Committee, which consists of me and Aimee Jackson, a Board member, can approve decisions up to $500,000, but only if we are unanimous.  The Board must sign off on all other decisions before they can be implemented.

## XVII.  <u>The Tribe Is Involved In Every Step Of The Loan Servicing Process.</u>

211.  From the very beginning, our Tribe has sought to run an honest and fair lending business.  We have done so primarily by retaining complete control over the issuance of loans to consumers with the goal of providing them with a transparent and positive experience. The Tribe maintains robust oversight of lending operations, establishes its own strict

underwriting criteria, and ensures that consumers have recourse in the event that they are dissatisfied with the terms of their loan agreement.

212. First, the Tribe's lending business must be licensed by our Tribal regulatory Commission before they may engage in lending.  And as previously explained, the lending portfolios must maintain a compliance management system to ensure compliance with Tribal law, including the numerous portions of federal law we have incorporated.  This system must include a full suite of written policies that cover all aspects of lending.

213. Each lender must also have internal controls and processes that allow it to monitor its operations to ensure that its procedures follow those policies.  As an additional control, our regulatory Commission audits these companies regularly.  If deficiencies are identified during an audit, or if a lender fails in any way to satisfy their compliance obligations, the Commission is empowered to take corrective action.  Such action includes imposing fines and penalties, as well as suspending and/or revoking the lender's license to extend credit.

214. It also important to note that we fill a gap in the financial services industry—we often extend loans to consumers who are in need of credit but are unable to secure funds from a traditional bank.  For example, some consumers are unable qualify for credit cards, or cannot afford the expensive fees that can come with a bounced check.  The loans that our portfolios offer are unsecured loans that are paid in installments, which means our lenders have very limited remedies if a customer defaults.

215. Our Tribe's lending business uses computer algorithms and data analytic tools to assess a consumer's application. Generally, an application's requested loan amount is then compared against a customer's income and existing credit obligations, because these are strong factors in determining their creditworthiness and ability to repay.  If the applicant

does not meet the lending company's underwriting requirements, or if the identity verification portion fails, then the application will be denied.  The Tribe gathers the information from subprime data companies that have been purchased by the country's three major credit reporting agencies—Experian, Equifax, and Transunion—to help evaluate whether to accept a loan application.

216.  Data from the Tribe's lending business illustrates the rigor and effectiveness of our underwriting.  From all of the applications received in 2018, only 3.33% were accepted, and only 1.86% were approved and funded. Put another way: 98.14% of potential customers are rejected in underwriting.  This commitment to responsible lending helps to prevent customers from taking loans they are unable to repay.

217.  The typical customer that our tribal lenders approve for credit is approximately 42 years old with a median income of around $44,000.  The median loan amount is roughly $825, and, although the installment contract is structured on a ten-month payment schedule, customers are encouraged to pay extra toward the principal or pay off the loan early without penalty.  On average, customers pay off their loans in fewer than 100 days.  Data also shows that our customers have moderate borrowing patterns: when measured over two years, our customers have an average of 1.6 loans.

218.  We have no interest in operating a predatory lending business.  Our Tribe is extremely proud of the strong consumer protections we have put in place and our low complaint rate for our lending portfolios.  In 2018, our total complaint rate across all our lending portfolios was less than 1%.

219. In sum, our Tribe exercises strict control over our lending criteria so that we can be sure that we are operating a business that fills a gap in the traditional banking system while also being sufficiently protective of consumer interests.

220. But we are also cognizant of the evolving litigation and regulatory environment in which we operate, and we have occasionally had to make business decisions to not accept loan applications from consumers who reside in certain states.  Virginia is one example; we have not accepted loan applications from consumers residing in the state since February 2018.

## XVIII.   The Tribe Designed The Loan Application Process To Ensure That Applicants Are Aware Of Their Rights And Responsibilities.

221. The lending portfolios implement the Tribe's lending criteria through an online application process.  For ease of reference, I will describe the process Silver Cloud used during the relevant time period, but the process for the other lending portfolios did not differ in any material way, and it has not changed materially since the lending portfolios began operations.

222. New customers begin by navigating or being redirected to the lending company's home page or landing page.  Although some customers might land directly on the portfolio's homepage as a result of inputting the lending company's website address or through an internet search for an online loan, it is more common that a customer is directed to the Esignature page via a lead aggregator.  On the home page, customers who have not completed an application through a lead aggregator begin the application process by choosing a desired loan amount and clicking "apply now."  The customer then completes the loan application.  As part of the application process, the customer provides basic

personal and financial information, including information on his or her employment and income. This information is already provided by applicants arriving to the Esignature page via a lead aggregator.

223. If the lender approves the application, the customer is asked to confirm the desired loan amount and is shown the due date for the first payment.

224. Before the application process is complete, the customer is presented with several documents for review. The applicant may view each of the required documents by clicking a bolded and brand-colored hyperlink. Next to each hyperlink is a description of the document and a check box. Only after checking the required boxes may the applicant click the "Sign Now" button to electronically sign the documents and complete the application. At the top of the page, the applicant is reminded that by checking the required boxes and clicking the "Sign Now" button, he or she will be electronically signing the loan documents and completing the transaction. Immediately above the "Sign Now" button, the customer is reminded that clicking the button will complete the loan application. The applicant is also reminded that "[w]hen you apply your signature, you are confirming that you have read, understand and agree to the terms in these documents." The following image is a representative example of the page that is presented to the customer, and indicates the required fields in red.[12]

---

[12] Mr. Mwethuku was presented a slightly different iteration of this page, but it presented him with similar documents and requirements.



225. As shown above, one of the documents the applicant must assert to have read, understood, and agreed to the terms presented therein is the "Consumer Loan and Arbitration Agreement" (the "Agreement"). This is the main loan agreement governing the relationship between the lender and the borrower. Next to the checkbox associated with the Agreement, the applicant is told that the "Consumer Loan and Arbitration Agreement is your loan agreement that contains important information about the terms of your loan and your payment schedule." To assist the applicant in reviewing this critical document before finalizing the application, the words "Consumer Loan and Arbitration Agreement" are highlighted in a branded color indicating a clickable hyperlink, and the customer may click on that link to view the Agreement before signing. Alternatively, or in addition to clicking the link, and before or after signing the loan documents, the customer may print

60

the loan documents or request copies by mail.  Moreover, each borrower who submits his

or her loan application can log in to the website to view their loan documents.[13]

226. Each plaintiff signed a separate Consumer Loan and Arbitration Agreement every time

they took out a loan.   I have reviewed each plaintiff's Agreements, and copies of those

Agreements are attached to this affidavit as Exs. 83-100.  The Agreements indicate the date

and time that each plaintiff checked the box signing and affirming that he or she had read,

understood, and agreed to the terms of the Consumer Loan and Arbitration Agreement, as

well as the IP address from which he or she did so.  In particular:

a. Plaintiff Steven Pike electronically signed Golden Valley's Consumer Loan and

Arbitration Agreement on August 2, 2016.  Ex. 83 at 8 (Steven Pike 8/2/2016 Loan

Agreement).

b. Plaintiff Sherry Blackburn received in total four loans from Majestic Lake. She

completed her first loan application on October 19, 2015. She electronically signed

Majestic Lake's Consumer Loan and Arbitration Agreement that same day.  Ex. 84

at 12 (Sherry Blackburn 10/19/2015 Loan Agreement). Ms. Blackburn received a

second loan from Majestic Lake on January 6, 2016. Ex. 85 at 10 (Sherry Blackburn

1/7/2016 Loan Agreement). She received another loan on April 14, 2016, and a

fourth on May 23, 2016. Ex. 86 at 8 (Sherry Blackburn 4/14/2016 Loan

---

[13] In mid-2017, we implemented new features to our websites that included an additional
required box to be checked by loan applicants. This box and its associated text is located at the top
of the page and is entitled "Tribal Ordinance." Next to the box the website notes: "I consent to the
jurisdiction of the Habematolel Pomo of Upper Lake and agree that its Tribal laws govern the
application for services, as well as all related transactions, which all occur with Tribal jurisdiction."
In addition to this language, a brand-colored hyperlink in the words "View/Print" is available and
directs the applicant to the agreement itself. This box was viewed and checked by Elwood
Bumbray, as well as Willie Rose on his third loan.

Agreement); Ex. 87 at 9 (Sherry Blackburn 5/23/2016 Loan Agreement). Each of these additional loans required her to go through the same application process, including assertions for each separate loan that she read, understood, and agreed to the Consumer Loan and Arbitration Agreement. She was also required to sign each new Agreement.

c.   Plaintiff Elwood Bumbray electronically signed Majestic Lake's Consumer Loan and Arbitration Agreement on November 9, 2017.  Ex. 88 at 7 (Elwood Bumbray 11/9/2017 Loan Agreement).

d.   Plaintiff George Hengle received in total three loans from Majestic Lake Financial. He completed his first loan application on September 12, 2016, the same day on which he electronically signed Majestic Lake's Consumer Loan and Arbitration Agreement.  Ex. 89 at 8 (George Hengle 9/12/2016 Loan Agreement). He received a second loan on September 28, 2016, and a third on October 24, 2016, Ex. 90 at 8 (George Hengle 9/28/2016 Loan Agreement); Ex. 91 at 9 (George Hengle 10/24/2016 Loan Agreement). Each of these additional loans required him to go through the same application process, including assertions for each separate loan that he read, understood, and agreed to the Consumer Loan and Arbitration Agreement. He was also required to sign each new Agreement.

e.   Plaintiff Tiffani Myers received in total two loans from Mountain Summit Financial. She completed her first loan application on July 19, 2016, the same day on which she electronically signed Mountain Summit's Consumer Loan and Arbitration Agreement. Ex. 92 at 8-9 (Tiffani Myers 7/19/2016 Loan Agreement). She received a second loan on September 9, 2016,. Ex. 93 8-9 (Tiffani Meyers

9/9/2016 Loan Agreement).   Each loan required her to go through the same application process, including assertions for each separate loan that she read, understood, and agreed to the Consumer Loan and Arbitration Agreement. She was also required to sign each new Agreement.

f.   Plaintiff Sue Collins in total received three loans from Mountain Summit Financial. She completed her first loan application on January 14, 2016, the same day on which she electronically signed Mountain Summit's Consumer Loan and Arbitration Agreement. Ex. 94 at 8-9 (Sue Collins 1/14/2016 Loan Agreement). She received a second loan on May 19, 2016, and a third on February 10, 2017. Ex. 95 at 8-9 (Sue Collins 5/19/2016 Loan Agreement); Ex. 96 at 8-9 (Sue Collins 2/10/2017 Loan Agreement). Each of these additional loans required her to go through the same application process, including assertions for each separate loan that she read, understood, and agreed to the Consumer Loan and Arbitration Agreement. She was also required to sign each new Agreement.

g.   Plaintiff Willie Rose in total received three loans from Silver Cloud. The first was on October 29, 2016, the same day on which he electronically signed Silver Cloud's Consumer Loan and Arbitration Agreement. Ex. 97 at 9 (Willie Rose 10/29/2016 Loan Agreement). He received a second loan on June 2, 2017, and a third on January 29, 2018. Ex. 98 at 7 (Willie Rose 6/2/2017 Loan Agreement); Ex. 99 at 8 (Willie Rose 1/29/2018 Loan Agreement). Each loan required him to go through the same application process, including assertions for each separate loan that he read, understood, and agreed to the Consumer Loan and Arbitration Agreement. He was also required to sign each new Agreement.

h. Plaintiff Lawrence Mwethuku electronically signed Golden Valley's Consumer Loan and Arbitration Agreement on July 29, 2013. Ex. 100 at 5 (Lawrence Mwethuku 7/29/2013 Loan Agreement). His agreement was different from the other plaintiffs in that it included a provision allowing him to opt out of the arbitration process, and he sent Golden Valley written notice that he had opted out of the arbitration process on September 6, 2013. Ex. 101 at 1 (Lawrence Mwethuku Opt Out Letter). Mr. Mwethuku's loan agreement explained that by opting out of the arbitration provisions, he agreed to bring any disputes arising from the agreement before the Tribal Forum, and that he consented to the Tribal Forum's jurisdiction over such claims.

## XIX.   The Tribe Designed The Consumer Loan And Arbitration Agreement To Provide A Convenient, Efficient, And Fair Dispute-Resolution Process.

227. Plaintiffs' Consumer Loan and Arbitration Agreements contain largely identical language providing that all disputes related to the agreement will be resolved by binding arbitration pursuant to Tribal law. For ease of reference, I will describe the language in the agreement between plaintiff Tiffani Myers and Mountain Summit, which is attached to this affidavit as Ex. 93; I will refer generally to language in "the Agreements" with respect to all of plaintiffs' Consumer Loan and Arbitration Agreements, and I will note any instances in which one of the Plaintiffs' agreements differs from the quoted language.

228. The Tribe took several steps to make sure that the Agreements were especially clear with respect to the dispute-resolution process and governing law. Each is identified at the top of the first page as the "**CONSUMER LOAN AND ARBITRATION AGREEMENT**." Ex. 93 at 1 (Tiffani Myers 7/19/2016 Loan Agreement). The dispute-resolution section

begins with a section titled "**RESOLVING DISPUTES; WAIVER OF JURY TRIAL**

**AND ARBITRATION PROVISION**," which provides that:

> In general, binding arbitration is a process in which persons with a dispute
> waive their rights to file a lawsuit in court and waive their rights to have a
> jury trial. Instead, the parties agree to submit their disputes to a neutral third
> person (an "arbitrator") for a decision. Arbitration provisions are private
> and less formal than court proceeding[s]. Each party to a dispute has an
> opportunity to present their evidence to the arbitrator regarding the dispute.
> After considering each party's evidence and arguments, the arbitrator then
> issues a final and binding decision resolving the dispute. We will follow
> and you agree to follow Our policy of arbitrating all disputes, including the
> scope and validity of this Arbitration Provision. As part of agreeing to
> arbitrate any dispute, You explicitly waive any right You may have to
> participate in any class action against Us.

*Id.* at 6.[14]

229.   The Agreements further emphasize, in all capital letters, the rights the applicant is waiving,

by requiring the borrower to "acknowledge and agree that by entering into this Arbitration

Provision:"

> (a) YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL
> BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST
> US OR RELATED THIRD PARTIES;
>
> (b) YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT
> RESOLVE ANY DISPUTE ALLEGED AGAINST US OR
> RELATED THIRD PARTIES; and
>
> (c) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A
> REPRESENTATIVE . . . IN ANY REPRESENTATIVE
> CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A
> CLASS OF CLAIMANTS, IN ANY LAWSUIT FLED AGAINST
> US AND/OR RELATED THIRD PARTIES.

---

[14] Mr. Mwethuku's agreement contains a slightly different version of the second-to-last
sentence. It states: "Unless You opt out of the arbitration process set forth below, We will follow
our Policy of arbitrating all disputes with customers, including the scope and validity of this
Arbitration Provision." Ex. 100 at 3.

230. Ex. 92 at 6. To avoid ambiguity, the Agreements further state that "[a]ll disputes including any Representative Claims against Us and/or related third parties shall be resolved by binding arbitration only on an individual basis with You." *Id.* at 6.  The Agreements explain that they are defining "dispute" with "the broadest possible meaning" and that definition expressly includes, among other things:

- "all claims, disputes, or controversies arising from or relating directly or indirectly to the signing of this Arbitration Provision, the validity and scope of this Arbitration Provision and any claim or attempt to set aside this Arbitration Provision;"
- "all tribal, federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to this Agreement, the information You gave Us before entering into this Agreement, including the customer information application, and/or any past agreement or agreements between You and Us;"
- "all counterclaims, cross-claims and third-party claims;"
- "all common law claims, based upon contract, tort, fraud, or other intentional torts;"
- "all claims based upon a violation of any tribal, state or federal constitution, statute or regulation;"
- "all claims asserted by Us against You, including claims for money damages to collect any sum We claim You owe us;"
- "all claims asserted by You individually against Us" and related third parties "including claims for money damages and/or equitable or injunctive relief;" and
- "all claims asserted by You . . . as a representative and member of a class of persons, or in any other representative capacity, against Us and/or related third parties . . . ."

*Id*.

231. In addition to ensuring that borrowers are aware of the applicable dispute-resolution process, the Tribe took steps to offer both sides to any dispute a fair and efficient resolution. For example, the Agreements give the borrower the right to select one of the two most prominent national arbitration organizations (the American Arbitration Association ("AAA") or JAMS) to conduct the arbitration, and the "rules and procedures used by the applicable arbitration organization applicable to consumer disputes" govern the dispute in tandem with laws of the Habematolel Pomo of Upper Lake Tribe. *Id.* at 6-7.  Moreover,

in addition to the rules of the applicable arbitration organization, the Agreements mandate that any arbitration be "governed by" the Federal Arbitration Act and require that the arbitrator "apply applicable substantive Tribal law consistent with the Federal Arbitration Act." *Id.* at 7. As I describe below, Tribal law incorporates numerous substantive provisions of federal consumer protection law. The Agreements also allow the arbitrator to award statutory damages and reasonable attorneys' fees and expenses if allowed by statute or applicable law. *Id.*

232. In distinction to some other dispute-resolution systems in our industry, we have chosen to make the decision of the arbitrator final and binding on both sides. *Id.* There is no avenue for the Tribe to seek further Tribal review of an unfavorable decision.

233. The Tribe chose these procedures because the rules cited are designed for disputes raised by consumers and help ensure a neutral and fair arbitration process.

234. Furthermore, the Agreements are written to ensure that the borrower can meaningfully participate in the process. Regardless of which party demands arbitration, the borrower may request that the arbitration take place within 30 miles of his or her home or another mutually agreed-upon location. *Id.* And we have agreed to advance the borrower's portion of the arbitration expenses (which we agree not to recoup in the event the borrower is successful). *Id.*

235. In short, the Tribe is invested in resolving disputes fairly and conveniently, and it has always sought to provide consumers with an arbitration mechanism that is fair to and binding on both parties. We have entered into arbitration with one consumer in the past. Donald Robinson, a resident of Nevada, sought leave to sue Majestic Lake for unlicensed high-interest lending allegedly contrary to Nevada statute, and the parties submitted the

dispute to a JAMS arbitrator.  A copy of the arbitrator's order is attached to this affidavit as Ex. 102.  The arbitrator first assessed the agreement's delegation clause and concluded that it was valid.   The arbitrator then determined that the loan contract was not unconscionable, noting that the requirements to arbitrate claims and have claims be governed by Tribal law appeared in multiple places in the contract, and that the application of "the law of another sovereign nation does not necessarily render a contract unconscionable."  Ex. 102 at 9 (Decision and Order Re: Class Action Waiver and Enforcement of the Arbitration Agreement). The arbitrator did, however, allow the claimant to submit additional briefing on several issues, including on the enforceability of any award against Tribal Defendants and the "take it or leave it" nature of the loan contract as applied to the claimant.  *Id.* at 11.  The matter was subsequently resolved outside arbitration.

## XX.    **The Tribe Took Steps To Ensure That Applicants Are Aware That They Are Contracting With Arms Of The Tribe And That Their Agreements Are Governed By Tribal Law.**

236. Plaintiffs' loan agreements also made clear that the lending entity with which they contracted was an arm of the Tribe and entitled to the Tribe's sovereign immunity.  For example, the first paragraph of the loan terms in Ms. Myers's agreement states that "In this Agreement, 'Company,' 'We,' 'Our' and 'Us' means Mountain Summit Financial, Inc., an arm of the Habematolel Pomo of Upper Lake Tribe of Indians that is a federally recognized Native American Indian Tribe."  Ex. 93 at 2.  The next paragraph, titled "Promise to Pay," explains that the borrower "promise[s] to pay to the order of Mountain Summit Financial Inc., an arm of the Habematolel Pomo of Upper Lake Tribe of Indians, a federally recognized Native American Indian Tribe, or any subsequent holder of this Agreement any

and all sums due hereunder." *Id.* at 2-3.  The agreement later highlights the consequence of these earlier provisions, explaining in the "Preservation of Sovereign Immunity" provision that:

> This loan and all related documents are being submitted by you to us as an economic arm, instrumentality, and corporation owned by the Tribe.  The Tribe is a federally-recognized Tribe and enjoys governmental sovereign immunity.  Because we and the Tribe are entitled to sovereign immunity, you will be limited as to what claims, if any, you may be able to assert against the Tribe and Us. Any complaint must be submitted by you or on your behalf to us as described below.  It is the express intention of the Tribe and Us operating as an economic arm of the Tribe, to fully preserve, and not waive either in whole or in part, sovereign governmental immunity, and any other rights, titles, privileges, and immunities, to which we and the Tribe are entitled.  To protect and preserve the rights of the parties, no person may assume a waiver of sovereign immunity.

*Id.* at 6.  With the exception of Mr. Mwethuku's agreement, the agreements signed by the remaining Plaintiffs contain the same language.[15]

237. The loan agreements also specified that the loans were governed by tribal law.  In a provision titled "Governing Law," the agreements state:

> This Agreement is made and accepted in the sovereign territory of the Habematolel Pomo of Upper Lake, and shall be governed by applicable tribal law, including but not limited to the Habematolel Tribal Consumer Financial Services Regulatory Ordinance.  You hereby agree that this governing law provision applies no matter where You reside at the time You request Your loan from Mountain Summit Financial, Inc.   Mountain Summit Financial, Inc. is regulated by the Habematolel Pomo of Upper Lake Tribal Consumer Financial Services Commission.  You may contact the Commission by mail at P.O. Box 516 Upper Lake CA 95485.

*Id.* at 8.

---

[15] Although Mr. Mwethuku's agreement did not contain the "Preservation of Sovereign Immunity" provision, it did include the "Promise to Pay" provisions which made clear that the relevant lending entity, Golden Valley, was "an arm of the Habematolel Pomo of Upper Lake Tribe of Indians."  Ex. 100 at 2-3.

238.  Other provisions of the agreement similarly mentioned Tribal law, including those setting forth the process for arbitration, the location for arbitration, Tribal Defendants' commitment to advance the borrower's fees for arbitration, and the law that governs in arbitration.

239.  Although the Agreements are expressly governed by Tribal law, the Tribe has crafted its own consumer-protection law to guarantee borrowers relevant federal protections. Specifically, the Habematolel Pomo of Upper Lake Tribal Consumer Financial Services Regulatory Ordinance, which is incorporated by reference into the Agreements and attached to this affidavit as Ex. 7, explains that it "is essential that the Tribal government regulate Consumer Financial Services in a manner commensurate with Tribal law and policy, and applicable federal law."  It also provides that a licensee under the Ordinance, like the lending portfolios, "shall conduct business in a manner consistent with principles of federal consumer protection law, including, without limitation," the following:

   a.   Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §§ 5491-5493;

   b.   Truth in Lending Act, 15 U.S.C. § 1601 et seq., and related regulations at 12 C.F.R. Part 226;

   c.   Consumer Leasing Act, 15 U.S.C. §§ 1667 et seq., and related regulations at 12 C.F.R. Part 213;

   d.   Fair Credit Billing Act, 15 U.S.C. § 1666a;

   e.   Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., and related regulations at 15 C.F.R. Part 202;

    f.   Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq., and related regulations at 12 C.F.R. Part 205;

    g.   Fair Credit Report Act, 15 U.S.C. § 1681 et seq., and related regulations at 12 C.F.R. Part 222;

    h.   Privacy provisions of Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6901 et seq., and related regulations at 16 C.F.R. Part 313 and 16 C.F.R. Part 314;

    i.   Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., and related regulations at 16 C.F.R. Part 901;

    j.   Talent Amendment, 10 U.S.C. § 987, and related regulations of the Department of Defense at 32 C.F.R. Part 232;

    k.   Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, and related regulation at 47 C.F.R. § 64.1200;

    l.   Telemarketing Sales Rule at 16 C.F.R. § 310;

    m.   Section 5 of the Federal Trade Commission Act at 15 U.S.C. § 45(a);

    n.   Servicemembers' Civil Relief Act, 50 U.S.C. App. §§ 501-596.

Ex. 7 at 20-21 (Tribal Lending Regulatory Ordinance (2015)).

## XXI.    Our Tribe Has Engaged In Meaningful Government Outreach As A Testament To Its Commitment To Operating A Sustainable Business.

240.   Our Tribe has exercised its sovereign power in other ways beyond our robust legal and regulatory framework. We have actively sought opportunities to enter into cooperative agreements or compacts with states as a means to promote a transparent and collaborative government-to-government regulatory environment. In this endeavor I have met with governors, state and federal legislators, and regulators to explain the nature and function

of our business.  This effort further highlights our commitment to being a lasting participant in this industry.

241. By way of example, our Tribe successfully entered into a Memorandum of Understanding ("MOU") with the State of New Mexico in December 2014, which explicitly memorialized our Tribe's sovereign authority to engage in online short-term lending and acknowledged that the legislation enacted by our Tribe effectively regulates transactions between consumers and licensed lenders that occur on Tribal land, adheres to best practices, and does not violate federal or Tribal law.

242. In October 2018, the Tribe entered into another Memorandum of Understanding with the Northshore Fire Protection District of California ("NSFPD"), the county fire district located near reservation land.  *See* Ex. 104 (NSFPD HPUL MOU 2018).  The Tribe sought this MOU in order to memorialize how the NSFPD would provide medical and fire response services to the Tribe's new call center in the event of an emergency.  *Id.* at 2.  The MOU outlines a $25,000 contribution the Tribe made to the NSFPD in exchange for this support.  *Id.* at 4.  Importantly, this MOU recognized the parties' intent "jointly to strive to create an environment … in which the Tribe can create a well-trained and experienced workforce for the Tribe's e-commerce opportunities with the goal of creating an 'e-commerce' hub for the region … and improving the economy of the Tribe, the region and the state and reducing institutional dependence in the area." *Id.* at 3.

243. The California Department of Business Oversight's Information-Sharing Pilot program offers another example of the initiatives our Tribe has undertaken to foster government-to-government cooperation with states. Our Tribe collaborated with the Department of

Business Oversight to explore opportunities to develop a framework that facilitates information exchanges between regulatory authorities.

244. I have also personally attended and/or spoken at conferences of both Republican and Democratic State Attorneys General in which I have endeavored to educate state officials about our Tribe's disadvantaged history, our efforts toward economic self-reliance, and how rural tribes like ours use e-commerce to benefit of our Tribes and local communities. A presentation I co-authored at a 2019 conference of Republican State Attorneys General is attached. *See* Ex. 105 (RAGA Tribal Presentation). The purpose of this presentation was to make these officials aware of the Tribe's eagerness to pursue additional government-to-government information-sharing relationships. *Id.*

245. As a result of this effort, states—including the government of Virginia—continue to recognize that our business is a sovereign Tribal lending operation, as consumers themselves repeatedly acknowledge before they are issued a loan. *See* Ex. 2 (Letter from Commonwealth of Virginia State Corporation Commission, Bureau of Financial Institutions (Feb. 12, 2018)). Specifically, the Virginia Bureau of Financial Services recently concluded after investigating a consumer complaint regarding a Mountain Summit loan agreement that Mountain Summit was "an arm of the Habematolel Pomo of Upper Lake," and was thus "not required to be licensed under the laws that are enforced by the Bureau." *Id.* at 2.

246. We continue to pursue open dialogues and additional Memoranda of Understanding with other states, ever eager to work cooperatively and communicate openly.

XXII. **The Lending Portfolios Have Employed Tribal Members Whenever Possible And Will Employ More in the Future.**

247. Online lending is a very competitive business requiring a great deal of technical knowledge. Our Board made an early decision to retain non-Tribal members in day-to-day management positions when the Tribe could not find a Tribal member with the necessary technical knowledge for the job.

248. Our lending operation is generally staffed very leanly. In total, we employ fewer than 170 people, the majority of whom hold jobs at our call center or perform other duties for ULPS. The four lending portfolios themselves have no employees, as each relies on ULPS, TLE, and Pomo One for all logistical support and infrastructure under our shared services agreements.

249. We have a total of five TLE officers, aside from me, that oversee call center and other core services operations. Two of those officers are located in Overland Park, Kansas. The other three work remotely from different states throughout the country. These individuals travel to California and Overland Park often.

250. With the completion of our new call center facility on reservation land, we have also been able to expand employment opportunities for more Tribal members and will increase those opportunities in the near future. Building infrastructure on the reservation is difficult, particularly in e-commerce—until recently, our Tribe did not even have high-speed fiber access to the internet. But we overcame that obstacle and we have now expanded our call center to hold 80 seats that greatly increase the opportunity to employ Tribal members. In addition to the Executive Council, who compose the Board of each lending company, the companies currently directly employ four Tribal members and a member's spouse at the call center.

74

251. The Tribe is also proud of the jobs that our lending business has indirectly created for Tribal members. For example, the Tribe has used lending business revenue to employ Tribal members or spouses in the following positions:

- Cemetery maintenance director

- Tribal water operator

- Education director

- Two education coordinators

- Receptionist

- Tribal Programs and Services Coordinator

- Tribal historian and archivist

- A general Tribal work force where members perform entry-level manual labor as needed.

252. In addition, the lending business supports the Tribal employment provided by our Tribe's casino. The casino has never been profitable; it is located in a remote county that has many other casinos within tens of miles.  The Tribe thus relies heavily on income from its lending portfolios to keep the casino operable.  For years, the Tribe has avoided default on its casino only with revenue from its lending portfolios.  This means that the Tribal members who are employed by the casino could lose their jobs if not for the revenue from the Tribe's lending business.  We also employ other members of our local community, which has one of the highest unemployment and poverty rates in the state of California.

253. We are proud of the many employment opportunities that our lending business has created for our members, both directly and indirectly.  But ultimately, it is our sovereign right to determine the future of our people.  And as Chairperson of the Tribe, I am always cognizant

75

of the risk that our members will become dependent on government support, including government employment.  Our Tribe is small—with around 275 enrolled members—and its long and difficult history has left those members generally behind in terms of educational and employment prospects.

254.   It is our responsibility as a Tribal government to provide our citizens with education and training that allows them to seek out whatever opportunities they want—not just entry-level opportunities on Tribal land.  It is likewise essential that our members find jobs outside of Tribal country, so that they can spread our culture and share in the diversity and promise of the United States.  That is why we have never wanted all of our Tribal members to work within our business and lands.  It is important to look beyond employment opportunities created by our business for Tribal members.  The revenues generated by our business offer even greater opportunities through educational scholarships, childcare and work incentives that help our Tribal members grow and prosper on whatever self-determined path they choose for success – whether they work for us or not.

## XXIII.   <u>The Tribe Has Derived Increasing Profit From Our Lending Portfolios As Our Business Has Grown.</u>

255.   As noted throughout this affidavit, the vast majority of our Tribal operating budget comes from revenue from our four lending portfolios. Since the inception of each of the lending portfolios, the Tribe has received a monthly dividend from one or more of the four. That dividend first gets disbursed to the lending company's parent, TLE, and TLE then disburses a portion of the total of these dividends to the Tribal budget.

256.   Before the Tribe paid off its notes, it would use a portion of each lending company's net income each month to pay down its debt obligations. But as our portfolios have grown over

time, and as we have paid off those notes, our monthly share of income has grown. This progress is shown in the attached Ex. 106 (Portfolio Financial Summary Chart).

257. Ex. 106 is a summary chart reflecting the percentage of total earnings that remained with the Tribe and its companies from year to year (the "Tribal assets") versus the percentage of earnings that were paid to outside individuals (the "Participants" or "Noteholders," and collectively, the "non-Tribal share"). The non-Tribal share was calculated by totaling either the portfolio's annual fee payments to participants or the portfolio's annual debt repayments to noteholders (or both, in 2014 when the mergers were consummated). In the years that the Tribe's lending portfolio was still a party to participation agreements, all income that left each portfolio to be distributed outside the Tribe was in the form of payment of collected fees to participants. Once the portfolio executed its buyout agreements, all income that left the portfolio to be distributed outside the Tribe was in the form of payment to noteholders. Because the four portfolios executed and terminated participation agreements at different times, the month and year in which each portfolio's non-Tribal share switched from participation payments to noteholder payments is different.

258. The Tribal assets in each portfolio were calculated by subtracting the non-Tribal share from each portfolio's annual net operating income to arrive at the amount of income retained by the portfolio (the "net Tribal income"). But the summary chart also reflects the fact that each portfolio also provided TLE an additional dividend that was calculated off of gross profit (the "TLE dividend"). This dividend was distributed from each portfolio to TLE before operating expenses were subtracted from gross profit in order to arrive at net operating income. In other words, the Tribal share in this chart represents the total of each

77

portfolio's annual Tribal income plus the total annual TLE dividend. In addition, the summary chart shows the Tribe's annual earnings from ULPS and Pomo One.

259. Ex. 106 shows that the Tribe retained a substantial portion of its earnings, even when it was making payments to participants or noteholders. In 2013, when the Tribe first entered into its participation agreements, it retained 7.44% of its total earnings. *See* Ex. 106 (Portfolio Financial Summary). In 2015, when the Tribe was paying off its debt obligations to the former participants, the Tribe retained 36.39% of all earnings from its lending business, while the remainder went to paying off its notes. In 2018, when the majority of these notes were retired, the Tribe's take-home share of net portfolio income increased again to 39.37%. *Id.* And so far in 2019, now that the Tribe has retired all but one note, it has retained 71.43% of all earnings from its lending business. *Id.*

260. Ex. 4 provides a monthly breakdown of the Tribe's progress toward paying down its notes and the Tribe's concomitant increasing share of retained income. This monthly summary shows that the Tribe has retained 100% of Silver Cloud's earnings since August 2018. *See* Ex. 4 (Portfolio Monthly Summary). The Tribe has retained 100% of Mountain Summit's earnings since December 2018. *Id.* The Tribe has retained 100% of all Golden Valley earnings since March 2019. *Id.* And once the Tribe retires its one remaining note for Majestic Lake in early next year, the Tribe will fully retain 100% of income from its entire lending business.

261. As a result of this progress, the portfolios' monthly dividends to TLE have also grown substantially. For example, in the first five start-up months of its operation in 2012, Silver

Cloud was distributing $20,000 per month to TLE.  *See* Ex. 107 (Tribal Dividend Calc).[16]
By 2015, post buyout, Silver Cloud was distributing about $100,000 per month to TLE.
*Id.* That number increased to $200,000 per month by the second half of 2018. *Id.*  Similarly,
Golden Valley went from distributing only $20,000 per month in 2012 to approximately
$200,000 per month in 2018. *Id.*  Mountain Summit increased its dividend to TLE from
$20,000 per month in 2012 to approximately $65,000 per month in 2018. *Id.*  Majestic
Lake has more consistently distributed close to or well over $200,000 per month since its
inception, in part because the Tribe was able to negotiate more favorable terms with its
participant. *Id.*

262.   The Tribe has also always collected a substantial dividend from Pomo One. In 2015, Pomo
One's first full year of revenue generation, it distributed over $1,000,000.00 to TLE. And
by 2018, that annual distribution had increased to roughly $1,700,000.00. Unlike the four
portfolios and Pomo One, ULPS was never intended to generate revenue for the Tribe. It
was instead meant to support the portfolios. Nonetheless, TLE has also traditionally
received a smaller monthly dividend from ULPS: it collected about $30,000 from ULPS
each month from 2015 through 2018, for example.

263.   The progress of our lending business has resulted in a steady increase in profit to TLE, and
thus a corresponding steady increase in financial benefit to members of our Tribe. In 2013,
TLE collected just short of $950,000 from the lending portfolios. By 2015 that number had

---

[16] Ex. 107, (Tribal Dividend Calc), reflects the total dividend distributed from each lending
portfolio to its parent company, TLE, from year to year. The chart indicates that as the Tribe
continued to pay off its noteholders, the monthly dividends to TLE constituted a greater percentage
of each portfolio's gross profit.

increased more than five-fold to just over $5,000,000. And by the end of last year, TLE had collected a yearly total of just shy of $11,000,000 from its lending portfolios.

264. Our Tribe is well aware of the need to diversify business and revenue opportunities to protect the long-term sustainability of our economy. In order to do that, the Tribe maintains a substantial base of operating capital within each of the lending portfolios. So while the lending portfolios distribute a sizable percentage of their net income to TLE, they leave the remainder of revenue within the lending portfolios for growth, product development, reinvestment, and diversification.

265. A summary of each portfolio's dividend distribution to TLE in comparison to the income retained within each portfolio is attached as Ex. 5. This summary chart shows, for example, that in 2018, Silver Cloud distributed a $2,092,596.71 dividend to TLE while retaining $6,815,521.61 within its portfolio. *See* Ex. 5 (TLE Dividend vs. Portfolio Retention). In 2018 Mountain Summit distributed a $773,220.87 dividend to TLE while retaining $1,079,466.44 within its portfolio. In the same year, Majestic Lake distributed $1,600,000.00 to TLE while retaining $3,348,587.32 within its portfolio. And in 2018, Golden Valley distributed $2,521,293.41 to TLE. *Id.* Because Golden Valley was accelerating payment on sizable notes for all of 2018, the portfolio did not retain any net income. But now that the notes have been fully repaid, the portfolio has already retained $3,264,818.93 this year. *Id.*

## XXIV.    <u>Profits From Our Lending Portfolios Go Directly To Tribal Welfare.</u>

266. There is no question that our lending business was created for the express purpose of bettering the lives of members of our Tribe. All profits that are not reinvested in the lending

business go directly to Tribal program development, job creation, land acquisition, governmental support for Tribal members, cultural preservation, and community outreach.

267. Most notably, our lending business has allowed the Tribe to fully fund our own education department, put hundreds of thousands of dollars toward assistance for first-time home and auto purchases, and develop programs of varying scale that incentivize the pursuit of education, job stability, home ownership, care for our elders, and healthy living. *See* Ex. 108 (HPUL TLE Presentation). As our profits have grown, we have added new Nation-building programs and have expanded programs already in existence in order to better serve the members of our Tribe.

268. Tribal welfare programs made possible by our online lending business include:

- A loan program that allows tribal members to borrow up to $500 to be repaid with their quarterly distribution. Over the years the amount allowed to be borrowed has increased to $1,000 and members were given additional flexibility to choose how their loans would be repaid. *Id.* at 3.

- An Education Clothing Allowance Program that provides parents of school aged youth up to $200 for school clothing. Last year, our Tribe spent over $13,000 on new clothing for 57 students. We have budgeted $24,000 for this calendar year. *Id.* at 4.

- An Honored Elders Assistance Program that provides tribal elders a $500 monthly stipend. The Tribe gave grants to 21 Tribal members last year, totaling a $125,000 expenditure. *Id.* at 4.

- A Supplemental Assistance Self Sufficiency Program (SASSP) to reimburse adult tribal members up to $300 annually for general welfare living expenses such as

census

rent, mortgage, transportation, education and utilities payments. Over the course of the program, the annual cap for SASSP reimbursement has been increased and is currently at $1,200 annually for allowable expenses to be reimbursed. The Tribe has spent over $112,000 on this program this year. *Id.* at 5.

- A First Time Homebuyer Down Payment Assistance Program that provides Tribal members with $10,000 for a down payment on the purchase of a new home. The Tribe has been able to help more than a dozen of its members buy their first home since the program was created in 2014. *Id.* at 5.

- A housing assistance program for students. The Tribe has spent more than $150,000 to provide rental assistance to students pursuing higher education.

- A Youth Apprentice Program. The program includes a week-long orientation that includes assistance with a job search, applications and resumes, and the interview process. *Id.* at 6.

- A Youth Advancement Program to reward and incentivize continued education for tribal youth who graduate from middle school. Students receive $400 to put toward a computer purchase as well as $750 to spend on other high school expenses. As of 2018 the program has evolved to the Education Graduation Incentive Program, where it has expanded to include adults earning degrees and/or certificates from institutions of higher learning such as universities, junior colleges and trade schools. *Id.* at 7.

- An employment incentive program that provides cash assistance to those tribal members who were seeking self-sufficiency in four specific categories; employed,

seeking employment, full time student, or disabled. The purpose of this program is to encourage long-term employment among Tribal members. *Id.* at 7.

269. The Tribe has also donated hundreds of thousands of dollars to dozens of different local community projects, including providing uniforms for local youth sports teams; assisting with many family members' funeral expenses; funding various youth summer camps; replacing the lights on the local high school football stadium; funding a local first responder group; and funding high school and middle school class field trips. *Id.* at 18-23. The Tribe started making donations to the local community as soon as it began to receive income from its lending business, and those donations have steadily increased over the years. In 2017 alone, the Tribe donated $166,758.75 to worthy local causes. *Id.* at 21-22. It has always been important to the Tribe to show that it intends to be a lasting and generous presence in its surrounding community.

270. We have also used funds from our lending business to restore some of our lost land, to expand assistance to our most vulnerable populations, and to assist working parents. Land restoration has been an important part of our Tribe's quest to reestablish our land base to what it once was.  We have been able to acquire over $1 million of new land since 2014. We have reserved this land to build Tribal administration offices, and to build a Tribal education center and community center. *See Id.* Some of this restored land is of great cultural and historical significance to our People. For example, the success of our lending business has enabled us to reacquire our ancestral cemetery.

271. Similarly, we have used some portion of profits to fund a program that reintroduces our members to Tribal culture, traditions, and our language.  Our People have enjoyed learning about our traditional dance, crafts, and dress. *Id*.  We hope that this program will help to

ensure that our younger generation preserves our traditions, and we believe that by preserving and restoring our culture, traditions, and language, we aid our People overcoming the adversity that generations of failed federal policy have imparted.

272.   Our Tribe's success in the lending industry has created a great sense of pride for our People and has garnered admiration from our neighboring community. For more information on all of these programs and our charitable giving, *see* Ex. 108.

## XXV.       Our Tribe Would Be Financially Devastated Without Online Lending.

273.   The lending business has been the engine for all of the economic, social, and educational progress our Tribe has made over the past decade.  Simply put, this business has become integral to our Tribe's nation-building effort. If the Tribe ceased its involvement in online lending, this progress would be completely halted.

274.   The vast majority of the Tribe's governmental operating budget comes from revenue from our lending portfolios. Although the Tribe receives some federal grant money, those federal funds are strictly earmarked; the Tribe's lending business income thus funds the vast majority of governmental services and Tribal programs.    Tribal Enterprise Operations ("TEO") is the umbrella account that controls all profit and expenses from the Tribe's business ventures—namely, its lending business and casino. The majority of Tribal welfare programs and day-to-day governmental operations are funded through a smaller Tribal administrative budget, and all money that flows to the administrative budget comes from the TEO budget. In 2018, the sole source of revenue to the TEO budget was a $4,722,255.00 dividend from TLE.  Ex. 109 (TEO 2018 Worksheet).  The TEO then distributed $2,912,305.00 of that revenue to fund the Tribe's administrative budget. This $2,912,305.00 distribution constituted the entirety of the Tribe's 2018 administrative

budget. *See* Ex. 110 (2018 Tribal Admin Budget vs. Expenditure) (noting that the Tribe's overall administrative budget for 2018 was $2,912.305.00).

275.    By comparison, our 2019 Tribal administrative budget projects that the Tribe will spend $2,949,774.51, 100% of which will come from the same annual TEO distribution. *See* Ex. 111 (2019 Tribal Admin Budget vs. Expenditure).   Our Tribe has thus reached a point where it could not function effectively without the income it receives from our lending portfolios.

276.    Other than servicing one remaining debt obligation related to Majestic Lake (discussed above at paragraphs 187 and 188), all the revenues from the lending operations are used to ensure the sustainability of the business and to provide opportunities to Tribal citizens. Revenues have increased steadily over the history of the Tribe's lending business and have made possible the creation and expansion of numerous tribal welfare programs.

277.    The progress of these portfolios and their distribution to the Tribal budget in just a few short years is remarkable, and the Tribal programs we have created over that time were made possible by the success of our lending portfolios. Knowing how important this business was to the future of the Tribe, I and the rest of the Tribal Executive Council did everything we could to make our dream of this progress a reality.

278.    It takes time to re-build a Nation, overturning a century of decisions that created a dependent, uneducated, and unskilled society left in abject poverty with little hope that those conditions would ever change. It has been especially challenging given the many false starts we had based on negative interactions with the federal government.  We are fortunate that e-commerce has allowed us to take substantial steps towards self-sufficiency

and self-determination.  Forcing us to stop the progress we have made would be a crippling blow that would prevent our People from fully realizing their potential.

**XXVI.**      **Conclusion.**

In this affidavit, I have endeavored to explain in detail the process by which our Tribe has built for itself a successful online lending business. We entered this industry in 2012 with no money, experience, or expertise. We will close out 2019 with an almost debt-free, successful online lending operation that has always been completely Tribally controlled and that has made an immeasurable impact on the lives of every single member of our Tribe. I have personally learned the industry and personally guide all aspects of our business with the cooperation and blessing of our Boards.  Our success illustrates our desire to determine our own future through financial independence and self-sufficiency.

I declare under penalty of perjury that the foregoing is true and correct. I also declare under penalty of perjury that each exhibit attached to this affidavit is a true and correct copy of that document.

Sherry Treppa

See Attached
Notarial Document

6/20/2019

87

# CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA

COUNTY OF SANTA BARBARA

On _June 20, 2019_ before me, Adan Rocha, Notary Public personally appeared

_____ Sherry Trepp _____

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(s), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



Commission Expires: 07/28/2021

ADAN ROCHA
Notary Public – California
Santa Barbara County
Commission # 2207521
My Comm. Expires Jul 28, 2021

---

**OPTIONAL**

Description of Attached Document: _Affidavit page 87_

_____

_____

Number of Pages:_____
Document Date:_____
Capacity of Signer(s):

Trustee
Power of Attorney
CEO/CFO/COO
President/ Vice-President/ Secretary/ Treasurer

Other:_____