# EXHIBIT 104

**MEMORANDUM OF UNDERSTANDING**

This Memorandum of Understanding ("MOU") is made this 26th day of October, 2018, by and between the Northshore Fire Protection District ("NFPD") and the Habematolel Pomo of Upper Lake ("Tribe"). (The capitalized terms used in this MOU shall have the meanings set forth in Section 1 below).

**RECITALS**

**WHEREAS**, the Tribe wishes to first recognize and thank the NFPD and all local state and federal emergency responders in their heroic efforts to protect our region, including our Tribal members, Tribal lands and our Tribal properties, from the massive fires known as the Mendo-Complex Fires; and

**WHEREAS**, during the dark days of federal termination, the United States unsuccessfully attempted to terminate the Tribe pursuant to the California Rancheria Act, but after banding together to protect their government and culture, the members of the Tribe prevailed in the lawsuit entitled *Upper Lake Pomo Association, et al., vs. Cecil Andrus*, et al., No. C-75-0181-SW ultimately obtaining a judgement finding that termination was not legally concluded thus recognizing that the Tribe has always remained a federally recognized sovereign Native American Tribe with continuous recognition by the federal government; and

**WHEREAS**, inclusion of the Tribe by U.S. Department of Interior, Bureau of Indian Affairs, on the Federally Recognized Indian Tribe List Act of 1994 (25 U.S.C. 479a) confirms that the Tribe is a federally recognized tribe for which Congress has explicitly expressed a federal policy to promote tribal self-determination and economic development; and

**WHEREAS**, after it overcame the challenges of past and disastrous federal policies, the Tribe regained its place as a federally-recognized, sovereign Indian tribe which possesses the inherent powers of the self-government and self-determination, and as such, the Tribe recognizes the important, cooperative and constructive role it has and can continue to play in the sovereign relationships with the local, state and national governments; and

**WHEREAS**, having been deprived of a traditional tax base, the Tribe has built business enterprises to provide the Tribe with governmental revenues for its operations and programs and to play an important role in the economy of the region. The Tribe believes strongly in the concept that all sovereigns (federal, state and local) should work cooperatively to better the quality of life for all of its citizens because the best way to advance the Tribe and its members is through advancement of all people in the the region, the state and nation; and

**WHEREAS**, due to its location in a beautiful, yet remote area, the Tribe, pursuant to its inherent sovereign authority and right to self-determination as recognized by the United States Congress in, among other statutes, the Native American Business Development, Trade Development and Tourism Act of 2000 (25 U.S.C. § 4301et. seq.), has turned to electronic commerce to bring customers to its wholly-owned tribal businesses including its online consumer financial services enterprises pursuant to duly enacted tribal laws authorizing the conduct of these business operations and subjecting each to intense regulation for the protection of all consumers by the Tribal Financial Services Regulatory Commission; and

**WHEREAS**, the Tribe and the NFPD, among other local and state authorities, wish jointly to strive to create an environment with educational and recruitment opportunities in the region over time, in which the Tribe can create a well-trained and experienced workforce for the Tribe's e-commerce opportunities with the goal of creating an "e-commerce" hub for the region providing well-paying jobs for Tribal members and Tribal neighbors and improving the economy of the Tribe, the region and the state and reducing institutional dependence in the area; and

**WHEREAS**, the Tribe provides many services for its members such as emergency assistance, substance abuse rehabilitation, child services, educational services, work incentives and elder care services and by doing so allows the County to better serve others by reducing the load on the County's and the area's already strained services; and

**WHEREAS**, the Tribe is currently constructing the Call Center (as defined in Article I) on Tribal Trust Lands to provide support services to the Tribe's e-commerce businesses and has existing smaller Facilities (as defined in Article I); and

**WHEREAS**, the Tribe and NFPD have been working closely to determine what off-reservation impacts the Call Center and the increased employment on Trust Land would have on the NFPD, and have been assessing how to resolve such impacts with the NFPD, and where necessary, assess the appropriate level of funding the NFPD would need to off-set any such potential impacts; and

**WHEREAS**, the Tribe desires to promote and provide a clean and safe environment for employees and visitors to the Call Center by ensuring adequate response by fire and medical response services; and

**WHEREAS**, although not legally required to do so, the Tribe nevertheless desires to make voluntary contributions to the NFPD to help mitigate any potential impacts of the Call Center on the cost of operations of the NFPD; and

**WHEREAS**, the Tribe and the NFPD acknowledge that the contributions to be made by the Tribe to the NFPD pursuant to this MOU are voluntary contributions by the Tribe to the NFPD and are not intended to be, and do not constitute, a tax, fee, charge or assessment by the NFPD to the Tribe, and, but for this MOU, the NFPD would not receive such contributions from the Tribe; and

**WHEREAS**, by approving, executing, delivering and implementing this MOU, the NFPD does not intend to commit itself to support, or to otherwise exercise discretionary judgment over, the Tribal Trust Lands, the Call Center or other Facilities; and

**WHEREAS**, the Tribal Trust Lands and the Call Center are not "projects" of the County within the meaning of CEQA and are not subject to the discretionary approval of the County or NFPD; and

**WHEREAS**, the NFPD does not have legal authority to deliberate on, approve, disapprove, or otherwise exercise judgment regarding the Call Center or the Facilities; and

**WHEREAS,** the NFPD is therefore not deliberating on, approving, supporting, disapproving or otherwise exercising judgment regarding the Call Center and the Facilities by approving, executing, delivering and implementing this MOU; and

**WHEREAS,** the Tribe is not legally required to enter into this MOU in order to to develop and operate the Call Center or Facilities; and

**WHEREAS,** the NFPD and the Tribe desire to establish a cooperative and mutually respectful relationship and to address other issues of mutual interest to the NFPD and the Tribe.

**WHEREAS,** the Tribe and the NFPD have an excellent history of working cooperatively to improve the quality of life for the local area; and

**WHEREAS,** the NFPD and the Tribe reiterate their dedication to cooperative efforts to improve the quality of life for the region, and the mutual respect each has for the sovereignty of the other, and their desire to address local issues in a cooperative and mutually respectful way; and

**WHEREAS,** in this spirit of advancing the region for all peoples, the Tribe and the NFPD previously entered into an MOU on November 29, 2006 addressing the Tribe's Trust Land acquisition and casino project (the "2006 MOU"); and for clarity, this MOU is separate from and does not supersede, preempt, amend or in any way affect the 2006 MOU; and

**WHEREAS,** this MOU shall serve as evidence of the continued goodwill and cooperation between the Tribe and the NFPD in fostering a mutually respectful government-to-government relationship that will serve the mutual interests of the NFPD and the Tribe.

**NOW, THEREFORE,** the Parties hereby agree as follows:

**I.   DEFINITIONS.**

The terms not defined elsewhere in this MOU shall have the following meanings:

"Call Center" means the development and operation by the Tribe of the approximately 10,000 square foot Facility of which approximately half is used for the Call Center and the other half for the Tribe's governmental offices on the Trust Property scheduled for completion and operations in late-2018.

"Chairperson" shall mean that person elected through a Tribal election to serve as Chairperson of the Tribe's Executive Council pursuant to the Tribe's Constitution.

"County" means the County of Lake, and its Departments, agencies and subdivisions.

"CEQA" means the California Environmental Quality Act (California Public Resources Code § 21000 et seq.) and the guidelines promulgated under such statute, as the same may be amended or modified from time to time.

3

"Executive Council" means the governing body of the Tribe pursuant to Article IV of the Tribe's Constitution consisting of seven members elected at large from the eligible voters of the Tribe.

"Facility" means any commercial building hosting the e-commerce businesses of the Tribe including the Call Center and any other building or modular unit hosting an activity that is directly related to Tribal e-commerce located on Tribal Trust Lands, and shall include Facility personal property, furnishings, and equipment contained therein.

"Financial Services Enterprises" means those financial services entities wholly-owned and operated by the Tribe and regulated by the Tribal Financial Services Regulatory Commission.

"MOU" means this Memorandum of Understanding, as the same may be amended by mutual written agreement of the Tribe and the County from time to time.

"NFPD" means the Northshore Fire Protection District, a California Special Fire Protection District formed pursuant to the California Health and Safety Code and the California Resources Code that provides emergency and fire protection services in Lake County, California.

"Party" means the NFPD or the Tribe.

"Parties" means the NFPD and the Tribe.

"State" means the State of California.

"Tribe" means the Habematolel Pomo of Upper Lake, a federally recognized Indian Tribe.

"Trust Lands" means property held in trust by the United States for the exclusive benefit of the Tribe.

## II. MITIGATION MEASURES.

A. General Contribution to NFPD. The NFPD and the Tribe recognize and agree that the Tribe's construction and operation of the Call Center and associated Facilities will have an impact upon the NFPD's operations and services throughout its service area, including among other things additional activities on or near the Trust Lands which may result in an increased need for emergency and fire services. The effect of the Call Center and associated Facilities may also increase emergency and fire services off Tribal Lands and within the County and other public entities. Therefore, in recognition of these potential impacts and demands upon the NFPD resulting from the Call Center and related Facilities, the Tribe agrees to make an annual contribution to the NFPD in the amount of $25,000 in four equal installments within ten days of the close of each quarter commencing at the end of the third quarter 2018 and continuing so long as this MOU is in effect or as modified below.

B. Term or Modification of Annual Contribution.

The Tribe shall continue to make the contributions set forth in Section II.A above unless:

1. The Tribe's Executive Council determines that its Financial Services Enterprises have insufficient cash flows in any particular quarter to fund that quarter's contribution; or

2. The occurrence of a Force Majeure event pursuant to Article V of this MOU; or

3. Either the NFPD or the Tribe terminate this MOU pursuant to Article IV of this MOU.

C. Additional Fire and Safety Mitigation by Tribe:

1. Evacuation Plan. Tribe shall provide a copy of its Emergency Evacuation Plan to the NFPD prior to commencing operations of the Call Center and ensure any updates or modifications to the plan are provided to NFPD upon implementation.

2. Fire Safety Features.

   (a) Acknowledging the lack of jurisdiction over the Call Center by the State, the Tribe has determined to voluntarily construct the Call Center in a manner consistent with applicable State Building Code Standards, and it will be equipped with fire sprinklers.

   (b) Paved access shall be provided to the Call Center for use by emergency personnel. Fire hydrants have already been installed in front of the Tribe's Casino for use by fire fighters.

3. Spark Arrestors. In constructing or modifying the Call Center, construction equipment and power tools shall be equipped with spark arrestors, as applicable, and maintained in good working order.

4. Storage of Combustible Materials. In constructing or modifying the Call Center, staging areas, welding areas, or areas slated for development using spark-producing equipment shall be cleared of dried vegetation or other materials that could serve as fire fuel. To the extent feasible, the contractor shall keep these areas clear of combustible materials in order to maintain a firebreak.

5. Hazardous Materials. In order to mitigate potential impacts of hazardous materials relating to the Call Center and associated Facilities and the surrounding community, the Tribe agrees to adopt the following mitigation measures:

   (a) If contaminated soil or groundwater or other suspected contamination is encountered during Call Center construction, work shall be halted in the affected area and the type and extent of the contamination shall be determined. A qualified professional, in consultation with appropriate regulatory agencies, shall then develop an appropriate method to remediate the contamination. If necessary, the Tribe shall implement a remediation plan in conjunction with continued Facility construction.

    (b)    Personnel shall follow written standard operating procedures for filling and servicing construction equipment and vehicles.

**III. Services to be Provided by NFPD.**

    A.    General Services. The NFPD and the Tribe recognize and agree there is a significant need for emergency and fire services provided by the NFPD at or near the Call Center and associated Facilities. Therefore, in recognition of these potential needs, the NFPD agrees to provide emergency and fire services to the Tribe including, but not limited to:

    1.    Fire and Hazard Response. This service includes, but is not limited to, responding to calls relating to fire prevention and fire suppression, hazards, etc., which may require engine companies, fire-fighting equipment, the use, laying and connection of hoses, maneuvering of nozzles and direct fire streams, raising and climbing ladders, extinguishers and fire-fighting hand tools.

    2.    Paramedic and Ambulatory Services. This aid would include, but not limited to, responding to calls for assistance requiring immediate medical attention or transportation to a nearby medical facility.

    3.    Public Service Response. This aid would include, but is not limited to, calls related to the rescue of trapped people or animals, protection of people which may require engine company, rescue squad, equipment cutters, rams, spreaders, air-bags, cutting torches, shoring equipment, lighting equipment, or generators.

    4.    Fire Investigation Service. This aid would include, but is not limited to, the following: investigation of major alarm fires and other fires mandated by NFPD policy, investigation of fires that appear to be significant in fire prevention practices, interviewing of witnesses, collection and preservation of evidence and comprehensive compilation of fire/emergency report data.

    5.    Fire Prevention and Inspection Services. This aid would include, but is not limited to, the following: community awareness and education about proper safety practices and identification and elimination of hazardous conditions that may pose a threat to life, the environment and property.

**IV. TERM AND TERMINATION**

    A.    Effective Date. The general effective date of this MOU is the date that it has been signed by the Tribe and the NFPD.

    B. Termination.

    1.    Written Notice for Termination unless terminated as provided herein. This MOU will remain in effect until superseded by a signed, mutual agreement of the Parties. A Party may withdraw from or otherwise terminate its participation in this MOU with no less than thirty (30) days written notice provided to the other Parties.

    2.    Information Retained After Termination of MOU. To the extent that a Party retains information upon termination of this MOU, all information provided by either Party shall continue to be treated in accordance with the terms of this MOU.

## V. FORCE MAJEURE.

If, due to Force Majeure (as hereinafter defined), an act of God, valid business considerations or in the event the Tribe ceases or suspends operations of its Financial Services Enterprises, the Parties' obligations under this MOU shall be suspended as of the date of such suspension or termination until such time as such operations are resumed. For the purposes of this Section, the term "Force Majeure" shall include, without limitation, the following: earthquake; flood; fire; other natural disasters; riots; war; terrorism; or the action of any state government or the federal government that impinges upon or negatively affects the Tribe's ability to conduct business.

## VI. DISPUTE RESOLUTION PROVISIONS.

In an effort to foster good relationships, the Parties agree that the highest ranking official of each Party shall meet with the other Parties and shall make their best efforts to resolve claims of any dispute specifically arising under this MOU by good faith negotiations.

## VII. MISCELLANEOUS.

    A.    Severability. If any provision of this MOU is held by a court of competent jurisdiction to be illegal, invalid, unenforceable, unauthorized, annulled, voided or set aside, under present or future laws, the remaining provisions of this MOU shall remain in full force and effect and shall not be affected by such provision or by its severance from this MOU. In the event of any such determination, the Parties shall enter into good faith negotiations to replace the prohibited or invalid provision with a valid provision, the effect of which comes as close as possible to that of the invalid provision.

    B.    Binding Agreement. This MOU is intended to be, and shall be construed to be, binding upon the Parties and all successors and successors-in-interest of each Party.

    C.    Amendments. The Parties may amend this MOU from time to time, provided that such amendments are agreed to in writing by all Parties.

    D.    Execution. This MOU may be executed in counterparts and by signature sent by facsimile or electronically, each of which shall be deemed an original for all purposes.

    E.    Authority. Each Party to this MOU represents and warrants that it has the requisite legal authority to enter into this MOU.

**IN WITNESS WHEREOF**, the Parties have executed this MOU as of the date first set forth above.

**NORTH SHORE FIRE PROTECTION DISTRICT**

*[signature]*
By: Mike Ciancio
Title: Fire Chief

**HABEMATOLEL POMO OF UPPER LAKE**

*[signature]*
By: Sherry Treppa
Title: Chairperson

8