**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

GEORGE HENGLE, SHERRY BLACKBURN,   :
WILLIE ROSE, ELWOOD BUMBRAY,     :  Civil Case No. 3:19-250 (REP)
TIFFANI MYERS, STEVEN PIKE, SUE      :
COLLINS, LAWRENCE MWETHUKU, *on behalf* :
*of themselves and all individuals similarly situated*, :
                  :
       Plaintiffs,        :
                  :
v.                  :
                  :
SCOTT ASNER; JOSHUA LANDY;     :
SHERRY TREPPA, CHAIRPERSON OF THE  :
HABEMATOLEL POMO OF UPPER LAKE   :
EXECUTIVE COUNCIL, *in her official capacity*; :
TRACEY TREPPA, VICE-CHAIRPERSON OF THE :
HABEMATOLEL POMO OF UPPER LAKE   :
EXECUTIVE COUNCIL, *in her official capacity*; :
KATHLEEN TREPPA, TREASURER OF THE  :
HABEMATOLEL POMO OF UPPER LAKE   :
EXECUTIVE COUNCIL, *in her official capacity*; :
IRIS PICTON, SECRETARY OF THE    :
HABEMATOLEL POMO OF UPPER LAKE   :
EXECUTIVE COUNCIL, *in her official capacity*; :
SAM ICAY, MEMBER-AT-LARGE OF THE   :
HABEMATOLEL POMO OF UPPER LAKE   :
EXECUTIVE COUNCIL, *in his official capacity*; :
AIMEE JACKSON-PENN, MEMBER-AT-LARGE :
OF THE HABEMATOLEL POMO OF UPPER  :
LAKE EXECUTIVE COUNCIL, *in her official capacity*; :
AMBER JACKSON, MEMBER-AT-LARGE OF THE :
HABEMATOLEL POMO OF UPPER LAKEMAN :
EXECUTIVE COUNCIL, *in her official capacity*; :
                  :
       Defendants.      :
_____ :

## FIRST AMENDED CLASS ACTION COMPLAINT

   COME NOW Plaintiffs, George Hengle, Sherry Blackburn, Willie Rose, Elwood

Bumbray, Tiffani Myers, Steven Pike, Sue Collins, and Lawrence Mwethuku ("Plaintiffs"), *on*

behalf of themselves and all individuals similarly situated, by counsel, and for their Class Action Complaint against Defendants, they allege as follows:

## INTRODUCTION

1.     This case involves an illegal lending enterprise that flouts state usury laws through the tribal lending business model—"the most recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012). Under this model, loans are originated through a company "owned" by a Native American tribe and organized under its laws—facilitating a dubious and legally incorrect claim that the loans are subject to tribal law, not the protections created by state usury and licensing laws. As the Supreme Court has repeatedly explained: "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973)

2.     Consistent with the tribal lending model, the scheme makes high-interest loans to consumers in the names of Golden Valley Lending, Inc. ("Golden Valley"), Silver Cloud Financial, Inc. ("Silver Cloud"), Mountain Summit Financial, Inc. ("Mountain Summit"), and Majestic Lake Financial, Inc. ("Majestic Lake," collectively the "Tribal Lending Entities")—four entities formed under the laws of the Habematolel Pomo of Upper Lake (the "Tribe"), a federally recognized Native American tribe. Although the Tribal Lending Entities are held out as "wholly

owned and operated" by the Tribe, "the companies largely operate[] out of a call center in Overland Park," Kansas.[1]

3.      Between 2012 and 2014, the vast majority of the operations and profits[2] were received by National Performance Agency, LLC and other companies, which appear to have been indirectly owned, in part, by Defendants Landy and Asner. After regulators caught onto the scheme, however, National Performance Agency was "sold" to the Tribe in an attempt to shield the non-tribal outsiders' illegal business practices. The sale was completed through a series of mergers, including a merger effective August 20, 2014, between National Performance Agency and a newly created tribal company, Clear Lake TAC G, Inc. Ex. 1, Certificate of Merger. Upon information and belief, Landy and Asner continue to participate in the affairs of the illegal lending enterprise, now as high-paid executives of the Tribal Lending Entities, as opposed to owners of the businesses that previously ran the companies.

4.      On paper, the Tribe now appears to own the lending business, ostensibly: (1) shielding National Performance Agency (and the substantial revenue paid to its owners) from any pre-merger claims; (2) enhancing the appearance of tribal ownership and control over operations; and (3) creating an argument that Landy and Asner are tribal employees entitled to benefit from its immunity. This sale model—designed by the Rosette law firm (counsel for the Tribe and Tribal

---

[1] Steve Vockrodt, *CFPB drops Kansas payday lending case, stoking fears Trump is backing off the industry,* The Kansas City Star (Jan. 19, 2018), available at https://www.kansascity.com/news/politics-government/article195623824.html.

[2] Julia Harte, Joanna Zuckerman Bernstein, *Payday Nation, When Tribes Team Up With PayDay Lenders, Who Profits?, Al Jazeera America* (June 17, 2014) (detailing a visit to the Tribe's reservation and observing that "little of the revenue that flows through these tribal businesses ends up in the rancheria or benefiting tribal members, as attested by the cluster of rundown houses nearby, where some members of the tribe live. They don't look like villainous tycoons preying on low-income Americans. They look more like those cash-strapped loan customers themselves.").

Lending Entities)—has been used by several other tribal lending enterprises involved in this illegal conduct. *See Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 272 (E.D. Va. 2018) (explaining that plaintiffs "presented credible evidence" that following a district court's decision against one of Rosette's other clients, the non-tribal member and "Tribe looked for ways to restructure" the "lending operation in order to reduce exposure liability"); *Solomon v. Am. Web Loan*, No. 4:17CV145, 2019 WL 1324490, at *7 (E.D. Va. Mar. 22, 2019) (describing a similar sale involving another tribal lending enterprise and rejecting an argument of derivative sovereign immunity shielding a non-tribal executive).

5.      Despite the sale in August 2014, the lending enterprise continues to be largely operated in the same manner, *i.e.*, by 111 people located in Overland Park, Kansas. Now these employees work for Upper Lake Processing Service, Inc.—another tribal entity created to facilitate the scheme. These employees—non-tribal members working thousands of miles away from the Tribe's reservation—handle the vast majority of the day-to-day administrative operations of the Tribe's lending businesses, such as underwriting, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website management.[3]

6.      This lawsuit challenges Defendants' collection of unlawful debts through its usurious lending enterprise. Because the Tribal Lending Entities claim they are entitled to sovereign immunity, Plaintiffs seek prospective relief against the seven-member Tribal Executive Council consisting of Defendants Sherry Treppa, Tracey Treppa, Kathleen Treppa, Iris Picton, Sam Icay, Aimee Jackson-Penn, and Amber Jackson (collectively, the "Tribal Officials").

---

[3] A 2017 declaration by Sherry Treppa, Chairperson of the Tribe's Executive Counsel, suggested that the operations for the Tribal Lending entities took place almost exclusively in Overland Park, Kansas. *See Exhibit A, Declaration of Sherry Treppa in Support of Defendants' Motion to Transfer Venue*, *CFPB v Golden Valley Lending, Inc.*, No. 2:17-cv-02521-JAR-JPO, Dkt. 27-1.

Plaintiffs seek to enjoin the tribal officials from their ongoing violations of federal and state law, and, thus, the tribal officials are not protected by the Tribe's immunity. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978) ("As an officer of the Pueblo, petitioner Lucario Padilla is not protected by the tribe's immunity from suit."); *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2034 (2014) ("As this Court has stated before . . . tribal immunity does not bar such a suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." (citing *Santa Clara Pueblo*, 436 U.S. at 59); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (2d Cir. 2019) (finding tribal immunity did not bar claims for prospective relief against tribal officials for their role in high-interest lending scheme).

7.     In addition, Plaintiffs seek monetary damages from Defendants Asner and Landy for their violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Together with the Tribal Officials and others not yet known to Plaintiffs, Anser and Landy each participated in the illegal lending scheme and conspired with each other and others to repeatedly violate state lending laws resulting in the collection of an unlawful debt from Plaintiffs and the class members. Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962(c)-(d).

8.     Plaintiffs assert a class claim for violations of Virginia's usury and licensing laws, as well as common law unjust enrichment claims. Because the enterprise's loans exceeded the annual percentage rate and licensing requirements required by Virginia law, such loans are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans. Va. Code § 6.2-1541(A); Va. Code § 6.2-303. Accordingly, Plaintiffs and the class members seek to recover amounts received by Landy and Asner, plus twice

the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorneys' fees and costs. Va. Code § 6.2-305(A).

**JURISDICTION**

9.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in Virginia, including in this District and Division.

**PARTIES**

11.     Plaintiff George Hengle is a natural person and resident of this Division.

12.     Plaintiff Sherry Blackburn is a natural person and resident of this Division.

13.     Plaintiff Willie Rose is a natural person and resident of this District.

14.     Plaintiff Elwood Bumbray is a natural person and resident of this District.

15.     Plaintiff Steven Pike is a natural person and resident of this District.

16.     Plaintiff Tiffani Myers is a natural person and resident of this District.

17.     Plaintiff Sue Collins is a natural person and resident of this District.

18.     Plaintiff Lawrence Mwethuku is a natural person and a resident of this District.

19.     Defendant Joshua Landy ("Landy") is a natural person and resident of Kansas. Landy is one of the former owners of National Performance Agency. *See* Ex. 2, Mar. 20, 2013 Annual Report (signed by Landy as a member of National Performance Agency).

20.     Defendant Scott Asner ("Asner") is a natural person and resident of Kansas City, Missouri. Asner is one of the former owners and managers of the National Performance Agency,

who signed the documents to effectuate the merger between National Performance Agency and Clear Lake TAC G, as well as the merger of several companies into National Performance Agency immediately prior to its merger with Clear Lake TAC G. *Compare* Ex. 1, Certificate of Merger (showing the merger of National Performance Agency occurred on August 20, 2014, at 3:05 p.m.); *with* Exs. 3-7 (showing Anser signed multiple documents merging other companies into National Performance Agency just a few hours before it merged with Clear Lake TAC G). Upon information and belief, Asner is also a former owner and manager of Nagus Enterprises, and Asner signed the documents to effectuate the merger between Nagus Enterprises and Clear Lake TAC S. Ex. 8, Certificate of Merger. Upon information and belief, Asner is also a former owner and manager of Edison Creek, and Asner signed the documents to effectuate the merger between Nagus Enterprises and Darden Creek, which occurred on the same day and following the merger between Darden Creek and Edison Creek. Exs. 9 and 10.

21.     Defendant Sherry Treppa is the Chairperson of the Habematolel Pomo of Upper Lakeman Executive Council. Plaintiffs seek prospective relief from Defendant Sherry Treppa in her official capacity only.

22.     Defendant Tracey Treppa is the Vice Chairperson of the Habematolel Pomo of Upper Lakeman Executive Council. Plaintiffs seek prospective relief from Defendant Tracey Treppa in her official capacity only.

23.     Defendant Kathleen Treppa is the Treasurer of the Habematolel Pomo of Upper Lakeman Executive Council. Plaintiffs seek prospective relief from Defendant Kathleen Treppa in her official capacity only.

24.     Iris Picton is the Secretary of the Habematolel Pomo of Upper Lakeman Executive Council. Plaintiffs seek prospective relief from Defendant Picton in her official capacity only.

25.     Sam Icay, is a Member-at-Large of the Habematolel Pomo of Upper Lakeman Executive Council. Plaintiffs seek prospective relief from Defendant Icay in his official capacity only.

26.     Aimee Jackson-Penn, is a Member-at-Large of the Habematolel Pomo of Upper Lakeman Executive Council. Plaintiffs seek prospective relief from Defendant Jackson-Penn in her official capacity only.

27.     Amber Jackson, is a Member-at-Large of the Habematolel Pomo of Upper Lakeman Executive Council. Plaintiffs seek prospective relief from Defendant Jackson in her official capacity only.

28.     Defendants Sherry Treppa, Tracey Treppa, Kathleen Treppa, Picton, Icay, Jackson-Penn and Jackson are each being sued in their official capacities as members of the Habematolel Pomo of Upper Lakeman Executive Council (the "Tribal Council") and will be referred to collectively as the "Tribal Council Defendants."

## FACTUAL BACKGROUND

**A.     Overview regarding the creation of the tribal lending business model.**

29.     In a "payday" loan, a consumer who can't afford to wait until payday receives a cash advance, and in exchange, the lender subtracts a larger amount from the consumer's paycheck. Consumers renew the loans when they are unable to pay them off, creating a cycle of mounting debt.

30.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra,* 69 Wash. & Lee L. Rev. at 759 (quoting Karen E. Francis, Note,

*Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611-12 (2010)).

31.     It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra,* 69 Wash. & Lee L. Rev. at 759.

32.     Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[4]

33.     Beginning in 2005, federal regulators began cracking down on rent-a-bank arrangements—largely by the assessment of penalties and fines against participating banks. *See, e.g.*, Creola Johnson, *America's First Consumer Financial Watchdog Is on A Leash: Can the CFPB Use Its Authority to Declare Payday-Loan Practices Unfair, Abusive, and Deceptive?*, 61 Cath. U. L. Rev. 381, 399 n. 16 (2012).

34.     In response to the crackdown on rent-a-bank arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. *Id.*; *see generally* Martin & Schwartz, *supra,* 69 Wash. & Lee L. Rev.

35.     For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV157522JFWRAOX, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

---

[4] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* at 17-22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

36.     Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id.*

37.     Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id.*

**B.     Overview of the Rosette law firm's role in the creation and implementation of the tribal business model.**

38.     Callaway presented herself to her clients as someone who could "'facilitate relationships' and provide opportunities" for payday lenders "to diversify and structure a lending model within requirements of law to 'avoid enforcement actions by state and federal regulators." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2018 WL 485963, at \*2 (C.D. Cal. Jan. 19, 2018).

39.     Callaway is one of several attorneys who represented the payday lenders in these transactions, others include Jennifer Weddle of Greenberg Traurig.

40.     On the other side of the table was Robert Rosette and representatives of his law firm, Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, available at: https://www.rosettelaw.com/our-firm/ (last visited on April 4, 2019).

41.     Robert Rosette is a well-known attorney who represents tribes willing to engage in the tribal business model.

42.     For example, Rosette negotiated the terms of the tribal lending arrangement between Matt Martorello and a tribal company formed by the Lac Vieux Desert Band of Chippewa Indians in Michigan.

43. Consistent with the tribal lending model, Rosette's client, Red Rock, received 2% of the net revenue from the loans in return for the use of its name. Ex. 11 at § 2.25.[5] Red Rock, in turn, provided 50% of this revenue to Rosette, via a company known as Tribal Loan Management, LLC.

44. Martorello's company received the "revenue remaining" and reimbursement for all advances and expenses. Ex. 11 at § 3.5.1; § 2.2.2.

45. Additionally, under the servicing agreement, one of Martorello's companies, SourcePoint, was contractually entitled to exercise almost exclusive control over Red Rock's operations.

46. For example, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. Ex. 11 at § 3.1.

47. Since as early as 2008, Rosette has represented the Habematolel Pomo of Upper Lake, including its tribal lending entities. *See, e.g.*, Elizabeth Larson, *Habematolel Pomo casino plans get federal approval*, Lake County News (July 27, 2008) (indicating that Rosette was "the tribe's attorney"); Rosette, *Robert Rosette*, available at: https://www.rosettelaw.com/professionals/robert-rosette/ (last visited on April 4, 2019); Ex. 12, Jan. 2014 e-mail from Robert Rosette (attempting to arrange a meeting between the Habematolel Pomo of Upper Lake and the CFPB).

---

[5] Because the servicing agreement was designated as confidential pursuant to the protective order in Williams, Plaintiffs attach hereto the publicly available form, which was filed at Dkt. 83-2 in *Williams v. Big Picture Loans, LLC*, Case No. 3:17-cv-461 (E.D. Va.).

48.     Mr. Rosette continued to represent the Habematolel Pomo of Upper Lake until June 2016. (ECF Doc. 44, ¶ 191.)

## C.      The Tribal Council's Role

49.     The Habematolel Pomo of Upper Lake Council serves as the Habematolel Pomo of Upper Lake's governing body and has the power to make laws and ordinances pursuant to the Constitution of the Habematolel, Pomo of Upper Lake. (ECF Doc. 44-4, at 3, 12.)

50.     Pursuant to Article X of the Constitution of the Habematolel, Pomo of Upper Lake, the Tribal Council is vested with significant powers including the power to "negotiate and make contracts with Federal, State, Local and Tribal governments and with any individual, firm or company" and to "manage and control Tribal property." (*Id*. at 12-13.)

51.     According to Chairwoman Treppa, the "Executive Council is the Tribe's governing body and is responsible for acting in all matters that concern the general welfare of the Tribe." (ECF 44 at ¶ 44). Chairwoman Treppa's declaration further indicates that "Council is tasked with passing all ordinances and resolutions relating to the Tribe's business, environmental, jurisdiction, health, education, and welfare needs." *Id*.

52.     This declaration further explains that Tribal Council—in their capacity as the TLE Board of Directors—"has always controlled all aspect of the lending business," including approval of strategic direction, annual budgets, funding strategy, appointment of corporate officers, approval of policies as proposed by any corporate officers, approval of benefit plans, and the hiring of any employee with an annual compensation totaling over $125,000.00.

53.     In their capacity, Tribal Council has purported to be responsible for the day to day operations and management of the Tribal Lending Entities; and Tribal Council purportedly has the discretion to control their overall operations. *See, e.g.*, ECF 43 at 6 ("The Executive Council, acting

through the various corporations' boards, has always actively supervised these lending businesses."); *id.* ("The TLE Board has the authority over the businesses' bank accounts and is exclusively responsible for approving, among other things, the strategic direction of the businesses, their annual budgets and forecasts, their capital structure and funding strategy, the appointment of corporate officers, and any policies proposed by any corporate officer."); *id.* ("The Board routinely exercises this authority, addressing high-level questions of strategy to more discrete issues, like setting job descriptions or terminating employees.").

54.     In short, Tribal Council is a purportedly necessary and critical component of the Tribal Lending Entities' ongoing violations of state and federal laws. As evidence by Treppa's declaration, it is within their power, as members comprising the Tribal Council, to shut down the operations of the Tribal Lending Entities, including the ceasing of the collection of unlawful amounts from Plaintiffs and class members. Prospective relief enjoining the Tribal Council from continued participation in the enterprise and directing them to cease unlawful originations and collections in Virginia would provide Plaintiffs and class members with meaningful relief from their ongoing and future harms.

**C.     Defendants establish the enterprise to avoid usury laws.**

55.     Consistent with other rent-a-tribe enterprises, Golden Valley was established in August 2012, and consumers were able to obtain a loan from the website, www.goldenvalleylending.com, as early as August 29, 2012.

56.     According to its website, Golden Valley provided short-term loans of "up to $1,000" and borrowers could be "approved in seconds."

57.     On its homepage, the website stated that "GOLDENVALLEYLENDING.COM IS A WEBSITE OWNED AND OPERATED BY GOLDEN VALLEY LENDING, WHICH IS A TRIBAL LENDING ENTITY WHOLLY OWNED AND OPERATED BY THE

HABEMATOLEL POMO OF UPPER LAKE, CALIFORNIA… AND IS OPERATING WITHIN THE TRIBE'S RESERVATION."[6]

58.     Consistent with this, Golden Valley's website and lending agreements claimed that its address was 635 East Highway 20, Upper Lake, CA 95485.

59.     Around this same time, Defendants established Silver Cloud in March 2012, and consumers were able to obtain a loan from the website, www.silvercloudfinancial.com, as early as June 8, 2013.

60.     Silver Cloud's website largely mirrored the website of Golden Valley, including the advertised loan amounts and misrepresentations that Silver Cloud was "wholly owned and operated" by the Tribe and operated "within the Tribe's reservation."[7]

61.     After launching Silver Cloud, Defendants established Mountain Summit in August 2012, and consumers were able to obtain a loan from the website, www.mountainsummitfinancial.com, as early as January 6, 2014.

62.     Mountain Summit's website largely mirrored the website of Golden Valley and Silver Cloud, including the advertised loan amounts and misrepresentations that Sliver Cloud was "wholly owned and operated" by the Tribe and operated "within the Tribe's reservation."[8]

---

[6] The Wayback Machine, a digital archive containing the history of billions of websites, first captured a snapshot of Golden Valley's website on June 10, 2013. *See* Wayback Machine, Archive of Golden Valley Lending, available at: https://web.archive.org/web/2013-0610153342/http://www.goldenvalleylending.com/. These misrepresentations appear to have stayed on the website since its inception and still appear there as of the date of this filing.

[7] The first available snapshot of Silver Cloud's website is June 8, 2013, and the misrepresentations still appear on the website as of the date of this filing.

[8] The first available snapshot of Silver Cloud's website is January 6, 2014, and the misrepresentations still appear on the website as of the date of this filing.

63.     Although the entities claimed to be "wholly owned and operated" by the Tribe within its reservation, the Tribe's role was a front—non-tribal outsiders handled every material aspect of the lending activities from Overland Park, Kansas, the hotbed of the online payday lending industry. *See generally When Tribes Team Up With PayDay Lenders, Who Profits?, Al Jazeera America* (June 17, 2014).

64.     Indeed, when investigative journalists went to visit the reservation, they observed that the tribal entities' "one-story office just off California's Highway 20 doesn't look like much," certainly not what you would expect of "four thriving financial enterprises." *Id*.

65.     To that end, the journalists further observed that "little of the revenue that flows through these tribal businesses ends up in the rancheria or benefiting tribal members, as attested by the cluster of rundown houses nearby, where some members live." *Id*.

66.     And interviews with tribal members confirmed that "none of them had any jobs related to payday lending." *Id*.

67.     Instead, nearly all activities performed on behalf of Golden Valley, Silver Cloud, and Mountain Summit were performed by owners and employees of non-tribal companies, primarily National Performance Agency and its affiliated companies, including National Processing of America and Nagus Enterprises.

68.     These employees were located at 7201 W. 110th Street, Suite 210, Overland Park, Kansas 66210—the same address now used by ULPS after the completion of the mergers between: (1) National Performance Agency and Clear Lake TAC G, and (2) Nagus Enterprises and Clear Lake TAC S.

69.     These employees, the majority of whom were retained after the merger, handled the day-to-day operations of Golden Valley, Silver Cloud, and Mountain Summit, including

underwriting, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website management.

70.     Additionally, the vast majority of the revenue went to non-tribal outsiders, such as Defendants Landy and Asner and their companies, such as Edison Creek, Nagus Enterprises, Cobalt Hills, and National Performance Agency. *See generally Consumer Financial Protection Bureau v. Golden Valley Lending, Inc.*, Case No. 17-cv-3155 (N.D. Ill. 2017) (Compl. at Dkt. 1) (hereafter *CFPB* Compl.).

71.     For example, between August and December 2013, Golden Valley and Silver Cloud paid those companies approximately $35.8 million and only "distributed approximately $536,000 to accounts held by the Habematolel Pomo Tribe." *CFPB* Compl. at ¶¶ 91-92.

72.     Upon information and belief, National Performance Agency, Edison Creek, Nagus Enterprises, and Cobalt Hills were owned and operated by Scott Asner, Josh Landy, and other individuals currently unknown to Plaintiffs.

73.     For example, National Performance Agency's Annual Report for 2012 was signed by Joshua Landy as a "member" of National Performance Agency. Ex. 2.

74.     Similarly, on February 7, 2013, Landy contributed $5,000 to the Online Lender's Association and listed his occupation as National Performance Agency. Ex. 13.

75.     As one of his responsibilities, Landy oversaw the dozens of employees located at 7201 W. 110th Street, Suite 210, Overland Park, Kansas 66210. *CFPB* Compl. at ¶ 84.

76.     Landy was also a signatory on a bank account held by National Performance Agency, as well as separate bank accounts held by Edison Creek, Nagus Enterprises, and Cobalt Hills—each of which was wrapped up in the merger.

77.     Similarly, Asner signed multiple documents on behalf of National Performance Agency, including: (1) a change of registered agent dated July 1, 2014, (2) its cancellation of authority to do business in Kansas dated June 27, 2014, (3) the certificate of merger between National Performance Agency and Cobalt Hills, (4) the certificate of merger between National Performance Agency and American Consumer Credit, (5) the certificate of merger between National Performance Agency and Community Credit Services, (6) the certificate of merger between National Performance Agency and Dynamic Marketing, and (7) the certificate of merger dated August 20, 2014, between National Performance Agency and National Opportunities Unlimited. Exs. 14, 15, 3-7.[9]

78.     Anser also signed multiple documents on behalf of Nagus Enterprises, including the merger agreements described above. *See* Exs. 8-10.

**D.     Events Leading to the Mergers.**

79.     A few years after the creation of the tribal lending model, regulators caught onto the scheme.

80.     Most notably, on August 6, 2013, the New York Department of Financial Services ("DFS") issued a cease and desist letter to 35 online lending companies, including Golden Valley. The Official Website of New York State, *Press Room*, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans.

---

[9] Upon information and belief, American Consumer Credit, Community Credit Services, Dynamic Marketing and National Opportunities Unlimited were each involved in the enterprise to collect usurious loans from consumers—necessitating inclusion of these companies in the merger in order to ostensibly shield them from any claims.

81.     The cease and desist was issued after an "extensive" investigation "uncovered that those companies were offering payday loans to consumers over the Internet in violation of New York law, including some loans with annual interest rates as high as 1,095 percent." *Id.*

82.     In addition to the cease and desist sent to the payday lenders, the Superintendent of Financial Services, Benjamin Lawsky, also sent letters to 117 banks and the National Automated Clearinghouse Association, requesting that "they work with DFS to cut off access to New York customer accounts for illegal payday lenders." *Id.*

83.     In his public comments on the letters, Mr. Lawsky explained: "Companies that abuse New York consumers should know that they can't simply hide from the law in cyberspace. We[ a]re going to use every tool in our tool-belt to eradicate these illegal payday loans that trap families in destructive cycles of debt." *Id.*

84.     In addition to Golden Valley, a number of other "tribal lenders" received the cease and desist, including Red Rock Tribal Lending, American Web Loan, Plain Green, Great Plains, and Western Sky Financial—some of which were also represented by Robert Rosette.

85.     In response, Red Rock, Great Plains Lending, and American Web Loan (as well as their respective tribes), filed a lawsuit against DFS and Mr. Lawsky in August 2013, seeking declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *See Otoe-Missouria Tribe of Indians v. New York State Dept. of Fin. Services*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

86.     Among others, the tribal lending entities and tribes were represented by Robert Rosette, as well as two other partners with his firm, Karrie Wichtman and Saba Bazzazieh. *See, e.g.*, Dkt. Nos. 29, 32, 34 (granting pro hac admissions).

87.     On September 30, 2013, the district court denied the tribal plaintiff's request for a preliminary injunction, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, the loans were "subject to the State's non-discriminatory anti-usury laws." 974 F. Supp. 2d at 361.

88.     The court reasoned, "There is simply no basis… that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id*.

89.     In addition to the loss in *Otoe-Missouria*, a growing number of lawsuits and government enforcement actions against the scheme's competitors brought increased scrutiny to the tribal lending business model, including the New York Attorney General's lawsuit filed in August 2013 against a tribal lending enterprise involving CashCall and Western Sky. *People of the State of New York v. Western Sky Financial, et al*, New York State Supreme Court, New York County, No. 451370/2013.

90.     Less than five months after the lawsuit was filed, the New York Attorney General entered into a settlement with Western Sky, CashCall, and their owners, requiring the enterprise to refund borrowers who paid more than the legal rate of interest and pay $1.5 million in penalties. New York State Office of the Attorney General, Press Releases, *A.G. Schneiderman Announces Settlement With Western Sky Financial And Cashcall For Illegal Loans Made Over The Internet* (Jan. 24, 2014), *available at* https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-western-sky-financial-and-cashcall-illegal-loans.

91.     The litigation in New York was a small part of the problem for the tribal lending business model, the Department of Justice launched "Operation Choke Point" in 2013 and the Consumer Financial Protection Bureau filed a lawsuit against CashCall in December 2013.

*Consumer Fin. Protection Bureau v. CashCall, Inc.*, No. 1:13-cv-13167 (Mass) (complaint filed on Dec. 16, 2013).[10]

92.    In that case, the CFPB took the same position as the district court in *Otoe-Missouria*, *i.e.*, that state usury laws applied to tribal lenders.

93.    Upon information and belief, the Tribal Lending Entities have received cease and desists from multiple other government regulators.

## D.    National Performance Agency and Nagus Enterprises Merge With Newly Created Tribal Companies in August 2014.

94.    As a result of the attack on the industry, Defendants, Rosette, and other industry insiders knew the tribal business model was at risk and the consequences would be severe.

95.    Over the next nine months, Defendants, Rosette, and other members in the industry worked to develop a solution to shield the non-tribal members but at the same time continue the deceptive scheme to collect usurious amounts from consumers.[11]

96.    Ultimately, the solution was the sale of National Performance Agency, Nagus Enterprises, and their affiliated entities to newly created tribal entities, Clear Lake TAC G and Clear Lake TAC S.

---

[10] *See, e.g.*, *In Re Cashcall, Inc.*, 2013 WL 3465250, at *1 (NH Banking Dept. 2013) ("it appears that Western Sky is nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."); *Consumer Fin. Protection Bureau v. CashCall, Inc.,* No. 1:13-cv-13167 (Mass) (complaint filed on Dec. 16, 2013); *In re Moses,* No. 12-05563-8-RDD, 2013 WL 53873, at *4 (Bankr. E.D.N.C. Jan. 3, 2013).

[11] At least two of Rosette's other clients, Red Rock and American Web Loan, completed similar mergers. *Williams v. Big Picture Loans, LLC*, 329 F. Supp. 3d 248, 272 (E.D. Va. 2018) (explaining that plaintiffs "presented credible evidence" that following a district court's decision against one of Rosette's other clients, the non-tribal member and "Tribe looked for ways to restructure" the "lending operation in order to reduce exposure liability."); *Solomon v. Am. Web Loan*, No. 4:17CV145, 2019 WL 1324490, at *7 (E.D. Va. Mar. 22, 2019) (describing a similar sale involving another tribal lending enterprise).

97.     The sales were completed via a merger effective August 20, 2014, as reflected by: (1) the certificate of merger of National Performance Agency into Clear Lake TAC G filed with Delaware Division of Corporations, and (2) the certificate of merger of Nagus Enterprises into Clear Lake TAC S filed with Delaware Division of Corporations. Ex. 1; Ex. 8.

98.     Hours before the mergers identified in the previous paragraph, National Performance Agency acquired several other companies involved in the scheme, including: Cobalt Hills, American Consumer Credit, Community Credit Services, Dynamic Marketing, and National Opportunities Unlimited. Exs. 4-8.

99.     Similarly, Nagus Enterprises acquired several other companies involved in the scheme, including Darden Creek and Rockstar Wagamama.

100.    Upon information and belief, Clear Lake TAC G and Clear Lake TAC S then dissolved shortly after acquiring National Performance Agency and Nagus Enterprises, whose assets were ultimately acquired by ULPS, another new tribal company created to facilitate the post-merger scheme.

101.    Although technically reorganized and renamed, ULPS continues to operate in the same manner as National Performance Agency, *i.e.*, with its operations being conducted by non-tribal members working thousands of miles away from the Tribe's reservation.

102.    These employees handle the vast majority of the day-to-day administrative operations of Golden Valley, Silver Cloud, Mountain Summit, and Majestic Lake, such as their underwriting, risk assessment, compliance, customer complaints, accounting, lead generation, collections, and website management. *See* Ex. 16, Linked In Profile for Shawn Hashmi (former "Vice President of Operations and Chief Operating Officer" describing ULPS as "a $190MM management group for three financial entities with 3 locations and 120 employees"); *see also* Ex.

17, Linked In Profile for Norvel C. Cradford (profile for a former "senior manager of sales, originations," who oversaw "four financial portfolios with a valuation upwards of $22M by creating and delivering industry leading lending processes to a 100 seat contact center specializing in voice, chat and email customer correspondence").

103.    Although they are held out as tribal employees, none of ULPS's employees are tribe members, and they continue to work from 7201 W. 110th Street, Suite 210, Overland Park, Kansas 66210.

104.    And upon information and belief, non-tribal outsiders continue to receive the vast majority of the revenue pertaining to the enterprise.

## F.    Defendants' Loans Violated State Usury Laws.

105.    Through the Tribal Lending Entities, the participants in the enterprise, including Asner, Landy, and the Tribal Officials, market, initiate, and collect usurious loans throughout the country, including in Virginia.

106.    Defendants know the subject loans were illegal under each state's usury and licensing laws, but they pursued the scheme anyway, misrepresenting that the lenders were operating "within the Tribe's reservation" and were "wholly owned and operated" by the Tribe.

107.    Because of the ostensible protections created by the tribal business model, the interest rates charged on the loans were significantly greater than the amounts permitted by each state's usury and licensing laws.

108.    For example, Hengle's loans with Majestic Lake had an annual percentage rate ("APR") of 636%, 722%, and 763%—over 60 times the 12% interest cap in Virginia for companies that are not licensed by the Commission. Va. Code § 6.2-303(A).

109.    Similarly, Rose's loan with Silver Cloud had an APR of 727%; Pike's loan with Golden Valley had an APR of 744%; Mwethuku's loan with Golden Valley had an APR of 919%; Bumbray's loan with Majestic Lake had an APR of 543%; and Myers' loan with Mountain Summit had an interest rate of 565%.

110.    Each of the Plaintiffs received these loans while in Virginia.

111.    When they applied for the loans, each of the Plaintiffs used their Virginia addresses.

112.    Upon information and belief, every loan originated by the enterprise had an APR of at least 300%.

113.    None of the Tribal Lending Entities had a consumer finance license permitting them to make loans charging interest in excess of 12% APR when they made the loans to Plaintiffs, nor did they ever attempted to obtain such a license from any state.

114.    As a result of their failure to obtain a license (as well as charging interest in excess of 12%), Defendants' loans are null and void under the laws of Virginia, as well as many other states with similar laws. Va. Code § 6.2-1541(A).

115.    Accordingly, the loans are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A).

116.    Defendants received at least $1,127.65 from Hengle in connection with the illegal loans issued to him in the name of Majestic Lake.

117.    Defendants received at least $4,161.75 from Blackburn in connection with the illegal loans issued to her in the name of Majestic Lake.

118.    Defendants received at least $1,439.00 from Rose in connection with the illegal loan issued to him in the name of Silver Cloud.

119.    Defendants received at least $1,561.00 from Bumbray in connection with the illegal loan issued to him in the name of Majestic Lake.

120.    Defendants received at least $1,725.00 from Pike in connection with the illegal loan issued to him in the name of Golden Valley.

121.    Defendants received at least $635.50 from Myers in connection with the illegal loan issued to her in the name of Mountain Summit.

122.    Defendants received at least $1,032.50 from Collins in connection with the illegal loan issued to her in the name of Mountain Summit.

123.    Defendants received at least $499.50 from Mwethuku in connection with the illegal loan issued to him in the name of Golden Valley.

124.    All of these amounts were collected from Plaintiffs when they resided in Virginia and the amounts were withdrawn from their bank accounts maintained in Virginia.

125.    Through their ownership interest and participation in the enterprise, Asner and Landy received amounts collected from Plaintiffs and the class members' loans.

126.    Because Plaintiffs' loans were null and void, it was unlawful any person to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A).

127.    Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

128.    RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

129.     Defendants charged an interest rate far in excess of the enforceable rate established by Va. Code § 6.2-1541(A), and thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

130.     As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT ONE:
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
### (CLASS CLAIM AGAINST SCOTT ASNER & JOSHUA LANDY)

131.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

132.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(c) Class"—initially defined as:

> All Virginia residents who entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake.

Plaintiffs are members of the § 1962(c) Class.

133.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by the revenues generated by Defendants, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

134.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common

questions include: (1) whether Defendants' association constitutes an "enterprise" under RICO; (2) whether Defendants participated in the enterprise; (3) whether the loans violated Virginia's licensing and usury laws because the interest rates were too high; and (4) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

135.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

136.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

137.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay

and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

138. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the Enterprise, prohibiting Defendants from continuing to engage in the Enterprise, and ordering the dissolution of any entity associated with the Enterprise.

139. As alleged above, Defendants Scott Asner and Joshua Landy conducted and/or participated in the affairs of the enterprise through the unlawful collection of debt.

140. RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

141. All loans made to consumers imposed interest rates far in excess of the enforceable rates in Virginia.

142. This conduct began sometime as early as 2012, continues to date, and will be repeated again and again in the future to the detriment of Virginia consumers.

143. Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c).

144.     Accordingly, Defendants Scott Asner and Joshua Landy are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT TWO:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST SCOTT ASNER AND JOSHUA LANDY)

145.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

146.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(d) Class"—initially defined as:

> All Virginia residents who entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake.

Plaintiffs are members of the § 1962(d) Class.

147.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

148.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

149.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

150. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

151. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

152. **Injunctive Relief Appropriate for the Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of the

Enterprise, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the Enterprise; and ordering the dissolution of each entity that has engaged in the Enterprise.

153.    As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to violate § 1962(c), as evidenced by their conduct; the original agreements related to the origination, funding, and servicing of the loans; and the merger agreements designed to shield the non-tribal outsiders from liability.

154.    Accordingly, Defendants Scott Asner and Joshua Landy are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE:**
**VIOLATIONS OF VIRGINIA USURY LAWS**
**(CLASS CLAIM AGAINST SCOTT ASNER AND JOSHUA LANDY,**

155.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

156.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> All Virginia residents who entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake.

Plaintiffs are members of the class.

157.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

158. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

159. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

160. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants obtained a license to lend in any state; (2) whether Defendants' loans violate the Virginia Consumer Finance Act; (3) whether Defendants' loans violate state usury laws, such as Va. Code § 6.2-305 because the interest levels were too high; (4) whether Golden Valley, Silver Cloud, Mountain Summit, Majestic Lake, or ULPS are entitled to share in the Tribe's sovereign immunity; and (5) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

161. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The

damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

162.    The Tribal Lending Entities' loans violate Virginia's general usury laws. Va. Code § 6.2-305(A).

163.    Through their role in the enterprise and affiliation with the Tribal Lending Entities, Landy and Answer receive amounts collected from consumers.

164.    As a result, Plaintiffs and the class members are entitled to recover the total amount of interest received, plus twice the amount of interest paid within the past two years. Va. Code § 6.2-305(A).

### COUNT FOUR:
### UNJUST ENRICHMENT
### (CLASS CLAIM AGAINST SCOTT ASNER AND JOSHUA LANDY)

165.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

166.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as follows:

All Virginia residents who entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake.

Plaintiffs are members of the Unjust Enrichment Class.

167. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

168. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants when they paid a void loan; (2) whether Defendants knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loan was void; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

169. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

170. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action

vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

171.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

172.    All loans made to consumers in Virginia were void and unenforceable.

173.    Plaintiffs conferred a benefit on Asner and Landy when they repaid the void loans; Asner and Landy knew or should have known of the benefit; and they have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

174.    Accordingly, Plaintiffs seek to recover from Asner and Landy, jointly and severally, all amounts repaid by Virginia consumers on any loans with Golden Valley, Silver Cloud, Mountain Summit or Majestic Lake.

**COUNT FIVE:**
**VIOLATIONS OF RICO, 18 U.S.C. §§ 1962(a)-(d)**
**(CLASS CLAIM AGAINST TRIBAL OFFICIALS IN THEIR OFFICAL CAPACITY**
**FOR PROSPECTIVE RELIEF)**

175.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

176.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Tribal Council RICO Class"—initially defined as follows:

> All Virginia residents who entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake.

Plaintiffs are members of the Tribal Council RICO Class.

177.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

178.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants when they paid a void loan; (2) whether Defendants knew or should have known of the benefit; and (3) whether Defendants retained an unjust benefit because the loan was void.

179.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of

action as the other members of the putative class. All claims are based on the same facts and legal theories.

180.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

181.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

182.     Defendants Sherry Treppa, Tracey Treppa, Kathleen Treppa, Picton, Icay, Jackson-Penn, and Jackson are each being sued in their official capacities as members of the Tribal Council and will be referred to collectively as the "Tribal Council Defendants."

183.     Each of the Tribal Council Defendants is a "person" as that term is defined in 18 U.S.C. § 1964(3).

184.     The Enterprise, consisting of the Tribal Council, Scott Asner, Joshua Landy, and the unnamed officers, executives, and other employees of Uppler Lake Processing Service are an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through online lenders Golden Valley, Silver Cloud, Mountain Summit and Majestic Lake.

185.     The Enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities.

186.     The Tribal Council violated and continue to violate 18 U.S.C. § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

187.     RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

188.     All of the loans made to Tribal Council RICO Class members and collected by the Tribal Council Defendants, Golden Valley, Silver Cloud, Mountain Summit and Majestic Lake, and others included interest rates far in excess of twice the enforceable rate in their states.

189.    Plaintiffs and Tribal Council RICO Class members were injured as a direct result of the Tribal Council Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

190.    This conduct began sometime in 2012, continues to date, and will be repeated again and again in the future to the detriment of consumers in Virginia.

191.    The Tribal Council Defendants also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt.

192.    Each of the Tribal Council Defendants knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

193.    Plaintiffs and Tribal Council RICO Class members were injured as a direct result of the Tribal Council Defendants' violations of 18 U.S.C. § 1962(d) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

194.    This conduct began sometime in 2012, continues to date, and will be repeated again and again in the future to the detriment of consumers in Virginia.

195.    Additionally, the Tribal Council Defendants also violated and continue to violate RICO, 18 U.S.C. § 1962(a) through the receipt of income derived, directly and indirectly, through collection of unlawful debt; and through the use and reinvestment of parts of such income to acquire interests in and to further establish and assist the operations of the enterprise.

196.    The Tribal Council Defendants participated and continue to participate in the collection of the unlawful debt by aiding, abetting, procuring proceeds from the enterprise, and willfully investing money for the purpose of the unlawful scheme.

197.     Plaintiffs and the class members were injured as a result of the violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for their investment and participation in the enterprise.

198.     Plaintiffs and RICO Class members were injured as a direct result of the violations of 18 U.S.C. § 1962(a) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

199.     The Tribal Council Defendants also violated 18 U.S.C. § 1962(b) by acquiring and maintaining interests in and control of the Enterprise involved in the unlawful collection of debt.

200.     The Tribal Council Defendants participated in the collection of the unlawful debt as principals by aiding, abetting, procuring proceeds from the enterprise, and by willfully acquiring and maintaining interests in and control of the enterprise.

201.     Plaintiffs and the class members were injured as a result of the violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for the Tribal Council Defendants' investment and participation in the enterprise.

202.     Plaintiffs and Tribal Council RICO Class members were injured as a direct result of the violations of 18 U.S.C. § 1962(b) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

203.     Accordingly, Plaintiffs seek injunctive relief from the Tribal Council Defendants, including but not limited to an order: (1) prohibiting the Tribal Council Defendants from continuing to collect on the unlawful loans in Virginia, (2) requiring the Tribal Council Defendants to send notice to Virginia consumers indicating that their loans are void; (3) prohibiting Tribal Council from selling the unlawful loans to third-party debt collectors; and (4) prohibiting the Tribal

Council Defendants from making any loans in Virginia in excess of 12% interest (or 36% if the Tribal Lending Entities obtain a consumer finance license).

## COUNT SEVEN:
## DECLARATORY JUDGMENT
## (CLASS CLAIM AGAINST TRIBAL OFFICIALS IN THEIR OFFICAL CAPACITY FOR PROSPECTIVE RELIEF)

204.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs. Pursuant to Rule 23 of the Federal Rules of Civil Procedure,

205.    Plaintiffs bring this action for themselves and on behalf of a class—the "Declaratory Judgment Class"—initially defined as follows:

> All Virginia residents who entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake and who have outstanding balances on the loans.

> Plaintiffs are members of the Declaratory Judgment Class.

206.    Virginia requires all who engage in the business of making personal loans to be licensed.

207.    Golden Valley, Silver Cloud and Majestic Lake were not licensed to make loans in Virginia.

208.    Because the loans were made without the required license and charged excessive interest rates, the loans are null and void in Virginia.

209.    In addition to licensing violations, Defendants' loan violated Virginia's general usury law and are void. *See* Va. Code § 6.2-305(A).

210.    As alleged herein, Defendants' loan agreements were violative of fundamental state public policy in Virginia.

211.    Further, the lending agreements used for Plaintiffs contained unconscionable choice of law and forum-selection provisions that are void and unenforceable for public policy concerns.

212.    Plaintiffs still have outstanding amounts owed for their Golden Valley, Silver Cloud and Majestic Lake accounts.

213.    Because of the triple digit interest rates charged on the loans, the debts are increasing in value substantially.

214.    Accordingly, Plaintiffs seek a determination as to their obligation to pay their outstanding debts.

215.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Loan Agreements as well as the validity, if any, of the choice of law and forum-selection provisions.

216.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

217.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

218.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

219. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

220. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

221. **Injunctive Relief. Fed. R. Civ. P. 23(b)(2).** The Class meets the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole. Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for defendants.

222. **Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** The Tribal Lending Entities and Tribal Officials have acted or refused to act on grounds that apply generally to the class, rendering declaratory relief appropriate respecting the class as a whole.

223.     Accordingly, on behalf of themselves and all others similarly situated, Plaintiffs seek a declaratory judgment that they are not obligated to pay any principal or interest outstanding on the illegal loans.

## COUNT EIGHT:
## VIOLATIONS OF VIRGINIA'S CONSUMER FINANCE ACT
## (CLASS CLAIM AGAINST TRIBAL OFFICIALS IN THEIR OFFICAL CAPACITY FOR PROSPECTIVE RELIEF)

224.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

225.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> All Virginia residents who entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake.

Plaintiffs are members of the class.

226.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

227.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

228.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute

the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

229. **Injunctive Relief. Fed. R. Civ. P. 23(b)(2).** The Class meets the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole. Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for defendants.

230. **Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** The Tribal Lending Entities and Tribal Officials have acted or refused to act on grounds that apply generally to the class, rendering declaratory relief appropriate respecting the class as a whole.

231. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

232. As alleged herein, Plaintiffs have taken out Golden Valley, Silver Cloud, Mountain Summit and Majestic Lake loans, which they maintain were void *ab initio* because they violated Virginia's licensing and usury requirements in addition to violating Virginia's public policy and using unconscionable terms.

233. Plaintiffs have outstanding balances on their Golden Valley, Silver Cloud, Mountain Summit and Majestic Lake loans.

234.    Because of the triple digit interest rates used by Golden Valley, Silver Cloud, Mountain Summit and Majestic Lake, each Plaintiff is subject to significant liability as the interest accrues on their unpaid debts.

235.    Accordingly, Plaintiffs seek injunctive relief from the Tribal Council Defendants, including but not limited to an order: (1) prohibiting the Tribal Council Defendants from continuing to collect on the unlawful loans in Virginia, (2) requiring the Tribal Council Defendants to send notice to Virginia consumers indicating that their loans are void; (3) prohibiting Tribal Council from selling the unlawful loans to third-party debt collectors; and (4) prohibiting the Tribal Council Defendants from making any loans in Virginia in excess of 12% interest (or 36% if the Tribal Lending Entities obtain a consumer finance license).

236.    Plaintiffs, on behalf of themselves and all others similarly situated, further seek a declaratory judgment that they are not obligated to pay any principal or interest outstanding on the illegal loans.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request the Court enter judgment for themselves and the class they seek to represent against Defendants, including for:

A.    Certification of this matter to proceed as a class action;

B.    Declaratory, injunctive, and compensatory relief as pled herein;

C.    Attorney's fees, litigation expenses, and costs of suit; and

D.    Any further relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By:_____/s/ Andrew J. Guzzo_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
Elizabeth W. Hanes, Esq., VSB #75574
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com
Email: elizabeth@clalegal.com

James W. Speer, VSB#23046
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA 23219
(804) 782-9430
(804) 649-0974
Email: jay@vplc.org

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 12, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

_____/s/_____
Andrew J. Guzzo, Esq., VSB #82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: aguzzo@kellyguzzo.com

*Attorneys for Plaintiffs and Proposed Classes*
