IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

GEORGE HENGLE, *et al.*,
*on behalf of themselves and*
*all individuals similarly situated,*
    Plaintiffs,

      v.                              Civil No. 3:19cv250 (DJN)

SCOTT ASNER, *et al.*,
    Defendants.

## MEMORANDUM OPINION

Plaintiffs George Hengle ("Hengle"), Sharon Blackburn ("Blackburn"), Willie Rose ("Rose"), Elwood Bumbray ("Bumbray"), Tiffani Myers ("Myers"), Steven Pike ("Pike"), Sue Collins ("Collins") and Lawrence Mwethuku ("Mwethuku") (collectively, "Plaintiffs") bring this action on behalf of themselves and all individuals similarly situated against Scott Asner ("Asner"), Joshua Landy ("Landy"), Sherry Treppa, Tracey Treppa, Kathleen Treppa, Iris Picton, Sam Icay, Aimee Jackson-Penn and Amber Jackson (collectively, "Defendants"), alleging that Defendants issued usurious loans to Plaintiffs in the name of Golden Valley Lending, Inc. ("Golden Valley"), Silver Cloud Financial, Inc. ("Silver Cloud"), Mountain Summit Financial, Inc. ("Mountain Summit"), and Majestic Lake Financial, Inc. ("Majestic Lake") (collectively, the "Tribal Lending Entities") — four entities formed under the laws of the Habematolel Pomo of Upper Lake (the "Tribe"), a federally recognized Native American tribe. Plaintiffs seek to enjoin Sherry Treppa, Tracey Treppa, Kathleen Treppa, Iris Picton, Sam Icay, Aimee Jackson-Penn and Amber Jackson (collectively, the "Tribal Officials") from collecting on the allegedly usurious loans issued by the Tribal Lending Entities and to prevent the Tribal

Lending Entities from issuing usurious loans to Virginia consumers in the future. Plaintiffs also seek monetary relief against Asner and Landy for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, Virginia's usury and consumer finance statutes and Virginia common law. This matter comes before the Court on Asner and Landy's Renewed Motion to Compel Arbitration (ECF No. 57) and Renewed Motion to Dismiss (ECF No. 59) and the Tribal Officials' Motion to Compel Arbitration (ECF No. 62) and Motion to Dismiss (ECF No. 64).[1]

For the reasons set forth below, the Court DENIES Defendants' Motions to Compel Arbitration (ECF Nos. 57, 62), GRANTS IN PART and DENIES IN PART the Tribal Officials' Motion to Dismiss (ECF No. 64) and DENIES Asner and Landy's Renewed Motion to Dismiss (ECF No. 59). The Court DISMISSES WITHOUT PREJUDICE Count Five of Plaintiffs' Amended Complaint and Count Seven to the extent that it seeks to enjoin future lending activities by the Tribal Lending Entities and to the extent that Bumbray, Blackburn and Collins seek to enjoin future collection of any outstanding loans.[2]

## I.     BACKGROUND

In considering Defendants' Motions to Compel Arbitration, the Court may consider materials outside of the pleadings, including all relevant, admissible evidence submitted by the parties. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citations omitted). "In

---

[1]     Also before the Court is the Motion to Compel Arbitration (ECF No. 46) filed by the Tribal Lending Entities and Upper Lake Processing Services, Inc. Because the Amended Complaint (ECF No. 54) no longer raises claims against the Tribal Lending Entities or Upper Lake Processing Services, Inc., and because those parties have been terminated, the Court DENIES AS MOOT their Motion to Compel Arbitration (ECF No. 46).

[2]     The Court finds that the materials before it adequately present the issues such that oral argument will not materially aid in the decisional process and therefore will dispense with a hearing on Defendants' Motions.

doing so, the court must draw all reasonable inferences in favor of the non-moving party." *Id.*

(citations omitted). To the extent that Defendants challenge the plausibility of Plaintiffs' claims

pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court will accept Plaintiffs' well-

pleaded factual allegations as true, though the Court need not accept Plaintiffs' legal conclusions.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Similarly, to the extent that Defendants challenge

the Court's personal jurisdiction over them "on the basis only of motion papers[,] . . . the court

must construe all relevant pleading allegations in the light most favorable to [Plaintiffs], assume

credibility, and draw the most favorable inferences for the existence of jurisdiction," *Combs v.*

*Bakker*, 886 F.2d 673, 676 (4th Cir. 1989), though the Court need not consider only Plaintiffs'

proof of personal jurisdiction to decide which inferences it will make, *Mylan Labs., Inc. v. Akzo,*

*N.V.*, 2 F.3d 56, 62 (4th Cir. 1993). And to the extent that Defendants raise substantive

challenges to the Court's jurisdiction over the subject matter of Plaintiff's Amended Complaint,

the Court may consider facts outside of the Amended Complaint and need not accept the

allegations in the Amended Complaint as true. *Kerns v. United States*, 585 F.3d 187, 192 (4th

Cir. 2009). Based on these standards, the Court accepts the following facts.

### A.    Origins of the Tribe's Lending Businesses

Plaintiffs are consumers residing in either this Division or District. (Am. Compl. (ECF

No. 54) ¶¶ 11-18.) Asner resides in Kansas City, Missouri, and served as the owner and manager

of National Performance Agency, LLC ("NPA"), Nagus Enterprises and Edison Creek. (Am.

Compl. ¶ 20.) Landy resides in Kansas and served as an owner of NPA. (Am. Compl. ¶ 19.)

Sherry Treppa, Tracey Treppa, Kathleen Treppa and Iris Picton serve respectively as the

chairperson, vice chairperson, treasurer and secretary of the Tribe's Executive Council. (Am.

Compl. ¶¶ 21-24.) Sam Icay, Aimee Jackson-Penn and Amber Jackson serve as members-at-large on the same Council. (Am. Compl. ¶¶ 25-27.)

As early as 2008, the Tribe retained Rosette, LLP, a law firm that advertises itself as a majority-Native-American firm that represents tribal governments and entities, including tribes interested in starting payday lending operations. (Am. Compl. ¶¶ 38-41, 47.) The Tribe's Executive Council engaged Rosette, LLP, in its capacity as the Tribe's governing body, "'responsible for acting in all matters that concern the general welfare of the Tribe.'" (Am. Compl. ¶ 51 (quoting Aff. of Sherry Treppa in Supp. of Tribal Defs.' Mot. to Dismiss & Mot. to Compel Arbitration ("Treppa Aff.") (ECF No. 44) ¶ 44).)

Out of this engagement, in August 2012, the Tribe established Golden Valley, which provided short-term loans of up to $1,000.00 to approved consumers. (Am. Compl. ¶¶ 55-56.) Soon thereafter, in June 2013, Defendants began issuing identical loans through Silver Cloud, a separate lending entity. (Am. Compl. ¶ 59.) And, in January 2014, Defendants began offering loans through Mountain Summit. (Am. Compl. ¶ 61.) All three entities advertised that they were wholly owned by the Tribe and based out of the Tribe's reservation in Upper Lake, California. (Am. Compl. ¶¶ 57-58, 60, 62.)

Despite the Tribal Lending Entities' representations regarding their ownership and operations, "nearly all activities performed on behalf of Golden Valley, Silver Cloud, and Mountain Summit were performed by owners and employees of non-tribal companies, primarily [NPA] and its affiliated companies, including National Processing of America and Nagus Enterprises." (Am. Compl. ¶ 67.) These non-tribal businesses operated out of Overland Park, Kansas, at the same address now used by Upper Lake Processing Services, Inc. ("ULPS"), a

tribal entity created after the merger between NPA and Clear Lake TAC G (a tribal entity) and Nagus Enterprises and Clear Lake TAC S (a tribal entity). (Am. Compl. ¶¶ 3, 5, 68.)

The Tribal Lending Entities distributed the vast majority of the revenues received from their operations to NPA, Edison Creek, Nagus Enterprises and Cobalt Hills (the "Non-Tribal Entities"), companies owned and operated by Asner, Landy and other unknown individuals. (Am. Compl. ¶¶ 71-74.) In his capacity as an owner and operator of the Non-Tribal Entities, Landy supervised dozens of employees and had signatory authority on bank accounts opened by each entity. (Am. Compl. ¶¶ 75-76.) Similarly, Asner signed multiple documents on behalf of NPA and Nagus Enterprises, including the documents effectuating the merger between those companies and Clear Lake TAC G and Clear Lake TAC S. (Am. Compl. ¶¶ 77-78.)

**B.      Events Leading to the Merger of the Non-Tribal and Tribal Entities**

Soon after the Tribal Lending Entities began operating, in August 2013, the New York State Department of Financial Services ("NYDFS") issued a cease and desist letter to thirty-five online lending companies, including Golden Valley, after discovering that those companies offered payday loans to New York consumers with annual interest rates as high as 1,095 percent, in violation of New York law. (Am. Compl. ¶¶ 80-81.) In response, several other tribal lending entities and the respective tribes that formed them sued NYDFS, seeking declaratory and injunctive relief to prevent the enforcement of New York law against them as sovereign tribes. (Am. Compl. ¶ 85 (citing *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014)).) The Southern District of New York denied the tribal plaintiffs' request for relief, finding that the tribes' loans were not exempt from New York's nondiscriminatory usury laws. (Am. Compl. ¶¶ 87-88 (citing *Otoe-Missouria Tribe of Indians*, 974 F. Supp. 2d at 361).)

5

Soon after losing their lawsuit in the Southern District of New York, two tribal lending enterprises, Western Sky Financial, LLC, and CashCall, Inc., entered into a settlement with the New York Attorney General, agreeing to refund borrowers who paid more than the legal rate of interest and to pay $1.5 million in penalties. (Am. Compl. ¶¶ 89-90.) The federal government also intervened, with the Department of Justice launching "Operation Choke Point" in 2013 and the Consumer Financial Protection Bureau ("CFPB") filing a lawsuit against CashCall, Inc., in December 2013. (Am. Compl. ¶ 91 (citing *CFPB v. CashCall, Inc.*, No. 1:13cv13167, ECF No. 1 (D. Mass. Dec. 16, 2013)).)

Following these actions by state and federal regulators, Defendants, Rosette, LLP, and other industry members decided to sell the Non-Tribal Entities to newly created tribal entities, Clear Lake TAC G and Clear Lake TAC S. (Am. Compl. ¶¶ 94-96.) Defendants effectuated these mergers in August 2014. (Am. Compl. ¶ 97.) Hours before NPA merged with Clear Lake TAC G, NPA acquired several other companies involved in the Tribe's lending practices, including Cobalt Hills, American Consumer Credit, Community Credit Services, Dynamic Marketing and National Opportunities Unlimited. (Am. Compl. ¶ 98.) Similarly, before merging with Clear Lake TAC S, Nagus Enterprises acquired several other companies, including Darden Creek and Rockstar Wagamama. (Am. Compl. ¶ 99.) Soon after merging with NPA and Nagus Enterprises, Clear Lake TAC G and Clear Lake TAC S dissolved and ULPS acquired the entities' assets. (Am. Compl. ¶ 100.) ULPS employs many of the same employees from before the merger, none of whom are members of the Tribe, and operates out of Overland Park, Kansas. (Am. Compl. ¶¶ 69, 101-03.) Plaintiffs allege that non-tribal entities and individuals continue to receive most of the revenue from the Tribe's lending practices. (Am. Compl. ¶ 104.)

### C. Plaintiffs' Loans from the Tribal Lending Entities

The Tribal Lending Entities market, issue and collect on loans throughout the United States, including Virginia. (Am. Compl. ¶ 105.) The loans issued by the Tribal Lending Entities charge interest rates that exceeded the usury cap in many of the states in which the Entities operate. (Am. Compl. ¶ 107.) For example, Hengle obtained three loans from Majestic Lake with an annual percentage rate ("APR") of 636, 722 and 763 percent, respectively, which exceed Virginia's 12-percent usury cap. (Am. Comp. ¶ 108 (citing Va. Code § 6.2-303(A)).) Similarly, Rose obtained a loan from Silver Cloud with an APR of 727 percent; Pike obtained a loan from Golden Valley with an APR of 744 percent; Mwethuku obtained a loan from Golden Valley with an APR of 919 percent; Bumbray obtained a loan from Majestic Lake with an APR of 543 percent; and, Myers obtained a loan from Mountain Summit with an APR of 565 percent. (Am. Compl. ¶ 109.) Plaintiffs obtained their loans while residing in Virginia and used their Virginia addresses to apply for the loans. (Am. Compl. ¶¶ 110-11.) The Tribal Lending Entities have not obtained a consumer finance license to issue loans in excess of Virginia's 12-percent usury cap. (Am. Compl. ¶ 113.)

In total, Hengle paid at least $1,127.65 in connection with his loans, while Blackburn paid at least $4,161.75, Rose paid at least $1,439.00, Bumbray paid at least $1,561.00, Pike paid at least $1,725.00, Myers paid at least $635.50, Collins paid at least $1,032.50 and Mwethuku paid at least $499.50. (Am. Compl. ¶¶ 116-23.) Plaintiffs paid these amounts while residing in Virginia using money withdrawn from bank accounts maintained in Virginia. (Am. Compl. ¶ 124.) Asner and Landy received part of the revenue from these payments through their ownership interest and participation in the Tribe's lending practices. (Am. Compl. ¶ 125.)

## D.    Plaintiffs' Amended Complaint

On July 12, 2019, Plaintiffs filed their First Amended Class Action Complaint (ECF No. 54), raising seven counts for relief based on the above allegations.[3]  In Count One, Plaintiffs allege that Asner and Landy violated § 1962(c) of RICO by participating in the affairs of an enterprise engaged in the collection of unlawful debts. (Am. Compl. ¶¶ 139-43.)  Plaintiffs assert Count One on behalf of themselves and a class of "[a]ll Virginia residents who entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake" (the "§ 1962(c) Class"). (Am. Compl. ¶ 132.)  Relatedly, in Count Two, Plaintiffs assert a claim on behalf of themselves and a class of "[a]ll Virginia residents who entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake" (the "§ 1962(d) Class"), alleging that Asner and Landy violated § 1962(d) of RICO by conspiring to violate § 1962(c). (Am. Compl. ¶¶ 146, 153.)

In Count Three, Plaintiffs assert a claim on behalf of the same class, alleging that Asner and Landy violated Virginia's usury statute, Va. Code § 6.2-303(A), through their role in the alleged RICO enterprise. (Am. Compl. ¶¶ 162-63.)  In Count Four, Plaintiffs assert a claim on behalf of the "Unjust Enrichment Class," which they define the same as in the preceding counts, alleging that the Class's payments on the usurious loans issued by the Tribal Lending Entities unjustly enriched Asner and Landy. (Am. Compl. ¶¶ 156, 173.)

In Count Five, Plaintiffs allege that the Tribal Officials violated and continue to violate § 1962(c) by participating in the affairs of an enterprise engaged in the collection of unlawful debts and violated and continue to violate § 1962(d) by conspiring to participate in such an

---

[3]      In their Amended Complaint, Plaintiffs mislabel Count Six as Count Seven and Count Seven as Count Eight. (Am. Compl. at 40, 43.) The Court will refer to the Counts according to their sequential order.

enterprise. (Am. Compl. ¶¶ 182-94.) Plaintiffs further allege that the Tribal Officials violated and continue to violate § 1962(a) by using and reinvesting income derived from their collection of unlawful debts and violated and continue to violate § 1962(b) by acquiring and maintaining interests in an enterprise engaged in the collection of unlawful debts. (Am. Compl. ¶¶ 195, 199.) Plaintiffs bring Count Five on behalf of the "Tribal Council RICO Class," which they define in the same manner as in the preceding counts. (Am. Compl. ¶ 176.) Plaintiffs limit the relief requested in Count Five to only prospective, injunctive relief against the Tribal Officials. (Am. Compl. ¶ 203.)

In Count Six, Plaintiffs seek a declaratory judgment against the Tribal Officials, declaring the loans issued to the "Declaratory Judgment Class" null and void. (Am. Compl. ¶¶ 205-16.) Plaintiffs define the "Declaratory Judgment Class" as "[a]ll Virginia residents who entered into a loan agreement with [the Tribal Lending Entities] and who have outstanding balances on the loans." (Am. Compl. ¶ 205.) Finally, in Count Seven, Plaintiffs seek to enjoin the Tribal Officials from continuing to collect on the loans issued to Plaintiffs and a class of similarly situated Virginia residents, because those loans violate Virginia law. (Am. Compl. ¶¶ 225, 232-35.) Plaintiffs also seek to enjoin the Tribal Officials from "making any loans in Virginia in excess of 12% interest (or 36% if the Tribal Lending Entities obtain a consumer finance license)." (Am. Compl. ¶ 235.)

### E.    Asner and Landy's Motions

In response to Plaintiffs' Amended Complaint, on August 9, 2019, Asner and Landy filed their renewed Motion to Compel Arbitration (ECF No. 57) and Motion to Dismiss (ECF No. 59). In support of their Motion to Compel Arbitration, Asner and Landy argue that all Plaintiffs

except Mwethuku[4] are bound by the arbitration language (the "Arbitration Provision") in the Consumer Loan and Arbitration Agreement that each of them signed in connection with the loans that they obtained from the Tribal Lending Entities. (Mem. in Supp. of Defs. Scott Asner & Joshua Landy's Renewed Mot. to Compel Arbitration ("A/L Arb. Mem.") (ECF No. 58) at 1.) Pursuant to the Federal Arbitration Act, 9 U.S.C. § 2, Asner and Landy contend that the Court must enforce the Arbitration Provision and compel arbitration of Plaintiffs' claims, dismissing Mwethuku's claims for other reasons. (A/L Arb. Mem. at 1 n.1.) Asner and Landy assert that the Arbitration Provision unequivocally requires an arbitrator to determine arbitrability issues, so the Court should compel arbitration regardless of Plaintiffs' challenges to the Provision. (A/L Arb. Mem. at 2-3, 10-14.) And Asner and Landy argue that the Arbitration Provision requires arbitration of the claims against them, even though they are not signatories to the loan agreements, because the agreements apply to "related third parties." (A/L Arb. Mem. at 3, 15-17.)

Alternatively, Asner and Landy move to dismiss Plaintiffs' claims against them for lack of personal jurisdiction, untimeliness, failure to join indispensable parties and failure to state a claim. (Mem. in Supp. of Defs. Scott Asner & Joshua Landy's Renewed Mot. to Dismiss ("A/L MTD Mem.") (ECF No. 60) at 6-30.) First, Asner and Landy argue that the Court should dismiss Plaintiffs' claims against them as untimely for either falling outside of the statute of limitations or the time period during which Asner and Landy were involved in the alleged RICO enterprise. (A/L MTD Mem. at 6-9.) Indeed, Asner and Landy note that one of the Tribal Lending Entities, Majestic Lake, did not begin operating until after they sold their businesses to

---

[4] For ease of reference, when discussing the Arbitration Provision, "Plaintiffs" means all Plaintiffs except Mwethuku.

the Tribe. (A/L MTD Mem. at 28.) Asner and Landy contend that Plaintiffs' allegation regarding their continued involvement as executives of the Tribal Lending Entities fails to mend the timeliness problem, because such an allegation lacks factual support, conflicts with the assertions in the affidavit of Sherry Treppa that the Tribe's Executive Council controls the Tribal Lending Entities and cannot be pled based on "information and belief." (A/L MTD Mem. at 9-13.)

Asner and Landy also contend that the choice-of-law provisions in Plaintiffs' loan agreements render their loans lawful under the Tribe's laws. (A/L MTD Mem. at 14-15.) And Asner and Landy argue that the Tribal Lending Entities constitute indispensable parties, requiring dismissal of Plaintiffs' claims pursuant to Federal Rules of Civil Procedure 12(b)(7) and 19. (A/L MTD Mem. at 15-16.)

As for Plaintiffs' state-law claims, Asner and Landy contend that they cannot be held liable for their alleged violations of Virginia law, because corporate liability principles protect them. (A/L MTD Mem. at 16-18.) Asner and Landy further contend that they do not constitute "lenders" within the meaning of Virginia's consumer finance statutes, nor did they receive the payments on Plaintiffs' loans, precluding Plaintiffs' claims against them. (A/L MTD Mem. at 18-20.) And Asner and Landy assert that Plaintiffs' unjust enrichment claim must fail, because Plaintiffs fail to sufficiently allege that Asner and Landy received and accepted any direct benefit from Plaintiffs. (A/L MTD Mem. at 20-22.)

Asner and Landy further argue that the Court should dismiss Plaintiffs' RICO claims, because: (1) the loans at issue do not constitute unlawful debts; (2) Plaintiffs fail to allege any involvement by Asner and Landy in the issuing or collection of loans after August 2014; (3) Plaintiffs fail to allege that Asner and Landy had sufficient involvement in the alleged RICO

enterprise; and, (4) Plaintiffs fail to allege that Asner and Landy agreed to violate RICO with knowledge of the alleged conspiracy's criminal objective. (A/L MTD Mem. at 23-28.)

Asner and Landy also challenge the Court's personal jurisdiction over them, arguing that because their RICO claims fail, Plaintiffs cannot rely on RICO's nationwide service of process provision and must therefore fall back on Virginia's long-arm statute and the Due Process Clause of the Fourteenth Amendment, under which Plaintiffs fail to allege sufficient contacts between Asner and Landy and Virginia. (A/L MTD Mem. at 28-29.) Based on these arguments, Asner and Landy contend that the Court should dismiss Plaintiffs' claims with prejudice, because Plaintiffs have already taken advantage of the opportunity to amend with sufficient notice of the deficiencies pointed out in Asner and Landy's first motion to dismiss, rendering futile any further amendments to Plaintiffs' allegations. (A/L MTD Mem. at 29-30.)

On September 16, 2019, Plaintiffs filed their Memoranda in Opposition to Asner and Landy's Motions, (Pls.' Opp. to Scott Asner & Joshua Landy's Renewed Mot. to Compel Arbitration ("Pls.' A/L Arb. Resp.") (ECF No. 97); Mem. in Opp. to Defs. Scott Asner & Joshua Landy's Renewed Mot. to Dismiss ("Pls.' A/L MTD Resp.") (ECF No. 99)), and, on October 4, 2019, Asner and Landy filed their Replies to Plaintiffs' Memoranda, (Reply in Supp. of Defs. Scott Asner & Joshua Landy's Renewed Mot. to Compel Arbitration ("A/L Arb. Reply") (ECF No. 103); Reply in Supp. of Defs. Scott Asner & Joshua Landy's Renewed Mot. to Dismiss ("A/L MTD Reply") (ECF No. 104)), rendering both Motions now ripe for review.

**F.    Tribal Officials' Motions**

Separately from Asner and Landy, on August 9, 2019, the Tribal Officials filed a Motion to Compel Arbitration (ECF No. 62) and a Motion to Dismiss (ECF No. 64). In support of their Motion to Compel Arbitration, like Asner and Landy, the Tribal Officials argue that the

Arbitration Provision binds all Plaintiffs except Mwethuku, requiring those Plaintiffs to arbitrate their claims against the Tribal Officials. (Mem. in Supp. of Tribal Defs.' Mot. to Compel Arbitration ("Tribe Arb. Mem.") (ECF No. 63) at 1, 4-8.) Like Asner and Landy, the Tribal Officials maintain that the validity and scope of the Arbitration Provision should be determined by an arbitrator pursuant to the terms of the Provision. (Tribe Arb. Mem. at 2, 14-18.) Should the Court decide to resolve questions of arbitrability, the Tribal Officials assert that the Arbitration Provision proves enforceable even though the Provision precludes Plaintiffs' class claims. (Tribe Arb. Mem. at 2-3, 19-25.) And the Tribal Officials move to dismiss Mwethuku's claims, because Mwethuku's decision to opt out of the Arbitration Provision invoked language requiring that he bring any claims through a prescribed administrative process, with appeals to the American Arbitration Association (the "AAA"). (Tribe Arb. Mem. at 3, 25-26.)

Alternatively, the Tribal Officials move to dismiss Plaintiffs' claims against them, arguing that the loans are lawful, because the Tribe's laws govern the validity of the loans pursuant to the loan agreements' choice-of-law provision. (Mem. in Supp. of Tribal Defs.' Mot. to Dismiss ("Tribe MTD Mem.") (ECF No. 65) at 5-10.) The Tribal Officials also assert that sovereign immunity precludes the Court from exercising jurisdiction over Plaintiffs' claims, because those claims are really against the Tribe and because Plaintiffs' decision to seek only prospective, injunctive relief against the Tribal Officials does not overcome the Officials' sovereign immunity. (Tribe MTD Mem. at 11-24.) And, like Asner and Landy, the Tribal Officials move for dismissal pursuant to Rules 12(b)(7) and 19 for Plaintiffs' failure to join the Tribal Lending Entities as indispensable parties. (Tribe MTD Mem. at 25-27.) Finally, the Tribal Officials contend that Plaintiffs lack standing to seek an injunction against future lending

and that Bumbray, Blackburn and Collins lack standing to enjoin the collection of outstanding debts, because they have already paid off their loans. (Tribe MTD Mem. at 28-30.)

On September 16, 2019, Plaintiffs filed their Memoranda in Opposition to the Tribal Officials' Motions, (Pls.' Opp. to Tribal Officials' Mot. to Compel Arbitration ("Pls.' Tribe Arb. Resp.") (ECF No. 96); Pls.' Opp. to Tribal Officials' Mot. to Dismiss ("Pls.' Tribe MTD Resp.") (ECF No. 98)), and the Tribal Officials filed their Replies to Plaintiffs' Memoranda on October 4, 2019, (Reply in Supp. of Tribal Defs.' Mot. to Compel Arbitration ("Tribe Arb. Reply") (ECF No. 105); Reply in Supp. of Tribal Defs.' Mot. to Dismiss ("Tribe MTD Reply") (ECF No. 106)), rendering the Tribal Officials' Motions now ripe for review.

Because Defendants' Motions to Compel Arbitration determine the proper forum to consider the merits of Plaintiffs' claims, the Court will first address those Motions. *See Docs Billing Sols., LLC v. GENETWORx LLC*, 2018 WL 4390786, at *2 (E.D. Va. Aug. 30, 2018) (noting that jurisdictional challenges — in that case, a motion to remand pursuant to a forum selection clause — should take precedence over other motions (citing *Bartels v. Saber Healthcare Grp., LLC*, 880 F.3d 668, 680 (4th Cir. 2018)). Only if Plaintiffs' claims survive Defendants' Motions to Compel Arbitration will the Court address Defendants' Motions to Dismiss.

## II.     MOTIONS TO COMPEL ARBITRATION

Because both Motions to Compel Arbitration rely on the same Arbitration Provision, the Court will consider the Motions together.

### A.     Standard of Review

Section 2 of the Federal Arbitration Act ("FAA") provides that "a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable,

and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Congress enacted the FAA "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991) (citations omitted). Thus, there exists a "strong federal policy in favor of enforcing arbitration agreements." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 671 (4th Cir. 2016) (citations omitted).

Relevant here, as well as agreeing to arbitrate the merits of a dispute, parties to an arbitration agreement may also agree to arbitrate certain "'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010) (citations omitted). However, "whether the parties have submitted a particular dispute to arbitration, i.e. the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (emphasis supplied) (quoting *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)). And the additional agreement to delegate gateway issues to an arbitrator must survive § 2 of the FAA, which subjects such agreements to legal and equitable defenses. *Rent-A-Center*, 561 U.S. at 70. If a delegation provision both clearly and unmistakably delegates gateway issues to an arbitrator and proves valid under § 2, a court may not decide the merits of any arbitrability issues and must submit such questions to the arbitrator consistent with the parties' agreement, even if the argument for arbitration proves "wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529-30 (2019).

In deciding the validity of arbitration agreements, including delegation provisions, courts apply federal law. *Smith Barney, Inc. v. Critical Health Sys.*, 212 F.3d 858, 860-61 (4th Cir. 2000). The FAA also "preserves state law contract defenses unless such defenses 'rely on the uniqueness of an agreement to arbitrate' and are applied 'in a fashion that disfavors arbitration.'" *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 334 (4th Cir. 2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341-42 (2011)). "Consistent with these contract principles, the Supreme Court has recognized that arbitration agreements that operate 'as a prospective waiver of a party's right to pursue statutory remedies' are not enforceable because they are in violation of public policy." *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985)).

## B.    The Arbitration Provision

Relevant here, the Tribal Lending Entities issued each loan to Plaintiffs pursuant to a contract titled "Consumer Loan and Arbitration Agreement." (Ex. 1 to A/L Arb. Mem. ("Agreement") (ECF No. 58-1) at 1.) Each Agreement included an Arbitration Provision.[5] (Agreement at 5-6.) The Arbitration Provision explained the general concept of arbitration in a section titled "Resolving Disputes; Waiver of Jury Trial and Arbitration Provision." (Agreement at 5.) The Arbitration Provision then explained that the relevant Tribal Lending Entity issued each loan as an "economic arm, instrumentality, and corporation owned by the Tribe," claiming the same sovereign immunity as the Tribe. (Agreement at 5.) Based on these representations, the Provision asked each consumer to acknowledge and agree that:

---

[5]    For a copy of each loan agreement, see (Exs. 83-100 to Treppa Aff. (ECF Nos. 45-33 to 45-50).) Plaintiffs do not dispute that they signed these agreements. Because the Arbitration Provision proves substantively the same in each agreement, the Court will cite to the loan agreement attached in support of Asner and Landy's Motion to Compel Arbitration.

1. For purposes of this Agreement, the words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation, (a) all claims, disputes, or controversies arising from or relating directly or indirectly to the signing of this Arbitration Provision, the validity and scope of this Arbitration Provision and any claim or attempt to set aside this Arbitration Provision; (b) all tribal, federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to this Agreement, the information You gave Us before entering into this Agreement, including the customer information application, and/or any past agreement or agreements between You and Us; (c) all counterclaims, cross-claims and third-party claims; (d) all common law claims, based upon contract, tort, fraud, or other intentional torts; (e) all claims based upon a violation of any tribal, state or federal constitution, statute or regulation; (f) all claims asserted by Us against You, including claims for money damages to collect any sum We claim You owe Us; (g) all claims asserted by You individually against Us and/or any of Our employees, agents, directors, officers, shareholders, governors, managers, members, parent company or affiliated entities (hereinafter collectively referred to as "related third parties"), including claims for money damages and/or equitable or injunctive relief; (h) all claims asserted on Your behalf by another person; (i) all claims asserted by You as a private attorney general, as a representative and member of a class of persons, or in any other representative capacity, against Us and/or related third parties (hereinafter referred to as "Representative Claims"); and/or (j) all claims from or relating directly or indirectly to the disclosure by Us or related third parties of any non-public personal information about You.

2. You acknowledge and agree that by entering into this Arbitration Provision: (a) YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES; (b) YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES; and (c) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES.

3. All disputes including any Representative Claims against Us and/or related third parties shall be resolved by binding arbitration only on an individual basis with You. THEREFORE, THE ARBITRATOR SHALL NOT CONDUCT CLASS ARBITRATION; THAT IS, THE ARBITRATOR SHALL NOT ALLOW YOU TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN THE ARBITRATION.

4. Any party to a dispute, including related third parties, may send the other party written notice by certified mail return receipt requested of their intent to arbitrate

and setting forth the subject of the dispute along with the relief requested, even if a lawsuit has been filed. Regardless of who demands arbitration, You shall have the right to select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association . . . or JAMS . . . . The parties to such dispute will be governed by the laws of the [Tribe] and such rules and procedures used by the applicable arbitration organization applicable to consumer disputes, to the extent those rules and procedures do not contradict the express terms of this Arbitration Provision or the law of the [Tribe], including the limitations on the arbitrator below. You may obtain a copy of the rules and procedures by contacting the arbitration organization listed above.

You have the right to request that the arbitration take place within thirty (30) miles of Your residence or some other mutually agreed upon location, provided, however, that such election to have binding arbitration occur somewhere other than on Tribal land shall in no way be construed as a waiver of sovereign immunity or allow for the application of any other law other than the laws of the [Tribe].

5. Regardless of who demands arbitration, We will advance Your portion of the arbitration expenses . . . at Your request. Throughout the arbitration, each party shall bear his or her own attorneys' fees and expenses, such as witness and expert witness fees . . . . The arbitrator may decide, with or without a hearing, any motion that is substantially similar to a motion to dismiss for failure to state a claim or a motion for summary judgment. If allowed by statute or applicable law, the arbitrator may award statutory damages and/or reasonable attorneys' fees and expenses. If the arbitrator does not render a decision or an award in Your favor resolving the dispute, then the arbitrator shall require You to reimburse Us for the Arbitration Fees We have advanced less any Arbitration Fees You have previously paid . . . . The arbitrator's award is binding and not appealable.

6. All parties, including related third parties, shall retain the right to enforce an arbitration award before the applicable governing body of the [Tribe] ("Tribal Forum"). Both You and We expressly consent to the jurisdiction of the Tribal Forum for the sole purposes of enforcing the arbitration award. The Tribe does not waive sovereign immunity.

7. This Arbitration Provision is made pursuant to a transaction involving both interstate commerce and Indian commerce under the United States Constitution and other federal and tribal laws. Thus, any arbitration shall be governed by the FAA and subject to the laws of the [Tribe]. If a final non-appealable judgment of a court having jurisdiction over this transaction and the parties finds, for any reason, that the FAA does not apply to this transaction, then Our agreement to arbitrate shall be governed by the laws of the [Tribe].

8. This Arbitration provision is binding upon and benefits You, Your respective heirs, successors and assigns . . . If any of this Arbitration Provision is held invalid, the remainder shall remain in effect.

(Agreement at 5-6.)

### C.     Delegation of Arbitrability Issues

Defendants first argue that the Arbitration Provision clearly and unmistakably reflects the parties' intent to delegate disputes regarding arbitrability to an arbitrator, requiring the Court to compel arbitration of Plaintiffs' challenges to the validity and scope of the Arbitration Provision. (A/L Arb. Mem. at 12-13; Tribe Arb. Mem. at 15-18.) Plaintiffs respond that the language in the Arbitration Provision that delegates arbitrability issues to an arbitrator (the "Delegation Clause") proves unenforceable, because the choice-of-law and forum selection clauses in the Provision and the loan agreements prospectively waive the application of federal and state law and therefore preclude defenses to arbitrability that arise under federal and state law, making delegation an exercise in futility. (Pls.' Tribe Arb. Resp. at 24-25; Pls.' A/L Arb. Resp. at 24-25.) Plaintiffs add that the Arbitration Provision's prospective waiver of their right to seek statutory remedies while simultaneously requiring arbitration of gateway issues renders the Delegation Clause unconscionable. (Pls.' Tribe Arb. Resp. at 25; Pls.' A/L Arb. Resp. at 25.) Plaintiffs also argue that the Court should void the Arbitration Provision, because the loan agreements themselves are void under Virginia's usury statute. (Pls.' Tribe Arb. Resp. at 25-26; Pls.' A/L Arb. Resp. at 26.)

Should the Court find the Delegation Clause enforceable, Plaintiffs argue that the Court should nonetheless avoid delegation, because the issue of whether the Arbitration Provision violates the prospective waiver doctrine can be easily determined without referral to an arbitrator. (Pls.' Tribe Arb. Resp. at 26-27; Pls.' A/L Arb. Resp. at 27-28.) And Plaintiffs argue

that the Court cannot enforce the Arbitration Provision without the offending clauses, because those clauses go to the essence of the Provision. (Pls.' Tribe Arb. Resp. at 27-28; Pls.' A/L Arb. Resp. at 28-29.)

### 1. The Arbitration Provision Clearly and Unmistakably Delegates to an Arbitrator Arbitrability Disputes.

As mentioned, "whether the parties have submitted a particular dispute to arbitration, i.e. the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam*, 537 U.S. at 83 (emphasis supplied) (quoting *AT&T Techs., Inc.*, 475 U.S. at 649). "[W]hen the parties disagree whether they have delegated [the authority to determine arbitrability issues] to an arbitrator, that question of arbitrability must be answered by the court." *Novic v. Credit One Bank, N.A.*, 757 F. App'x 263, 265 (4th Cir. 2019) (citations omitted). To that end, whether a delegation clause "clearly and unmistakably" delegates arbitrability issues is an "exacting" standard, "and . . . a general agreement to arbitrate disputes . . . will not suffice to establish the parties' intent concerning questions of arbitrability." *Id.* Rather, "to meet the 'clear and unmistakable' standard, an agreement must contain language specifically and plainly reflecting the parties' intent to delegate disputes regarding arbitrability to an arbitrator." *Id.* at 265-66 (citing *Peabody Holding Co. v. United Mine Workers of Am.*, 665 F.3d 96, 103 (4th Cir. 2012) and *Carson v. Giant Food, Inc.*, 175 F.3d 325, 329 (4th Cir. 1999)). A party may challenge the validity of a delegation clause, including whether its terms are clear and unmistakable; "[h]owever, absent a challenge to the validity of such delegation, courts will not intervene in interpreting the parties' agreement . . . [and] a party's challenge to a different contract provision, or to the contract as a whole, will not prevent a court from submitting to the arbitrator the question of arbitrability." *Id.* at 266 (citations omitted).

Here, the Delegation Clause provides that the disputes subject to arbitration under the Arbitration Provision include "all claims, disputes, or controversies arising from or relating directly or indirectly to the signing of this Arbitration Provision, the validity and scope of this Arbitration Provision and any claim or attempt to set aside this Arbitration Provision." (Agreement at 5.) This language clearly and unmistakably delegates arbitrability issues to an arbitrator by requiring that any challenge to the validity or scope of the Arbitration Provision — and not merely the loan agreement generally — be determined by an arbitrator. This precise language proves distinguishable from more general language that the Fourth Circuit has rejected under the "clear and unmistakable" standard, *see, e.g.*, *Peabody*, 665 F.3d at 103 (rejecting clause requiring arbitration of "[a]ny dispute alleging a breach of this" contract); *Carson*, 175 F.3d at 329 (rejecting clause requiring arbitration of "'any grievance or dispute aris[ing] between the parties regarding the terms of this Agreement' and any 'controversy, dispute or disagreement . . . concerning the interpretation of the provisions of this Agreement'"), and resembles delegation language that the Fourth Circuit has enforced, *see, e.g.*, *Novic*, 757 F. App'x at 266 (upholding clause that required arbitration of claims regarding "*the application, enforceability or interpretation of* [the cardholder agreement], *including this arbitration provision*" (emphasis supplied)). Accordingly, unless the Delegation Clause proves unenforceable under § 2 of the FAA, the Court must compel arbitration of Plaintiffs' challenges to the arbitrability of their claims.

### 2.     *The Delegation Clause is Unenforceable.*

Plaintiffs argue that the Delegation Clause is unenforceable, in part, because it delegates questions of arbitrability to an arbitrator who cannot apply federal or state law pursuant to the Arbitration Provision's choice-of-law clauses, meaning the arbitrator could not apply the

prospective waiver doctrine or other federal and state defenses to arbitrability. (Pls.' Tribe Arb. Resp. at 24-25; Pls.' A/L Arb. Resp. at 24-25.) Plaintiffs also argue that the Court should avoid delegation of arbitrability issues, because the Arbitration Provision unambiguously waives Plaintiffs' rights under federal and state law. (Pls.' A/L Arb. Resp. at 27-29.) Specifically, because no doubt remains as to whether the Arbitration Provision's choice-of-law and forum-selection clauses prospectively waive their federal statutory rights, Plaintiffs contend that the Court can refuse to enforce the Delegation Clause and find the Arbitration Provision wholly unenforceable under the prospective waiver doctrine. (Pls.' A/L Arb. Resp. at 27.) Plaintiffs assert that the Court should especially avoid delegation in cases such as this, in which enforcement of the Arbitration Provision would effectively preclude federal judicial review of an arbitrability decision, because the Provision reserves jurisdiction to enforce an arbitrator's award in an ill-defined "Tribal Forum." (Pls.' A/L Arb. Resp. at 28; Agreement at 6 ¶ 6.) Plaintiffs maintain that the choice-of-law and tribal review clauses prove inseverable from the Arbitration Provision such that the Court cannot cure the prospective waiver problem. (Pls.' A/L Arb. Resp. at 28-29.)

Defendants respond that the choice-of-law language in the Arbitration Provision does not prevent an arbitrator from considering federal or state defenses to arbitrability, because "'[t]he Supreme Court has . . . squarely rejected the argument that a federal court should read a contract's general choice of law provision . . . as displacing federal arbitration law.'" (Tribe Arb. Reply at 6 (quoting *Porter Hayden Co. v. Century Indem. Co.*, 136 F.3d 380, 382 (4th Cir. 1998) (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995))).) Defendants contend that the Arbitration Provision expressly provides that the FAA governs any arbitration in addition to the Tribe's laws. (Tribe Arb. Reply at 7; Agreement at 6 ¶¶ 5, 7.)

In support of their argument, Plaintiffs rely primarily on the Fourth Circuit's holdings in *Hayes v. Delbert Services Corporation*, 811 F.3d 666 (4th Cir. 2016), and *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017). In *Hayes*, the Fourth Circuit considered an arbitration provision contained in a payday loan obtained by the plaintiffs from Western Sky, a lender operated by the Cheyenne River Sioux Tribe. 811 F.3d at 668. The plaintiffs' loan agreements included a forum selection clause that subjected the agreement "solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe," further providing that "no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation." *Id.* at 669 (emphasis removed) (internal quotations and citations omitted). The agreements also contained a section titled "GOVERNING LAW," which further disavowed the application of federal or state law. *Id.* at 669-70. The agreements required arbitration of any disputes — including disputes concerning the validity and enforceability of the arbitration provision — before an authorized representative of the Cheyenne River Sioux Tribe, with the arbitrator limited to applying only the tribe's laws. *Id.* at 670. However, the agreements later allowed consumers to select from two, well-regarded arbitration organizations (the AAA or JAMS) to "administer the arbitration." *Id.* The district court found that the non-tribal servicer of the plaintiffs' loans could enforce the arbitration provision, and the plaintiffs appealed. *Id.* at 670-71.

On appeal, the plaintiffs argued that the arbitration provision provided a "hollow arbitral mechanism," because, despite the tribe's representations in the loan agreements, the Cheyenne River Sioux Tribe had no authorized representative to conduct arbitrations, no method for selecting an authorized arbitrator and no established arbitration procedures. *Id.* at 672. The plaintiffs further maintained that the additional option to select the AAA or JAMS to

"administer" arbitrations under the loan agreements failed to improve the tribe's arbitration process, noting that the language of the arbitration provision still required an authorized representative of the tribe to conduct the arbitration. *Id.* at 673.

The Fourth Circuit avoided answering the plaintiffs' arguments, finding instead that the arbitration provision failed "for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims." *Id.* The Fourth Circuit noted that "[w]ith one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away." *Id.* at 673-74. The Fourth Circuit took particular issue with the loan agreements' choice-of-law clause, which "[i]nstead of selecting the law of a certain jurisdiction to govern the agreement, as is normally done with a choice of law clause," was used by the tribe to "waive all of a potential claimant's federal rights," rendering the clause a "choice of no law clause [that] . . . flatly and categorically renounce[d] the authority of the federal statutes to which [the loan agreement] is and must remain subject." *Id.* at 675. Because the choice-of-law and forum selection clauses went to the "essence" of the arbitration provision, the Fourth Circuit found the provision inseverable from the offending clauses and thus voided the provision, reversing the district court. *Id.* at 675-76.

A year later, in *Dillon*, the Fourth Circuit considered a similar arbitration provision in a payday loan issued to the plaintiff James Dillon by Great Plains, a lender owned by the Otoe-Missouria Tribe of Indians. 856 F.3d at 332. As with the agreement in *Hayes*, the loan agreement signed by Dillon included choice-of-law provisions in both the underlying agreement and the accompanying arbitration agreement that disclaimed the application of state and federal law, subjecting the loan agreement and any arbitration solely to the laws of the Otoe-Missouria

Tribe. *Id.* If a borrower opted out of the arbitration provision, the loan agreement provided that

the tribe's laws would still govern the loan and that the borrower had to bring any disputes

within the tribe's court system. *Id.* Further, in a third provision, the loan agreement explicitly

prohibited the application of federal or state law to both the agreement and the tribe. *Id.* at 333.

The district court denied the defendant BMO Harris Bank's motion to compel arbitration,

likening the Great Plains loan agreements to the Western Sky agreements at issue in *Hayes*, and

BMO Harris appealed. *Id.*

On appeal, the Fourth Circuit held that a choice-of-law provision will not automatically

void an arbitration provision under the prospective waiver doctrine and that "[w]hen there is

uncertainty whether the foreign choice of law would preclude otherwise applicable federal

substantive statutory remedies, the arbitrator should determine in the first instance whether the

choice of law provision would deprive a party of those remedies." *Id.* at 334 (citing *Vimar*

*Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 540-41 (1995) and *Aggarao v.*

*MOL Ship Mgmt. Co.*, 675 F.3d 355, 371-73 (4th Cir. 2012)). "In such a case, the prospective

wavier issue would not become ripe for final determination until the federal court is asked to

enforce the arbitrator's decision." *Id.* (citations omitted). BMO Harris argued that the Great

Plains loan agreement presented such an uncertain situation, requiring the district court to

postpone the prospective-waiver determination until it was asked to enforce the arbitrator's

decision. *Id.* at 335.

The Fourth Circuit disagreed with BMO Harris's position, finding that the Great Plains

agreement included many of the same provisions that proved unenforceable in *Hayes*. *Id.*

Because the arbitration provision in the context of the entire loan agreement unambiguously

functioned to prospectively waive Dillon's federal statutory rights, the Fourth Circuit found the

arbitration provision "unenforceable as a matter of law." *Id.* at 335-36. The Fourth Circuit

further refused to sever the offending choice-of-law provisions from the arbitration agreement,

finding that Great Plains did not act in good faith when it "drafted the choice of law provisions in

the arbitration agreement to avoid the application of state and federal consumer protection laws."

*Id.* at 336. Accordingly, the Fourth Circuit affirmed the district court's order denying BMO

Harris's motion to compel arbitration. *Id.* at 337.

In response to Plaintiffs' arguments, Defendants contend that the Supreme Court's recent

decision in *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524 (2019), overturns

the holdings in *Hayes* and *Dillon* to the extent that they permit district courts to decide the

prospective waiver issue before enforcing a valid delegation clause. (Tribe Arb. Reply at 8-9

n.4.) In *Schein*, the Supreme Court addressed a frequent practice among some federal courts of

deciding arbitrability questions despite the enforceability of a delegation clause when the

argument for arbitration of a dispute proved to be "wholly groundless." 139 S. Ct. at 527-28.

The Court held that the so-called "wholly groundless" exception ran counter to the FAA's

mandate, which, based on Supreme Court precedent, treats delegation clauses as "additional,

antecedent agreement[s]" that should be enforced like any other contract. *Id.* at 529. Thus,

"[j]ust as a court may not decide a merits question that the parties have delegated to an arbitrator,

a court may not decide an arbitrability question that the parties have delegated to an arbitrator."

*Id.* at 530. That said, the Supreme Court reiterated that, "[t]o be sure, before referring a dispute

to an arbitrator, the court determines whether a valid arbitration agreement exists." *Id.* (citing 9

U.S.C. § 2).

Although the Fourth Circuit has yet to revisit its holdings in *Hayes* and *Dillon* since the

Supreme Court handed down its opinion in *Schein*, a court in this District has interpreted *Schein*

as preserving within the purview of the federal courts questions concerning the validity of a delegation clause, including under the prospective waiver doctrine. *Gibbs v. Stinson* (*Gibbs II*), 2019 WL 4752792, at *12 (E.D. Va. Sept. 30, 2019) (Lauck, J.), *appeal filed*, No. 19-2113 (4th Cir. Oct. 10, 2019). The Court agrees with Judge Lauck's reasoning in *Gibbs II* and will likewise proceed to consider whether the Delegation Clause proves unenforceable under the prospective waiver doctrine.

Indeed, a delegation clause that "require[s] an arbitrator to determine whether a valid and enforceable arbitration agreement exists absent the federal and state law tools necessary to do so" results in the "'sort of farce'" that Congress did not intend to create in enacting the FAA. *Id.* (quoting *Hayes*, 811 F.3d at 674). Of course, following the same logic, if a delegation clause provides an arbitrator with the federal and state law tools necessary to determine whether a valid and enforceable arbitration agreement exists, absent other cognizable challenges to the validity of the delegation clause, the Court should delegate prospective waiver challenges applicable only to the arbitration provision generally.

As mentioned, Defendants first argue that the choice of the Tribe's laws to govern arbitration disputes does not prospectively waive federal and state defenses to arbitrability, because Supreme Court precedent rejects "'the argument that a federal court should read a contract's general choice of law provision as . . . displacing federal arbitration law.'" (Tribe Arb. Reply at 6 (quoting *Porter Hayden Co.*, 136 F.3d at 382 (citing *Mastrobuono*, 514 U.S. at 52)).) However, the language at issue in *Mastrobuono* proves distinguishable from the choice-of-law language at issue here.

In *Mastrobuono*, the Supreme Court considered a contract specifying that the "entire agreement" would "be governed by the laws of the State of New York." 514 U.S. at 58-59. The

contract also provided for arbitration of any disputes arising out of the transaction between the parties. *Id.* at 59. Under New York law, only courts — not arbitrators — could award punitive damages, so the lower courts ruled that New York law, as incorporated by the choice-of-law provision, prohibited the arbitrator from awarding punitive damages. *Id.* The Supreme Court disagreed, finding that the general choice-of-law provision "[a]t most, . . . introduce[d] an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards." *Id.* at 62. Because the FAA expresses a strong federal policy favoring arbitration, the Court held that the ambiguity created by the general choice-of-law provision should be "'resolved in favor of arbitration.'" *Id.* (quoting *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 476 (1989)).

By comparison, the Arbitration Provision at issue here includes no such ambiguities as to the exclusive application of tribal law. For one, the Provision provides that "[t]he parties to such dispute [in arbitration] shall be governed by the laws of the [Tribe] and such rules and procedures used by the applicable arbitration organization applicable to consumer disputes, *to the extent those rules and procedures do not contradict the express terms of this Arbitration Provision or the law of the [Tribe], including the limitations on the arbitrator below.*" (Agreement at 6 (emphasis added).) The Provision then clarifies that even if a consumer elects to hold an arbitration within thirty miles of his or her residence, "such election . . . shall in no way be construed as a waiver of Tribal sovereign immunity *or allow the application of any other law other than the laws of the [Tribe].*" (Agreement at 6 (emphasis added).) Although the first clause could be read to, at most, create ambiguity that should be resolved in favor of arbitration, the first clause read in tandem with the second clearly evinces the Tribal Lending Entities' intent to disclaim the application of federal or state defenses to arbitrability, thereby prospectively waiving Plaintiffs' federal statutory remedies under § 2 of the FAA in violation of public policy.

Specifically, because the first clause allows the application of rules promulgated by the AAA or JAMS so long as those rules do not contradict "the limitations on the arbitrator below" and then — in the second clause written "below" — clarifies that only the laws of the Tribe shall apply to arbitrations to the exclusion "of any other law," the two provisions function to limit the application of defenses provided under "any other law," including the FAA. Thus, if compelled to arbitrate their arbitrability challenges, Plaintiffs could not raise any federal or state law defenses to arbitration provided under the FAA.

Defendants also contend that the Arbitration Provision "eliminate[s] any doubt" as to the applicability of federal arbitration law by "expressly providing for the application of the [FAA]." (Tribe Arb. Reply at 7 (citing Agreement at 6 ¶¶ 5, 7).) Indeed, below the first and second clauses described above, the Arbitration Provision includes two additional clauses stating that: (1) "the arbitrator shall apply applicable substantive Tribal law consistent with the [FAA];" and, (2) "any arbitration shall be governed by the FAA and subject to the laws of the [Tribe]." (Agreement at 6 ¶¶ 5, 7.) However, these clauses do not mend the prospective waiver issue as Defendants hope. For one, the clause providing that the arbitrator shall apply "applicable substantive Tribal law consistent with the [FAA]," interpreted by its plain language, simply allows for the application of the Tribe's laws. The words "consistent with the [FAA]" merely assert that the application of substantive Tribal law proves consistent with the FAA's requirements; they do not require that the Tribe's laws *be* consistent with the FAA or that the FAA should be applied in lieu of the Tribe's laws.

As for the clause stating that "any arbitration shall be governed by the FAA and subject to the laws of the [Tribe]," the Court again finds nothing in the language of the clause that reverses the prospective waiver of Plaintiffs' arbitrability defenses. In the context of the

29

paragraph in which the clause resides, the clause merely affirms that the FAA governs the

enforceability of the Arbitration Provision, because the transaction giving rise to the Provision

falls within the jurisdictional bounds of the Act. Specifically, the paragraph reads:

> This Arbitration Provision is made pursuant to a transaction involving both
> interstate commerce and Indian commerce under the United States Constitution
> and other federal and tribal laws. *Thus, any arbitration shall be governed by the*
> *FAA and subject to the laws of the [Tribe]*. If a final non-appealable judgment of
> a court having jurisdiction over this transaction and the parties finds, for any
> reason, that the FAA does not apply to this transaction, then Our agreement to
> arbitrate shall be governed by the laws of the [Tribe].

(Agreement at 6 ¶ 7 (emphasis added).) The use of the word "thus" to introduce the clause in

question clearly serves to confirm the assertion in the preceding sentence that the Arbitration

Provision falls under the FAA's jurisdictional requirement that an arbitration provision be part of

"any maritime transaction or a contract evidencing a transaction involving commerce" for a court

to enforce it. 9 U.S.C. § 2. Indeed, the sentence following the clause in question clarifies that

should the loan transaction giving rise to the Provision not involve interstate or Indian commerce

as asserted, the laws of the Tribe will determine the validity of the Arbitration Provision,

including the Delegation Clause.

Ultimately, the Court must read the Arbitration Provision to give effect to all of its terms

and render them consistent with each other. *Mastrobuono*, 514 U.S. at 63. The most

harmonious reading of the "governed by the FAA" clause and the preceding clauses that require

any arbitrated disputes to be "governed by the laws of the [Tribe]" and disclaim "the application

of any other law other than the laws of the [Tribe]" would be to read the "governed by the FAA"

clause as asserting that the Arbitration Provision falls within the purview of the FAA and should

be enforced by a court pursuant to that Act, while, following enforcement of the Provision by a

court of competent jurisdiction, an arbitrator must apply only the laws of the Tribe to the

exclusion of Plaintiffs' potential federal and state statutory rights, including defenses to

arbitrability arising under federal and state law. To read the clauses otherwise would create an

impermissible and illogical conflict between the terms of the Arbitration Provision by, on the one

hand, excluding the application of "any other law" during arbitration and, on the other,

permitting the application of federal and state law to arbitrability disputes. Clearly, the

Delegation Clause in tandem with the choice-of-law and forum selection clauses in the

Arbitration Provision serves to prospectively waive Plaintiffs' right to pursue statutory remedies.

The question then becomes whether the Court can sever the offending clauses from the

Delegation Clause such that the Court can enforce the Delegation Clause without contravening

public policy. To that end, the Fourth Circuit in *Hayes* instructed that "[i]t is a basic principle of

contract law that an unenforceable provision cannot be severed when it goes to the 'essence' of

the contract." 811 F.3d at 675-76 (internal quotations and citations omitted). In *Dillon*, the

Fourth Circuit clarified that "[u]nlawful portions of a contract may be severed *only* if: (1) the

unlawful provision is not central or essential to the parties' agreement; and (2) the party seeking

to enforce the remainder negotiated the agreement in good faith." 856 F.3d at 336 (emphasis

supplied). Applying these principles, in *Hayes*, the Fourth Circuit found that the offending terms

of the arbitration agreement at issue went to the "essence" of the agreement, because "the

animating purpose of the arbitration agreement was to ensure that Western Sky and its allies

could engage in lending and collection practices free from the strictures of any federal law." 811

F.3d at 676. Likewise, in *Dillon*, the Fourth Circuit found that "Great Plains purposefully

drafted the choice of law provisions in the arbitration agreement to avoid the application of state

and federal consumer protection laws," adding that "[b]ecause these choice of law provisions

were essential to the purpose of the arbitration agreement, BMO Harris'[s] consent to the

application of federal law would defeat the purpose of the arbitration agreement in its entirety." 856 F.3d at 336. The Fourth Circuit also faulted BMO Harris for relying on terms that Great Plains extracted using its "superior bargaining power . . . in a calculated attempt to avoid the application of state and federal law," which demonstrated an absence of good faith. 856 F.3d at 337.

Defendants argue that the Arbitration Provision "display[s] a clear intent to require arbitration regardless of which substantive law may ultimately apply" and thus the Provision proves distinguishable from the agreements at issue in *Hayes* and *Dillon*. (Tribe Arb. Mem. at 25.) Defendants highlight language providing that "[i]f any of th[e] Arbitration Provision is held invalid, the remainder shall remain in effect" as evidencing the Tribe's desire to arbitrate disputes even with the concession that federal and state statutory rights should be available to Plaintiffs. (Tribe Arb. Mem. at 24-25 (citing Agreement at 6 ¶ 8).) However, even assuming that the severability language establishes an intent to arbitrate without the restrictions of the offending clauses — a dubious contention — Defendants ignore the requirement of good faith. *Dillon*, 856 F.3d at 336. Clearly, the Tribal Lending Entities possessed superior bargaining power over Plaintiffs, who resorted to the triple-digit, high-interest payday loans that the Entities offered. The Tribal Lending Entities took advantage of their superior bargaining power to extract Plaintiffs' assent to terms couched in an Arbitration Provision that plainly functioned to violate public policy by depriving Plaintiffs of statutory remedies otherwise available to them. Accordingly, the Delegation Clause proves inseverable from the offending provisions and, therefore, unenforceable as a matter of law.

**D.    The Arbitration Provision Prospectively Waives Plaintiffs' Statutory Rights in Violation of Public Policy.**

Because the Delegation Clause proves invalid and unenforceable pursuant to § 2 of the FAA, the Court will not delegate arbitrability disputes to an arbitrator and may address the validity of the Arbitration Provision as a whole.  Plaintiffs argue that the Arbitration Provision fails for the same reason as the Delegation Clause:  the Provision prospectively waives Plaintiffs' rights under federal and state law.  (Pls.' Tribe Arb. Resp. at 9-17.)  The Tribal Officials contend that to the extent that the Arbitration Provision prospectively waives the applicability of federal and state statutes, it does so only to the extent that tribal sovereign immunity protects the Tribal Officials.  (Tribe Arb. Mem. at 23-24.)  Asner and Landy add that the Arbitration Provision does not waive federal causes of action as to them, because the Provision clearly limits the claims of sovereign immunity to the Tribe and the Tribal Lending Entities.  (A/L Arb. Mem. at 20-21.)  Defendants jointly assert that the Arbitration Provision otherwise provides a fair arbitral forum before respected arbitration organizations, and they argue that the general choice-of-law provision in the loan agreements differs from the terms at issue in *Hayes* and *Dillon*, because it does not expressly disclaim the application of federal or state law.  (A/L Arb. Mem. at 21-22; Tribe Arb. Reply at 11-12.)  Defendants also point to language in the loan agreements that invokes federal and state law, including language in the Arbitration Provision that requires consumers to arbitrate "all tribal, federal or state law claims, disputes or controversies" and "all claims based upon a violation of any tribal, state or federal constitution, statute or regulation." (A/L Arb. Mem. at 22-23 (internal quotations and citations omitted); Tribe Arb. Reply at 12.)

The Court disagrees with Defendants that the Arbitration Provision prospectively waives Plaintiffs' federal and state statutory rights only to the extent that the Tribe, the Tribal Lending Entities and the Tribal Officials enjoy sovereign immunity.  Although the Arbitration Provision

33

repeatedly affirms that the Tribe and the Tribal Lending Entities enjoy and preserve their claim to sovereign immunity, such a claim proves distinct from the offending language highlighted in the Court's analysis above. (Agreement at 5-6.) Indeed, the Arbitration Provision explains that if a consumer elects to hold an arbitration somewhere other than on the Tribe's land, "such election . . . shall in no way be construed as a waiver of sovereign immunity *or* allow for the application of any other law other than the laws of the [Tribe]." (Agreement at 6 ¶ 4 (emphasis added).) The use of the disjunctive "or" clearly expresses the Tribal Lending Entities' intent to categorically disclaim the application of federal and state law during arbitration regardless of the extent to which tribal sovereign immunity might protect them from suit under those laws. To read the language otherwise would give no meaning or effect to the words following "or," which the Court must avoid. *See* Restatement (Second) of Contracts § 203 cmt. b (Am. Law Inst. 2019) ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous.").

Neither do the other provisions in the loan agreements mend the prospective waiver problem. Defendants contend that the loan agreements' general choice-of-law provision does not prospectively waive federal and state statutory remedies, because it provides only that the agreements will be governed by "applicable tribal law" and does not expressly reject federal or state law like the provisions at issue in *Hayes* and *Dillon*. (A/L Arb. Mem. at 22; Tribe Arb. Reply at 11-12; Agreement at 7.) However, Defendants ignore the more specific choice-of-law language in the Arbitration Provision, which clearly disclaims the application of "any other law other than the laws of the [Tribe]." (Agreement at 6 ¶ 4.) The Court will not ignore the language of specific terms within the Arbitration Provision in favor of general terms contained in an entirely separate provision. *See* Restatement (Second) of Contracts § 203 cmt. e (Am. Law Inst.

34

2019) ("[I]n case of conflict [between general and specific or exact terms,] the specific or exact term is more likely to express the meaning of the parties with respect to the situation than the general language.").

Defendants also highlight invocations of federal and state law in the loan agreements that supposedly imply Plaintiffs' ability to effectively pursue federal and state causes of action through arbitration, namely: (1) language in the Arbitration Provision affirming that the Provision "is made pursuant to a transaction involving both interstate commerce and Indian commerce under the United States Constitution and other federal and tribal laws," (Agreement at 6 ¶ 7); (2) language in the agreement acknowledging that certain notices required by federal statutes may be delivered electronically, providing information "in a manner consistent with principles under United States federal law," and requiring consumers to indemnify the Tribal Lending Entities for the consumer's violation "of applicable federal, state or local law, regulation or ordinance," (Agreement at 6-7, 9, 11); and, (3) language in the Arbitration Provision requiring the arbitration of claims arising under federal or state constitutions, laws and regulations, (Agreement at 5 ¶ 1(b), (e)). (A/L Arb. Mem. at 22-23; Tribe Arb. Reply at 12.) The Court remains unconvinced.

For one, the language regarding the provision of notices and information required by federal law again requires the Court to ignore the specific disclaimer of non-tribal law in the Arbitration Provision in favor of highly general language contained in provisions with no relation to the arbitration of disputes. Similarly, the language requiring consumers to indemnify the Tribal Lending Entities for the consumers' violations of federal, state or local laws has no relation to Plaintiffs' ability to invoke federal law before an arbitrator and, if anything, reinforces

Plaintiffs' argument that the loan agreements establish an unfair and one-sided relationship between them and the Entities.

As for the language affirming that the Arbitration Provision "is made pursuant to a transaction involving both interstate commerce and Indian commerce under the United States Constitution and other federal and tribal laws," such an affirmation merely follows the definition of "commerce" under the FAA and, as discussed above, does so in order to invoke the FAA to the extent that it favors enforcement of arbitration provisions. 9 U.S.C. §§ 1-2. That the loan transactions between the Tribal Lending Entities and Plaintiffs qualify as transactions covered by the FAA says nothing of the arbitrator's ability to apply federal and state law, especially considering the specific repudiation of "any other law" in the Arbitration Provision. And that the disputes covered by the Arbitration Provision include those arising under federal and state law merely serves the Tribal Lending Entities' apparent purpose in crafting the Provision to compel arbitration of all possible disputes only to nullify the disputes by precluding the application of federal and state law — the precise problem highlighted by the Fourth Circuit in *Hayes*. 811 F.3d at 673-74.

Finally, Defendants assert that the Tribe's Consumer Financial Services Regulatory Ordinance (the "Ordinance") requires the Tribal Lending Entities to comply with all applicable federal laws. (Tribe Arb. Reply at 13-14.) Because the loan agreements explicitly provide that the Ordinance governs the agreements and the Ordinance by incorporation subjects the Tribal Lending Entities to "applicable" federal statutes, Defendants contend that the Arbitration Provision does not prospectively waive Plaintiffs' right to pursue statutory remedies. (Tribe Arb. Reply at 13-14.) The Court agrees that the exclusion of inapplicable federal statutory rights does not constitute a prospective waiver in violation of public policy. *See Gibbs II*, 2019 WL

36

4752792, at *24 (explaining that "'applicable federal law' is redundant," because an adjudicator, "by definition, would never rely on 'inapplicable federal law,'" meaning the preservation of claims under "applicable federal law" applies federal law, "seemingly without qualification"). However, the Ordinance's requirement that the Tribal Lending Entities comply with applicable federal laws does not allow Plaintiffs to effectively vindicate their rights under those laws.

Indeed, although the Ordinance requires "Licensees of any type" to comply with "federal laws as applicable," the Ordinance does not provide that consumers may seek remedies under those laws. (Ex. 2 to Pls.' Tribe Arb. Resp. ("Ordinance") (ECF No. 96-2) § 7.1.) Instead, the Ordinance provides specific remedies for violations of its terms, none of which are tied to the remedies provided under federal law. (*See* Ordinance § 11.4(e) (providing that the Tribe's consumer finance commission may award no more than the total amount of a consumer's outstanding debt plus reimbursement of payments).) Thus, the Ordinance still precludes consumers from vindicating their federal statutory rights by replacing the remedial and deterrent remedies selected by Congress with the Tribe's own remedial scheme — the exact concern that gave rise to the prospective waiver doctrine. *See Am. Ex. Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013) ("[The prospective waiver] exception finds its origin in the desire to prevent 'prospective waiver of a party's *right to pursue statutory remedies.*'" (emphasis partly added) (quoting *Mitsubishi Motors*, 473 U.S. at 637 n.19)). Accordingly, the incorporation of the Ordinance does not save the Arbitration Provision.

Because the Arbitration Provision prospectively waives statutory remedies otherwise available to Plaintiffs, the question then becomes whether the Court can sever the remainder of the Provision from its offending terms such that the Court could enforce the Provision without violating public policy. The Court finds the offending terms inseverable. For one, the offending

terms go to the "essence" of the Arbitration Provision, because the Provision read as a whole clearly demonstrates an intent to arbitrate all disputes, including those arising under federal and state law, while depriving Plaintiffs of any remedy under those laws. Moreover, as explained above, the Court will not enforce the remainder of the Arbitration Provision without the offending terms, because the Tribal Lending Entities clearly used their superior bargaining power to extract Plaintiffs' assent to terms that blatantly deprived them of remedies granted to them by Congress and their state legislators. Accordingly, the Arbitration Provision proves unenforceable in its entirety and the Court will deny Defendants' Motions to Compel Arbitration (ECF Nos. 57, 62) to the extent that Defendants ask the Court to enforce the Arbitration Provisions in Plaintiffs' loan agreements.

### E.    The Court Will Not Compel Tribal Exhaustion of Mwethuku's Claims.

Separate from their request to enforce the Arbitration Provision to which all Plaintiffs except Mwethuku agreed, Defendants ask the Court to enforce the terms in Mwethuku's loan agreement that require him to bring any disputes arising from his loan before the "Tribal Forum." (A/L Arb. Mem. at 1 n.1; Tribe Arb. Mem. at 25-26.) Because Mwethuku has not exhausted the remedies available to him in the Tribal Forum, Defendants ask the Court to stay the proceedings as to Mwethuku's claims until he has exhausted his available remedies in that Forum. (Tribe Arb. Mem. at 26.)

Plaintiffs respond that Mwethuku's loan agreement (the "Mwethuku Agreement") defines the "Tribal Forum" as "the applicable governing body of the [Tribe]," which proves insufficiently vague. (Pls.' Tribe Arb. Resp. at 29; Ex. 5 to Pls.' Tribe Arb. Resp. ("Mwethuku Agreement") (ECF No. 96-5) at 4 ¶¶ 6, 9.) Plaintiffs also contend that the tribal exhaustion doctrine does not apply here, because the Supreme Court developed the doctrine to ensure

comity between federal and tribal courts when litigants ask federal courts to intervene in ongoing litigation before a tribal court. (Pls.' Tribe Arb. Resp. at 30.) Because no such ongoing tribal litigation exists here, Plaintiffs maintain that the tribal exhaustion doctrine does not prevent Mwethuku's claims from proceeding in this Court. (Pls.' Tribe Arb. Resp. at 30.) And should the Court find that the tribal exhaustion doctrine does apply to the circumstances of this case, Plaintiffs argue that the Court should avoid referral to the Tribal Forum, because the process and structure of the Forum lack indicia of neutrality and validity. (Pls.' Tribe Arb. Resp. at 30.)

"The tribal exhaustion doctrine directs that a federal court should 'give the tribal court precedence and afford it a full and fair opportunity to determine the extent of its own jurisdiction over a particular claim or set of claims' when a 'colorable claim of tribal court jurisdiction has been asserted.'" *Brown v. W. Sky Fin., LLC*, 84 F. Supp. 3d 467, 476 (M.D.N.C. 2015) (quoting *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 31 (1st Cir. 2000)). The tribal exhaustion doctrine advances three specific interests: (1) supporting tribal self-government and self-determination; (2) promoting the "orderly administration of justice in the federal court by allowing a full record to be developed in the Tribal Court;" and, (3) providing other courts with the benefit of the tribal courts' expertise in their own jurisdiction. *Nat'l Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 856-57 (1985). "Where applicable, this prudential doctrine has force whether or not an action actually is pending in a tribal court. Moreover, the doctrine applies even though the contested claims are to be defined substantively by state or federal law." *Ninigret Dev. Corp.*, 207 F.3d at 31.

That said, courts recognize four exceptions to the tribal exhaustion requirement, namely where:

(1) an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith; (2) the action is patently violative of express jurisdictional prohibitions; (3) exhaustion would be futile because of the lack of adequate opportunity to challenge the court's jurisdiction; or (4) it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by *Montana*'s main rule.

*Burlington N. R.R. Co. v. Red Wolf*, 196 F.3d 1059, 1065 (9th Cir. 1999) (citations omitted). As

to the fourth exception, in *Montana v. United States*, the Supreme Court established the

boundaries of tribal sovereignty over nonmembers, opining that, as to nonmembers, the "exercise

of tribal power beyond what is necessary to protect tribal self-government or to control internal

relations is inconsistent with the dependent status of the tribes, and so cannot survive without

express congressional delegation." 450 U.S. 544, 564 (1981) (citations omitted). At the same

time, the Court recognized that tribes could exercise "some forms of civil jurisdiction over non-

Indians . . . even on non-Indian fee lands," including, in relevant part, regulation "through

taxation, licensing, or other means" of "the activities of nonmembers who enter consensual

relationship with the tribe or its members, through commercial dealing, contracts . . . or other

arrangements." *Id.* at 565.[6] Within these parameters, "activities of non-Indians on reservation

lands almost always require exhaustion if they involve the tribe," whereas "off-the-reservation"

conduct by non-Indians "must at a bare minimum impact *directly* upon tribal affairs" to trigger

the exhaustion requirement. *Ninigret Dev. Corp.*, 207 F.3d at 32 (emphasis added).

Here, the Court finds that several factors militate against staying or dismissing

Mwethuku's claims until he has exhausted potential tribal remedies. First, Defendants fail to

---

[6] The Court finds the other *Montana* exception — concerning the power of tribes to exercise civil authority over nonmembers within their reservations "when that conduct has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe," 450 U.S. at 565 — inapplicable to this case. *See Heldt v. Payday Fin., LLC*, 12 F. Supp. 3d 1170, 1182-83 (D.S.D. 2014) (finding the same exception inapplicable in a similar tribal payday lending case).

state a colorable claim of tribal jurisdiction. In *Jackson v. Payday Financial, LLC*, the Seventh Circuit directly addressed a tribal exhaustion argument in the context of tribal payday loans. 764 F.3d 765 (7th Cir. 2014). In *Jackson*, the plaintiffs obtained high-interest loans from lenders associated with the Cheyenne River Sioux Tribe. *Id.* at 768-69. The plaintiffs brought suit under Illinois's usury and consumer fraud statutes, and the district court dismissed the case for improper venue, finding that the arbitration provision in the loan agreements required the plaintiffs to bring their claims in the tribal forum. *Id.* at 769-70.

On appeal, after finding the arbitration provision unenforceable, the Seventh Circuit considered the defendants' argument that the arbitration provision constituted a forum selection clause that required any litigation under the agreements to be conducted in the courts of the Cheyenne River Sioux Tribe. *Id.* at 781-82. Based on the Supreme Court's ruling in *Montana*, the Seventh Circuit determined that the plaintiffs had not engaged in any activities inside the tribe's reservation, because they applied for their loans, negotiated their loans and executed loan documents online from their homes in Illinois. *Id.* at 782. The Seventh Circuit further found that the plaintiffs had not consented to tribal jurisdiction by entering into the loan agreements, because "tribal courts are not courts of general jurisdiction" and any claim to jurisdiction over nonmembers must implicate "'the tribe's inherent sovereign authority.'" *Id.* at 783 (first citing *Nevada v. Hicks*, 533 U.S. 353, 367 (2001) and then quoting *Plains Commerce Bank v. Long Family & Cattle Co.*, 554 U.S. 316, 337 (2008)). Because the plaintiffs' claims did "not arise from the actions of nonmembers on reservation land and d[id] not otherwise raise issues of tribal integrity, sovereignty, self-government, or allocation of resources," the Seventh Circuit concluded that "[t]here simply is no colorable claim that the courts of the Cheyenne River Sioux Tribe can exercise jurisdiction over the Plaintiffs." *Id.* at 786. *But see Heldt v. Payday Fin.,*

41

*LLC*, 12 F. Supp. 3d 1170, 1186 (D.S.D. 2014) (finding that "in today's modern world of business transactions through internet or telephone, requiring physical entry on the reservation particularly in a case of a business transaction with a consent to jurisdiction clause, seems to be requiring too much" and enforcing the tribal exhaustion doctrine (citations omitted)).[7]

The Court finds the reasoning in *Jackson* persuasive and likewise finds that the Tribe has not asserted a colorable claim of jurisdiction over Mwethuku's claims, or the claims of Plaintiffs generally. Like in *Jackson*, Plaintiffs obtained, negotiated and executed their loans from their residences in Virginia through websites maintained by companies in Kansas, far from the Tribe's reservation in California. (Am. Compl. ¶¶ 67-68; Treppa Aff. ¶¶ 117-18, 121, 128, 221-26, 247, 249.) Plaintiffs also made loan payments from Virginia to payment processors operating out of Kansas. And although Mwethuku signed a loan agreement purporting to subject him to the jurisdiction of the "Tribal Forum," as the Seventh Circuit noted in *Jackson*, "a tribal court's authority to adjudicate claims involving nonmembers concerns its subject matter jurisdiction, not personal jurisdiction," so "a nonmember's consent to tribal authority is not sufficient to establish the jurisdiction of a tribal court." 764 F.3d at 783 (citing *Hicks*, 533 U.S. at 367 n.8); *see also Strate v. A-1 Contractors*, 520 U.S. 438, 459 (1997) (reiterating that *Montana*'s main rule limits a tribe's inherent power to "'what is necessary to protect tribal self-government or to control internal relations,'" a relatively high bar (quoting *Montana*, 450 U.S. at 564)).

---

[7] The Court finds the reasoning in *Jackson* more persuasive than the reasoning in *Heldt*, because, unlike in *Heldt*, the Tribal Lending Entities here do not operate out of the Tribe's reservation, creating an extra layer of separation between the Tribe's sovereign authority and Plaintiffs. Indeed, the Fourth Circuit in *Hayes* favorably cited similar reasoning to the Seventh Circuit in *Jackson*. 811 F.3d at 676 n.3 (reciting district court's reasoning that tribal exhaustion doctrine did not apply, because "the conduct at issue in this action did not involve an Indian-owned entity, did not occur on the [Tribe's] reservation, and did not threaten the integrity of the [T]ribe" and finding "no fault with the court's ruling on these points," further adopting them as the opinion of the Fourth Circuit (internal quotations and citations omitted)).

Moreover, to the extent that Defendants have asserted a colorable claim of tribal jurisdiction, the Mwethuku Agreement fails to indicate any forum to hear that colorable claim. Although the Mwethuku Agreement requires Mwethuku to bring any disputes arising from the Agreement before "the Tribal Forum," the Agreement defines "Tribal Forum" as "the applicable governing body of the [Tribe]," a vague definition that appears to reference the Tribe's Executive Council. (Mwethuku Agreement at 4 ¶¶ 6, 9.) Defendants aver that the "Tribal Forum" refers to the Tribe's Consumer Financial Services Regulatory Commission (the "Commission") "and possibly an independent arbitrator," (Tribe Arb. Mem. at 26; Tribe Arb. Reply at 19-20), but the definition provided in the Mwethuku Agreement does not reference that Commission, (Mwethuku Agreement at 4 ¶ 6).[8] Indeed, *Black's Law Dictionary* defines "governing body" as "[a] group of officers or persons having *ultimate* control," which in this instance would be the Tribe's Executive Council, not the Commission. (11th ed. 2019) (emphasis added). Defendants fail to establish that Mwethuku, or any Plaintiff for that matter, knew or had reason to know of the meaning that the Tribal Lending Entities had attached to the term "governing body," so there was no meeting of the minds as to that term. *See* Restatement (Second) of Contracts § 201 cmt. d (Am. Law Inst. 2019) (describing rules of interpretation when one party does not know or have reason to know of the meaning ascribed to ambiguous terms by the other, including that courts should enforce the contract without the ambiguous and

---

[8] On August 30, 2019, the Commission submitted an amicus brief in support of Defendants' Motions. (Mem. for Habematolel Pomo of Upper Lake Consumer Fin. Servs. Regulatory Comm'n, as Amicus Curiae Supp. Defs. ("Comm'n Amicus Br.") (ECF No. 76).) In its brief, the Commission argues that it applies greater protections than federal law "in some cases." (Comm'n Amicus Br. at 18-19.) However true this may be, the Commission's ability to fairly and effectively enforce the Tribe's laws says little about the Commission's jurisdiction over Mwethuku's claims, or whether the Commission in fact serves as the "Tribal Forum" under the Mwethuku Agreement, especially in light of the contrary meaning provided by the Agreement itself.

undefined terms if possible). Notably, the Seventh Circuit in *Jackson* similarly found unreasonable "an illusory forum" such as the "Tribal Forum" at issue here. 764 F.3d at 776.

The vaguely defined "Tribal Forum" also prevents the Court from determining whether Mwethuku could adequately challenge the Tribe's jurisdiction, further militating against tribal exhaustion. With no clear answer under the terms of the contract as to what the Tribal Forum would be, the Court cannot readily determine the rules and substantive laws that govern the Forum. Thus, by enforcing the forum selection clause in the Mwethuku Agreement, the Court could compel Mwethuku — and potentially other Plaintiffs — to resort to a tribal adjudicative structure that lacks any meaningful procedures for challenging its jurisdiction or, worse yet, does not exist at all. And if the Tribal Forum in fact refers to the Tribe's Executive Council as the plain meaning of "governing body" suggests, the Tribal Officers who compose that Council could hardly be considered unbiased adjudicators of Mwethuku's claims against them.

For these reasons, the Court denies Defendants' Motions to Compel Arbitration (ECF Nos. 57, 62) to the extent that they ask the Court to compel tribal exhaustion of Mwethuku's or any other Plaintiff's claims.

### III.    MOTIONS TO DISMISS

Having denied Defendants' Motions to Compel Arbitration, the Court will now consider the merits of Defendants' Motions to Dismiss (ECF Nos. 59, 64). As discussed above, Defendants move for dismissal of Plaintiffs' claims as to both Asner and Landy and the Tribal Officials, because: (1) Plaintiffs' loans are legal under the loan agreements' choice-of-law provision, (A/L MTD Mem. at 14-15; Tribe MTD Mem. at 5-11); and, (2) Plaintiffs fail to join the Tribal Lending Entities as indispensable parties, (A/L MTD Mem. at 15-16; Tribe MTD Mem. at 25-27). Separately, the Tribal Officials move to dismiss Plaintiffs' claims as to them,

because: (1) the Officials enjoy tribal sovereign immunity and Plaintiffs cannot overcome that immunity by requesting only injunctive relief, (Tribe MTD Mem. at 11-25); and, (2) Plaintiffs, either in whole or in part, lack standing to seek their desired relief as to future or ongoing collection of loans issued by the Tribal Lending Entities, (Tribe MTD Mem. at 28-30). Asner and Landy move separately for dismissal of Plaintiffs' claims as to them, because: (1) Plaintiffs' claims fall either outside of the applicable statute of limitations or outside of the time that they claim Asner and Landy were involved with the Tribal Lending Entities, (A/L MTD Mem. at 6-14); (2) Plaintiffs fail to state plausible claims against Asner and Landy, (A/L MTD Mem. at 16-28); and, (3) the Court lacks personal jurisdiction over Asner and Landy, because Plaintiffs fail to state a plausible RICO claim against them and therefore cannot rely on RICO's nationwide service of process provision, (A/L MTD Mem. at 28-29). The Court will first consider Defendants' joint grounds for dismissal and then proceed, if necessary, to consider the separate grounds for dismissal presented by the Tribal Officials and Asner and Landy, respectively.

### A.     The Choice-of-Law Provision in Plaintiffs' Loan Agreements Proves Unenforceable.

Defendants first argue that Plaintiffs' claims must fail, because they rely on the usury cap established under Virginia law when, in fact, the Tribe's laws govern Plaintiffs' loans pursuant to the loan agreements' choice-of-law provision (the "Choice-of-Law Provision"). (Tribe MTD Mem. at 5-6.)[9] Because the interest rates on Plaintiffs' loans do not violate the Tribe's laws, Defendants contend that the loans do not constitute unlawful debts under RICO. (Tribe MTD Mem. at 6-11.) Plaintiffs respond that the Court should not enforce the Choice-of-Law

---

[9]     Because Asner and Landy refer to the Tribal Officials' argument concerning the enforceability of the Choice-of-Law Provision, the Court will rely on the Tribal Officials' arguments in its analysis. (A/L MTD Mem. at 14-15.)

Provision, because the Provision prospectively waives Plaintiffs' rights under federal law, violates Virginia's public policy against usurious lending and proves both procedurally and substantively unconscionable. (Pls.' Tribe MTD Resp. at 6-20.)

Because Plaintiffs invoke the Court's supplemental jurisdiction over their Virginia usury claims, in considering those claims, the Court will apply the choice of law rules applicable in Virginia. *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983). In Virginia, courts considering contract-related claims will give a choice-of-law provision in a contract the fullest effect intended by the parties absent unusual circumstances. *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) (citing *Tate v. Hain*, 25 S.E.2d 321, 324 (Va. 1943)). Such unusual circumstances exist when enforcement of a choice-of-law provision would violate public policy, meaning enforcement shocks "one's sense of right." *Tate*, 25 S.E.2d at 325. Virginia courts will also avoid enforcement of choice-of-law provisions when "the party challenging enforcement establishes that such provisions are unfair or unreasonable, or are affected by fraud or unequal bargaining power." *Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 397 S.E.2d 804, 807 (Va. 1990).

Relevant here, the Choice-of-Law Provision provides that:

> This Agreement is made and accepted in the sovereign territory of the [Tribe], and shall be governed by applicable tribal law, including but not limited to the [Ordinance]. You hereby agree that this governing law provision applies no matter where You reside at the time You request Your loan from [the relevant Tribal Lending Entity]. [The relevant Tribal Lending Entity] is regulated by the [Commission]. You may contact the Commission by mail at P.O. Box 516 Upper Lake CA 95485.

(Agreement at 7.)

## 1.   The Choice-of-Law Provision Does Not Violate the Prospective Waiver Doctrine.

Plaintiffs first argue that the Choice-of-Law Provision proves unenforceable under the prospective waiver doctrine. (Pls.' Tribe MTD Resp. at 6-11.) Specifically, Plaintiffs contend that the Provision "works in tandem with the arbitration provision and forum selection provision to waive all of a consumer[']s federal and state rights." (Pls.' Tribe MTD Resp. at 7.) Plaintiffs rely on the language in the Arbitration Provision that explicitly excludes the application of any other law by an arbitrator, arguing that such language likewise voids the Choice-of-Law Provision. (Pls.' Tribe MTD Resp. at 8-9.) Plaintiffs add that the Tribe's laws — namely, the Ordinance — also prospectively waive the remedies otherwise available to Plaintiffs. (Pls.' Tribe MTD Resp. at 10-11.)

The Court disagrees that the offending language in the Arbitration Provision renders the loan agreements' general Choice-of-Law Provision unenforceable. Although Plaintiffs cite to the language in the Arbitration Provision that precludes an arbitrator from applying "any other law other than the laws of the Tribe," such language does not affect the application of federal law to the loan agreements outside of arbitration. (Agreement at 6 ¶ 4.) Indeed, "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006). Thus, although the Arbitration Provision must fail, because its terms prospectively waive Plaintiffs' statutory remedies in violation of public policy, the prospective waiver of Plaintiffs' available remedies before an arbitrator does not translate into a prospective waiver under the terms of the generally applicable Choice-of-Law Provision at issue here. Accordingly, the Court may enforce the Choice-of-Law Provision unless its own terms prospectively waive the application of federal law to the loan agreements.

To that end, the Court finds that the Choice-of-Law Provision does not waive the application of federal law to Plaintiffs' loans. The Provision provides that the loan agreements "shall be governed by applicable tribal law," but the Provision does not expressly disavow the application of federal law. (Agreement at 7.) Such language proves analogous to other choice-of-law provisions that select the law of another state to govern the interpretation and enforcement of a contract while implicitly allowing for the application of relevant federal statutes. Such language also proves distinguishable from choice-of-law provisions that courts have found unenforceable under the prospective waiver doctrine. *See, e.g.*, *Dillon*, 856 F.3d at 332 (refusing to enforce choice-of-law provision providing that "no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation" (internal quotations omitted)); *Hayes*, 811 F.3d at 670 (refusing to enforce choice-of-law provision providing "that no United States state or federal law applies to this Agreement" (internal quotations and citations omitted)); *Gibbs v. Haynes Invs., LLC* (*Gibbs I*), 368 F. Supp. 3d 901, 929 (E.D. Va. 2019) (refusing to enforce choice-of-law provision providing that the lender "may choose to voluntarily use certain federal laws as guidelines for the provision of services" but that such voluntary use did not "represent acquiescence of the [Tribe] to any federal law"). Moreover, although the Choice-of-Law Provision states that the Ordinance shall also govern the loan agreements, the Provision does not select the Ordinance to govern to the exclusion of federal law. Therefore, the Choice-of-Law Provision does not prove unenforceable under the prospective waiver doctrine.

### 2.    *The Choice-of-Law Provision Violates Virginia Public Policy.*

Plaintiffs argue that the Court should also avoid enforcement of the Choice-of-Law Provision, because enforcing the Provision would violate Virginia's public policy against usurious loans. (Pls.' Tribe MTD Resp. at 11.) Anticipating Plaintiffs' argument, Defendants

cite to the Virginia Supreme Court's opinion in *Settlement Funding, LLC v. Von Neumann-Lillie*, 645 S.E.2d 436 (Va. 2007), contending that the Court clearly rejected the argument that choice-of-law provisions violate public policy when they permit the enforcement of interest rates exceeding Virginia's usury cap. (Tribe MTD Mem. at 9.) Defendants add that the Tribe's interest in self-sufficiency and self-government favors enforcement of the Choice-of-Law Provision despite the resulting violation of Virginia's usury statute. (Tribe MTD Mem. at 9-10.)

In *Settlement Funding*, the Virginia Supreme Court considered a loan agreement between Carla Von Neumann-Lillie ("Lillie") and WebBank Corporation ("WebBank") that contained a choice-of-law provision selecting the laws of Utah to govern the agreement. 645 S.E.2d at 437. WebBank thereafter assigned its right, title and interest in the loan to Settlement Funding, LLC. *Id.* Pursuant to the loan agreement, Lillie assigned to Settlement Funding her interest in payments that she won through the Virginia Lottery. *Id.*

After Lillie defaulted on her loan, Settlement Funding claimed an interest in Lillie's lottery winnings and the Virginia Lottery filed an interpleader action in state court, asserting that lottery prizes are non-assignable. *Id.* Settlement Funding filed a crossclaim against Lillie, requesting a declaratory judgment that its interest in Lillie's lottery winnings could be enforced. *Id.* In response, Lillie asserted four affirmative defenses, one of which argued that Virginia's usury statute voided the loan agreement. *Id.*

Following a hearing on Settlement Funding's claims, the state circuit court declined to apply Utah law, because "Settlement Funding produced no proper proof as to Utah law at trial." *Id.* at 438. "Without proof of Utah law, the circuit court reasoned it must presume Utah law to be identical to Virginia law and, under Virginia Code § 6.01-330.55, a loan with an interest rate in excess of twelve percent is usurious. Accordingly, the circuit court held Settlement Funding

could collect only the principal sum of Lillie's loan, less credit for payments received, but could not recover interest or fees." *Id.* On appeal, the Virginia Supreme Court held that Settlement Funding had "provided the circuit court with sufficient information regarding the substance of Utah law," and, "[t]herefore, the circuit court erred in refusing to apply Utah law in the construction of the loan agreement." *Id.* at 439.

Despite Defendants' contention, the Court finds that *Settlement Funding* does not squarely reject the argument that a choice-of-law provision violates public policy when the chosen law permits interest rates above Virginia's usury cap. Rather, *Settlement Funding* addressed only the evidentiary issue of whether Settlement Funding had met its burden to prove the substance of Utah law. Indeed, the Virginia Supreme Court explicitly noted that its opinion did not address Settlement Funding's second assignment of error — that "the circuit court erred in . . . applying Virginia usury statutes and concluding that the interest rate for the subject loan was usurious," 645 S.E.2d at 438-39 n.2 — thereby leaving open the possibility that the choice-of-law provision nonetheless violated public policy. As Plaintiffs note, other courts, including a court in this Division, have also narrowly interpreted the *Settlement Funding* decision. (Pls.' Tribe MTD Resp. at 13-14 (citing *Gibbs I*, 368 F. Supp. 3d at 929 (Lauck, J.) and *Commonwealth v. NC Fin. Sols. of Utah, LLC*, 2018 WL 9372461 (Va. Cir. Ct. Oct. 28, 2018)).) Accordingly, the Court will consider whether enforcement of the Choice-of-Law Provision violates Virginia public policy.

As mentioned, to violate Virginia's public policy, enforcement of a choice-of-law provision must result in "something immoral, shocking one's sense of right." *Tate*, 25 S.E.2d at 325. "Merely because one [forum's] law differs from Virginia's does not, ipso facto, justify refusal to adhere to comity principles." *Chesapeake Supply & Equip. Co. v. J.I. Case Co.*, 700 F.

Supp. 1415, 1421 (E.D. Va. 1988). Ultimately, "[t]he public policy of [Virginia] . . . [must be] so compelling as to override the application of the [chosen forum's laws]." *Willard v. Aetna Cas. & Sur. Co.*, 193 S.E.2d 776, 779 (Va. 1973).

Plaintiffs contend that Virginia has established a compelling public policy against usurious loans. (Pls.' Tribe MTD Resp. at 11-12.) Indeed, at least one Virginia circuit court has avoided enforcement of a choice-of-law provision when the chosen forum provides no usury cap. *See NC Fin. Sols. of Utah*, 2018 WL 9372461, at *11-13 (finding unenforceable choice-of-law provision selecting Utah law, because the provision allowed the lender to avoid Virginia's "long-recognized . . . public policy against allowing usury by unregulated lenders"); *see also Williams v. Big Picture Loans, LLC*, Case No. 3:17cv461 (REP), ECF No. 125 ¶ 6 (E.D. Va. June 26, 2018) (denying motion to dismiss based on choice-of-law provision, in part, because the complaint "plausibly and adequately alleges that the choice-of-law provision at issue violates the public policy of the Commonwealth of Virginia against usurious loans"). The Court's own review of Virginia's regulation of usurious lending leads it to the same conclusion.

Since as early as 1734, Virginia's legislature has regulated usurious loans. *Town of Danville v. Pace*, 66 Va. 1, 20 (1874). These "usury laws are founded upon considerations of public policy . . . [and] are modified from time to time, and even abolished, as the popular sentiment may dictate, or the public interest require." *Id.* at 19. In modern times, "'usury statutes represent a clarification of the public policy of [Virginia] that usury is not to be tolerated, and . . . court[s] should therefore be chary in permitting this policy to be thwarted.'" *Radford v. Cmty. Mortg. & Inv. Corp.*, 312 S.E.2d 282, 285 (Va. 1984) (quoting *Heubusch v. Boone*, 192 S.E.2d 783, 789 (Va. 1972)). To be sure, Virginia does not categorically prohibit loans with interest rates greater than 12 percent; however, the General Assembly has outlined a specific

licensure and regulatory scheme for lenders wishing to offer otherwise usurious loans. *See* Va. Code § 6.2-303(B) (providing for exceptions to the general usury cap under enumerated statutory provisions); § 6.2-1500 (providing for the regulation and licensure of consumer finance companies); § 6.2-1800 (providing for the regulation and licensure of payday lenders). The General Assembly has also affirmed its intention that its usury laws should apply to all contracts without waiver. § 6.2-306(A). And, notably, Virginia's usury laws reside within a larger statutory scheme designed to afford greater protections to Virginia consumers. *See NC Fin. Sols.*, 2018 WL 9372461, at *12 (describing Virginia's "statutory scheme regulating deceptive trade practices encompassing the inducement, terms, and collection of loans in general," thereby expressing "a strong public policy to 'expand the remedies afforded to consumers and to relax the restrictions imposed upon them by the common law'" (quoting *Owens v. DRS Auto. Fantomworks*, 764 S.E.2d 256, 260 (Va. 2014))).

Considering the evolution of Virginia's usury protections, the Court finds that enforcement of the Choice-of-Law Provision would violate Virginia's compelling public policy against the unregulated lending of usurious loans. Indeed, enforcement of the Choice-of-Law Provision would allow Defendants to circumvent the comprehensive consumer finance regulatory scheme established by Virginia's General Assembly in favor of a regulatory scheme that provides not only no usury protections but also comparatively little in remedies to consumers. *Compare* Va. Code § 6.2-305 (providing for the recovery of all interest paid in excess of the statutory cap, twice the total amount of interest paid during the two years immediately preceding the date of the filing of the action and reasonable fees and costs), *with* (Ordinance § 11.4(e) (providing for the recovery of no more than the total loan amount)). Of course, a court should not void a choice-of-law provision merely because the chosen forum's

laws do not provide the same type or degree of protection as Virginia, but the apparent absence

of any comparable protection for aggrieved consumers under the Tribe's laws rises to the level of

"shocking one's sense of right" such that enforcement of the Choice-of-Law Provision would

violate Virginia's compelling public policy against usurious lending practices.[10]

For these reasons, the Court will not enforce the Choice-of-Law Provision and will

instead apply Virginia's standard choice-of-law rules for contract claims. To that end, Virginia

follows the longstanding rule that "[t]he nature, validity and interpretation of contracts are

governed by the law of the place where made." *C.I.T. Corp. v. Guy*, 195 S.E. 659, 661 (Va.

1938). "[T]he place of acceptance of a proposal is the place where a contract is made, since

acceptance by the offeree completes the contract process." *Madaus v. Nov. Hill Farm, Inc.*, 630

F. Supp. 1246, 1249 (W.D. Va. 1986). Plaintiffs allege that they accepted their loans while in

Virginia, so Virginia law governs the loans' validity at this stage. (Am. Compl. ¶ 110.) Pursuant

to Virginia law, "[e]xcept as otherwise permitted by law, no contract shall be made for the

payment of interest on a loan at a rate that exceeds 12 percent per year." Va. Code § 6.2-303.

Under RICO, "'unlawful debt' means a debt . . . which was incurred in connection with the

business . . . of lending money . . . at a rate usurious under State or Federal law, where the

usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). Plaintiffs allege, and

the Court accepts as true, that the Tribal Lending Entities do not possess a consumer finance

---

[10] In their Reply, the Tribal Officials cite to a February 12, 2018 letter from the Virginia State Corporation Commission's Bureau of Financial Institutions, in which the Bureau denied that it has any authority to regulate Mountain Summit, because Mountain Summit constitutes an arm of the Tribe. (Ex. 2 to Treppa Aff. (ECF No. 44-3) at 2.) The Tribal Officials contend that this letter confirms that Virginia does not have a compelling public policy against usurious lending. (Tribe MTD Reply at 5.) The Court finds this argument unavailing, because the letter lacks any explanation and has no binding effect on this Court. To the extent that the Bureau's letter might support the argument that Virginia's usury laws do not apply to the Tribal Lending Entities, the Court will defer consideration of that argument until a later stage.

license that would permit them to issue loans with greater than 12 percent interest under Virginia law. (Am. Compl. ¶ 113.) Yet, the Tribal Lending Entities issued and collected on loans with interest rates of at least 300 percent, far exceeding Virginia's usury cap. (Am. Compl. ¶ 112.) Accordingly, Plaintiffs have stated a plausible claim that the loans at issue violate Virginia's usury statute and constitute an "unlawful debt" under RICO, and the Court denies Defendants' Motions to Dismiss (ECF Nos. 59, 64) to the extent that they argue that Plaintiffs' loans are not usurious or unlawful under RICO.

### B. The Tribal Lending Entities Do Not Constitute Indispensable Parties Under Rule 19.

Defendants contend that the Court should dismiss Plaintiffs' claims pursuant to Rules 12(b)(7) and 19 for failure to join the Tribal Lending Entities as indispensable parties. (Tribe MTD Mem. at 25-27.)[11] Specifically, Defendants argue that the Tribal Lending Entities constitute necessary parties under Rule 19, because they — not Defendants — have the direct contractual relationship with Plaintiffs pursuant to Plaintiffs' loan agreements. (Tribe MTD Mem. at 25.) Defendants argue that the Tribal Lending Entities' direct contractual relationship with Plaintiffs both requires their joinder to accord complete relief and provides the Entities with a legally protected interest in the subject matter of Plaintiffs' claims. (Tribe MTD Mem. at 26.) Because the Tribal Lending Entities enjoy sovereign immunity, Defendants argue that their joinder as necessary parties proves infeasible and that equity and good conscience require dismissal of Plaintiffs' claims. (Tribe MTD Mem. at 26-27.)

---

[11] Because Asner and Landy reiterate the Tribal Officials' arguments on this point, the Court will consider the Tribal Officials' arguments as representing the interests of all Defendants. (A/L MTD Mem. at 15-16.)

Plaintiffs respond that the Tribal Lending Entities do not constitute necessary parties, because Plaintiffs have sued the Tribal Officials in their official capacities and those officials adequately represent the interests of the Entities. (Pls.' Tribe MTD Resp. at 41-42.) Plaintiffs likewise contend that inclusion of the Tribal Officials allows for the accordance of complete relief among the parties. (Pls.' Tribe MTD Resp. at 42-43.)

Federal Rule of Civil Procedure 12(b)(7) allows a party to move for dismissal of a claim for failure to join a necessary party under Rule 19. Rule 19 requires a two-step inquiry, namely: (1) whether the party is "necessary" to the action under Rule 19(a); and, (2) whether the party is "indispensable" under Rule 19(b). *Nat'l Union Fire Ins. Co. v. Rite Aid of South Carolina, Inc.*, 210 F.3d 246, 249 (4th Cir. 2000). A party is necessary under Rule 19(a) if "in that person's absence, the court cannot accord complete relief among the existing parties" or "that person claims an interest relating to the subject matter of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest . . . or leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(A)-(B). A necessary party proves indispensable to an action if it cannot be joined and "in equity and good conscience" the court determines that the action should be dismissed after considering: (a) "the extent to which a judgment rendered in the [necessary party's] absence might prejudice that [necessary party] or the existing parties;" (b) "the extent to which any prejudice could be lessened or avoided by . . . protective provisions in the judgment . . . shaping of relief . . . [or] other measures;" (c) "whether a judgment rendered in the [necessary party's] absence would be adequate;" and, (d) "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(1)-(4).

Ultimately, the burden rests on the party asserting failure to join "to 'show that the person who was not joined is needed for a just adjudication.'" *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005) (quoting 7 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 1609 (3d ed. 2001)). "Courts are loathe to dismiss cases based on nonjoinder of a party, so dismissal will be ordered only when the resulting defect cannot be remedied and prejudice or inefficiency will certainly result." *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 441 (4th Cir. 1999).

In support of their argument that the Tribal Lending Entities constitute necessary parties, Defendants rely primarily on the Fourth Circuit's decision in *Yashenko v. Harrah's NC Casino Company, LLC*, 446 F.3d 541 (4th Cir. 2006). (Tribe MTD Mem. at 25.) *Yashenko* considered, in part, the implications of a tribe's contract with a private employer that obligated the employer to give preference to qualified members of the tribe in recruiting, training and employment decisions. 446 F.3d at 543. Yashenko sued the private employer, alleging that the tribal preference policy violated 42 U.S.C. § 1981. *Id.* at 545. The district court granted summary judgment to the employer. *Id.*

On appeal, the Fourth Circuit affirmed the decision of the district court, holding that Yashenko could not pursue his § 1981 claim, because the tribe constituted a necessary party under Rule 19 whose joinder proved infeasible due to tribal sovereign immunity. *Id.* at 552. The Fourth Circuit found the tribe to be necessary, because "a judgment in the plaintiff's favor would only bind him and the private employer and would not prevent the tribe from continuing to enforce its tribal preference policy on its own property." *Id.* at 553 (citing *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1155-56 (9th Cir. 2002)). The Fourth Circuit also reasoned that "any judgment on [the § 1981 claim] would threaten 'to impair

the [Tribe]'s contractual interests, and thus, its fundamental economic relationship with'" the private employer, "as well as 'its sovereign capacity to negotiate contracts and, in general, to govern' the reservation." *Id.* (quoting *Dawavendewa*, 276 F.3d at 1157). And the Fourth Circuit found that any judgment in Yashenko's favor would leave the private employer "'subject to substantial risk of incurring multiple or inconsistent obligations.'" *Id.* (quoting *Dawavendewa*, 276 F.3d at 1157). Because the district court "could not shape the relief sought in such a way as to mitigate this prejudice to [the employer] and the [t]ribe," the Fourth Circuit found that the tribe's absence required dismissal of Yashenko's § 1981 claim. *Id.*

Plaintiffs argue that *Yashenko* proves distinguishable from this case, because, unlike Yashenko, they bring suit against the Tribal Officials, whose inclusion allows the Court to accord complete relief without joinder of the Tribe or the Tribal Lending Entities. (Pls.' Tribe MTD Resp. at 42-43.) In support of this argument, Plaintiffs cite to the Ninth Circuit's post-*Dawavendewa* decision in *Salt River Project Agricultural Improvement & Power District v. Lee*, which distinguished between cases involving tribal officials and those involving no representatives of the tribe at all, 672 F.3d 1176, 1181 (9th Cir. 2012). (Pls.' Tribe MTD Resp. at 42-43.)

Indeed, in *Salt River Project*, the Ninth Circuit expressly noted that "[in *Dawavendewa*] — unlike here — the tribal officials were *not* parties to the action and thus could not represent the absent tribe's interests." 672 F.3d at 1181 (emphasis supplied). Because *Salt River Project* included claims for injunctive relief against the tribal official defendants in their official capacities, the Ninth Circuit found that: (1) the tribe did not constitute a necessary party under Rule 19(a)(1)(A), because "[a]n injunction against a public officer in his official capacity . . . remains in force against the officer's successors;" (2) the tribe did not constitute a necessary

party under Rule 19(a)(1)(B)(i), because the tribal officers adequately represented the tribe's

interests; and, (3) the tribe did not constitute a necessary party under Rule 19(a)(1)(B)(ii),

because although the tribe would not be bound by the requested injunction, the tribe could not

enforce the injurious tribal statute without the aid of the tribal official defendants who would be

bound by the plaintiffs' requested injunction. *Id.* at 1180-81. The Ninth Circuit added that to

hold otherwise "would effectively gut the *Ex parte Young* doctrine," which "permits actions for

prospective non-monetary relief against state or tribal officials in their official capacity to enjoin

them from violating federal law, without the presence of the immune State or tribe." *Id.* at 1181

(citing *Ex parte Young*, 209 U.S. 123 (1908)).

The Court agrees with Plaintiffs that their claims against the Tribal Officials in their

official capacities renders the inclusion of the Tribal Lending Entities unnecessary under Rule

19. First, because Plaintiffs seek an injunction against the Tribal Officials which will also enjoin

future officials in those same positions, Plaintiffs may obtain complete relief without specific

redress against the Tribal Lending Entities. Indeed, the Tribal Officials affirm that the Tribe's

Executive Council has full control of the Entities' operations. (*See* Treppa Aff. ¶¶ 200-10

(describing the current organizational structure of the Tribe's lending businesses, with the

Tribe's Executive Council composing the Board of Directors that has final authority over the

Tribe's lending businesses).) Thus, if successful on the merits of their claims, Plaintiffs will

enjoin the Tribal Officials who, by virtue of their positions on the Tribe's Executive Council,

control the Tribal Lending Entities, rendering the Tribal Lending Entities unnecessary to accord

complete relief. *See Gingras v. Rosette*, 2016 WL 2932163, at *20 (D. Vt. May 18, 2016)

(rejecting similar argument for the joinder of a tribal lending entity and its associated tribe,

because "the presence of the [tribal officials] in this case satisfies the requirements of Rule 19").

Plaintiffs' inclusion of the Tribal Officials likewise renders the Tribal Lending Entities unnecessary under Rule 19(a)(1)(B). As with *Salt River Project*, the Tribal Officials here can adequately represent the interests of the Tribe and the Tribal Lending Entities that the Tribe effectively control. 672 F.3d at 1181; *see also Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (reasoning that the potential for prejudice to a non-party tribe was "largely nonexistent due to the presence in this suit of . . . the tribal officials" and other similarly interested defendants). And though any injunction against the Tribal Officials will not directly enjoin the Tribal Lending Entities, by the Tribal Officials' own admission, they retain control of those Entities such that any act or omission by the Entities could not be undertaken without the Officials' consent, meaning Plaintiffs would not be exposed to inconsistent obligations if they succeed on the merits.

Because the Tribal Lending Entities do not constitute necessary parties under Rule 19(a), the Court need not consider whether those Entities prove indispensable to Plaintiffs' claims. Accordingly, the Court denies Defendants' Motions to Dismiss (ECF Nos. 59, 64) to the extent that they move for dismissal for Plaintiffs' failure to join the Tribal Lending Entities as indispensable parties.

**C.    Tribal Sovereign Immunity Does Not Shield the Tribal Officials from Plaintiffs'** *Ex Parte Young*-**Style Claims Under State Law.**

The Tribal Officials move to dismiss Plaintiffs' claims against them for lack of subject matter jurisdiction, claiming that they enjoy the same immunity from suit as the Tribe and as legislators. (Tribe MTD Mem. at 11-25.) The Tribal Officials argue that "the relief Plaintiffs seek would nullify the Tribe's laws and policies by dictating that it must comply with the contrary law of a state that has no political or regulatory power over the Tribe," rendering "meaningless" the Tribal Lending Entities' sovereign immunity as arms of the Tribe. (Tribe

MTD Mem. at 12.) The Tribal Officials maintain that Plaintiffs fail to overcome this immunity by limiting their desired relief against the Officials to only prospective, injunctive relief, because the Tribe constitutes the "real party in interest," as any relief against the Officials would operate primarily against the Tribe. (Tribe MTD Mem. at 13-15.) The Tribal Officials add that to allow Plaintiffs to obtain their desired relief against the Officials would "eviscerate" the interests of tribal self-government and self-sufficiency that underpin the tribal sovereign immunity doctrine. (Tribe MTD Mem. at 15-16.) And the Tribal Officials contend that *Ex parte Young*'s "limited intrusion on sovereign immunity" does not allow for vindication of Plaintiffs' state-law and RICO claims. (Tribe MTD Mem. at 17-25.)

Plaintiffs respond that tribal immunity "'is a shield, however, not a sword'" and "'poses no barrier to plaintiffs seeking prospective equitable relief for violations of federal or state law.'" (Pls.' Tribe MTD Resp. at 20-21 (quoting *Gingras*, 922 F.3d at 128).) Plaintiffs argue that the Supreme Court's holding in *Michigan v. Bay Mills Indian Community*, 572 U.S. 782 (2014), allows *Ex parte Young*-style claims against tribal officials for violations of state law. (Pls.' Tribe MTD Resp. at 21 (citing *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 121 (2d Cir. 2019)).) As for the Tribal Officials' argument that the Tribe constitutes the "real party in interest" in this suit, Plaintiffs contend that the "real party in interest" analysis addresses claims that seek monetary relief against government employees merely to overcome sovereign immunity and therefore proves inapposite to their claims for injunctive and declaratory relief. (Pls.' Tribe MTD Resp. at 23-24.) Plaintiffs maintain that the Court need only perform a "'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" (Pls.' Tribe MTD Resp. at 25 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002)).)

*1.*     ***Plaintiffs May Use*** **Ex parte Young** ***to Vindicate Their State-Law Claim Against the Tribal Officials to the Extent that Plaintiffs Seek to Enjoin Future Collection of Their Loans, Declare Their Loans Void and Require Notice to the Putative Class in Count Seven.***

The Court will first address the Tribal Officials' argument that Plaintiffs cannot bring *Ex parte Young*-style claims to vindicate violations of state law and RICO, for if Plaintiffs cannot obtain their desired relief in an *Ex parte Young*-style action generally, the Court need not address whether tribal sovereign immunity protects the Tribal Officials in this case. To that end, as mentioned, Plaintiffs contend that the Supreme Court in *Bay Mills* endorsed *Ex parte Young* actions against tribal officials for violations of state law. (Pls.' Tribe MTD Resp. at 21.) The Tribal Officials characterize the language in *Bay Mills* on which Plaintiffs rely as mere dictum that does not support Plaintiffs' "novel riff on *Ex parte Young*." (Tribe MTD Mem. at 18.)

*a.*     **Bay Mills** *Permits* **Ex parte Young-***Style Claims Against Tribal Officials for Violations of State Law.*

*Bay Mills* addressed a gaming compact between Michigan and the Bay Mills Indian Community executed pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.* 572 U.S. at 785-86. Under the compact, Bay Mills could conduct Class III gaming activities — namely, casino games, slot machines and horse racing — on Indian lands, but could not conduct such activities on non-Indian lands. *Id.* at 786. In 2010, Bay Mills began operating a Class III gaming facility on non-Indian land that it had purchased using an appropriation from Congress. *Id.* The congressional appropriation provided that any land acquired using the funds "shall be held as Indian lands are held." *Id.* (internal quotations and citations omitted). Bay Mills therefore argued that the previously non-Indian land became Indian land under the compact, permitting the operation of Class III gaming facilities on that land. *Id.* Michigan disagreed and sued Bay Mills in federal court to enjoin the operation of a casino on the

new land. *Id.* at 787. After the district court issued a preliminary injunction against Bay Mills, the tribe appealed, and the Sixth Circuit reversed, finding that tribal sovereign immunity barred Michigan's suit against Bay Mills unless Congress provided otherwise. *Id.* Because the IGRA provision on which Michigan relied permitted a suit to enjoin gaming activities only on Indian lands, the Sixth Circuit held that Congress did not abrogate the tribe's sovereign immunity for gaming activities on non-Indian lands, which included the new land purchased by Bay Mills. *Id.* at 787-88.

The Supreme Court affirmed the Sixth Circuit's reasoning, agreeing that the IGRA abrogated tribal sovereign immunity only for gaming activities on Indian lands. *Id.* at 791-97. As part of its opinion, the Court addressed Michigan's concern that such a narrow abrogation would leave states without the effective power to regulate gaming within their borders. *Id.* at 795-96. Rejecting this argument, the Court noted that states have "many other powers over tribal gaming that [they] do[] not possess (absent consent) in Indian territory." *Id.* at 795. The Court proceeded to list examples of these powers, including using generally applicable casino licensing schemes to deny a license to off-reservation tribal casinos. *Id.* at 795-96. Relevant here, the Supreme Court further opined that "if Bay Mills went ahead [with operating an unlicensed casino] anyway, Michigan could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gambling without a license" in violation of state law. *Id.* at 796 (citing Mich. Comp. Laws Ann. §§ 432.220, 600.3801(1)(a) (West 2013)). The Supreme Court added that, pursuant to *Ex parte Young*, "tribal immunity does not bar such a suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct." *Id.* (emphasis supplied) (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978)).

The Fourth Circuit has yet to conclude whether the language in question — opining that Michigan could seek to enjoin tribal officials for violations of state law pursuant to *Ex parte Young* — constitutes mere dictum or proves central to the Supreme Court's holding in *Bay Mills*; however, other courts have taken up the issue. Most notably, in *Gingras v. Think Finance, Inc.*, the Second Circuit directly addressed an identical argument to the one lodged by the Tribal Officials here. 922 F.3d at 122-24. In finding that the language in question constituted binding precedent, the Second Circuit reasoned that the availability of alternative remedies, including *Ex parte Young*-style actions for violations of state law, served as a central justification for the Supreme Court's holding that the IGRA does not abrogate tribal sovereign immunity for off-reservation gaming activity. *Id.* at 122.

For one, the Second Circuit noted that the Supreme Court relied on the alternative remedies available to Michigan to support its reasoning that Congress in enacting the IGRA intended to narrowly abrogate tribal sovereign immunity for only on-reservation activities. *Id.* (citing *Bay Mills*, 572 U.S. at 794-95). The Second Circuit also cited to the Supreme Court's explanation for refusing to overturn its decision in *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751 (1998), in which the Court reasoned that "'[a]dhering to *stare decisis* is particularly appropriate here given that [Michigan], as we have shown, has many alternative remedies: It has no need to sue the Tribe to right the wrong it alleges.'" *Id.* (quoting *Bay Mills*, 572 U.S. at 799 n.8). And the Second Circuit observed that "[t]hree distinct opinions in *Bay Mills* recognized the availability of *Ex parte Young* actions for violations of state law." *Id.* (citing *Bay Mills*, 572 U.S. at 796; *id.* at 809 (Sotomayor, J., concurring) (rejecting the dissent's "concern that, although tribal leaders can be sued for prospective relief," (citing

majority op.), "Tribes' purportedly growing coffers remain unexposed to broad damages liability," (citing dissenting op.)); *id.* at 822-24 (Thomas, J., dissenting)).

As for the tribal defendants' argument that to read the language in *Bay Mills* as more than mere dictum would "upset decades of immunity jurisprudence," the Second Circuit found no such contradiction. *Id.* The Second Circuit acknowledged that the Supreme Court in *Pennhurst State School & Hospital v. Halderman* "declined to extend the *Ex parte Young* rationale to suits seeking to hold state officials accountable for violations of that state's laws." *Id.* (citing 465 U.S. 89, 106 (1984)). However, the Second Circuit found that the justification behind the *Pennhurst* holding — that *Ex parte Young* is designed to "hold state officials responsible to the supreme authority of the United States" and thus cannot be used to hold a state official responsible to the authority of her own state's laws — did not apply to suits seeking to hold tribal officials responsible to the laws of a state, "because tribes cannot empower their officials to violate state law the way a state can interpret its own laws to permit a state official's challenged conduct." *Id.* at 122-23 (quotations and citations omitted). In other words, the Second Circuit reasoned that the "concomitant sovereign concerns" at issue in *Pennhurst* did not "prevent the federal courts from instructing a tribal official how to conform that official's conduct to either state or federal law," meaning *Pennhurst* and the language at issue in *Bay Mills* could stand in harmony. *Id.* at 123. The Second Circuit added that the Supreme Court's citation to its previous decision in *Santa Clara Pueblo* when affirming Michigan's ability to enjoin tribal officials for violations of its laws confirmed that "*Bay Mills* was not a wayward departure from, but rather a clear demarcation of, the outer limits of tribal sovereign immunity." *Id.*

Finally, the Second Circuit rejected the tribal defendants' argument that *Bay Mills* provided for only individual, and not official, capacity suits, explaining that the defendants'

"proffered reading makes little sense . . . [f]rom an efficiency perspective, [because] it is impractical to require a new lawsuit and a new injunction each time a tribal official is replaced." *Id.* The Second Circuit likewise rejected the tribal defendants' argument that *Bay Mills* authorized only states to sue tribal officials, noting that "[o]fficial capacity suits . . . have long been available to private parties" and seeing "no reason to depart from that tradition now." *Id.* at 123-24 (citations omitted).

Although the Tribal Officials contend that *Gingras* reached the wrong conclusion, because the language at issue did not prove "'necessary to [the] result'" of the *Bay Mills* holding, (Tribe MTD Mem. at 18 n.4 (modifications supplied) (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66-67 (1996))), the Court finds the reasoning in *Gingras* persuasive and will join the Second Circuit in finding that *Bay Mills* permits *Ex parte Young*-style claims against tribal officials for violations of state law that occur on non-Indian lands.[12] To hold otherwise would allow "[t]ribes and their officials . . ., in conducting affairs outside of reserved lands, to violate state laws with impunity." *Gingras*, 922 F.3d at 124. Moreover, allowing *Ex parte Young*-style suits against tribal officials for violations of state law aligns with "the federal government's strong interest in providing a neutral forum for the peaceful resolution of disputes between domestic sovereigns," because such suits would fall within the jurisdiction of the federal courts, who already serve as the constitutionally designated arbiter of disputes between the states. *Id.* (citing U.S. Const. art. III, § 2, cl. 2).

---

[12] Notably, the Eleventh Circuit has reached the same conclusion. *See Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015) ("[T]ribal officials may be subject to suit in federal court for violations of state law under the fiction of *Ex parte Young* when their conduct occurs outside of Indian lands." (citing *Bay Mills*, 572 U.S. at 795-96)).

### b.   Plaintiffs' Loans Constitute Off-Reservation Conduct Subject to State Law.

Assuming that *Gingras* reached the correct conclusion, the Tribal Officials further argue that the holding in *Bay Mills* "does not extend to the on-reservation conduct challenged in this lawsuit." (Tribe MTD Mem. at 18, 21-22.)  The Tribal Officials cite to the decision of Senior United States District Judge Robert E. Payne in *Williams v. Big Picture Loans*, which found that "because all loan applications are approved by [the tribal lender's] employees on the Reservation, all consumer loans are originated there." 329 F. Supp. 3d 248, 264 (E.D. Va. 2018).  The Tribal Officials aver that the Tribal Lending Entities also approved loan applications on the Tribe's reservation, noting that the loan agreements stated that each loan was "made and accepted in the sovereign territory of the [Tribe]," which "precludes [Plaintiffs] from arguing that the loans originated elsewhere." (Tribe MTD Mem. at 21 (internal quotations and citations omitted).)

Plaintiffs respond that the Tribal Officials ignore the findings in *Gingras* and similar lawsuits that tribal lending practices constitute off-reservation activity subject to generally applicable state laws. (Pls.' Tribe MTD Resp. at 25-26 (citing *Gingras* 922 F.3d at 121; *United States v. Hallinan*, 2016 WL 7477767, at *1 (E.D. Pa. Dec. 29, 2016); *Otoe-Missouria*, 974 F. Supp. 2d at 361; *Colorado v. W. Sky Fin., LLC*, 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011)).)  Plaintiffs contend that the Tribal Officials mischaracterize Judge Payne's finding in *Williams*, because the statement quoted by the Officials concerned the relevant tribal lender's associations with the tribe in that case, not whether the tribal lender's practices constituted on- or off-reservation activity. (Pls.' Tribe MTD Resp. at 27 (citing *Williams*, 329 F. Supp. 3d at 264).)  Plaintiffs note that Judge Payne later made a contrary finding when examining whether the plaintiffs had to exhaust tribal remedies, ruling that "'there was no basis on which to conclude

that a non-member of the Tribe acted on tribal land.'" (Pls.' Tribe MTD Resp. at 27 (quoting *Williams v. Big Picture Loans*, No. 3:17-cv-461 (REP), ECF No. 142 ¶ 1 (E.D. Va. July 25, 2018)).) And Plaintiffs contend that, in any case, there exists sufficient evidence at this stage to find that the loans issued by the Tribal Lending Entities originated in Kansas, not on the Tribe's reservation in California. (Pls.' Tribe MTD Resp. at 28.)

Even after accepting the Tribal Officials' contention that Plaintiffs' loans originated on the Tribe's reservation, that fact alone does not render the Tribal Lending Entities' lending activities wholly on-reservation conduct. The Tribal Officials do not dispute that Plaintiffs resided on non-Indian lands when applying for their respective loans, executing relevant loan documents and making loan payments from bank accounts maintained in Virginia. Plaintiffs did not travel to the Tribe's lands at any point. Such activity proves directly analogous to the lending activity that other courts have found to clearly constitute off-reservation conduct subject to nondiscriminatory state regulation. *See Gingras* 922 F.3d at 121 (finding that the tribal defendants "engaged in conduct outside of Indian lands when they extended loans to the Plaintiffs in Vermont"); *Hallinan*, 2016 WL 7477767, at *1 ("Because the loans at issue involve activity that takes place, at least in part, off reservation, state law still applies."); *Otoe-Missouria*, 974 F. Supp. 2d at 361 ("The undisputed facts demonstrate that the activity the State seeks to regulate is taking place in New York, off of the Tribes' lands."); *W. Sky Fin., LLC*, 845 F. Supp. 2d at 1181 ("Business conducted over the Internet that would confer jurisdiction on a state court also demonstrates that the business activity constitutes off-reservation activity."); *cf. Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1304 (10th Cir. 2008) (finding that Kansas could regulate Utah lender's loans to Kansas residents despite lender's lack of physical presence in Kansas, because lending to Kansas residents constituted in-state activity).

As for the Tribal Officials' reliance on Judge Payne's finding in *Williams* that "because all loan applications are approved by [the tribal lender's] employees on the Reservation, all consumer loans are originated there," such a finding proves inapposite to the issue here. 329 F. Supp. 3d at 264. The statement on which the Tribal Officials rely appears within the background section of the *Williams* opinion and merely draws an obvious conclusion: that if the tribal lender's employees approve loan applications on the tribe's reservation, the loans originate on the reservation. *Id.* The court in *Williams* said nothing about whether the lending practices constituted on- or off-reservation activity. And, in any case, that loans originate in one sovereign jurisdiction does not end the Court's analysis, for, as the Court explains above, a loan transaction inherently involves more than the originator.[13]

The Tribal Officials contend that the Court should not determine the locus of the lending conduct "based solely on 'a mere determination of the [borrower's] physical location,'" because doing so "would make little sense in the context of 'many modern-day contracts involving reservation-based business.'" (Tribe MTD Mem. at 22 (quoting *FTC v. Payday Fin., LLC*, 935 F. Supp. 2d 926, 940 (D.S.D. 2013)).) But the Tribal Officials again mischaracterize the quoted text, which addressed the extent of tribal jurisdiction over non-Indian borrowers, not the extent of state jurisdiction over off-reservation conduct. *Payday Fin.*, 935 F. Supp. 2d at 940. Indeed, the Tribal Officials' contention stands in direct opposition to the Supreme Court's instruction

---

[13] In their Reply, the Tribal Officials argue that the loan agreements explicitly provide that the agreements are made and accepted on the Tribe's reservation, which binds the Plaintiffs to accept that the Tribe's lending practices constituted wholly on-reservation activity. (Tribe MTD Reply at 14-15.) The Court disagrees that Plaintiffs' stipulation that they accepted the loans on the Tribe's reservation precludes the application of Virginia law to clearly off-reservation activity occurring in Virginia. *See* Restatement (Second) of Contracts § 207 (Am. Law Inst. 2019) ("In choosing the meanings of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred.").

that "[a] State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate State intervention." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 336 (1983). Such "off-reservation effects" clearly exist here and warrant the imposition of Virginia's generally applicable laws. Moreover, the Court does not base its off-reservation-conduct finding solely on the physical location of Plaintiffs when they executed the loan agreements; rather, as explained above, the lending activities in question constitute at least partly off-reservation conduct, because they reach into the sphere of a different sovereign and rely on conduct — including performance of the loan agreements — that occurred within that sphere.

Neither does the Court agree with the Tribal Officials' argument that enjoining them from violating state law would "eviscerate modern federal Indian policy and the purposes of sovereign immunity, which are designed to encourage Tribes to seek out new business ventures like e-commerce." (Tribe MTD Mem. at 22.) If anything, the conclusion that the Tribal Officials ask the Court to reach would eviscerate the power of states to subject "Indians going beyond reservation boundaries . . . to any generally applicable state law" by allowing tribes operating as payday lenders to reach far beyond their sovereignty and violate state consumer protection statutes with impunity. *Bay Mills*, 572 U.S. at 795. Further, that Plaintiffs might be able to vindicate their state-law claims through injunctive relief in this instance does not mean that the Tribal Lending Entities cannot structure their future loans to balance the Tribe's interest in self-sufficiency with the Entities' obligation to obey the laws of the sovereign states into which they reach.[14] Nor does the Court's conclusion preclude the Tribe from structuring its

---

[14]     In its Amicus Brief, the Commission argues that tribes "cannot be sovereign and yet be required to follow laws enacted by states," citing to cases that extend tribal sovereign immunity to commercial activities on non-Indian lands. (Comm'n Amicus Br. at 11.) However, as the

loans and lending practices to properly avoid Virginia's consumer finance statutes in favor of its

own.

     *c.*     ***Plaintiffs May Enjoin the Tribal Officials from Violating Virginia's Consumer Finance Act Only to the Extent that the Officials' Violations Affect Loans Issued to Them and the Putative Class in Count Seven.***

The Tribal Officials also argue — albeit briefly — that Plaintiffs cannot enjoin them from

violating state law, because the Virginia statutes invoked by Plaintiffs provide for injunctive

relief against only "lenders," which in this case would be the Tribal Lending Entities. (Tribe

MTD Mem. at 22 (citing Va. Code § 1541(B)).) Plaintiffs respond that Virginia law permits

them to obtain an injunction even when a statute does not provide for equitable remedies. (Pls.'

Tribe MTD Resp. at 39 (citing *Levisa Coal Co. v. Consolidation Coal Co.*, 662 S.E.2d 44, 53

---

Supreme Court noted in *Kiowa*, "[t]here is a difference between the right to demand compliance with states laws and the means available to enforce them [i.e., *Ex-parte Young* actions, taxation, etc.]." 523 U.S. at 755; *see also Fla. Paraplegic Ass'n, Inc. v. Miccosukee Tribe of Indians*, 166 F.3d 1126, 1130 (11th Cir. 1999) ("[W]hether an Indian tribe is *subject* to a statute and whether the tribe may be *sued* for violating the statute are two entirely different questions." (emphasis supplied)). The cases cited by the Commission refer to the latter issue and do not preclude Virginia — or private plaintiffs authorized to bring suit under Virginia law — from demanding compliance with Virginia laws when the Tribe reaches into the Commonwealth.

Similarly, various tribal nonprofit organizations led by the Native American Finance Officers Association ("NAFOA") (collectively, the "Tribal Amici Curiae") argue in their own amicus brief that "a decision to override the well-established doctrine of sovereign immunity and subject tribal governments . . . to the disparate laws of the various states would constitute a sea-change in the management of tribal affairs and result in a myriad of deleterious consequences." (Amicus Br. of Tribal Amici Curiae ("NAFOA Amicus Br.") (ECF No. 102) at 6.) Yet, the Tribal Amici Curiae ignore that *Ex parte Young* relief constitutes an *exception* to, and not an override of, tribal sovereign immunity. *See Crowe & Dunlevy v. Stidham*, 640 F.3d 1140, 1154-55 (10th Cir. 2011) (recognizing that *Ex parte Young* constitutes "an exception not just to state sovereign immunity but also tribal sovereign immunity" (collecting cases)). The Tribal Amici Curiae likewise ignore the Supreme Court's express holding that "[u]nless federal law provides differently, Indians going beyond reservation boundaries are subject to any generally applicable state law." *Bay Mills*, 572 U.S. at 795 (internal quotations and citations omitted).

(Va. 2008) ("[U]nless a party is entitled to an injunction pursuant to a statute, a party must establish the traditional prerequisites . . ." (internal quotations and citations omitted)).)

The Supreme Court has recognized that *Ex parte Young* is itself "a judge-made remedy," quite apart from any statutory remedy, designed "'to prevent an injurious act by a public officer.'" *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015). However, the Supremacy Clause does not vest private plaintiffs with an implied right of action to bring *Ex parte Young*-style claims. *Id.* Thus, Plaintiffs must rely on the Court's equitable powers to enjoin unlawful executive action, and those equitable powers are "subject to express and implied statutory limitations," meaning a litigant seeking in equity to enjoin a government official from violating federal or, in this case, state law must have the statutory authority to do so. *Id.* at 1385. Notably, when enforcing rights created under state law, federal courts should be especially cautious in exercising their equitable powers. *See Johnson v. Collins Entm't Co.*, 199 F.3d 710, 726 (4th Cir. 1999) (noting that "[t]he district court's reliance on its 'inherent equitable power' in granting [an expansive injunction against video poker operators] made federal encroachment on the state's regulatory domain all the more invasive").

Applying these principles, the Supreme Court in *Seminole Tribe* found that permitting *Ex parte Young*-style suits to enforce § 2710(d)(3) of the IGRA proved inconsistent with the statute's "detailed remedial scheme." 517 U.S. at 74. Similarly, in *Armstrong*, the Court held that private litigants could not obtain *Ex parte Young*-style relief for violations of § 30(A) of the Medicaid Act, because "the sole remedy Congress provided for a State's failure to comply with [the Section] . . . is the withholding of Medicaid funds by the Secretary of Health and Human Services" and the Section's text proved "judicially unadministrable," foreclosing the possibility that Congress intended for private enforcement of the provision. 135 S. Ct. at 1378. By

comparison, in *Verizon*, the Supreme Court found that the Telecommunications Act of 1996 did

not foreclose jurisdiction under *Ex parte Young*, because the Act places "no restriction on the

relief a court can award," "does not even say whom the suit is to be brought against" and does

not "'impose upon the State a liability that is significantly more limited than would be the

liability imposed upon the state officer under *Ex parte Young*.'" 535 U.S. at 647-48 (quoting

*Seminole Tribe*, 517 U.S. at 75-76).

Here, in Count Seven (Count Eight in the Amended Complaint), Plaintiffs bring a claim

for injunctive relief against the Tribal Officials under Virginia's Consumer Finance Act

("VCFA"). (Am. Compl. ¶¶ 224-36.) Though Plaintiffs do not specify the statutory section

entitling them to relief, the Court presumes that Plaintiffs seek relief pursuant to Virginia Code

§ 6.2-1541, which provides that:

> A. A loan contract shall be void if any act has been done in the making or
> collection thereof that violates § 6.2-1501.
>
> B. The lender on any loan for which a person has taken any action in its making
> or collection in violation of § 6.2-1501 shall not collect, receive, or retain any
> principal, interest, or charges whatsoever with respect to the loan, and any
> principal or interest paid on the loan shall be recoverable by the person by or for
> whom payment was made.

Section 6.2-1501 prohibits the unlicensed lending of consumer loans with interest rates

exceeding Virginia's usury cap. The Virginia Supreme Court has found that § 6.2-1541(B)

permits "a recovery of restitution only from the lender," which excludes members, officers,

directors, agents and employees of that lender. *Greenberg v. Commonwealth ex rel. Att'y Gen.

of Va.*, 499 S.E.2d 266, 270 (Va. 1998). Notably, restitution provides for only retrospective

relief by returning to the plaintiff what the defendant rightfully owes her. Restatement (Third) of

Restitution § 1 cmt. a (Am. Law Inst. 2019). However, § 6.2-1541(B) also implicitly provides

for prospective injunctive relief by prohibiting the collection, receipt and retention of principal,

interest and charges with the respect to any unlawful loan. The question thus becomes whether this prospective relief allows the Court, in equity, to use *Ex parte Young* to enjoin the Tribal Officials from issuing future usurious loans in Virginia. The Court finds that it does not.

In Virginia, when "'a statute creates a right and provides a remedy for the vindication of that right, then that remedy is exclusive unless the statute says otherwise.'" *Concerned Taxpayers of Brunswick Cty. v. County of Brunswick*, 455 S.E.2d 712, 717 (Va. 1995) (quoting *Vansant & Gusler, Inc. v. Washington*, 429 S.E.2d 31, 33 (Va. 1993) (internal quotations and citations omitted)). Here, the rights relied upon by Plaintiffs are purely statutory. Although Plaintiffs contend that Virginia recognizes a right to injunctive relief apart from any statute, the case to which they cite in support of that proposition, *Levisa Coal Company*, merely clarifies that a plaintiff seeking injunctive relief must first prove irreparable harm unless a statute provides for injunctive relief, in which case a plaintiff proves irreparable harm by proving the harm under the statute. 662 S.E.2d 44, 53. *Levisa* does not provide a blanket right to injunctive relief for purely statutory claims. Plaintiffs otherwise fail to point to any equitable remedy concerning usurious lending that preexists those enumerated in the VCFA. Indeed, as mentioned, usury regulation in Virginia has been a creature of statute since the colonial period. *Pace*, 66 Va. at 20. Thus, Plaintiffs must rely exclusively on the remedies provided by the VCFA.

Because the VCFA provides for prospective relief only to the extent necessary to prevent the collection and receipt of any principal, interest and charges on a plaintiff's unlawful loan, the Court may use *Ex parte Young*-style relief only to the same extent, meaning the Court cannot use *Ex parte Young* to enjoin future usurious lending by the Tribal Officials. Neither may the Court order the Tribal Officials to restore monies already paid by Plaintiffs, because restitution, though often classified as an equitable remedy, "is in practical effect indistinguishable in many aspects

from an award of damages against the State." *Edelman v. Jordan*, 415 U.S. 651, 668 (1974). Of course, should Plaintiffs succeed on the merits, assuming the Tribal Lending Entities do not establish a lawful workaround, any future loans issued to Virginia residents by those Entities would have to conform to Virginia's legal requirements, with collateral estoppel effect given to this Court's judgment on the usury issue.

As for the Tribal Officials' argument that the VCFA permits relief only against a "lender," the Court finds that the Tribal Officials constitute the "lender" under the fiction of *Ex parte Young*, because, as discussed above, the Tribal Lending Entities cannot act without the explicit or implicit approval of the Tribal Officials. Indeed, as in *Verizon*, the liability imposed on the Tribal Officials here would not be any more — and, in fact, would be less — than the liability imposed on the Tribal Lending Entities if Plaintiffs could sue them directly under the VCFA. 535 U.S. at 647-48. Thus, Plaintiffs may vindicate their VCFA claim against the Tribal Officials using *Ex parte Young*, but only to the extent of their outstanding debts.

### d.   *RICO Does Not Permit* Ex Parte Young-*Style Relief Against the Tribal Officials.*

The Tribal Officials argue that Plaintiffs may not vindicate their RICO claims using *Ex parte Young*-style relief, because § 1964(c) of RICO provides private plaintiffs with a right to only monetary damages, not injunctive or declaratory relief. (Tribe MTD Mem. at 23 (citing *Johnson*, 199 F.3d at 726).) The Tribal Officials further contend that they cannot be held liable under RICO, because RICO "'entails a *mens rea* requirement that a governmental entity cannot form.'" (Tribe MTD Mem. at 23 (quoting *Gil Ramirez Grp., LLC v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 412 (5th Cir. 2015)).) The Tribal Officials maintain that Plaintiffs cannot evade RICO's *mens rea* requirement by suing the Officials in their official capacities, because Plaintiffs

have sued every member of the Tribe's Executive Council, which equates to suing the Tribe's government. (Tribe MTD Mem. at 24.)

Plaintiffs respond that the law remains unsettled on whether a litigant may sue governmental entities under RICO, noting that while the Fifth and Ninth Circuits have precluded RICO claims against such entities, the Second and Third Circuits have permitted such claims. (Pls.' Tribe MTD Resp. at 29 (comparing *Gil Ramirez*, 786 F.3d at 412 and *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir. 1991) with *Gingras*, 922 F.3d at 124-15 and *Genty v. Resolution Tr. Corp.*, 937 F.2d 899, 909 (3d Cir. 1991)).) Plaintiffs argue that the Court should side with the Second and Third Circuits, because: (1) RICO defines a "person" capable of violating the Act as "'any individual or entity capable of holding a legal or beneficial interest in property,'" which includes the Tribe, (Pls.' Tribe MTD Resp. at 29-30 (quoting 18 U.S.C. § 1961(3))); (2) RICO is itself silent on the *mens rea* issue, so Plaintiffs need not show that the Tribal Officials acted with criminal intent but merely performed the predicate act — in this case, collecting an unlawful debt, (Pls.' Tribe MTD Resp. at 30); and, (3) the cases exempting governmental bodies from RICO liability provide no legitimate reasoning for such a categorical conclusion, (Pls.' Tribe MTD Resp. at 30-31).

As for the Tribal Officials' contention that the Fourth Circuit in *Johnson* held that RICO provides for only monetary damages, Plaintiffs respond that although *Johnson* expressed "'substantial doubt'" whether RICO allows injunctive relief for private plaintiffs, the Fourth Circuit did not decide the issue. (Pls.' Tribe Resp. at 31 (quoting *Johnson*, 199 F.3d at 726), 32-33.) And Plaintiffs note that "Supreme Court jurisprudence 'has consistently rejected interpretations by the courts of appeals that would limit the scope of RICO actions in ways not contemplated by the text of the statute.'" (Pls.' Tribe MTD Resp. at 31 (quoting *Nat'l Org. for*

*Women, Inc. v. Scheidler*, 267 F.3d 687, 698 (7th Cir. 2001) (collecting cases), *rev'd on other*

*grounds*, 537 U.S. 393 (2003)).) Plaintiffs maintain that a plain reading of § 1964 and statutory

context clearly allow for injunctive relief. (Pls.' Tribe MTD Resp. at 34-39.) Before addressing

whether Plaintiffs may hold the Tribal Officials liable under RICO, the Court will first consider

whether RICO precludes *Ex parte Young*-style relief.

In support of their argument that RICO precludes injunctive and declaratory relief for

private plaintiffs, the Tribal Officials rely primarily on the Fourth Circuit's opinion in *Johnson v.*

*Collins Entertainment Company*, 199 F.3d 710 (4th Cir. 1999). In *Johnson*, the Fourth Circuit

considered a district court's order enjoining video poker operators from paying out more than

$125 daily to a customer at one location pursuant to South Carolina law. *Id.* at 715. The Fourth

Circuit reversed the district court, holding that the court should have abstained from exercising

jurisdiction over the plaintiffs' predominantly state-law claims. *Id.* at 719-21. In reaching this

conclusion, the Fourth Circuit addressed the plaintiffs' assertion of RICO claims against the

video poker operators, finding that such claims amounted to "state law in federal clothing,"

which could not "mask the quintessentially state character of [the present] controversy." *Id.* at

721-22. The Fourth Circuit also faulted the district court's reliance on its "inherent equitable

power" to issue the injunction, noting that "[n]o federal statute expressly authorized the relief

that [the] plaintiffs sought," because § 1964(c) of RICO "makes no mention whatever of

injunctive relief," thereby creating "'substantial doubt whether RICO grants private parties . . . a

cause of action for equitable relief.'" *Id.* at 726 (quoting *Dan River, Inc. v. Icahn*, 701 F.2d 278,

290 (4th Cir. 1983)).

Although the Tribal Officials cite to *Johnson* for the proposition that RICO does not

allow private parties to obtain equitable relief, the Court interprets *Johnson* merely as expressing

doubt in the context of an expansive injunction issued by a district court without any clear

statutory basis. Indeed, as Plaintiffs note, two years after *Johnson*, the Fourth Circuit reaffirmed

that it had not yet addressed the question of whether RICO permits injunctive relief for private

litigants, again deferring the issue. *See Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*,

262 F.3d 260, 268 n.4 (4th Cir. 2001) ("[W]e have no occasion to consider the parties'

arguments as to whether equitable relief is available in a private civil RICO action, and reserve

for another day the question of whether relief which goes beyond a purely compensatory

measure of money damages is available in private civil RICO actions.") Thus, the *Johnson*

language constitutes non-binding dictum. Because the *Johnson* dictum does not appear to result

from thorough consideration of adversarial arguments or provide clear instruction to lower

courts, the Court will decide on its own whether RICO provides private plaintiffs with a right to

injunctive relief. *See Companion Prop. & Cas. Ins. Co. v. U.S. Bank, N.A.*, 2016 WL 6781057,

at *16 (D.S.C. Nov. 16, 2016) (noting that "dictum of a superior tribunal should be followed if it

is the result of thorough consideration of the issue and is intended as a guide for the future

conduct of lower courts" (citing *United States v. Bell*, 542 F.2d 202, 206 (2d Cir. 1975))).

In relevant part, § 1964 of RICO provides that:

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to . . . imposing reasonable restrictions on the future activities or investments of any person[.]

(b) The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]

> (d) A final judgment or decree rendered in favor of the United States in any
> criminal proceeding brought by the United States under this chapter shall estop
> the defendant from denying the essential allegations of the criminal offense in any
> subsequent proceeding brought by the United States.

18 U.S.C. § 1964(a)-(d).

Circuit courts that have directly addressed whether § 1964 provides for injunctive and

declaratory relief in private RICO actions have reached opposite conclusions. On the one hand,

the Ninth Circuit in *Religious Technology Center v. Wollersheim*, on a matter of first impression

for any circuit court, concluded that RICO does not authorize injunctive relief for private

litigants. 796 F.2d 1076, 1084 (9th Cir. 1986). The Ninth Circuit began with an analysis of the

language in § 1964, noting that:

> Part (a) is a broad grant of equitable jurisdiction to the federal courts. Part (b)
> permits *the government* to bring actions for equitable relief. Part (d) grants
> collateral estoppel effect to a criminal conviction in a subsequent civil action by
> the government. Part (c), the private civil RICO provision, states that a private
> plaintiff may recover treble damages, costs and attorney's fees. In contrast to part
> (b), there is no express authority to *private plaintiffs* to seek the equitable relief
> available under part (a).

*Id.* at 1082. The Ninth Circuit observed that although part (c) did not "expressly limit private

plaintiffs to 'only' the enumerated remedies," and although part (a) did not "expressly limit the

availability of the illustrative equitable remedies to the government," "the inclusion of a single

statutory reference to private plaintiffs, and the identification of a damages and fees remedy for

such plaintiffs in part (c), logically carries the negative implication that no other remedy was

intended to be conferred on private plaintiffs." *Id.* at 1082-83.

The Ninth Circuit rejected two alternative readings offered by the plaintiff. In the first,

the plaintiff suggested that because the treble damages provision followed the word "and" and

not the word "to," Congress intended treble damages to be an additional remedy beyond

equitable relief. *Id.* at 1083. The Ninth Circuit found such an interpretation unconvincing, noting that "[n]o court has accepted this reading." *Id.* In the second reading, the plaintiff argued that part (a) provides a general grant of equitable relief, placing "no limit on the class or category of litigants who might avail themselves of the remedies it makes available under RICO." *Id.* The Ninth Circuit found the second reading "plausible" on its face but untenable upon review of Congress's actions in enacting the civil RICO provision. *Id.* at 1084.

Specifically, the Ninth Circuit observed that during the RICO bill's passage through Congress, the House of Representatives "rejected an amendment . . . which would expressly permit private parties to sue for injunctive relief under section 1964(a)" and "the very next year after RICO's enactment, Congress refused to enact a bill to amend section 1964 and give private plaintiffs injunctive relief." *Id.* at 1085. The Ninth Circuit also found RICO's treble damages provision analogous to § 4 of the Clayton Act, which the Supreme Court found does not include private injunctive relief. *Id.* at 1087 (citing *Paine Lumber Co. v. Neal*, 244 U.S. 459, 471 (1917)). Based on this legislative history, the Ninth Circuit rejected the plaintiff's second reading, finding that RICO does not provide injunctive relief to private RICO plaintiffs. *Id.*

Fifteen years after *Wollersheim* — and two years after the Fourth Circuit's dictum in *Johnson* — the Seventh Circuit took up the same issue, reaching the opposite conclusion to the Ninth Circuit. *Scheidler*, 267 F.3d at 695-700. Specifically, the Seventh Circuit found that "Supreme Court decisions since the 1986 *Wollersheim* opinion convince[] us that the approach of the Ninth Circuit (which relied almost exclusively on legislative history of RICO to reach its result, as opposed to the actual language of the statute) no longer conforms to the Court's present jurisprudence." *Id.* at 695. Contrary to the Ninth Circuit in *Wollersheim*, the Seventh Circuit read § 1964(a) to provide "general remedies, including injunctive relief, that all plaintiffs

authorized to bring suit may seek," with §§ 1964(b) and (c) simply providing for additional

remedies depending on the category of plaintiff. *Id.* at 696. The Seventh Circuit found that "this

reading of the statute gives the words their natural meaning and gives effect to every provision in

the statute." *Id.*

The Seventh Circuit then proceeded to consider the defendants' counterarguments,

including that § 1964(a) constitutes "purely a jurisdictional provision authorizing the district

court to hear RICO claims and to grant injunctions to parties authorized by other provisions of

the law to seek that form of relief." *Id.* The defendants argued that § 1964(b) permits the

Attorney General to seek relief prescribed under that provision and the equitable relief prescribed

in § 1964(a), while § 1964(c) provides only "a limited right of action for private parties." *Id.*

The Seventh Circuit rejected this reading of the statute, opining that the *Wollersheim* decision

misread § 1964(b) as permitting the government to bring actions for equitable relief when in fact

it provides only for "*interim* remedies." *Id.* (emphasis supplied). Thus, the Seventh Circuit

reasoned, the government's ability to obtain permanent injunctive relief derives not from

§ 1964(b), but § 1964(a). *Id.* at 696-97. "Given that the government's authority to seek

injunctions comes from the combination of the grant of a right of action to the Attorney General

in § 1964(b) and the grant of district court authority to enter injunctions in § 1964(a)," the

Seventh Circuit concluded that, "by parity of reasoning, . . . private parties can also seek

injunctions under the combination of grants in §§ 1964(a) and (c)." *Id.* at 697.

The Seventh Circuit likewise rejected the defendants' contention that § 1964(a) is purely

jurisdictional, analogizing the language in § 1964(a) to a similar statute interpreted by the

Supreme Court as remedial as well as jurisdictional. *Id.* (citing *Steel Co. v. Citizens for a Better

Env't*, 523 U.S. 83, 90 (1998) (interpreting 42 U.S.C. § 11046(c), which provides that "[t]he

district court shall have jurisdiction in actions brought under subsection (a) of this section . . . to enforce the requirement concerned and to impose any civil penalty provided for violation of that requirement," as specifying remedial powers of the court and not simply providing for jurisdiction)). The Seventh Circuit reasoned that the defendants' desired reading would render the remedies enumerated in § 1964(a) unavailable unless explicitly provided in another section; yet, no other section provided for permanent, equitable relief. *Id.*

Finally, the Seventh Circuit found inapposite the defendants' argument that providing injunctive relief to private plaintiffs would read injunctive relief into a statute that prescribes specific remedies to such plaintiffs, noting that § 1964(a) does explicitly provide for injunctive relief and that the absence of a specific category of plaintiff in that section merely reinforces that RICO provides injunctive relief to all plaintiffs, governmental or private. *Id.* at 698. The Seventh Circuit opined that its reading aligned with both "Congress's admonition that the RICO statute is to be 'liberally construed to effectuate its remedial purposes,'" *id.* (quoting Pub. L. No. 91-452, § 904(a), 84 Stat. 947 (1970)), and the Supreme Court's consistent rejection of "interpretations by the courts of appeals that would limit the scope of RICO actions in ways not contemplated by the text of the statute," *id.* (collecting cases).

Having considered these opinions and district court opinions addressing the same issue, the Court finds the Ninth Circuit's interpretation of § 1964 more persuasive, though without relying on legislative history. Indeed, when interpreting statutes, courts "must first and foremost strive to implement congressional intent by examining the plain language of the statute." *United States v. Passaro*, 577 F.3d 207, 213 (4th Cir. 2009). "[I]f a disputed statutory provision has a plain and unambiguous meaning, then interpretation giving effect to that meaning must be adopted and the statutory construction inquiry ends." *United States v. Mitchell*, 691 F. Supp. 2d

655, 668 (E.D. Va. 2010) (citing *United States v. Whitley*, 529 F.3d 150, 156 (2d Cir. 2008)); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." (internal quotations and citations omitted)). By its plain terms, § 1964 vests district courts with the authority "to prevent and restrain violations of section 1962 . . . by issuing appropriate orders." 18 U.S.C. § 1964(a). Section 1964(a) then provides a non-exhaustive list of the types of "appropriate orders" that a court may issue to prevent and restrain violations. Such language cannot possibly be read as only jurisdictional, for no other provision in § 1964 provides for any equitable remedies of the type listed in § 1964(a). That said, §§ 1964(b) and (c), not § 1964(a), provide the distinguishing language that precludes injunctive relief for private plaintiffs.

For one, after providing the courts with a general grant of remedial powers in § 1964(a), § 1964(b) provides that "[t]he Attorney General may institute proceedings under *this section*," listing interim forms of relief that the Attorney General may receive "[p]ending final determination thereof." (emphasis added). By comparison, § 1964(c) provides a specific cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962," explaining that such persons "shall recover threefold the damages he sustains and the cost of the suit." By providing the government with authority to institute proceedings under § 1964 and not providing private plaintiffs with that same authority, Congress expressed an intent that the general grant of injunctive power to the courts in § 1964(a) not apply in cases involving only private plaintiffs. Indeed, by providing a cause of action only if a private plaintiff has suffered monetary damages, Congress implicitly precluded the possibility of equitable relief for such plaintiffs, because — as has been the case since the conception of courts of equity — to obtain equitable relief, a plaintiff must have an inadequate remedy at law. *See eBay Inc. v.*

82

*MercExchange, LLC*, 547 U.S. 388, 391 (2006) ("According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief," including "(2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury"). In other words, by requiring that private plaintiffs have first suffered monetary damages and then explaining that those plaintiffs shall obtain treble those damages, Congress provided an adequate remedy at law that would seemingly preclude equitable relief of the sort described in § 1964(a).

Moreover, § 1964(b) lists interim forms of equitable relief while § 1964(c) does not, which further demonstrates that RICO precludes injunctive relief for private plaintiffs. Interim remedies are often necessary "to preserve the court's power to render a meaningful decision after a trial on the merits." 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2947 (3d ed. 2013). Thus, the explicit provision of interim equitable relief in RICO actions instituted by the Attorney General and the absence of any provision for such relief in private-plaintiff suits confirms that the power of courts to issue equitable remedies under § 1964(a) applies only to government-instituted proceedings. To interpret § 1964 otherwise would render superfluous the additional provision of interim remedies in § 1964(b) — a result the Court must avoid. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("[C]ourts should disfavor interpretations of statutes that render language superfluous.").

Furthermore, as the Ninth Circuit observed in *Wollersheim*, § 1964 mirrors § 4 of the Clayton Act, 796 F.2d at 1085, which the Supreme Court in *Pain Lumber Co.* found not to include a private right to injunctive relief, 244 U.S. at 471. Indeed, 15 U.S.C. § 4 provides that "[t]he several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title," which mirrors § 1964(a)'s grant of jurisdiction

and power to the district courts to "prevent and restrain" violations of § 1962. Section 4 then proceeds to empower United States attorneys, "under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations," which mirrors § 1964(b)'s authorization to the Attorney General to "institute proceedings under this section." But § 4 does not allow private plaintiffs to bring such claims, suggesting that §§ 1964(a) and (b) are intended to mirror § 4 of the Clayton Act, including its exclusion of private equity claims, while § 1964(c) provides an additional, narrower right to recovery for private plaintiffs. *See Northcross v. Bd. of Educ.*, 412 U.S. 427, 428 (1973) (noting that similarity of language between two statutory provisions "is, of course, a strong indication that the two statutes should be interpreted pari passu," adding that a shared "raison d'etre" between the statutes creates an even stronger indication); *see also Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987) (finding that "the Clayton Act clearly provides a far closer analogy" to RICO and thus adopting the Clayton Act's statute of limitations for civil RICO claims).

As for the extent to which § 1964(c) provides an additional right to recovery for private plaintiffs, the antitrust statutes once more prove instructive. Like RICO, the antitrust statutes include a provision allowing for private causes of action to obtain treble damages, *see* 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained"); yet, unlike RICO, the antitrust statutes also include a separate provision permitting injunctive relief for private plaintiffs, *see* 15 U.S.C. § 26 ("Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws."). That Congress would provide private antitrust plaintiffs with a separate right to prospective, injunctive relief under a nearly

identical remedial structure and not provide the same right under RICO further confirms that RICO does not provide for injunctive relief in private civil actions. *Northcross*, 412 U.S. at 428.

For these reasons, the Court finds that RICO does not provide private plaintiffs with a right to injunctive relief. Because RICO does not provide private plaintiffs with equitable remedies while providing such remedies to the government, the Act expresses a congressional intent not to provide *Ex parte Young*-style relief of the sort requested by Plaintiffs. *Armstrong*, 135 S. Ct. at 1384. Accordingly, the Court dismisses without prejudice Count Five of Plaintiffs' Amended Complaint.

In sum, based on the foregoing analysis, Plaintiffs may receive prospective injunctive relief against the Tribal Officials under the principles of *Ex parte Young* only to the extent that they seek to enjoin future collection on the loans issued to them and the putative class under Count Seven. Plaintiffs may also pursue their declaratory judgment claim (Count Six) to the same extent. *See Alden v. Maine*, 527 U.S. 706, 757 (1999) (noting that sovereign immunity does not bar suits against officers for "injunctive or declaratory relief" (citations omitted)).

## 2. *Tribal Sovereign Immunity Does Not Bar Plaintiffs' Narrowed Claims.*

The Tribal Officials contend that to allow Plaintiffs' claims to proceed would render meaningless the Tribal Lending Entities' sovereign immunity as arms of the tribe. (Tribe MTD Mem. at 12.) Specifically, the Tribal Officials maintain that the Tribe and the Tribal Lending Entities constitute the real parties in interest under Plaintiffs' claims. (Tribe MTD Mem. at 13-15.) The Tribal Officials stress that the principles of tribal self-governance and self-sufficiency that undergird the tribal sovereign immunity doctrine militate in favor of barring all claims against them. (Tribe MTD Mem. at 15-16.)

Plaintiffs respond that the "real party in interest" analysis addresses claims that seek monetary relief against government employees merely to overcome sovereign immunity and therefore proves inapposite to their claims for injunctive and declaratory relief. (Pls.' Tribe MTD Resp. at 23-24.) Plaintiffs argue that the Court need only perform a "'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" (Pls.' Tribe MTD Resp. at 25 (quoting *Verizon*, 535 U.S. at 645).)

"When a suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." *Pennhurst*, 465 U.S. at 101. Sovereign immunity will bar a suit against state officials when "'the state is the real, substantial party in interest.'" *Id.* (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)). "The general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Hawaii v. Gordon*, 373 U.S. 57, 58 (1963). "[A] suit against state officials that is in fact against a State is barred regardless of whether it seeks damages or injunctive relief." *Pennhurst*, 465 U.S. at 102. The same principles apply in the context of tribal sovereign immunity, *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017), and in *Ex parte Young* actions, *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 277 (1997); *see also Ex parte New York*, 256 U.S. 490, 500 (1921) (noting that *Ex parte Young*'s applicability "is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record").

The Fourth Circuit in *Martin v. Wood* outlined a non-exhaustive, five-part inquiry to determine the real, substantial party in interest in a government-official suit. 772 F.3d 192, 196 (4th Cir. 2014). Pursuant to this inquiry, courts should consider whether: (1) "the allegedly

unlawful actions of the . . . officials [were] tied inextricably to their official duties;" (2) "if the . .
. officials had authorized the desired relief at the outset, . . . the burden [would] have been borne
by the State;" (3) a judgment against the officials would be "institutional and official in
character, such that it would operate against the State;" (4) the actions of the officials were
"taken to further personal interests distinct from the State's interests;" and, (5) the officials'
actions were *ultra vires*. *Id.* Applying this test, the Fourth Circuit in *Martin* found that the
plaintiff failed to allege that her supervisors acted in an *ultra vires* manner or attempted to serve
their own personal interests by refusing to approve overtime compensation for the plaintiff,
because the supervisors acted within their lawful discretion. *Id.*

      In considering whether the Tribe or the Tribal Lending Entities constitute the real parties
in interest, the Court will cabin its analysis to the surviving claims for injunctive and declaratory
relief against the Tribal Officials, which, as explained, do not affect the Tribe's ability to offer
loans to Virginia consumers in the future and do not require restitution of monies already paid by
Plaintiffs. Based on these narrowed claims, the Court finds that neither the Tribe nor the Tribal
Lending Entities constitute the real parties in interest. Unlike the plaintiff in *Martin*, Plaintiffs
here do not allege that the Tribal Officials' exercise of their lawful discretion resulted in the
alleged wrong. Rather, Plaintiffs allege that the Tribal Officials, through their control of the
Tribal Lending Entities, continue to reach beyond the Tribe's reservation to collect and receive
principal, interest and costs associated with loans that violate Virginia law. As explained above,
these alleged practices constitute off-reservation activity subject to generally applicable state
laws, and Plaintiffs may seek to enjoin further violations of such laws, including the VCFA,
through an *Ex parte Young*-style claim against the Tribal Officials.

Moreover, although the narrowed relief available to Plaintiffs may have certain ancillary effects on the revenues collected by the Tribe and the Tribal Lending Entities, such effects do not render those bodies the real parties in interest. Indeed, the Supreme Court has endorsed *Ex parte Young* claims that have arguably had greater monetary consequences. *See, e.g., Graham v. Richardson*, 403 U.S. 365 (1971) (prohibiting state officials from denying welfare benefits to otherwise qualified noncitizens); *Goldberg v. Kelly*, 397 U.S. 254 (1970) (enjoining New York welfare officials from terminating benefits paid to welfare recipients without a hearing). Neither will the Court infringe on the sovereign immunity of the Tribe and the Tribal Lending Entities by requiring the Tribal Officials to provide notice to the putative class in Count Seven that the loans issued to them are void under Virginia law, for such relief likewise proves ancillary to the alleged ongoing violations of Virginia law that Plaintiffs seek to enjoin. *See Green v. Mansour*, 474 U.S. 64, 71 (1985) (holding that "a request for a limited notice order will escape the [sovereign immunity] bar if the notice is ancillary to the grant of some other appropriate relief that can be 'noticed,'" such as an ongoing violation of federal or, in this case, state law).

For these same reasons, the Court also rejects the Tribal Officials' argument that Plaintiffs' desired relief will violate their immunity as legislators. (Tribe MTD Mem. at 12.) Plaintiffs' limited relief does not seek to hold the Tribal Officials liable for passing the Ordinance or for licensing the Tribal Lending Entities, but merely for allowing the continued collection of loans deemed usurious under generally applicable Virginia law.

Accordingly, the Court finds that regardless of the sovereign immunity enjoyed by the Tribe and the Tribal Lending Entities, Plaintiffs may proceed to bring their now-narrowed claims for injunctive and declaratory relief against the Tribal Officials pursuant to *Ex parte Young*.

**D. Bumbray, Blackburn and Collins Lack Standing to Enjoin Future Collection on Outstanding Loans.**

The Tribal Officials challenge Plaintiffs' standing on two grounds. (Tribe MTD Mem. at 28-30.) First, the Officials contend that Plaintiffs as a whole lack standing to enjoin future lending by the Tribal Lending Entities. (Tribe MTD Mem. at 28-29.) Second, the Officials argue that Bumbray, Blackburn and Collins (the "Paid-Off Plaintiffs") lack standing to enjoin future collection efforts, because all three have no outstanding debt with the Tribal Lending Entities. (Tribe MTD Mem. at 29-30.) Because the Court has already found that Plaintiffs may not enjoin the Tribal Officials from issuing usurious loans in the future, the Court will focus its analysis on the standing of the Paid-Off Plaintiffs to enjoin future collection of existing loans.

Plaintiffs argue that the Paid-Off Plaintiffs have standing to enjoin future collection efforts on their loans, because even though they have paid off their loans, "it is not uncommon for a debt collector to nonetheless collect the debt." (Pls.' Tribe MTD Resp. at 44.) Plaintiffs add that even without the threat of potential debt collection on their paid-off loans, the Paid-Off Plaintiffs "have been subject to harm and have a sufficient personal stake in the outcome to seek an injunction on behalf of other consumers." (Pls.' Tribe MTD Resp. at 44.) And the Paid-Off Plaintiffs maintain that they have standing to seek a declaratory judgment that their loans are void, because such a declaration would redress at least some of the harm caused by having their loans on their credit reports. (Pls.' Tribe MTD Resp. at 45.)

A defendant moving to dismiss a claim pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the Court's subject-matter jurisdiction over the complaint. Article III of the Constitution limits federal courts' jurisdiction to "Cases" and "Controversies." U.S. Const. Art. III, § 2. To satisfy the case-or-controversy requirement of Article III, a plaintiff must establish his standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

89

Specifically, a plaintiff must show that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (citing *Lujan*, 504 U.S. at 560-61 (additional citations omitted)). The Court must dismiss an action if it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

In a class action, the Court "analyze[s] standing based on the allegations of personal injury made by the named plaintiffs. 'Without a sufficient allegation of harm to the named plaintiff in particular, [he] cannot meet [his] burden of establishing standing.'" *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Beck v. McDonald*, 848 F.3d 262, 269-70 (4th Cir. 2017) (additional citations omitted)). As the parties invoking federal jurisdiction, Plaintiffs bear the burden of establishing all three elements of standing. *Id.*

The Paid-Off Plaintiffs' standing to enjoin future collection of their loans boils down to redressability. Plaintiffs argue that an injunction against future collection on outstanding loans would redress the Paid-Off Plaintiffs' alleged injury, because it would foreclose potential future debt collection on their paid-off loans and would also satisfy their interest in seeing future collection efforts against other consumers halted. But the mere possibility of future debt collection by non-party debt collectors and the Paid-Off Plaintiffs' gratification in seeing justice delivered do not satisfy the redressability requirement. Indeed, the Supreme Court has held that "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co.*, 523 U.S. at 107. And the Supreme Court has likewise required a showing of a "real [and] immediate threat that [a] plaintiff will be wronged again" to obtain an injunction against future harm. *Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Plaintiffs' affirmation that "it is not uncommon for [a] debt collector to nonetheless collect [a

90

paid-off] debt" does not rise to the level of a real and immediate threat. (Pls.' Tribe MTD Resp. at 44.)

Thus, the Paid-Off Plaintiffs lack standing to enjoin future collection on the outstanding loans in Count Seven and their claims in that Count will be dismissed. That said, the Paid-Off Plaintiffs have standing to seek a declaratory judgment that their loans are void in Count Six, because the avoidance of their loans has a likelihood of redressing at least some of the harm from the loans issued to them, including allowing the Paid-Off Plaintiffs to remove the loans from their credit histories.[15] *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (noting that a plaintiff need only show that a favorable decision would redress "an injury" not "every injury").

To summarize, having addressed the Tribal Officials' arguments for dismissal, the Court will dismiss Count Five of Plaintiffs' Amended Complaint and dismiss Count Seven to the extent that it seeks to enjoin future lending by the Tribal Lending Entities. Plaintiffs may prosecute their declaratory judgment claim in Count Six, and Plaintiffs except the Paid-Off Plaintiffs may prosecute the remaining requests for injunctive relief in Count Seven.

### E.     The Statutes of Limitations and Time Periods at Issue Do Not Warrant Dismissal of Plaintiffs' Claims at this Stage.

Asner and Landy primarily argue that Plaintiffs' claims against them must fail, because they fall either outside the statute of limitations or the time during which Asner and Landy were involved in the alleged RICO enterprise. (A/L MTD Mem. at 6-14.) Specifically, Asner and Landy contend that Plaintiffs' allegations show that their involvement ended in August 2014,

---

[15]     Notably, Plaintiffs define the Declaratory Judgment Class in Count Six as those Virginia residents "who have outstanding balances" on their loans. (Am. Compl. ¶ 205.) This definition seemingly excludes the Paid-Off Plaintiffs from the Class. However, because Plaintiffs have not yet sought certification of the Declaratory Judgment Class in Count Six, the Court will postpone consideration of this issue until a later stage.

when Plaintiffs allege that Asner and Landy sold their companies to the Tribe. (A/L MTD Mem. at 6.) Asner and Landy also note that the limitations period on Plaintiffs' RICO and state-law claims expired after four and two years respectively. (A/L MTD Mem. at 7.) Therefore, Asner and Landy maintain that Plaintiffs' claims against them are either: (1) time-barred, because the claims accrued over four years ago while Asner and Landy were involved with the alleged RICO enterprise; or, (2) inapplicable to them, because the claims accrued after Asner and Landy sold their interests in the alleged enterprise. (A/L MTD Mem. at 7.)

Asner and Landy argue that Plaintiffs' amended allegation — that, "[u]pon information and belief, Landy and Asner continue to participate in the affairs of the illegal lending enterprise, now as high-paid executives of the Tribal Lending Entities, as opposed to owners of the businesses that previously ran the companies," (Am. Compl. ¶ 3) — fails to salvage the timeliness problem, because: (1) the allegation proves too conclusory to support a plausible inference that Asner and Landy are still involved with the Tribal Lending Entities; (2) the Affidavit of Chairwoman Sherry Treppa (the "Treppa Affidavit") on which Plaintiffs relied in formulating their Amended Complaint directly contradicts the allegation; and, (3) Plaintiffs may not rely upon information and belief to support the allegation, because whether Asner and Landy are still involved in the Tribal Lending Entities was not information solely within Defendants' control and Plaintiffs point to no contextual facts or second-hand information to support the allegation. (A/L MTD Mem. at 9-14.)

Plaintiffs respond that for a coconspirator to escape liability for post-involvement conduct, RICO requires more than merely selling off an interest in a RICO enterprise, which is all that Asner and Landy point to as their act of withdrawal. (Pls.' A/L MTD Resp. at 6.) Instead, a coconspirator must "'take affirmative actions inconsistent with the object of the

92

conspiracy and communicate his intent to withdraw in a manner likely to reach his accomplices.'" (Pls.' A/L MTD Resp. at 6 (quoting *United States v. Hill*, 2019 WL 4040619, at *12 (E.D. Va. Aug. 27, 2019)).) Plaintiffs contend that Asner and Landy's sale of their lending-associated companies to the Tribe does not meet this standard, exposing both Defendants to continued liability for any unlawful debt collection after August 2014. (Pls.' A/L MTD Resp. at 7.) And Plaintiffs maintain that their allegations regarding the similar operational structure of the alleged RICO enterprise both before and after Asner and Landy sold their businesses to the Tribe support the plausible inference that Asner and Landy maintained at least some role in the RICO enterprise after their alleged withdrawal. (Pls.' A/L MTD Resp. at 7.)

Plaintiffs further argue the Court should toll the statutes of limitations for their state-law claims, because Asner and Landy acted fraudulently to conceal their wrongdoing and keep Plaintiffs ignorant of their rights. (Pls.' A/L MTD Resp. at 8-10 (citing Va. Code § 8.01-229(D)).) Specifically, Plaintiffs point to the purported prospective waiver of Plaintiffs' rights in the loan agreements and the complex system of arbitration and tribal exhaustion that the agreements attempted to create to avoid federal- and state-law claims. (Pls.' A/L MTD Resp. at 9-10.) Plaintiffs maintain that the same conduct permits tolling under an estoppel theory. (Pls.' A/L MTD Resp. at 10.)

"The statute of limitations is an affirmative defense that may be raised in a Rule 12(b)(6) motion to dismiss for failure to state a claim." *United States v. Kivanc*, 714 F.3d 782, 789 (4th Cir. 2013). However, because courts generally do not reach the merits of affirmative defenses at the motion-to-dismiss stage, dismissal based on statutes of limitations occurs in "relatively rare circumstances." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Ultimately, for a claim to be dismissed as time-barred on a 12(b)(6) motion, "all facts necessary to show the time

bar must clearly appear 'on the face of the complaint.'" *Dickinson v. Univ. of N.C.*, 91 F. Supp. 3d 755, 763 (M.D.N.C. 2015) (quoting *Goodman*, 494 F.3d at 464). In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts Plaintiffs' well-pleaded factual allegations as true. *Iqbal*, 556 U.S. at 678.

### 1. *Asner and Landy Remain Liable Under RICO.*

Plaintiffs must bring civil RICO claims within four years of the claims' accrual. *Agency Holding Corp.*, 483 U.S. at 156. A civil RICO claim accrues when a plaintiff knew or should have known of his injury. *Rotella v. Wood*, 528 U.S. 549, 553-54 (2000). An action based on the collection of unlawful debts "requires only a single act of collection as a predicate for RICO liability." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 481 (2009) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989)).

Here, Plaintiffs fail to allege the exact dates of the loans at issue; however, the Court may rely on the loan agreement documents to determine the timeliness of Plaintiffs' claims, because neither party disputes the authenticity of the agreements and Plaintiffs clearly relied on those agreements in drafting their Amended Complaint. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (holding that courts considering motions to dismiss may consider a document that proved "integral to the complaint," so long as "there is no dispute about the document's authenticity"). The agreement documents show that the Tribal Lending Entities issued all but one of Plaintiffs' loans within the last four years, with Mwethuku's July 29, 2013 loan being the only loan issued before October 19, 2015. (*See* Exs. 83-100 to Treppa Aff. (ECF Nos. 45-33 to 45-50) (loan agreements for Plaintiffs' loans).) Thus, Mwethuku's injury accrued outside of the four-year limitations period for civil RICO claims and the remaining Plaintiffs accrued injuries within four years of the present action, but after Asner and Landy sold their

businesses to the Tribe. Given these distinctions, the Court must conduct a two-fold inquiry, asking whether: (1) the limitations period for Mwethuku's claims should be tolled; and, (2) Asner and Landy remain liable for the injuries to the remaining Plaintiffs despite their August 2014 sale of their interests in the alleged RICO enterprise.

As to the first inquiry, the Supreme Court has affirmed that equitable principles may toll RICO's statute of limitations. *Rotella*, 528 U.S. at 560-61. To toll a limitations period, "[t]he circumstances preventing a party from pursuing his or her rights must be external to the party's own conduct." *CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 478 (4th Cir. 2015) (quotations and citations omitted). Such circumstances must be extraordinary and include instances when "'wrongful conduct on the part of the defendant'" prevents the plaintiff from asserting his claims. *Id.* (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)). For a court to equitably toll a plaintiff's claim, the plaintiff must also demonstrate diligence in pursuing his or her rights. *Id.* at 476 (citing *Holland v. Florida*, 560 U.S. 631, 649 (2010)). Ultimately, whether to equitably toll a plaintiff's claims falls within the Court's discretion, and appellate courts will overturn such decisions only if arbitrary or based on "erroneous factual or legal premises." *Id.* (citations omitted).

Based on these standards, the Court finds that equity warrants tolling of Mwethuku's RICO claims against Asner and Landy until at least June 2017, when similarly situated consumers first filed suit against a tribal payday lending practice in this District, putting Mwethuku on notice that he could pursue similar claims in federal court. *Williams v. Big Picture Loans, LLC*, No. 3:17cv461 (REP), ECF No. 1 (E.D. Va. June 22, 2017). The Court finds that the terms of Mwethuku's loan agreement warrant tolling, because they purported to waive Mwethuku's federal rights and force him to litigate any remaining rights in an ill-defined "Tribal

Forum" with no apparent existence. (Mwethuku Agreement at 4 ¶¶ 6, 9.) Thus, the Court will

not fault Mwethuku for failing to bring any RICO claim until after June 2017, because the plain

terms of his loan agreement purported to waive such a claim and provided an ambiguous forum

for the presentation of any claims, even those arising under tribal law. Plaintiffs' allegations

regarding Asner and Landy's pre-2014 involvement in the alleged enterprise proves sufficient at

this stage to hold them accountable, in equity, for this concealment. (Am. Compl. ¶¶ 55-78; *see*

Treppa Aff. ¶ 128 (affirming that Landy served as a manager of NPA before the Tribe purchased

NPA's assets and for some time thereafter).) And the Court finds that tolling would not defeat

the "basic policies of all limitations provisions" — namely, "repose, elimination of stale claims,

and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities"

— because Mwethuku's claims rely on nearly identical factual and legal issues as the remaining

Plaintiffs' claims against Asner and Landy, for which, as explained below, the two remain liable.

*Rotella*, 528 U.S. at 555.

    At this stage, Asner and Landy remain liable for the injuries to the remaining Plaintiffs,

because, "[l]ike other conspiracies, a defendant who agrees to do something illegal and opts into

or participates in a [RICO] conspiracy is liable for the acts of his coconspirators even if the

defendant did not agree to do or conspire with respect to that particular act." *Proctor*, 645 F.

Supp. 2d at 483. Thus, so long as a civil RICO complaint, "at the very least . . . allege[s]

specifically . . . an agreement" to commit predicate RICO acts, *Hecht v. Commerce Clearing*

*House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990), and also pleads independent acts prohibited by

RICO in furtherance of that conspiracy, *Beck v. Prupis*, 529 U.S. 494, 501-04 (2000),

coconspirators may be held vicariously liable for those independent acts until the object of the

conspiracy has been achieved or the coconspirators effectively withdraw from or abandon the

conspiracy, *cf. Osborn v. Visa Inc.*, 797 F.3d 1057, 1067-68 (D.D.C. 2015) (applying similar concepts in a civil antitrust action). "Whether there was an effective withdrawal is typically a question of fact for the jury." *Id.* at 1068 (citations omitted). A court may infer a defendant's agreement to join a RICO conspiracy "from circumstantial evidence of the defendant's status in the enterprise or knowledge of the wrongdoing." *First Interreg'l Advisors Corp. v. Wolff*, 956 F. Supp. 480, 488 (S.D.N.Y. 1997).

As discussed below, Plaintiffs have alleged sufficient facts to support the plausible inference that Asner and Landy entered a conspiracy to collect unlawful debts and that their coconspirators committed independent acts prohibited by RICO in furtherance of that conspiracy, namely: participation in the affairs of an enterprise through the collection of unlawful debts. § 1962(c). Although Asner and Landy contend that the sale of their businesses to the Tribe withdrew them from the alleged conspiracy, such a defense proves better suited for summary judgment or trial. *See Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (noting that a Rule 12(b)(6) motion "tests the sufficiency of a complaint . . . [and] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" (citations omitted)).

The Court likewise finds unpersuasive Asner and Landy's argument that because § 1962(c) requires proof of their ongoing involvement in the alleged RICO enterprise, Plaintiffs cannot hold them liable for post-2014 conduct under that section based on a coconspirator liability theory. (A/L MTD Reply at 18.) As the Supreme Court has noted, "conspiracy is an inchoate [violation]" separate from a violation of § 1962(c); therefore, Plaintiffs may simultaneously hold Asner and Landy liable for their coconspirators' violations of § 1962(c) under a coconspirator liability theory while also holding Asner and Landy liable for the separate

act of conspiring to violate § 1962(c). *Boyle v. United States*, 556 U.S. 938, 950 (2009); *see also*

*United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 13, 18 (D.D.C. 2004) (noting in the

context of a civil RICO action that "one who opts into or participates in a Section 1962(d)

conspiracy to violate Section 1962(c) is liable for the acts of his co-conspirators even if that

defendant did not personally agree to commit, or to conspire with respect to, any particular one

of those acts." (citing *Salinas v. United States*, 522 U.S. 52, 65 (1997))). Accordingly, because

the remaining Plaintiffs timely filed their RICO claims and plausibly allege that Asner and

Landy remain liable for post-2014 conduct, the Court will not dismiss those claims as untimely.

### 2. *The Court Will Allow Plaintiffs' State-Law Claims Against Asner and Landy to Proceed at this Stage.*

Plaintiffs also bring two state-law claims against Asner and Landy for violations of

Virginia's usury statutes (Count Three) and unjust enrichment (Count Four). Virginia Code

§ 6.2-305(A) permits recovery for violations of Virginia's usury statute "within two years of the

first to occur of: (i) the date of the last loan payment or (ii) the date of the payment of the loan in

full." And unjust enrichment claims must be filed within three years of accrual. *Belcher v.

Kirkwood*, 383 S.E.2d 729, 731 (Va. 1989). Because all facts necessary to prove the time bar

argued by Asner and Landy do not appear on the face of Plaintiffs' Amended Complaint, the

Court will postpone consideration of Asner and Landy's limitations arguments regarding

Plaintiffs' state-law claims. *Goodman*, 494 F.3d at 464. As for Asner and Landy's argument

that they are not liable under state law for post-2014 loans, at this stage in the proceedings, the

Court will allow Plaintiffs' state-law claims based on post-2014 loans to proceed on the theory of

civil conspiracy liability, which Virginia recognizes. *See Gelber v. Glock*, 800 S.E.2d 800, 821

(Va. 2017) (noting that "[t]he object of a civil conspiracy claim is to spread liability to persons

other than the primary tortfeasor" (citing *Beck v. Prupis*, 162 F.3d 1090, 1099 n.8 (11th Cir.

1998) ("[A] civil conspiracy plaintiff must prove that someone in the conspiracy committed a tortious act that proximately caused his injury; the plaintiff can then hold other members of the conspiracy liable for that injury.")); *Citizens of Fauquier Cty. v. SPR Corp.*, 1995 WL 1055819, at *3 (Va. Cir. Ct. Mar. 27, 1995) (sustaining statutory cause of action against coconspirators based on civil conspiracy liability theory).

### F.     Plaintiffs State Plausible Claims Against Asner and Landy.

Asner and Landy argue that Plaintiffs fail to state plausible state-law claims against them in Counts Three and Four, because:  (1) Plaintiffs fail to allege sufficient facts to hold Asner and Landy personally liable as corporate officers, (A/L MTD Mem. at 16-18); (2) Asner and Landy do not constitute "lenders" under Virginia Code § 6.2-1541(B), (A/L MTD Mem. at 18-20); and, (3) Plaintiffs fail to allege that Asner and Landy received any benefit in support of their unjust enrichment claim, (A/L MTD Mem. at 19-22).  Asner and Landy also move to dismiss Plaintiffs' RICO claims for failure to state a claim, because:  (1) Plaintiffs do not allege that Asner and Landy collected unlawful debts, (A/L MTD Mem. at 23); (2) Asner and Landy cannot be held liable for collection of unlawful debts after the August 2014 sale of their businesses to the Tribe, (A/L MTD Mem. at 23-24); (3) Plaintiffs fail to allege that Asner and Landy participated in or associated with the conduct of the alleged RICO enterprise before the August 2014 sale of their businesses, (A/L MTD Mem. at 24-28); and, (4) Plaintiffs cannot hold Asner and Landy liable for loans issued by Majestic Lake, because the Tribe established that company in 2015, after the sale of Asner and Landy's interests in the alleged RICO enterprise, (A/L MTD Mem. at 28).

Plaintiffs respond that they seek to hold Asner and Landy liable pursuant to Virginia Code § 6.2-305, not § 6.2-1541, citing to the language of their Amended Complaint. (Pls.' A/L MTD Resp. at 18 (citing Am. Compl. ¶ 8).)  Plaintiffs maintain that § 6.2-305 permits recovery

against any "person" who takes or receives payments on usurious loans, which includes Asner and Landy. (Pls.' A/L MTD Resp. at 17.) And Plaintiffs contend that they have alleged sufficient facts to support the plausible inference that they unjustly enriched Asner and Landy personally. (Pls.' A/L MTD Resp. at 18-21.)

As for their RICO claims, Plaintiffs respond that their allegations clearly support an inference that Asner and Landy engaged in an enterprise that collected unlawful debts. (Pls.' A/L MTD Resp. at 20-22.) Plaintiffs reiterate that because Asner and Landy failed to affirmatively withdraw from the alleged RICO conspiracy, they may be held liable for post-2014 debt collection. (Pls.' A/L MTD Resp. at 22-24.) And Plaintiffs argue that they have plausibly pled sufficient involvement by Asner and Landy in the alleged RICO enterprise and conspiracy to hold them liable under §§ 1962(c) and (d). (Pls.' A/L MTD Resp. at 24-29.)

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N.C.*, 980 F.2d at 952. In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim

must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

### 1.  *Plaintiffs State a Plausible Claim Under Virginia Code § 6.2-305.*

Virginia Code § 6.2-305(A) permits "[the person paying] interest in excess of that permitted by an applicable statute . . . to recover from the person taking or receiving such payments: 1. The total amount of the interest paid to such person in excess of that permitted by the applicable statute; 2. Twice the total amount of interest paid to such person during the two years immediately preceding the date of the filing of the action; and 3. Court costs and reasonable attorney fees." Relying on this provision, Plaintiffs seek recovery from Asner and Landy personally. (Am. Compl. ¶ 164.) The Court finds that Plaintiffs have stated a plausible claim under § 6.2-305.

Although Asner and Landy argue that the corporate veil shields them from liability, such an inquiry proves better suited for later stages in the litigation process. *See Greenberg*, 499 S.E.2d at 272 (noting that "a decision whether to disregard the corporate structure to impose personal liability is a fact-specific determination," requiring "close examination of the factual circumstances surrounding the corporation"). For now, the Court finds that Plaintiffs have stated

a plausible claim, because § 6.2-305 permits recovery against any "person" who takes or receives payments on usurious loans. A court within this District has found that owners and managers of entities receiving payments on usurious loans constitute a "person taking or receiving such payments." *Gibbs I*, 368 F. Supp. 3d 901, 928 (E.D. Va. 2019) (Lauck, J.). Indeed, while the usury statute provides no definition of "person," the plain meaning of the word includes any "human being." *Person*, Black's Law Dictionary (11th ed. 2019); *see Hubbard v. Henrico Ltd. P'ship*, 497 S.E.2d 335, 338 (Va. 1998) ("When . . . a statute contains no express definition of the term, the general rule of statutory construction is to infer the legislature's intent from the plain meaning of the language used."). Thus, a plain reading of § 6.2-305 plausibly permits recovery against individuals who take and receive payments on usurious loans, even if those payments pass through corporate entities.

Asner and Landy's reliance on § 6.2-1541 to avoid liability proves equally unavailing, for Plaintiffs clearly rely on § 6.2-305 as their basis for relief in Count Three. (Am. Compl. ¶ 164.) Because Plaintiffs' allegations prove sufficient at this stage to hold Asner and Landy liable for even post-2014 loans on a civil conspiracy theory, the Court denies Asner and Landy's Motion to Dismiss as to Count Three.

### 2. *Plaintiffs State a Plausible Claim for Unjust Enrichment.*

In Virginia, to recover for unjust enrichment, a plaintiff must demonstrate that: "(1) [she] conferred a benefit on [the defendant]; (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the benefit without paying for its value." *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008). The Court finds that Plaintiffs have stated a plausible claim for relief under these elements.

Asner and Landy contend that this case proves analogous to *Hyundai Emigration Corporation v. Empower-Visa, Inc.*, in which a court in this District dismissed the plaintiff's unjust enrichment claim against an individual defendant, because the plaintiff "fail[ed] to allege that it paid [the individual defendant] directly or that [the individual defendant] received any portion of the payments [that the plaintiff] made to Empower." 2009 WL 10687986, at *7 (E.D. Va. June 17, 2009). However, the Court finds *Hyundai* distinguishable, because Plaintiffs here have alleged sufficient facts to support the inference that Asner and Landy owned and operated companies that received a substantial portion of the revenues from the Tribe's lending businesses pre-merger, (Am. Compl. ¶¶ 70-72), which includes payments plausibly made by Mwethuku, whose loan predates the alleged sale of Asner and Landy's companies, (Am. Compl. ¶¶ 94-104; Mwethuku Agreement at 7). *See Gibbs I*, 368 F. Supp. 3d at 933-34 (finding that the plaintiffs stated a plausible unjust enrichment claim, because the alleged facts showed that the nontribal defendants "benefitted from Plaintiffs' payments on their loans because . . . [the nontribal defendants] derived income from the enterprise based on borrowers entering into loan [c]ontracts with [the tribal lending entities]"). And Plaintiffs' allegations support a civil conspiracy theory of liability against Asner and Landy for the post-2014 loan payments. As with Plaintiffs' usury claim, the Court will defer answering whether corporate liability principles shield Asner and Landy from liability until a later stage.

### 3.    *Plaintiffs Have Stated a Plausible Claim Under § 1962(c).*

In Count One, Plaintiffs allege that Asner and Landy violated 18 U.S.C. § 1962(c), which prohibits "any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce" from conducting or participating "direct or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." "To

establish a violation of § 1962(c), Plaintiffs must allege that [Asner and Landy] (1) conducted the affairs of an enterprise (2) through collection of unlawful debt (3) while employed by or associated with (4) the enterprise engaged in . . . interstate or foreign commerce." *Gibbs I*, 368 F. Supp. 3d at 932 (internal quotations and citations omitted). Asner and Landy challenge the first and third elements, so the Court will focus on those elements in its analysis.

In *Reves v. Ernst & Young*, the Supreme Court adopted the "operation or management" test to determine whether someone has conducted the affairs of an enterprise. 507 U.S. 170, 179 (1993). To be sure, "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management," as well as third parties who are somehow "associated with" the enterprise and exert control over it. *Id.* at 184. However, to be liable under § 1962(c), an individual must be a "direct participant" in the affairs of the enterprise and not merely "acting in an advisory professional capacity (even if in a knowingly fraudulent way)." *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, 633 F. Supp. 2d 214, 230 (E.D. Va. 2008).

Based on these standards, the Court finds that Plaintiffs have stated a plausible claim that Asner and Landy conducted the affairs of the alleged RICO enterprise. For example, Plaintiffs alleged that Defendants, including Asner and Landy, established several of the Tribal Lending Entities. (Am. Compl. ¶¶ 59, 61.) Plaintiffs also allege that non-tribal entities owned and operated by Asner and Landy performed nearly all of the operations of the Tribal Lending Entities, working in tandem with those entities to issue and collect on triple-digit, high-interest loans. (Am. Compl. ¶¶ 67-69, 72.) Plaintiffs further describe a revenue sharing scheme between Asner and Landy's businesses and the Tribe, in which Asner and Landy received nearly all of the revenues from the collected debts. (Am. Compl. ¶¶ 70-71.) And Plaintiffs allege facts

supporting the inference that Asner and Landy were not mere passive investors in the lending scheme but possessed significant authority and influence over the alleged enterprise. (Am. Compl. ¶¶ 73-78.) Importantly, Plaintiffs describe in sufficient detail a coordinated effort by Asner and Landy and the Tribe to shield the enterprise from perceived liability. (Am. Compl. ¶¶ 79-104.)

These same facts support the plausible inference that Asner and Landy were "associated with" the alleged enterprise. "[O]nly a person employed by or associated with an enterprise, and not the enterprise itself, may violate section 1962(c)." *Levinson v. Mass. Mut. Life Ins. Co.*, 2006 WL 3337419, at *7 (E.D. Va. Nov. 9, 2006). Thus, "RICO liability depends upon a showing that a defendant acted or participated in the enterprise's affairs, and not just his or her own affairs." *Id.* (citing *Reves*, 507 U.S. at 185). Plaintiffs satisfy this distinction requirement by alleging facts regarding the formation, nature and operation of the alleged enterprise. The facts detailed above support the plausible inference that Asner and Landy did not merely participate in the alleged enterprise through their ordinary business activity, but helped to devise and structure an associated group of individuals and businesses that issued and collected unlawful debts under the auspices of the Tribe while in fact funneling most of the revenues to nontribal entities and individuals, including Asner and Landy. These facts prove sufficient to support the plausible inference that Asner and Landy were "associated with" the alleged enterprise as distinct persons.

Because Plaintiffs otherwise allege sufficient facts to support the remaining elements of their § 1962(c) claim, and because Asner and Landy plausibly remain liable for the post-2014 conduct of their coconspirators, the Court denies Asner and Landy's Motion to Dismiss as to Count One.

### 4. *Plaintiffs Have Stated a Plausible Claim under § 1962(d).*

Asner and Landy argue that Plaintiffs' allegations fail to plausibly demonstrate that they knew of or agreed to the overall objective of the RICO enterprise, *i.e.*, the collection of unlawful debts. (A/L MTD Mem. at 27.) Asner and Landy aver that Plaintiffs' allegations in fact support the inference that they wished not to be involved with the alleged enterprise, because they sold their businesses to the Tribal Lending Entities in August 2014. (A/L MTD Mem. at 27.)

"A conspiracy may exist even if a coconspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas*, 522 U.S. at 63. Nonetheless, coconspirators "must agree to pursue the same criminal objective." *Id.* Under RICO, "liability only attaches to 'the knowing agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute.'" *Solomon v. Am. Web Loan*, 2019 WL 1320790, at *11 (E.D. Va. Mar. 22, 2019) (quoting *United State v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012)). "Accordingly, to prove a RICO conspiracy, two things must be established: '(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense.'" *Id.* (quoting *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998)). Proof of such an agreement "may be established solely by circumstantial evidence." *Id.* (citations omitted).

Plaintiffs have alleged sufficient facts to support the plausible inference that Asner and Landy agreed to engage in a conspiracy with other individuals and entities with knowledge that the objective of the conspiracy would be the collection of unlawful debts. Plaintiffs allege multiple business arrangements between Asner and Landy and other entities in the alleged enterprise, including revenue sharing, operations and merger agreements. Although Asner and Landy contend that the 2014 sale of their companies to the Tribal Lending Entities only

demonstrates their desire to leave the alleged RICO conspiracy, such a sale does not nullify the initial agreement to violate RICO, nor does it necessarily establish sufficient withdrawal from the conspiracy. Indeed, in the context of the mounting regulatory and legal pressure facing tribal lending businesses across the United States, the 2014 sale of Asner and Landy's businesses only highlights their perception of the unlawfulness of the alleged enterprise's activities.

Ultimately, these facts support the inference that Asner and Landy "objectively manifested an agreement to participate directly or indirectly in the affairs of the enterprise" through the collection of unlawful debts and "had knowledge of the essential nature of the plan" of the conspiracy. *United States v. Tillett*, 763 F.2d 628, 632 (4th Cir. 1985). Accordingly, the Court denies Asner and Landy's Motion to Dismiss (ECF No. 59) as to Count Two. Because Asner and Landy's personal jurisdiction challenge relies on the Court dismissing Plaintiffs' RICO claims, such a challenge must also fail. (A/L MTD Mem. at 28-29.) Thus, the Court denies Asner and Landy's Motion to Dismiss (ECF No. 59) as to all Counts against them.

## IV. CONCLUSION

For the reasons set forth above, the Court DENIES Defendants' Motions to Compel Arbitration (ECF Nos. 57, 62), GRANTS IN PART and DENIES IN PART the Tribal Officials' Motion to Dismiss (ECF No. 64) and DENIES Asner and Landy's Renewed Motion to Dismiss (ECF No. 59). The Court DISMISSES WITHOUT PREJUDICE Count Five of Plaintiffs' Amended Complaint and Count Seven to the extent that it seeks to enjoin future lending activities by the Tribal Lending Entities and to the extent that Bumbray, Blackburn and Collins

seek to enjoin future collection of any outstanding loans. An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Date: January 9, 2020