IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

GEORGE HENGLE, *et al.*,
*on behalf of themselves and*
*all individuals similarly situated,*
    Plaintiffs,

      v.                             Civil No. 3:19cv250 (DJN)

SCOTT ASNER, *et al.*,
    Defendants.

**MEMORANDUM OPINION**

Plaintiffs George Hengle ("Hengle"), Sharon Blackburn ("Blackburn"), Willie Rose

("Rose"), Elwood Bumbray ("Bumbray"), Tiffani Myers ("Myers"), Steven Pike ("Pike"), Sue

Collins ("Collins") and Lawrence Mwethuku ("Mwethuku") (collectively, "Plaintiffs") bring this

action on behalf of themselves and all individuals similarly situated against Scott Asner

("Asner") and Joshua Landy ("Landy") and Sherry Treppa, Tracey Treppa, Kathleen Treppa, Iris

Picton, Sam Icay, Aimee Jackson-Penn and Amber Jackson (collectively, the "Tribal Officials,"

and, together with Asner and Landy, "Defendants"), alleging that Defendants issued usurious

loans to Plaintiffs in the name of Golden Valley Lending, Inc. ("Golden Valley"), Silver Cloud

Financial, Inc. ("Silver Cloud"), Mountain Summit Financial, Inc. ("Mountain Summit"), and

Majestic Lake Financial, Inc. ("Majestic Lake") (collectively, the "Tribal Lending Entities") —

four entities formed under the laws of the Habematolel Pomo of Upper Lake (the "Tribe"), a

federally recognized Native American tribe. This matter comes before the Court on Defendants'

Motions for Leave to Appeal Under 28 U.S.C. § 1292(b) (ECF Nos. 112, 115), moving the Court

to certify for interlocutory appeal its decision that enforcement of the choice-of-law provision in

Plaintiffs' loan agreements (the "Choice-of-Law Provision") would violate Virginia's compelling public policy against unregulated usurious lending.[1]

For the reasons set forth below, the Court GRANTS Defendants' Motions (ECF Nos. 112, 115) and AMENDS its January 9, 2020 Order (ECF No. 110) to certify the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) on the question of whether enforcement of the Choice-of-Law Provision would violate Virginia's compelling public policy against unregulated usurious lending (the "public policy question").[2] On its own initiative, the Court also certifies for interlocutory appeal the question of whether the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, permits *Ex parte Young*-style relief against the Tribal Officials (the "RICO question").

## I.    BACKGROUND

The Court recites the allegations in Plaintiffs' Amended Complaint for the purposes of background only.

---

[1]    Defendants define the question that they would like to appeal more broadly than the question actually decided by the Court in its January 9, 2020 opinion (ECF No. 109). That is, Defendants wish to certify for appeal the issue of whether the Tribe's laws govern Plaintiffs' loan agreements. However, the Court cannot certify for appeal that which it has not decided, and the Court has not decided conclusively that the Tribe's laws do not govern the loan agreements, only that the Choice-of-Law Provision that selects the Tribe's laws would violate Virginia public policy if enforced. *See* 16 Fed. Prac. & P. Juris. § 3930 (3d ed. 2019) (noting that § 1292(b) "does not contemplate that a district court may simply certify a question without first deciding it"). Accordingly, the Court will determine only whether that conclusively decided, narrower question should be certified.

[2]    Notably, § 1292(b) "authorizes certification of orders for interlocutory appeal, not certification of questions," so the Court will certify the entire Order (ECF No. 110) at issue for interlocutory appeal. *Linton v. Shell Oil Co.*, 563 F.3d 556, 557 (5th Cir. 2009) (citations omitted). However, "it is helpful if the district judge frames the controlling question(s) that the judge believes is presented by the order being certified." *Id.* Thus, the Court has framed the questions for interlocutory appeal to assist the Fourth Circuit in determining whether to take an interlocutory appeal of those questions.

2

## A.    Basic Allegations

Plaintiffs are consumers residing in either this Division or District.  (Am. Compl. (ECF No. 54) ¶¶ 11-18.)  Asner resides in Kansas City, Missouri, and served as the owner and manager of National Performance Agency, LLC ("NPA"), Nagus Enterprises and Edison Creek.  (Am. Compl. ¶ 20.)  Landy resides in Kansas and served as an owner of NPA.  (Am. Compl. ¶ 19.) Sherry Treppa, Tracey Treppa, Kathleen Treppa and Iris Picton serve respectively as the chairperson, vice chairperson, treasurer and secretary of the Tribe's Executive Council.  (Am. Compl. ¶¶ 21-24.)  Sam Icay, Aimee Jackson-Penn and Amber Jackson serve as members-at-large on the same Council.  (Am. Compl. ¶¶ 25-27.)

As early as 2008, the Tribe retained Rosette, LLP, a law firm that advertises itself as a majority-Native-American firm that represents tribal governments and entities, including tribes interested in starting payday lending operations.  (Am. Compl. ¶¶ 38-41, 47.)  The Tribe's Executive Council engaged Rosette, LLP, in its capacity as the Tribe's governing body, "'responsible for acting in all matters that concern the general welfare of the Tribe.'"  (Am. Compl. ¶ 51 (quoting Aff. of Sherry Treppa in Supp. of Tribal Defs.' Mot. to Dismiss & Mot. to Compel Arbitration ("Treppa Aff.") (ECF No. 44) ¶ 44).)

Out of this engagement, in August 2012, the Tribe established Golden Valley, which provided short-term loans of up to $1,000.00 to approved consumers.  (Am. Compl. ¶¶ 55-56.) Soon thereafter, in June 2013, Defendants began issuing identical loans through Silver Cloud, a separate lending entity.  (Am. Compl. ¶ 59.)  And, in January 2014, Defendants began offering loans through Mountain Summit.  (Am. Compl. ¶ 61.)  All three entities advertised that they were wholly owned by the Tribe and based out of the Tribe's reservation in Upper Lake, California.  (Am. Compl. ¶¶ 57-58, 60, 62.)

Despite the Tribal Lending Entities' representations regarding their ownership and operations, "nearly all activities performed on behalf of Golden Valley, Silver Cloud, and Mountain Summit were performed by owners and employees of non-tribal companies, primarily [NPA] and its affiliated companies, including National Processing of America and Nagus Enterprises." (Am. Compl. ¶ 67.) These non-tribal businesses operated out of Overland Park, Kansas, at the same address now used by Upper Lake Processing Services, Inc. ("ULPS"), a tribal entity created after the merger between NPA and Clear Lake TAC G (a tribal entity) and Nagus Enterprises and Clear Lake TAC S (a tribal entity). (Am. Compl. ¶¶ 3, 5, 68.)

The Tribal Lending Entities distributed the vast majority of the revenues received from their operations to NPA, Edison Creek, Nagus Enterprises and Cobalt Hills (the "Non-Tribal Entities"), companies owned and operated by Asner, Landy and other unknown individuals. (Am. Compl. ¶¶ 71-74.) In his capacity as an owner and operator of the Non-Tribal Entities, Landy supervised dozens of employees and had signatory authority on bank accounts opened by each entity. (Am. Compl. ¶¶ 75-76.) Similarly, Asner signed multiple documents on behalf of NPA and Nagus Enterprises, including the documents effectuating the merger between those companies and Clear Lake TAC G and Clear Lake TAC S. (Am. Compl. ¶¶ 77-78.)

The Tribal Lending Entities market, issue and collect on loans throughout the United States, including Virginia. (Am. Compl. ¶ 105.) The loans issued by the Tribal Lending Entities charged interest rates that exceeded the usury cap in many of the states in which the Entities operate. (Am. Compl. ¶ 107.) For example, Hengle obtained three loans from Majestic Lake with an annual percentage rate ("APR") of 636, 722 and 763 percent, respectively, which exceed Virginia's 12-percent usury cap. (Am. Comp. ¶ 108 (citing Va. Code § 6.2-303(A)).) Similarly, Rose obtained a loan from Silver Cloud with an APR of 727 percent; Pike obtained a loan from

Golden Valley with an APR of 744 percent; Mwethuku obtained a loan from Golden Valley with an APR of 919 percent; Bumbray obtained a loan from Majestic Lake with an APR of 543 percent; and, Myers obtained a loan from Mountain Summit with an APR of 565 percent. (Am. Compl. ¶ 109.)

### B.    Plaintiffs' Amended Complaint

On July 12, 2019, Plaintiffs filed their First Amended Class Action Complaint (ECF No. 54), raising seven counts for relief based on the above allegations.[3] In Count One, Plaintiffs allege that Asner and Landy violated § 1962(c) of RICO by participating in the affairs of an enterprise engaged in the collection of unlawful debts. (Am. Compl. ¶¶ 139-43.) Plaintiffs assert Count One on behalf of themselves and a class of "[a]ll Virginia residents who entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake." (Am. Compl. ¶ 132.) Relatedly, in Count Two, Plaintiffs assert a claim on behalf of themselves and a class of "[a]ll Virginia residents who entered into a loan agreement with Golden Valley, Silver Cloud, Mountain Summit and/or Majestic Lake," alleging that Asner and Landy violated § 1962(d) of RICO by conspiring to violate § 1962(c). (Am. Compl. ¶¶ 146, 153.)

In Count Three, Plaintiffs assert a claim on behalf of the same class, alleging that Asner and Landy violated Virginia's usury statute, Va. Code § 6.2-303(A), through their role in the alleged RICO enterprise. (Am. Compl. ¶¶ 162-63.) In Count Four, Plaintiffs assert a claim on behalf of the "Unjust Enrichment Class," which they define the same as in the preceding counts,

---

[3]    In their Amended Complaint, Plaintiffs mislabel Count Six as Count Seven and Count Seven as Count Eight. (Am. Compl. at 40, 43.) The Court will refer to the Counts according to their sequential order.

alleging that the Class's payments on the usurious loans issued by the Tribal Lending Entities unjustly enriched Asner and Landy. (Am. Compl. ¶¶ 156, 173.)

In Count Five, Plaintiffs allege that the Tribal Officials violated and continue to violate § 1962(c) by participating in the affairs of an enterprise engaged in the collection of unlawful debts and violated and continue to violate § 1962(d) by conspiring to participate in such an enterprise. (Am. Compl. ¶¶ 182-94.) Plaintiffs further allege that the Tribal Officials violated and continue to violate § 1962(a) by using and reinvesting income derived from their collection of unlawful debts and violated and continue to violate § 1962(b) by acquiring and maintaining interests in an enterprise engaged in the collection of unlawful debts. (Am. Compl. ¶¶ 195, 199.) Plaintiffs bring Count Five on behalf of the "Tribal Council RICO Class," which they define in the same manner as in the preceding counts. (Am. Compl. ¶ 176.) Plaintiffs limit the relief requested in Count Five to only prospective, injunctive relief against the Tribal Officials. (Am. Compl. ¶ 203.)

In Count Six, Plaintiffs seek a declaratory judgment against the Tribal Officials, declaring the loans issued to the "Declaratory Judgment Class" as null and void. (Am. Compl. ¶¶ 205-16.) Plaintiffs define the "Declaratory Judgment Class" as "[a]ll Virginia residents who entered into a loan agreement with [the Tribal Lending Entities] and who have outstanding balances on the loans." (Am. Compl. ¶ 205.) Finally, in Count Seven, Plaintiffs seek to enjoin the Tribal Officials from continuing to collect on the loans issued to Plaintiffs and a class of similarly situated Virginia residents, because those loans violate Virginia law. (Am. Compl. ¶¶ 225, 232-35.) Plaintiffs also seek to enjoin the Tribal Officials from "making any loans in Virginia in excess of 12% interest (or 36% if the Tribal Lending Entities obtain a consumer finance license)." (Am. Compl. ¶ 235.)

## C. Defendants' Motions to Compel Arbitration and Motions to Dismiss

In response to Plaintiffs' Amended Complaint, on August 9, 2019, Asner and Landy filed their renewed Motion to Compel Arbitration (ECF No. 57) and Motion to Dismiss (ECF No. 59). In support of their Motion to Compel Arbitration, Asner and Landy argued that all Plaintiffs except Mwethuku are bound by the arbitration language (the "Arbitration Provision") in the Consumer Loan and Arbitration Agreement that each of them signed in connection with the loans that they obtained from the Tribal Lending Entities. (Mem. in Supp. of Defs. Scott Asner & Joshua Landy's Renewed Mot. to Compel Arbitration ("A/L Arb. Mem.") (ECF No. 58) at 1.)

Alternatively, Asner and Landy moved to dismiss Plaintiffs' claims against them for lack of personal jurisdiction, untimeliness, failure to join indispensable parties and failure to state a claim. (Mem. in Supp. of Defs. Scott Asner & Joshua Landy's Renewed Mot. to Dismiss ("A/L MTD Mem.") (ECF No. 60) at 6-30.) In relevant part, Asner and Landy argued that the Choice-of-Law Provision rendered Plaintiffs' loans lawful under the Tribe's laws. (A/L MTD Mem. at 14-15.)

Separately from Asner and Landy, on August 9, 2019, the Tribal Officials filed a Motion to Compel Arbitration (ECF No. 62) and a Motion to Dismiss (ECF No. 64). In support of their Motion to Compel Arbitration, like Asner and Landy, the Tribal Officials argued that the Arbitration Provision bound all Plaintiffs except Mwethuku, requiring those Plaintiffs to arbitrate their claims against the Tribal Officials. (Mem. in Supp. of Tribal Defs.' Mot. to Compel Arbitration ("Tribe Arb. Mem.") (ECF No. 63) at 1, 4-8.) And the Tribal Officials moved to dismiss Mwethuku's claims, claiming that Mwethuku's decision to opt out of the Arbitration Provision invoked language that required him to bring any claims through a prescribed

administrative process, with appeals to the American Arbitration Association. (Tribe Arb. Mem. at 3, 25-26.)

Alternatively, like Asner and Landy, the Tribal Officials moved to dismiss Plaintiffs' claims against them, because the Tribe's laws govern the validity of the loans pursuant to the Choice-of-Law Provision. (Mem. in Supp. of Tribal Defs.' Mot. to Dismiss ("Tribe MTD Mem.") (ECF No. 65) at 5-10.) The Tribal Officials also asserted that sovereign immunity precludes the Court from exercising jurisdiction over Plaintiffs' claims, because those claims are really against the Tribe and because Plaintiffs' decision to seek only prospective, injunctive relief against the Tribal Officials does not overcome the Tribe's sovereign immunity. (Tribe MTD Mem. at 11-24.)

### D.    The Court's Memorandum Opinion and Order

On January 9, 2020, the Court issued a Memorandum Opinion (ECF No. 109) and accompanying Order (ECF No. 110) denying Defendants' Motions to Compel Arbitration (ECF Nos. 57, 62), granting in part and denying in part the Tribal Officials' Motion to Dismiss (ECF No. 64) and denying Asner and Landy's Renewed Motion to Dismiss (ECF No. 59). Specifically, the Court held that the Arbitration Provision proves unenforceable under the prospective waiver doctrine, because the choice-of-law language in the Provision functions to preclude Plaintiffs from obtaining the remedies available to them under federal law in violation of public policy. (Mem. Op. (Jan. 9, 2020) ("Op.") (ECF No. 109) at 14-38.)

As for Defendants' Motions to Dismiss, the Court found that Plaintiffs could seek *Ex parte Young*-style relief against the Tribal Officials in Count Seven, but only to the extent that they seek to enjoin future collection of existing loans, and the Court granted the Officials' Motion to the extent that Plaintiffs' sought prospective, injunctive relief under RICO in Count

8

Five, finding that RICO does not provide private plaintiffs with a right to *Ex parte Young*-style relief. (Op. at 59-88.)

Relevant here, the Court rejected Defendants' argument that the Choice-of-Law Provision rendered Plaintiffs' loans lawful under the parties' chosen law. (Op. at 45-54.) Although the Court found that the Choice-of-Law Provision did not prospectively waive Plaintiffs' federal statutory remedies in violation of public policy, (Op. at 47-48), the Court held that the Provision violated Virginia's compelling public policy against unregulated usurious lending, (Op. at 48-54).

In reaching this conclusion, the Court first considered Defendants' contention that the Virginia Supreme Court in *Settlement Funding LLC v. Von Neumann-Lillie*, 645 S.E.2d 436 (Va. 2007), rejected the argument that choice-of-law provisions violate public policy when they permit the enforcement of interest rates exceeding Virginia's usury cap. (Op. at 48 (citing Tribe MTD Mem. at 9).) The Court disagreed with Defendants' characterization of the *Settlement Funding* decision and interpreted the decision as merely addressing an evidentiary issue, explicitly preserving the question of whether a choice-of-law provision violates Virginia public policy when it selects the law of a forum with no usury protections. (Op. at 49-50.) After reviewing Virginia's history of usury regulation and comparing Virginia law with the law of the Tribe, the Court found that "the apparent absence of any comparable protection for aggrieved consumers under the Tribe's laws rises to the level of 'shocking one's sense of right' such that enforcement of the Choice-of-Law Provision would violate Virginia's compelling public policy against usurious lending practices." (Op. at 52-53.)

### E.    Defendants' Appeals and Instant Motions

On January 16, 2020, the Tribal Officials filed their Notice of Appeal (ECF No. 111), appealing the Court's decisions to deny their Motion to Compel Arbitration and deny their Motion to Dismiss on the issue of sovereign immunity.  The Tribal Officials exercised their interlocutory appellate rights on these issues pursuant to 9 U.S.C. § 16(a)(1) and the collateral-order doctrine.  (Notice of Appeal (ECF No. 111)); *see* § 16(a)(1) (providing a right to appeal any order refusing to compel arbitration); *Yousuf v. Samantar*, 699 F.3d 763, 768 n.1 (4th Cir. 2012) ("A pretrial order denying sovereign immunity is immediately appealable under the collateral-order exception to the final judgment rule . . . [including] orders denying claims of sovereign immunity under the common law.").

Along with their Notice of Appeal, the Tribal Officials filed their instant Motion for Leave to Appeal Under 28 U.S.C. § 1292(b) (ECF No. 112), moving the Court to certify for interlocutory appeal the question of whether the Tribe's laws govern Plaintiffs' loan agreements. In support of their Motion, the Tribal Officials argue that the Court's decision on the choice-of-law issue constitutes a controlling question of law, because reversal of the Court's decision would "terminate all claims against [the Tribal Officials]."  (Mem. in Supp. of Tribal Defs.' Mot. for Leave to Appeal Under 28 U.S.C. § 1292(b) ("Tribe Mem.") (ECF No. 113) at 2.)  The Tribal Officials further contend that there exists a substantial ground for difference of opinion on the enforceability of the Choice-of-Law Provision, because Virginia requires enforcement of a choice-of-law provision except in unusual circumstances and the Court's decision not to enforce the Choice-of-Law Provision did not rely on any authority from the Virginia Supreme Court. (Tribe Mem. at 4-5.)  And the Tribal Officials argue that certifying the choice-of-law issue for immediate appeal would "materially advance the ultimate termination of the litigation," because

if the Choice-of-Law Provision proves enforceable, Plaintiffs' claims fail as a matter of law, and because the Officials are already appealing the Court's decisions on arbitration and sovereign immunity. (Tribe Mem. at 6.)

On January 21, 2020, Asner and Landy filed their own Notice of Appeal (ECF No. 117), appealing the Court's Order denying their Motion to Compel Arbitration. Like the Tribal Officials, along with their Notice of Appeal, Asner and Landy filed their Motion for Leave to Appeal Under 28 U.S.C. § 1292(b) (ECF No. 115), moving to certify for interlocutory appeal the same question as the Tribal Officials. In support of their Motion, Asner and Landy rely on "substantially the same reasons advanced by [the] Tribal [Officials]." (Mem. in Supp. of Defs. Scott Asner & Joshua Landy's Mot. for Leave to Appeal Under 28 U.S.C. § 1292(b) ("A/L Mem.") (ECF No. 116) at 1.) Accordingly, the Court will rely primarily on the arguments presented by the Tribal Officials in resolving Defendants' Motions.

On February 4, 2020, Plaintiffs filed their responses to Defendants' Motions, (Pls.' Opp. to the Tribal Defs.' Mot. for Leave to Appeal ("Pls.' Tribe Resp.") (ECF No. 123); Pls.' Opp. to Asner & Landy's Mot. for Leave to Appeal ("Pls.' A/L Resp.") (ECF No. 124)), and, on February 10, 2020, Defendants filed their briefs in reply, (Reply in Supp. of Asner & Landy's Mot. for Leave to Appeal ("A/L Reply") (ECF No. 125); Reply in Supp. of Tribal Defs.' Mot. for Leave to Appeal ("Tribe Reply") (ECF No. 127)), rendering Defendants' Motions now ripe for review.

## II.    STANDARD OF REVIEW

28 U.S.C. § 1292(b) provides that a district judge may certify for interlocutory appeal any "order not otherwise appealable under this section" when the judge is "of the opinion that such order [1] involves a controlling question of law [2] as to which there is a substantial ground for

11

difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation." The relevant court of appeals may then, "in its discretion, permit an appeal to be taken from such order." § 1292(b). Section 1292(b) "has been construed as granting district courts 'circumscribed authority to certify for immediate appeal interlocutory orders deemed pivotal and debatable.'" *Difelice v. U.S. Airways, Inc.*, 404 F. Supp. 2d 907, 908 (E.D. Va. 2005) (quoting *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 46 (1995)). "[B]ecause § 1292(b) is contrary to the general rule that appeals may be had only after a final judgment, it should be used sparingly and its requirements must be strictly construed." *Id.* (citing *Myles v. Laffitte*, 881 F.2d 125, 127 (4th Cir. 1989)); *see Commonwealth ex rel. Integra Rec LLC v. Countrywide Sec. Corp.*, 2015 WL 3540473, at *3 (E.D. Va. June 3, 2015) (noting the "gravity of the relief sought" in a request for interlocutory certification (internal quotations and citations omitted)).

The party seeking an interlocutory appeal must first demonstrate that the issue for which the party seeks certification constitutes a "controlling question of law." § 1292(b). "This element may be divided into two requirements: the question must be 'controlling' and must be one 'of law.'" *Integra*, 2015 WL 3540473, at *4. To be "controlling," the Court "must actually have decided [the] question" and resolution of the question must "be completely dispositive of the litigation, either as a legal or practical matter, whichever way it goes." *Id.* (internal quotations and citations omitted). Even if a question proves practically or legally controlling, the Court should certify the question for immediate appeal only if the question presents "'an abstract legal issue that the court of appeals can decide quickly and cleanly.'" *United States ex rel. Michaels v. Agape Senior Cmty.*, 848 F.3d 330, 340 (4th Cir. 2017) (quoting *Mamani v. Berzain*, 825 F.3d 1304, 1312 (11th Cir. 2016) (internal quotations omitted)). Courts should not certify

interlocutory appeals when "the question presented turns on whether there is a genuine issue of fact or whether the district court properly applied settled law to the facts or evidence of a particular case." *Id.* at 341 (internal quotations and citations omitted).

The party moving for interlocutory certification must also demonstrate that a "substantial ground for difference of opinion" exists as to the controlling question of law. § 1292(b). This "'substantial ground' . . . must arise 'out of a genuine doubt as to whether the district court applied the correct legal standard.'" *Wyeth v. Sandoz, Inc.*, 703 F. Supp. 2d 508, 527 (E.D.N.C. 2010) (quoting *Consub Del. LLC v. Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007)). "[T]he mere presence of a disputed issue that is a question of first impression [in the Fourth Circuit], standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *Flor v. BOT Fin. Corp (In re Flor)*, 79 F.3d 281, 284 (2d Cir. 1996) (per curiam). "Rather, it is the duty of the district judge to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." *Id.* (emphasis supplied) (quotations and alterations omitted). An absence of unanimity on the question presented does not provide a substantial ground for difference of opinion. *Wyeth*, 703 F. Supp. 2d at 527.

Finally, the moving party must establish that certification "may materially advance the ultimate termination of the litigation." § 1292(b). Mere speculation regarding the potential pre-trial and trial expenses and effort to be saved by an interlocutory appeal does not satisfy this requirement. *Integra*, 2015 WL 3540473, at *5. Instead, the Court must examine whether "appellate review might avoid protracted and expensive litigation." *State ex rel. Howes v. Peele*, 889 F. Supp. 849, 852 (E.D.N.C. 1995). The Court should not permit "piecemeal review of decisions that are but steps toward final judgments of the merits . . ., because they can be

effectively and more efficiently reviewed together in one appeal from the final judgments." *James v. Jacobson*, 6 F.3d 233, 237 (4th Cir. 1993).

Ultimately, district courts should adhere to the general principle that § 1292(b) constitutes "a rare exception to the final judgment rule that generally prohibits piecemeal appeals." *Koehler v. Bank of Bermuda, Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996). Indeed, "[e]ven if the requirements of [S]ection 1292(b) are satisfied, the district court has 'unfettered discretion' to decline to certify an interlocutory appeal if exceptional circumstances are absent." *Manion v. Spectrum Healthcare Res.*, 966 F. Supp. 2d 561, 567 (E.D.N.C. 2013) (citations omitted).

## III. ANALYSIS

Because § 1292(b) requires Defendants to satisfy all three elements under the Section, the Court will analyze each element in turn.

### A. Whether the Choice-of-Law Provision Violates Virginia Public Policy Constitutes a Controlling Question of Law.

As mentioned, Defendants first argue that the Court's decision on the enforceability of the Choice-of-Law Provision constitutes a controlling question of law, because reversal of the Court's decision would "terminate all claims against [Defendants]." (Tribe Mem. at 2.) Plaintiffs respond that the Court did not reach a conclusive decision on whether Virginia law governs Plaintiffs' loan agreements, so the question of whether the Tribe's laws govern the loan agreements has not been conclusively decided. (Pls.' Tribe Resp. at 8 (citing Op. at 53 ("Plaintiffs allege that they accepted their loans while in Virginia, so Virginia law governs the loans' validity <u>at this stage</u>." (emphasis supplied))).)[4] Plaintiffs argue that the Court in fact

---

[4]     Because Plaintiffs lodge essentially the same arguments in opposition to both Motions for Leave to Appeal, where appropriate, the Court will cite only to Plaintiffs' arguments in opposition to the Tribal Officials' Motion.

decided a much narrower issue of whether the Choice-of-Law Provision violates Virginia public policy, which proves distinguishable from the broader issue of whether the Tribe's laws govern the loan agreements. (Pls.' Tribe Resp. at 8-9.) To highlight this point, Plaintiffs contend that even if the Court reached the opposite conclusion and found that the Choice-of-Law Provision did not violate Virginia public policy, the Tribe's laws would not necessarily apply, because other arguments exist to prevent the application of tribal law to the loan agreements, including the illusory nature of the Tribe's legal system and the independent unconscionability of the interest rates on Plaintiffs' loans. (Pls.' Tribe Resp. at 9 n.5.) And Plaintiffs argue that the choice-of-law analysis proves too fact-intensive for interlocutory appeal. (Pls.' Tribe Resp. at 10-11.)

As to Plaintiffs' first point — that the Court has not conclusively decided whether the Tribe's laws should govern Plaintiffs' loan agreements — the Court has mooted that argument by limiting the question subject to interlocutory certification to that which it has conclusively decided, namely: that enforcement of the Choice-of-Law Provision would violate Virginia's compelling public policy against unregulated usurious lending. (Op. at 52-53.)

The question then becomes whether this conclusive decision presents (a) a question of law (b) that is controlling. To the first point, the narrow issue decided by the Court would require the Fourth Circuit to interpret the unambiguous terms of the Choice-of-Law Provision — a question of law — the contents and meaning of the Tribe's laws — another question of law — and Virginia's public policy on usurious lending — also a question of law. *See Bd. of Supervisors v. Sampson*, 369 S.E.2d 178, 180 (Va. 1988) (noting that whether a contractual provision "is not against public policy" constitutes "a question of law to be determined by the court" (citations omitted)); *see also Gordonsville Energy, L.P. v. Va. Elec. & Power Co.*, 512

15

S.E.2d 811, 816 (Va. 1999) (noting that "the interpretation of plain and unambiguous terms of a contract is a question of law" for which appellate courts "are afforded the same opportunity as the trial court to review"); *Wallihan v. Hughes*, 82 S.E.2d 553, 558 (Va. 1954) (noting that "[t]he term 'public policy' is equivalent to 'the policy of the law'" and represents an issue for courts to decide as a matter of law (citations omitted)); *cf. Omniplex World Servs. Corp. v. U.S. Investigations Servs., Inc.*, 618 S.E.2d 340, 342 (Va. 2005) (noting that whether a covenant not to compete violates Virginia public policy or otherwise proves unenforceable constitutes a question of law). Therefore, although addressing whether the Choice-of-Law Provision violates Virginia public policy would require minimal intrusion by the Fourth Circuit into the record to review the terms of the Provision and the Tribe's laws, the intrusion would end there. Notably, one of the issues already appealed as of right — whether the Court erroneously denied Defendants' Motions to Compel Arbitration — would require a nearly identical level of intrusion into the record, because the arbitration language at issue resides within the same contracts as the Choice-of-Law Provision. Therefore, the Fourth Circuit need only "turn the page" between its analysis of the arbitration question and the question now subject to interlocutory certification. Importantly, the Fourth Circuit would not be called upon to make credibility determinations or resolve factual disputes, for neither side challenges the contents of the Choice-of-Law Provision or the validity of Plaintiffs' loan agreements generally.

As to the second point, Plaintiffs argue that whether the Choice-of-Law Provision violates Virginia public policy does not control the outcome of this case, because other arguments exist to prevent the application of the Tribe's laws even if the Fourth Circuit reverses the Court on the public policy question. (Pls.' Tribe Resp. at 9.) However, Plaintiffs ignore that a question of law may be dispositive "either as a legal *or practical* matter." *Fannin v. CSX*

*Transp., Inc.*, 873 F.2d 1438, at *5 (4th Cir. 1989) (Table) (emphasis added); *see also United States v. Woodbury*, 263 F.2d 784, 787 (9th Cir. 1959) (refusing to hold that "a question brought here on interlocutory appeal must be dispositive of the lawsuit in order to be regarded as controlling" (citing as example *United States v. View Crest Garden Apts., Inc.*, 265 F.2d 205 (9th Cir. 1958) (allowing interlocutory appeal of whether state or federal law governed relief available to the government))); *Consub Del. LLC*, 476 F. Supp. 2d at 309 (noting that to be "controlling," reversal of the district court's order must terminate the action "or at a minimum . . . *materially affect the litigation's outcome*" (emphasis added)). Although reversal by the Fourth Circuit on the narrow question now subject to certification would not completely dispose of this case, because Plaintiffs have other arguments to prevent the application of the Tribe's laws to their loan agreements, the Court finds that reversal on the question would "materially affect the . . . outcome" of this litigation. *Consub Del. LLC*, 476 F. Supp. 2d at 309.

Indeed, the additional arguments highlighted by Plaintiffs to prevent the application of the Tribe's laws would, as a practical matter, be heavily influenced by the Fourth Circuit's analysis on the question of whether enforcing the Choice-of-Law Provision — and, thus, applying the Tribe's laws to Plaintiffs' loan agreements — violates Virginia's public policy against usurious lending. For instance, Plaintiffs' additional argument that the "Tribe does not have a court system and thus would not have caselaw or rules that would apply" would presumably be informed by the Fourth Circuit's analysis of the public policy issue, because such analysis would require consideration of the Tribe's consumer protection laws. (Pls.' Tribe Resp. at 9 n.5.) Likewise, Plaintiffs' second additional argument that the individual interest rates on Plaintiffs' loans could be deemed unconscionable and against public policy in their own right would be a relevant consideration of the Fourth Circuit, even if the Fourth Circuit declines to

address the argument directly. (Pls.' Tribe Resp. at 9 n.5.) As such, whether the Choice-of-Law Provision violates Virginia public policy constitutes the strongest determining factor of the appropriate law to apply in this case and, ultimately, Plaintiffs' right to relief.

Accordingly, the Court finds that the question of whether enforcement of the Choice-of-Law Provision would violate Virginia public policy constitutes a controlling question of law under § 1292(b).

**B.      A Substantial Ground for Difference of Opinion Exists as to Whether Enforcement of the Choice-of-Law Provision Would Violate Virginia's Public Policy Against Unregulated Usurious Lending.**

Defendants contend that there exists a substantial ground for difference of opinion on the enforceability of the Choice-of-Law Provision, because Virginia requires enforcement of a choice-of-law provision except in unusual circumstances and the Court's decision not to enforce the Choice-of-Law Provision did not rely on any authority from the Virginia Supreme Court. (Tribe Mem. at 4-5.) Plaintiffs respond that Defendants "mischaracterize the 'substantial ground for difference of opinion' standard, because they rely merely on their own disagreement with the Court's opinion and not on any actual disagreement between courts on the same legal question." (Pls.' Tribe Resp. at 5-6.) Plaintiffs argue that no other court has interpreted the *Settlement Funding* decision — the decision at the heart of Defendants' choice-of-law argument — differently to this Court and thus no substantial ground for a difference of opinion exists. (Pls.' Tribe Resp. at 6.)

The Court agrees with Defendants. Although "the mere presence of a disputed issue that is a question of first impression [in the Fourth Circuit], standing alone, is insufficient to demonstrate a substantial ground for difference of opinion," *Flor*, 79 F.3d at 284, courts have recognized that a substantial ground for difference of opinion exists when resolution of the

question presented "is not substantially guided by previous decisions" and the question "is difficult," *DRFP, LLC v. Republica Bolivarina de Venezuela*, 945 F. Supp. 2d 890, 918 (S.D. Ohio 2013) (internal quotations and citations omitted); *see also, e.g., Nat'l Veterans Legal Servs. Program v. United States*, 321 F. Supp. 3d 150, 155 (D.D.C. 2018) (finding substantial ground for difference of opinion, because "there [was] a complete absence of any precedent from any jurisdiction" on the question subject to interlocutory appeal); *Consub Del. LLC*, 476 F. Supp. 2d at 309 ("The requirement that such a substantial ground exist may be met when . . . the issue is particularly difficult and of first impression for the Second Circuit." (internal quotations omitted)); 16 Fed. Prac. & P. Juris. § 3930 (3d ed. 2019) ("The level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case."). The Court's decision on the enforceability of the Choice-of-Law Provision presents one such question.

For one, as the Court noted in its Memorandum Opinion, the Virginia Supreme Court has not established whether a choice-of-law provision that selects the law of a forum without any usury regulation violates Virginia's public policy. (Op. at 50.) Thus, putting aside whether the Court correctly interpreted the *Settlement Funding* decision — an interpretation as to which, the Court agrees with Plaintiffs, there exists no substantial doubt in existing caselaw — the Court's analysis after that point necessarily relied on its own interpretation of Virginia's public policy on usurious lending and whether enforcement of the Choice-of-Law Provision would violate that policy, without any guidance from Fourth Circuit or Virginia Supreme Court jurisprudence. To be sure, in its analysis, the Court relied, in part, on a Virginia circuit court decision that reached the same conclusion on similar facts, (Op. at 51 (citing *Commonwealth v. NC Fin. Sols. of Utah, LLC*, 2018 WL 9372461, at *11-13 (Va. Cir. Ct. Oct. 28, 2018)), but the agreement of a Virginia

trial court with this Court's analysis does not mean that no substantial ground for difference of opinion exists, especially considering the difficulty of discerning Virginia's public policy on usurious lending and whether such a policy presents a compelling justification for overriding the application of the parties' chosen law. Indeed, as the Virginia Supreme Court noted in *Wallihan*, "no fixed rules can be given by which to determine what is public policy." 82 S.E.2d at 558 (internal quotations and citations omitted). Moreover, the violation of Virginia's public policy effected by enforcement of a choice-of-law provision must be so compelling as to "shock[] one's sense of right." *Tate v. Hain*, 25 S.E.2d 321, 325 (Va. 1943). Considering this high standard and the lack of guidance from controlling caselaw on the public policy question, the Court finds that a substantial ground for difference of opinion exists and warrants interlocutory certification of that question under § 1292(b).

### C.     Interlocutory Appeal of the Public Policy Question May Materially Advance the Termination of the Instant Litigation.

As mentioned, Defendants argue that certifying the choice-of-law issue for immediate appeal would "materially advance the ultimate termination of the litigation," because if the Choice-of-Law Provision proves enforceable, Plaintiffs' claims fail as a matter of law, and because the Officials are already appealing the Court's decisions on arbitration and sovereign immunity. (Tribe Mem. at 6.) Plaintiffs respond that their claims will not necessarily fail as a matter of law if the Fourth Circuit reverses this Court's ruling on the public policy question, because other arguments exist to prevent the application of the Tribe's laws. (Pls.' Tribe Resp. at 12.) Plaintiffs assert that "it is unclear what enforcement of [the Choice-of-Law Provision] would look like" should the Fourth Circuit reverse this Court's decision. (Pls.' Tribe Resp. at 12.) And Plaintiffs note that should the Fourth Circuit side with Defendants on their arbitration and sovereign immunity appeals, "it is entirely possible that the choice-of-law issue will not be

addressed by the Fourth Circuit," because reversal on those issues will moot the choice-of-law arguments. (Pls.' Tribe Resp. at 13.)

The Court finds that interlocutory appeal of whether the Choice-of-Law Provision violates Virginia public policy would materially advance the ultimate termination of the instant litigation. For one, as explained above, even if other arguments could prevent the application of the Tribe's laws to Plaintiffs' loan agreements despite a reversal on the public policy question, the Fourth Circuit's decision on the public policy question would dramatically narrow the arguments available and thereby avoid the protracted appeal and remand of the parties' choice-of-law arguments predicted by Plaintiffs. Indeed, assuming the Fourth Circuit reverses the Court on the public policy question, doing so now while this case remains stayed pending resolution of Defendants' appeals as of right will allow the case to come back on remand with clarity as to whether the Court needs to address Plaintiffs' remaining arguments against the application of the Tribe's laws, thereby avoiding successive rounds of appeal and remand in the future. As such, certifying the public policy question now will either: (a) if the Fourth Circuit affirms the Court's ruling, resolve once and for all whether the Choice-of-Law Provision can be enforced without violating Virginia's public policy against unregulated usurious lending, mooting Plaintiffs' additional arguments; or, (b) if the Fourth Circuit reverses the Court's ruling, avoid successive rounds of appeal and remand on Plaintiffs' additional arguments by allowing the Court to resolve those arguments through summary judgment or trial and providing an all-encompassing ruling for final appeal. In other words, certification will move the inevitable timeline predicted by Plaintiffs forward, thereby advancing the ultimate termination of this case.

As for Plaintiffs' argument that the Fourth Circuit may not even address the public policy question if Defendants succeed on their arbitration or sovereign immunity appeals, while the

Court agrees that interlocutory appeal would be inappropriate for questions that likely will become moot, the Court will not engage in conjecture about what the Fourth Circuit will ultimately decide. Rather, the Court must ask whether immediate appeal "may materially advance the ultimate termination of the litigation." § 1292(b). For the reasons stated above, the Court finds that immediate appeal in this instance will do just that.

Accordingly, the Court finds that the public policy question satisfies all three factors under § 1292(b) and will therefore certify that question for interlocutory appeal.

**D.** **The Court Further Certifies for Interlocutory Appeal the Question of Whether RICO Permits *Ex parte Young*-Style Relief Against the Tribal Officials.**

Although no party has moved for interlocutory certification of whether RICO permits *Ex parte Young*-style relief against the Tribal Officials, the Court may *sua sponte* certify any question for interlocutory appeal that meets the factors enumerated in § 1292(b). § 1292(b) (noting that a district judge may certify an order for interlocutory appeal when he or she "shall be of the opinion" that the three factors are satisfied). Finding that such a question — the so-called "RICO question" — satisfies the necessary factors, the Court will also certify the RICO question for interlocutory appeal.

First, the RICO question constitutes a controlling question of law, because it presents a pure question of law and resolution of the question on appeal will materially affect the outcome of this litigation. Indeed, as it stands, Plaintiffs may enjoin the Tribal Officials only to the extent of their existing loans, whereas *Ex parte Young*-style relief against the Officials under RICO may allow the Court to enjoin future lending activities deemed violative of the Act. Second, there exists substantial ground for a difference of opinion on the RICO question, as evidenced by the circuit-split noted in the Court's analysis. (Op. at 74-85.) And, third, resolution of the RICO

question now would materially advance the termination of this case, because Defendants have already appealed two issues as of right, thereby staying the instant litigation, and the early resolution of the question will avoid protracted appeals after a final judgment.

Accordingly, the Court also certifies for interlocutory appeal the question of whether RICO permits *Ex parte Young*-style relief against the Tribal Officials.

## IV. CONCLUSION

For the reasons set forth above, the Court GRANTS Defendants' Motions (ECF Nos. 112, 115) and AMENDS its January 9, 2020 Order (ECF No. 110) to certify the Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) on the question of whether enforcement of the Choice-of-Law Provision would violate Virginia's compelling public policy against unregulated usurious lending. On its own initiative, the Court also certifies for interlocutory appeal the question of whether RICO permits *Ex parte Young*-style relief against the Tribal Officials. An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date: February 20, 2020